Joe E. Marshall, SBT # 13031100
Kate Patrick, SBT # 24037243
Lee J. Pannier, SBT # 24066705
**MUNSCH HARDT KOPF & HARR PC**
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Tel: 214.855.7573
Fax: 214.978.4365
jmarshall@munsch.com

Kevin McCullough, SBT # 00788005
Kerry Ann Miller, SBT # 24050875
**ROCHELLE MCCULLOUGH, LLP**
325 N. Saint Paul Street
Suite 4500
Dallas, Texas 75201
Tel: 214.953.0182
Fax: 214.953.0185
kdm@romclawyers.com

**PROPOSED COUNSEL FOR HERITAGE
CONSOLIDATED LLC**

**PROPOSED COUNSEL FOR HERITAGE
STANDARD CORPORATION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** § | | **CASE NO. 10-36484-hdh -11** |
| § | | |
| **HERITAGE CONSOLIDATED LLC,** § | | **Chapter 11** |
| *et al.,* § | | |
| § | | **(Joint Administration Requested)** |
| **DEBTORS.** § | | |
| § | | |

## EXPEDITED MOTION FOR ORDER (A) APPROVING PLAN SUPPORT AGREEMENT, SALE PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH SALE OF ASSETS; (B) APPROVING FORM AND MANNER OF NOTICE OF SALE AND OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF

Heritage Consolidated LLC ("Consolidated") and Heritage Standard Corporation ("Standard"), debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned bankruptcy cases, hereby file this *Expedited Motion for Order (A) Approving Plan Support Agreement, Sale Procedures and Bid Protections in Connection with Sale of Assets; (B) Approving Form and Manner of Notice of Sale and of Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "Motion") and in support thereof respectfully states as follows:

**EXPEDITED MOTION FOR ORDER (A) APPROVING PLAN SUPPORT AGREEMENT, SALE PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH SALE OF ASSETS; (B) APPROVING FORM AND MANNER OF NOTICE OF SALE AND OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**     **Page 1 of 21**
v5 Heritage Motion to Authorize Sale Procedures (final).DOC

# I.    JURISDICTION AND VENUE

1.    On September 14, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief (collectively, the "Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors seek to jointly administer the Cases under Case No. 10-36484-11.

2.    Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

# II.    FACTUAL BACKGROUND

## A.    The Debtors and Their Operations

5.    The Debtors are privately-held companies that operate in the oil and gas industry. The Debtors' core operations consist of exploration for, and acquisition, production, and sale of, crude oil and natural gas.  Consolidated is a Texas limited liability company that owns the majority of the oil and gas wells, leasehold interests, and mineral interests that allow the Debtors to conduct their oil and gas operations.  Specifically, Consolidated, among other things:  (i) acquires and owns the pertinent oil and gas leases; (ii) participates in drilling and completing oil and gas wells on the properties covered by those leases; (iii) markets and sells oil, gas, and other hydrocarbons from those wells; and (iv) acquires and owns other oil and gas properties such as mineral interests and development and production rights.  HSC, a Texas corporation, is an exploration and production company that develops oil and gas prospects and operates wells

**EXPEDITED MOTION FOR ORDER (A) APPROVING PLAN SUPPORT AGREEMENT, SALE PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH SALE OF ASSETS; (B) APPROVING FORM AND MANNER OF NOTICE OF SALE AND OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF    Page 2 of 20**

owned by Consolidated and other working interest owners; it is also a lessee of certain oil and gas leases.

6.      The Debtors focus their development efforts primarily on the Permian Basin in west Texas and southeastern New Mexico (the "<u>Target Area</u>"). The Debtors and their predecessors have been exploring and developing the Target Area since 1984.

7.      As part of conducting their business, the Debtors are lessees under, or assignees of, oil and gas leases and are parties to certain operating agreements, farmout agreements, joint venture agreements, gas marketing agreements, gas transportation agreements, and other agreements.

**B.      Events Leading To The Chapter 11 Filing**

8.      In August, 2009, HSC began operations on that certain oil and gas well in Winkler County, Texas, known as the Pat Howell well (the "<u>Pat Howell Well</u>"). The Pat Howell Well is located in the Permian Basin which has proven reserves of approximately 16.9 billion cubic feet ("bcf") of natural gas in the Atoka formation. Over the course of ten months, HSC conducted operations to re-enter the existing wellbore for the Pat Howell Well and then complete operations to the Atoka formation. Due to a series of operational mistakes and difficulties with the wellbore, the Pat Howell Well has not been completed and placed on online and approximately $11.6 million in contractor and service debt has been accumulated as a result thereof. Most, if not all, of the problems encountered in these operations were the result of contractor negligence, which is now the subject of lawsuits initiated by HSC and pending in various Texas state courts. The significant debt incurred in connection with the operations on the Pat Howell Well, coupled with the lack of anticipated production therefrom, negatively impacted the Debtors' ability to meet their ongoing obligations to trade creditors and its lenders. As a

result, the Debtors determined that it was in the best interest of creditors to initiate the Bankruptcy Cases in order to protect and preserve their assets in order to implement a plan to successfully complete the Pat Howell operations and maximize the potential recoveries through a court approved sale process for the payment of its debt. The Debtors also intend to utilize the recoveries from the pending suits involving the Pat Howell Well in its reorganization to satisfy all legitimate claims against their bankruptcy estates.

**C.     The Plan, Disclosure Statement, Plan Support Agreement, and Purchase and Sale Agreement**

9.      Within the first week of these cases, the Debtors, CIT Capital USA Inc. ("CIT Capital"), and Consolidated's secured lender (the "Lender") will be filing their *Joint Plan of Reorganization for the Debtors* (as amended, supplemented, and modified, the "Plan"), and the Debtors will file their *Disclosure Statement for Joint Plan of Reorganization for the Debtors* (as amended, supplemented, and modified, the "Disclosure Statement"). Under the Plan, the Debtors propose to, among other things, effectuate the sale and transfer of assets (the "Sale") under that certain Purchase and Sale Agreement dated as of September 7, 2010 by and among Permian Atlantis LLC ("Permian Atlantis"), Permian Phoenix LLC (together with Permian Atlantis, the "Permian Entities")[1] and the Debtors (the "Purchase and Sale Agreement") subject to higher and better offers. A true and correct copy of the Purchase and Sale Agreement is attached hereto as **Exhibit "A."**

10.     Under the Purchase and Sale Agreement, the Permian Entities agree to serve as the stalking horse bidder with respect to certain assets associated with the Debtors' "Section 6 Assets" and "Non-Section 6 Assets" and to purchase those assets free and clear of any and all

---

[1] The Permian Entities are indirect subsidiaries of Cross Canyon Energy Corporation ("Cross Canyon").

liens, claims, rights, interests, and encumbrances except as otherwise provided under the Plan.[2] Under the Purchase and Sale Agreement, the Permian Entities generally agree to assume substantial claims of CIT Capital and the Lender and to satisfy substantial claims of Standard under its joint operating agreements.

11.     The consummation of the transaction contemplated under the Purchase and Sale Agreement is subject to higher and better offers on the terms set forth in this Motion.  As set forth below, a qualified bidder may submit a qualified bid for the Transferred Properties.[3]  Such qualified bid may provide for the consummation of the Sale under the Plan or through a stand-alone sale hearing.  If the qualified bid is determined to be the highest and best bid as provided below and such bid provides for the consummation of the Sale through a stand-alone sale hearing, the Plan may be withdrawn upon the closing of the Sale.  If such a Sale does not close or if the Plan does not go effective, then, at the option of CIT Capital, the Debtors must pursue the transaction under a Back-Up Purchase and Sale Agreement (Non-Section 6 Assets) by and among the Permian Entities and the Debtors (the "Back-Up Purchase and Sale Agreement") on terms similar to those set forth in the Purchase and Sale Agreement and for consideration including the assumption or other satisfaction of approximately $12 million of the Lender Secured Claim (as defined in the Plan) and one-quarter of the DIP Claim (as defined in the Plan), and the payment of no more than $3.56 million in satisfaction of all Claims (as defined in the Plan) under the Non-Section 6 JOAs (as defined in the Plan).

12.     In connection with the Plan, Disclosure Statement, and Purchase and Sale Agreement, the Debtors, the Permian Entities, CIT Capital, Cross Canyon and Michael B.

---

[2] The Section 6 Assets and the Non-Section 6 Assets constitute substantially all of Consolidated's assets.

[3] "Transferred Properties" shall mean all assets identified as "Properties" under the Purchase and Sale Agreement.

Wisenbaker ("Wisenbaker") executed that certain Plan Support Agreement dated as of September 14, 2010 (the "Plan Support Agreement") under which those parties agreed to, among other things, support the Sale and confirmation of the Plan, subject to the terms of an Order approving this Motion. A true and correct copy of the Plan Support Agreement is attached hereto as **Exhibit "B."**

## III.    RELIEF REQUESTED

### A.    Introduction

13.    Pursuant to Bankruptcy Code §§ 105(a), 363, 365, 503, and 507 and Rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors request that the Court enter an Order approving (a) the Plan Support Agreement; (b) the form and manner of notice of the Sale Procedures (as defined below) and the respective dates, times and places for an auction, if required under the Sale Procedures, substantially in the form which is attached hereto as **Exhibit "C"** (the "Sale Notice"); (c) the form and manner of notice of the assumption and assignment of executory contracts and unexpired leases, substantially in the form which is attached hereto as **Exhibit "D"** (the "Assumption Notice"); (d) the sale procedures and bidding protections, substantially in the form attached hereto as **Exhibit "E"** (the "Sale Procedures");[4] and (d) such other relief as is fair and equitable.

### B.    Plan Support Agreement

14.    Plan support agreements are often entered into and approved by Bankruptcy Courts. *See*, *e.g.*, *In re Heritage Organization, LLC*, 376 B.R. 783, 791-93 (Bankr. N.D. Tex. 2007) (holding a written document memorializing negotiations between the debtor and its creditor constituents was not a solicitation in violation Bankruptcy Code § 1125(b)); *see also*

---

[4] Capitalized terms that are not defined herein shall have the meaning given to them in the Sale Procedures.

*Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 101-02 (3d Cir. 1988) (holding the prohibition of "solicitation" under § 1125(b) must be read narrowly so as not to impede the negotiations of creditors during the plan process).  The Plan Support Agreement in these Cases memorializes the negotiations and agreements to support the Plan among the Debtors, CIT Capital, the Permian Entities, and Wisenbaker.  Furthermore, similar to the situation in *Heritage Organization*, many of the parties to the Plan Support Agreement are also co-proponents of the Plan.  *Id*.  The Plan Support Agreement does not "specifically request an official vote" on the Plan or prevent a party thereto from reconsidering its preliminary decision to vote in favor of the Plan, as was also the case in *Heritage Organization*.  *Id*.  Accordingly, the Plan Support Agreement is a proper means to evidence the agreements reached among the Debtors, CIT Capital, the Permian Entities, and Wisenbaker, is a proper solicitation of votes under Bankruptcy Code § 1125(b), and should be approved.

**C.    Sale Notice and Assumption Notice**

15.    Bankruptcy Rule 2002(a) provides, in relevant part, that all creditors must be given at least 21 days' notice by mail of a proposed use, sale or lease of property of the estate other than in the ordinary course of business.  Further, Bankruptcy Rule 2002(c) sets forth that such notices must include the time and place of any sale, the terms and conditions of such sale, and the time fixed for filing objections.

16.    As Permian proposes to effectuate the Purchase and Sale Agreement through the Plan, the Debtors are in a unique position in these Cases because the date of the hearing to consider confirmation of the Plan (the "Confirmation Hearing") will not be set prior to the entry of an Order approving this Motion.  As such, in addition to the Sale Notice and Assumption Notice discussed herein, the Debtors propose to serve one or more subsequent notices (the

"Supplemental Notice") advising parties of, among other things, the deadline to file objections to the Sale or confirmation of the Plan, other matters required to permit consummation of the Sale, and the date of the Confirmation Hearing or other hearing to consider approval of the Sale (the "Sale Hearing").[5]

17.     In combination with the Supplemental Notice, the Sale Notice (a) contains the type of information required under Bankruptcy Rule 2002, (b) includes information concerning the Sale Procedures, and (c) is reasonably calculated to provide due, adequate and timely notice to all interested parties of (i) the auction of the Transferred Properties and other assets of the Debtors, (ii) the Sale Procedures, (iii) the deadline to object to the Sale or confirmation of the Plan, and (iv) the Confirmation Hearing or the Sale Hearing (as applicable). Accordingly, the Debtors request that this Court approve the form and content of the Sale Notice.

18.     Within three business days after the Court enters an Order approving this Motion, the Debtors shall serve the Sale Notice by (a) first class United States mail, postage prepaid on (i) the parties identified on the Master Service List maintained in these Cases (who do not receive electronic notice) at the addresses set forth therein, (ii) the parties identified on the Creditor Matrix filed in these Cases at the addresses set forth therein, (iii) the parties that have filed proofs of claim in these Cases at the addresses set forth in the respective proofs of claim, and (iv) any other parties who have expressed an interest in acquiring any of the Debtors' assets; and (b) the Court's electronic filing system on those parties receiving electronic notice by such system. In combination with the Supplemental Notice, service of such Sale Notice is proper, due, timely, good, and sufficient notice of, among other things, the Sale Procedures, the auction

_____

[5] The proposed forms of the Supplemental Notice shall be set forth in the Debtors' motion to approve the disclosure statement and related procedures (the "Disclosure Statement Motion").

(if required under the Sale Procedures), the proposed Sale, and the procedure for objecting thereto. Additionally, the Debtors may provide publication notice but only to the extent that the Debtors believe that such additional notice would improve the results of the auction and is in the best interest of the estate.

19.      In accordance with Bankruptcy Rule 2002, the Debtors must provide notice of (a) the potential assumption and assignment of executory contracts and unexpired leases, (b) the maximum amount that the Debtors may pay to cure all defaults, if any, and to pay all losses that have resulted from defaults, under executory contracts and unexpired leases that the Debtors propose to assume and assign (collectively, the "Cure Amounts"), and (c) the deadline to file objections to such assumption and assignment, the maximum Cure Amounts, and the existence of any defaults and/or adequate assurance of the future performance.

20.      In combination with the Sale Notice and the Supplemental Notice, the Assumption Notice (a) contains the type of information required under Bankruptcy Rule 2002 that is currently known to the Debtors, and (b) is reasonably calculated to provide due, adequate and timely notice to all interested parties of (i) the potential assumption and assignment of executory contracts and unexpired leases, (ii) the maximum amount and manner offered to satisfy the Cure Amounts, and (iii) the deadline to file objections to such assumption and assignment, maximum Cure Amounts, and/or adequate assurance of the future performance.

21.      Within three business days after the Court enters an Order approving this Motion, the Debtors shall serve the Assumption Notice by (a) first class United States mail, postage prepaid on (i) the parties identified on the Master Service List maintained in these Cases (who do not receive electronic notice) at the addresses set forth therein, and (ii) all counterparties to executory contracts and unexpired leases that may be assumed by one or more of the Debtors

pursuant to Bankruptcy Code § 365 (the "365 Contracts"); and (b) the Court's electronic filing system on those parties receiving electronic notice by such system. In combination with the Supplemental Notice, such Assumption Notice is proper, due, timely, good, and sufficient notice of, among other things, the possible assumption and assignment of 365 Contracts, the Cure Amounts, and the procedures for objecting thereto.

**D.  Objections**

22.     The Debtors request that the following procedures be implemented with respect to the Sale Notice and Assumption Notice and relief related thereto:

a.      Objections, if any, to the Sale and/or the proposed assumption and assignment of the 365 Contracts, including but not limited to objections relating to any Cure Amounts and/or adequate assurances of future performance, must (i) be in writing, (ii) state with specificity the nature of such objection, (iii) if concerning a Cure Amount, set forth a specific default in the 365 Contract and claim a specific monetary amount that differs from the Cure Amount (if any) specified by the Debtors in the Assumption Notice (with appropriate documentation in support thereof), (iv) comply with the Federal Rules of Bankruptcy Procedure, and (v) be filed with this Court and served upon the following parties (collectively, the "Notice Parties") in accordance with the Assumption Notice on or before the deadline subsequently set by the Court (the "Objection Deadline"):[6]

- Counsel for Heritage Consolidated: Munsch Hardt Kopf & Harr PC, Attn.: Joe E. Marshall, 3800 Lincoln Plaza, 500 N. Akard Street, Dallas, Texas, 75201-6659, (fax) 214.978.4365;

---

[6] The Supplemental Notice, which the Debtors will serve on the parties as set forth in this Motion, will identify the Objection Deadline.

- Counsel for Heritage Standard: Rochelle McCullough, LLP, Attn.: Kevin McCullough, 325 N. St. Paul Street, Suite 4500, Dallas, Texas, 75201, (fax) 214.953.0185;

- Counsel for CIT Capital: Vinson & Elkins LLP, Attn.: Richard H. London, Trammell Crow Center, 2001 Ross Avenue, Suite 3700, Dallas, Texas, 75201, (fax) 214.999.7823; and

- the Office of the United States Trustee, Attn: George McElreath, 1100 Commerce Street, Room 9-C-60, Dallas, Texas, 75242, (fax) 214.767.6530.

b.      The Debtors are authorized to amend the Assumption Notice by adding and/or deleting 365 Contracts at any time prior to the Confirmation Hearing or Sale Hearing (as applicable) (by sending a new or amended Assumption Notice), and they shall use commercially reasonable efforts to affect the assumption and assignment of such 365 Contract by the applicable Debtor in accordance with the Bankruptcy Code and the Plan; provided, however, that counterparties to any 365 Contracts that are added to or deleted from the Assumption Notice shall have at least five calendar days from service of the amended Assumption Notice to (i) properly object to such addition/deletion, and (ii) modify their vote to accept or reject the Plan.

c.      Any person failing to timely file an objection to the Sale shall be forever barred from objecting to the Sale or the consummation thereof, including the vesting or transferring of the Debtors' assets free and clear of any and all liens, claims and other interests except as otherwise set forth in the Plan, and will be deemed to consent to the Sale.

d.      Any Person failing to timely file an objection to any Cure Amounts set forth in the Assumption Notice or the proposed assumption and assignment of the 365 Contracts shall be forever barred from objecting to the Cure Amounts and from asserting a claim for any

cure or other amounts (or asserting that any defaults exist under the 365 Contract as of the date of assumption) against any Debtors, their estates, the reorganized Debtors, Buyer (as defined in the Plan), the Newco Entities (as defined in the Plan), or their respective successors and affiliates with respect to its 365 Contract arising prior to assumption and assignment of the 365 Contract and will be deemed to consent to the proposed assumption and assignment of its 365 Contract.

e.     Where a counterparty to a 365 Contract files a timely objection asserting a higher cure amount than the maximum Cure Amount set forth in the Assumption Notice and the parties are unable to consensually resolve the dispute prior to the Confirmation Hearing or Sale Hearing (as applicable), the amount to be paid with respect to such objection will be determined at the Confirmation Hearing or Sale Hearing (as applicable) or such other date and time as may be fixed by this Court.  All other objections to the proposed assumption and assignment of the 365 Contracts will be heard at the Confirmation Hearing or Sale Hearing (as applicable).

f.     If any Person (as defined in the Plan) asserts that any property, other than an executory contract or unexpired lease, cannot be transferred, sold, vested, assumed, and/or assigned free and clear of all liens, claims and other interests except as otherwise set forth in the Plan, on account of one or more alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, or similar rights, then such Person shall file and serve a notice (a "Rights Notice") so that the Rights Notice is actually received by the Notice Parties on or before the Objection Deadline.  Each Rights Notice must identify the property or properties that are subject to such alleged right, identify the type of right(s) claimed by such party, identify the agreement, document, or statute giving rise to such right, and identify the portion of the agreement, document, or statute giving rise to such right.

g.     Any Person failing to timely file and serve a Rights Notice shall be (i) forever barred from objecting to the transfer, sale, vesting, assumption, and/or assignment of the properties, free and clear of all liens, claims and other interests except as otherwise set forth in the Plan, and from asserting any alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, or similar rights with respect to the Debtors' transfer, sale, assumption, and/or assignment of the properties, and (ii) deemed to consent to and approve of the transfer, sale, vesting, assumption, and/or assignment of the properties, free and clear of all liens, claims and other interests except as otherwise set forth in the Plan (regardless of whether such consent must be in writing).

23.     In combination with the Supplemental Notice, the Sale Notice and the Assumption Notice to be provided and the method of service proposed herein constitute good, proper and adequate notice of the Sale and the proceedings to be had with respect thereto. Therefore, the Debtors respectfully request that this Court approve the foregoing notice procedures.

**E.     Bid Procedures**

24.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or auction. The Debtors believe that good cause exists to expose the Transferred Properties to sale at auction. An auction conducted substantially in accordance with the Sale Procedures will enable the Debtors to obtain the highest and best offers for the Transferred Properties, thereby maximizing the value of the estates.

25.     The Sale Procedures provide an appropriate framework for obtaining offers for a Sale other than under the Purchase and Sale Agreement and will enable the Debtors to review, analyze and compare all bids received to determine which bid is in the best interests of the

Debtors' estate and creditors. Similarly, the Sale Procedures concerning the assumption and assignment of executory contracts and unexpired leases provide an appropriate procedure for dealing with such executory contracts and unexpired leases. Therefore, the Debtors respectfully request that this Court approve the Sale Procedures.

26.     The Debtors have marketed the Transferred Properties, and although they have determined in their reasonable business judgment that an auction sale of the Transferred Properties at this time will result in the highest and best price for the Transferred Properties, the auction would be of little value absent the Permian Entities setting the minimum purchase price for the Sale. As a result, the Debtors request authority to pay the Permian Entities $800,000.00 plus reimbursement of actual and reasonable out-of-pocket expenses of no more than $400,000 (the "Break-Up Fee") if the conditions set forth in the Sale Procedures are satisfied. The Debtors propose that the Break-Up Fee constitute an administrative expense claim against any Debtor under Bankruptcy Code § 503(b) or 507(a)(2).

27.     The Purchase and Sale Agreement is part of an extensive process undertaken by the Debtors and their professionals to identify and negotiate a transaction to maximize the value realized for the benefit of the Debtors' estates, their creditors and other parties in interest. Cross Canyon and the Permian Entities have expended, and likely will continue to expend, considerable time, money and energy pursuing the Sale and have engaged in extended and lengthy good faith negotiations.

28.     The Purchase and Sale Agreement, including the Break-Up Fee, were negotiated, proposed and entered into by the Debtors and the Permian Entities without collusion, in good faith and from arm's-length bargaining positions.

29.     The Break-Up Fee is (a) an actual and necessary cost of preserving the Debtors' estates within the meaning of Bankruptcy Code §§ 503(b) and 507(a), (b) commensurate to the real and substantial benefit conferred upon the Debtors' estates by Cross Canyon and the Permian Entities, (c) reasonable and appropriate in light of, among other things (i) the size and nature of the Sale and comparable transactions, (ii) the substantial efforts that have been and will be expended by Cross Canyon and the Permian Entities, and (iii) the benefits Cross Canyon and the Permian Entities have provided to the Debtors' estates, their creditors and other parties in interest, and (d) necessary to induce the Permian Entities to serve as "stalking horse" bidders and to continue to pursue the Sale.  The grant, allowance and payment of the Break-Up Fee are in the best interest of the Debtors, their respective estates and creditors.  The Break-Up Fee induced the Permian Entities to submit a bid that will serve as a minimum floor on which the Debtors, their creditors and other bidders may rely.  As such, Cross Canyon and the Permian Entities have provided a material benefit to the Debtors and their creditors (and the Debtors have received a material benefit) by increasing the likelihood that the best possible price for the Transferred Properties will be received.

30.     The payment to the Permian Entities of the Break-Up Fee under the terms and conditions set forth in the Purchase and Sale Agreement and the Sale Procedures should be approved because, among other things: (a) the Break-Up Fee was a material inducement for, and express condition of, the Permian Entities' willingness to enter into the Agreements, and (b) assurance to the Permian Entities of payment of the Break-Up Fee has promoted (and will promote) more competitive bidding by, among other things, inducing the Permian Entities' offer, which offer otherwise would not have been made and without which competitive bidding would be limited.  Thus, Cross Canyon and the Permian Entities have provided a material and

substantial benefit to the Debtors' estates, their creditors and other parties in interest by increasing the likelihood that the price at which the Sale may be effected will reflect the Transferred Properties' true value. Accordingly, the Sale Procedures and the Break-Up Fee are fair, reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

31.     The payment of the Break-Up Fee and the establishment of the Sale Procedures are both reasonable and necessary to induce the Permian Entities to enter into the transactions contemplated under the Purchase and Sale Agreement and to obtain the highest price possible for the Transferred Properties.

32.     The payment of a termination, or break-up fee is normal and customary in transactions of this nature. Such fees frequently have been approved in connection with transactions in other chapter 11 cases. Break-up fees are a vital means by which a debtor in possession can manage value maximization risk by setting a value floor for assets to be conveyed, which is a key benefit to the Debtors and their estates and weighs heavily in favor of approving the Break-Up Fee. Moreover, without prompt approval of the Break-Up Fee, the sale and reorganization process would be substantially hampered. Such fees encourage an initial bidder to invest the time, effort and money necessary to consummate the transaction, despite the possibility that such bidder may not ultimately effectuate the transaction. A break-up fee is an important tool to be used to encourage bidding. Court approval of the Break-Up Fee is necessary, reasonable, and in the best interests of the Debtors, their estate and creditors.

33.     The determination of whether a break-up fee should be allowed is made based on whether the fees and expenses are necessary to preserve the value of the estate. *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 534 (3rd Cir. 1999). The considerations that underlie

a debtor's business judgment to pay a break-up fee are relevant to the Court's determination of the request. *Id.* Indeed, courts have evaluated break-up fee arrangements under the business judgment rule standard. *See, e.g., Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. 422 (S.D.N.Y. 1988); *In re Integrated Res., Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed by* 3 F.3d 49 (2d Cir. 1993).

34.     It is well-established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." *In re Integrated Res., Inc.*, 147 B.R. at 658. In the instant case, the proposed Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and the Permian Entities. The Break-Up Fee is approximately 3% of the consideration to be received by Debtors under the Purchase and Sale Agreement. It is the Debtors' business judgment that the Break-Up Fee is fair and reasonable in the perspective of the time, effort, cost and expense that Cross Canyon and the Permian Entities have incurred in negotiating the Purchase and Sale Agreement and will continue to incur and the aggregate consideration to be provided by the Permian Entities.

35.     Further, the Break-Up Fee is necessary to enhance and preserve the value of the Transferred Properties and to allow the Debtors to obtain the best "stalking-horse" bid possible. Without the "stalking-horse" bid, the consideration for the Sale would be minimized. If higher and better bids in connection with the Sale are received, it will be because the Permian Entities have served as "stalking-horses" for such offers.

36.     The Break-Up Fee of approximately 3% is within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See e.g., In re VarTec Telecom, Inc.*, Case No. 04-81694 (SAF) (Bankr. N.D. Tex., November 23, 2004 and April 15, 2005)

(approving a break-up fee of approximately 3% with respect to two sales of assets); *In re Datavon, Inc., et al.,* Case No. 02-38600-SAF-11 (Bankr. N.D. Tex. 2002) [Doc. No. 224] (approving a 3% break-up fee); *In re Mirant Corp., et al.,* Case No. 03-46590 (DML) (Bankr. N.D. Tex. 2004) [Doc. No. 6092] (approving 3% break-up fees); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (approving a break-up fee of 3.64% or $4,000,000 in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp.*, et al., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (approving a termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *see also Integrated Res.*, 147 B.R. at 648; *In re Crowthers McCall Pattern, Inc.*, 113 B.R. 877, 879 (Bankr. S.D.N.Y. 1990); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

37.     The Purchase and Sale Agreement is subject to higher and better offers received pursuant to the Sale Procedures.  If higher and better offers emerge, they will be considered with reference and by comparison to the terms of the Purchase and Sale Agreement.  Therefore, the Break-Up Fee should be approved because it is necessary to maximize the value of the Transferred Properties, and it does not prejudice the Debtors' estates.

**F.      Consummation of Back-Up Purchase and Sale Agreement**

38.     In order to maximize value for the benefit of the Debtors' estates, the Debtors propose that they be authorized to (a) adjourn the Confirmation Hearing if they determine that the highest and best bid provides for the consummation of the Sale through a Sale Hearing (on the terms set forth in the Sale Procedures), (b) proceed with the Sale Hearing, and (c) withdraw the Plan upon the closing of the Sale.

39. The Debtors request that, at the Confirmation Hearing or Sale Hearing (as applicable), the Court will consider approval of the Back-Up Purchase and Sale Agreement which, at the election of CIT Capital, may be effectuated without further Order of the Court as (a) a primary transaction in the event that the Sale is denied or the Sale is not approved on or before December 13, 2010; or (b) a back-up or secondary transaction under the "Back-Up Bidders" section of the Sale Procedures in the event that the Sale is approved but does not close on or before December 28, 2010. Any such approval of the Back-Up Purchase and Sale Agreement would be reflected in the Order approving the Sale. Further, the Debtors request that if the Confirmation Hearing or Sale Hearing (as applicable) is not held (and the Back-Up Purchase and Sale Agreement is not approved) on or before December 13, 2010, at the election of CIT Capital, the Debtors be permitted to seek an emergency setting to consider approval of the Back-Up Purchase and Sale Agreement. These alternatives will provide the Debtors the greatest ability to effectuate a transaction and to prevent extensive diminution in the value of the Debtors' estates.

## IV. PRAYER

WHEREFORE, the Debtors respectfully request that the Court enter an Order approving (a) the Plan Support Agreement; (b) the form and manner of notice of the Sale Procedures and the respective dates, times and places for an auction, if required under the Sale Procedures; (c) the form and manner of notice of the assumption and assignment of executory contracts and unexpired leases; (d) the Sale Procedures; and (e) such other relief, both at law and in equity to which they may be justly entitled.

**EXPEDITED MOTION FOR ORDER (A) APPROVING PLAN SUPPORT AGREEMENT, SALE PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH SALE OF ASSETS; (B) APPROVING FORM AND MANNER OF NOTICE OF SALE AND OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF** **Page 19 of 20**

Dated: September 15, 2010      Respectfully Submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By:   /s/ Joe E. Marshall
      Joe E. Marshall
      Texas Bar No. 13031100
      Kathleen M. Patrick
      Texas Bar No. 24037243
      Lee J. Pannier
      Texas Bar No. 24066705
      3800 Lincoln Plaza
      500 North Akard Street
      Dallas, Texas 75201-6659
      Telephone:  (214) 855-7500
      Facsimile:   (214) 978-4365
      jmarshall@munsch.com
      kpatrick@munsch.com
      lpannier@munsch.com

(PROPOSED) COUNSEL FOR HERITAGE
CONSOLIDATED, LLC,
DEBTOR AND DEBTOR IN POSSESSION

-and-

**ROCHELLE McCULLOUGH LLP**

By:   /s/ Kevin McCullough
      Kevin McCullough
      Texas Bar No. 00788005
      Kerry A. Miller
      Texas Bar No. 24050875
      325 N. St. Paul, Suite 4500
      Dallas, Texas 75201
      Telephone:  (214) 953-0182
      Facsimile:   (214) 953-0185
      kdm@romclawyers.com
      kmiller@romclawyers.com

(PROPOSED) COUNSEL FOR HERITAGE
STANDARD CORPORATION,
DEBTOR AND DEBTOR IN POSSESSION

**EXPEDITED MOTION FOR ORDER (A) APPROVING PLAN SUPPORT AGREEMENT, SALE PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH SALE OF ASSETS; (B) APPROVING FORM AND MANNER OF NOTICE OF SALE AND OF ASSUMPTION AND ASSIGNMENT OF <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF</u>     Page 21 of 20**

MHDocs 2856637_1 11672.2