# PURCHASE AND SALE AGREEMENT

### for Oil and Gas Properties
### located in

### Winkler and Loving Counties, State of Texas
### and Lea County, State of New Mexico

### by and among


### Heritage Consolidated LLC

### and

### Heritage Standard Corporation

### as "Sellers"

### and

### Permian Atlantis LLC

### and

### Permian Phoenix LLC,

### collectively as "Buyer"


### Dated September 7, 2010

CONFIDENTIAL

# TABLE OF CONTENTS

Page

1. **DEFINITIONS; CONSTRUCTION** ........................................................... 1

2. **PURCHASE AND SALE.** ..................................................................... 9

3. **CONSIDERATION** ............................................................................ 12

4. **ASSIGNMENT EFFECTIVE DATE AND CLOSING** .............................. 12

5. **REPRESENTATIONS AND WARRANTIES OF SELLERS** ..................... 12

6. **REPRESENTATIONS AND WARRANTIES OF BUYER** ........................ 15

7. **ENVIRONMENTAL INSPECTION** ..................................................... 17

8. **CASUALTY LOSS** ............................................................................ 17

9. **COVENANTS PRIOR TO CLOSING.** ................................................... 17

10. **ADDITIONAL COVENANTS** ............................................................. 19

11. **CONDITIONS PRECEDENT TO CLOSING.** .......................................... 20

12. **CLOSING** ....................................................................................... 23

13. **POST CLOSING OBLIGATIONS.** ....................................................... 24

14. **INDEPENDENT INVESTIGATION AND DISCLAIMER** ........................ 26

15. **TERMINATION** .............................................................................. 27

16. **MISCELLANEOUS.** .......................................................................... 29

## Attachments

Exhibits A-1(a) and A-1(b)    - Leases
Exhibits A-2(a) and A-2(b)    - Wells

Schedule 2(b)(iv)             - Excluded Items

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the **"Agreement"**) is made this 7th day of September, 2010 (**"Execution Date"**) by and among **HERITAGE CONSOLIDATED LLC**, a Texas limited liability company, located at 2911 Turtle Creek Blvd., Suite 850, Dallas, Texas 75219 (**"HCL"**), **HERITAGE STANDARD CORPORATION**, a Texas corporation, located at 2911 Turtle Creek Blvd., Suite 850, Dallas, Texas 75219 (**"HSC"**), (HSC and HCL, are sometimes collectively referred to herein as the **"Sellers"**) and **PERMIAN ATLANTIS LLC**, a Delaware limited liability company, located at 6630 Cypresswood Drive, Suite 200, Spring, Texas 77379 (**"Atlantis"**), and **PERMIAN PHOENIX LLC**, a Delaware limited liability company, located at 6630 Cypresswood Drive, Suite 200, Spring, Texas 77379 (**"Phoenix"**) (Atlantis and Phoenix are collectively referred to herein as **"Buyer"**). The Buyer and Sellers may be collectively referred to herein as the **"Parties"** and individually as a **"Party."** Buyer and Sellers agree as follows:

## AGREEMENT

1. **Definitions; Construction.** Unless provided otherwise in this Agreement or the Exhibits, each capitalized term in this Agreement and the Exhibits and Schedules have the meaning given to it in this Section.

   (a) **"Affiliate"** means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries or otherwise) controls, is controlled by, or is under common control with the first Person.

   (b) **"Agreement"** has the meaning given to it in the introductory paragraph.

   (c) **"Allowed"** has the meaning given to it in the Plan.

   (d) **"Assignment and Bill of Sale"** has the meaning given to it in Section 12 .

   (e) **"Assignment Effective Date"** has the meaning given to it in Section 4.

   (f) **"Assumed Obligations"** means the following obligations and no others, but expressly excluding any Retained Liabilities, to-wit: (a) all duties and obligations of Sellers arising from and after the Assignment Effective Date, under the terms of all oil, gas and mineral leases, easements and similar agreements constituting part of the Properties, as well as under the terms and provisions of all Contracts constituting part of the Properties and under any Contracts entered into by the Sellers after the Execution Date which are both attributable to, and constitute part of, the Property, and (b) all Third Party claims, demands, violations, actions, assessments, penalties, fines, costs, expenses, obligations or other liabilities with respect to the ownership, operation or maintenance of any of the Property from and after the Assignment Effective Date.

(g) **"Bankruptcy Cases"** shall mean the bankruptcy cases of HCL and HSC jointly administered under Bankruptcy Case No. 10-_____ currently pending in the Bankruptcy Court.

(h) **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

(i) **"Bankruptcy Code"** shall mean the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 through 1532, as may have been or are amended from time to time.

(j) **"Bankruptcy Rules"** shall mean, collectively, (i) the Federal Rules of Bankruptcy Procedure, (ii) the Federal Rules of Civil Procedure, and (iii) the local rules of the Bankruptcy Court, as (i) through (iii) may be applicable to the Bankruptcy Cases and proceedings therein and as (i) through (iii) may have been or are amended from time to time.

(k) **"Break-Up Fee"** has the meaning given to it in Section 15.

(l) **"Business Day"** means between 8:00 a.m., Central Time and 5:00 p.m., Central Time, on any Day other than a Saturday or Sunday or a Day on which banking institutions in Dallas, Texas are authorized by Law to close.

(m) **"Buyer"** has the meaning given to it in the introductory paragraph of this Agreement.

(n) **"Capital Expenditures"** means, with respect to the Properties, the sum of (a) the cost of (i) drilling and completion of any development and/or exploration well; (ii) providing surface, lease, and well equipment to produce such wells; (iii) deepening and/or recompleting an existing wellbore to a formation which has not previously produced; and (iv) renewing or extending any existing Lease included in the Properties; and (b) imputed interest on such costs calculated at a rate equal to 10% per annum from the date such costs are incurred until such costs are repaid in full.

(o) **"Casualty Loss"** means an instance in which any portion of the Property is damaged, destroyed or taken by condemnation or eminent domain or suffers a reduction in value as a result of a volcanic eruption, act of God, terrorist act, fire, explosion, earthquake, wind storm, flood, drought, condemnation, the exercise of eminent domain, confiscation or seizure.

(p) **"Claims"** means any and all claims, demands, suits, causes of action, losses, damages, liabilities, fines, penalties, expenses, and costs (including attorneys' fees and costs of litigation), whether known or unknown.

(q) **"Closing"** or **"Closing Date"** has the meaning given to it in Section 4.

(r) "**Confirmation Order**" has the meaning given to it in the Plan.

(s) "**Contracts**" has the meaning given to it in the definition of "Properties".

(t) "**Data**" means originals or copies (electronic media, hardcopy media or both) of the Sellers' books, records and files, wherever located and whether in the possession of Sellers' representatives, consultants, or employees, including all Contracts and any and all title, Tax, financial, joint interest billing, technical, engineering, environmental and safety records and information, and, to the extent available, such Data in an electronic format that relate to the Properties. "Data" shall include originals of lease files, land files, wells files, rights of way, easements, title opinions, run sheets, title documents, land data, and revenue decks, division order files, abstracts, title files, engineering and/or production files, maps, accounting records, proprietary seismic data, consultant's geologic, geophysical and engineering reports, mapping and interpretations, studies and information and engineering, facility design (including equipment data books and design drawings), electrical (including equipment data books and design drawings), geological and geophysical information, automation (including equipment data books and design drawings, field automation software, piping and instrument drawings), mechanical, maintenance, property, property tax (including 2008 and 2009 filed ad valorem tax returns), contract, environmental, U.S. Department of Transportation documents and records, operational and land books, records, drawings, maps, manuals and files in their present form, and other information owned by Sellers or copies thereof related to the Properties, and all rights relating thereto.

(u) "**Day**" means a calendar day consisting of twenty-four (24) hours from midnight to midnight central time.

(v) "**Delivery Point**" means the tanks and facilities located at the Black Kettle #1W disposal well located 1420' FEL & 2180' FSL of Section 7, Block 74, PSL Survey, and the Little Wolf #1W disposal well located1660' FEL & 223' FNL of Section 16, Block C-23, PSL Survey, both in Winkler County, Texas, and to such other points as to which the Parties hereto may mutually agree.

(w) "**Designation**" has the meaning given to it in Section 10.

(x) "**DIP Claim**" has the meaning given to it in the Plan.

(y) "**Due Diligence Expiration Date**" shall mean a date three days prior to the Bid Deadline, as defined in the Plan.

(z) "**Easements**" has the meaning given to it in the definition of "Properties".

(aa) **"Environmental Claim"** means any Claim that is asserted pursuant to Environmental Laws.

(bb) **"Environmental Laws"** means any and all Laws that relate to (a) prevention of pollution or environmental damage, (b) removal or remediation of pollution or environmental damage, or (c) protection of the environment or health and safety.

(cc) **"Equipment"** has the meaning given to it in the definition of Properties.

(dd) **"Excluded Items"** has the meaning given to it in Section 2(b).

(ee) **"Execution Date"** has the meaning given to it in the introductory paragraph.

(ff) **"Expense Reimbursement"** means all of the actual, documented out of pocket costs and expenses incurred by Buyer in connection with the due diligence review of the Properties, drafting and negotiations concerning this Agreement and Bankruptcy Court hearings related thereto.

(gg) **"Expense Reimbursement Cap"** has the meaning given to it in Section 15(c).

(hh) **"GAAP"** means generally accepted accounting principles, consistently applied, as recognized by the U.S. Financial Accounting Standards Board (or any generally recognized successor). The requisite that such principles be consistently applied means that the accounting principles in a current period are comparable in all material respects to those applied in preceding periods.

(ii) **"Governmental Authority"** means any federal, state, local, municipal or other government or department thereof, any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or any court or governmental tribunal, including without limitation, any tribal authority.

(jj) **"Hydrocarbons"** means crude oil, natural gas, casinghead gas, condensate, sulfur, natural gas liquids and other liquid or gaseous hydrocarbons and such other substances conveyed to the lessee under each respective Lease.

(kk) **"Knowledge of Sellers"** or **"Sellers' Knowledge"** means the actual knowledge after reasonable investigation of the following individuals:

(i) Michael Wisenbaker

(ii) Gary Todd

(ll) **"Laws"** means any and all laws, statutes, codes, ordinances, permits, licenses, authorizations, agreements, decrees, writs, orders, judgments, principles of

common law, rules or regulations (including, for the avoidance of doubt, Environmental Laws) that are promulgated, issued or enacted by a Governmental Authority having jurisdiction.

(mm)  "**Leases**" has the meaning given to it in the definition of "Properties".

(nn)  "**Lender**" has the meaning given to it in the Plan.

(oo)  "**Lender Secured Claim**" has the meaning given to it in the Plan.

(pp)  "**Lien**" means any lien, mortgage, security interest, pledge, burden, charge, encumbrance, restriction or rights of a vendor under any title retention.

(qq)  "**Marketable Title**" means (i) as defined in Standard 2.10 of the Texas Title Examination Standards, a record title that is free from reasonable doubt such that a prudent person, with knowledge of all salient facts and circumstances and their legal significance, would be willing to accept it, and (ii) all consents to assign and preferential rights to purchase applicable to the subject Lease have been obtained or waived, respectively.

(rr)  "**Material Adverse Effect**" means any result, consequence, condition or matter (i) that materially adversely affects the Properties, the rights to be acquired in the Properties under this Agreement, or the value of such Properties, in each case with the materiality of such change being evaluated in light of the impact of such change on all of the Properties and rights considered in the aggregate; or (ii) that impairs, prevents or materially delays the Sellers' ability to perform any of their obligations under this Agreement or to consummate the transactions contemplated by this Agreement; provided, however, that neither the commencement nor prosecution of the Bankruptcy proceedings of the Sellers nor any change in the market price for oil or gas, generally, shall constitute a Material Adverse Effect

(ss)  "**Material Documents**" means the following documents:

   (i)  All joint venture and area of mutual interest agreements which affect any Property after the Assignment Effective Date;

   (ii)  All gas purchase contracts, oil purchase contracts, gathering contracts, exchange agreements, transportation contracts, supply contracts, marketing contracts, disposal or injection contracts and all other contracts affecting any Property which are not, by the terms thereof, subject to termination upon sixty (60) Days or less notice;

   (iii)  All governmental approvals and third party contractual consents required in order to consummate the transactions contemplated by this Agreement,

other than routine consents required in connection with transfers of U.S. federal, state and Indian leases;

(iv) All agreements pursuant to which third parties have preferential rights or similar rights to acquire any portion of the Property upon the transfer of the Property by Sellers to the Buyer as contemplated by this Agreement;

(v) Any contract or agreement for capital expenditures or the acquisition or construction of fixed assets that requires aggregate future payments in excess of Ten Thousand Dollars ($10,000.00) which affects any Property;

(vi) Any indenture, mortgage, loan, credit, sale-leaseback or similar contract or agreement which affects any Property;

(vii) Any contract which involves any future payment or obligation in excess of Ten Thousand Dollars ($10,000) or is otherwise or could reasonably be expected to be material to the operations or development of the Properties;

(viii) Any contract or agreement with any Affiliate of Sellers which affects any Property; and

(ix) Any unit agreement, joint operating agreement, operating agreement, surface use agreement, easement or right of way or similar agreement applicable to the Properties.

(tt) **"Net Cash Flow"** means (a) the proceeds from settlements, proceeds from judgment and other recoveries associated with the Apollo Litigation and the Pathfinder Litigation received by Buyers in accordance with the Plan; plus (b) proceeds of production from the Properties or sale of the Properties, LESS (c) the sum of the following, to the extent related to the Properties: lease operating expenses, Capital Expenditures, well workover expenses, severance taxes, ad valorem taxes, allocated G&A expenses, and other direct costs associated with operating the Properties.

(uu) **"Non-Appealable Order"** has the meaning given to it in the Plan.

(vv) **"Non-Section 6 JOAs"** has the meaning given to it in the Plan.

(ww) **"Parties"** or **"Party"** has the meaning given to it in the introductory paragraph of this Agreement.

(xx) **"Payout Date"** means the date and time at which Net Cash Flow, as defined in the Plan, equals the Payout Obligations.

(yy) **"Payout Obligations"** means the sum of the Allowed DIP Claim, as defined in the Plan, the Allowed Lender Secured Claim (which shall bear interest at a rate of 12% per annum from the Petition Date until such Claim has been

satisfied in full), as defined in the Plan, the unpaid attorney's fees and other out-of-pocket expenses of the Lender, as defined in the Plan, the Allowed Standard Non-Section 6 Secured Claim, as defined in the Plan, and the Allowed Standard Section 6 Secured Claim, as defined in the Plan.

(zz)  "**Permit**" has the meaning given to it in the definition of "Properties."

(aaa)  "**Permitted Encumbrances**" means any and all:

    (i)  Consents to assignment and similar contractual provisions affecting the Property;

    (ii)  Rights reserved to or vested in a Governmental Authority having jurisdiction to control or regulate the Properties in any manner whatsoever, and all Laws of such Governmental Authorities;

    (iii)  Easements, rights-of-way, servitudes, surface leases, sub-surface leases, grazing rights, logging rights, ponds, lakes, waterways, canals, ditches, reservoirs, equipment, pipelines, utility lines, railways, streets, roads and structures on, over and through the Properties; provided, that such encumbrances do not either individually or in the aggregate interfere materially with the use, operation or development of the Property affected thereby for the purpose for which such Property is currently used or is intended to be used; and

    (iv)  Liens for Taxes not yet delinquent.

(bbb)  "**Person**" means an individual, group, partnership, limited partnership, limited liability company, corporation, trust, Governmental Authority or other entity.

(ccc)  "**Plan**" means the Joint Plan of Reorganization for the Debtors dated September 6, 2010, as the same may be amended, supplemented, or otherwise modified.

(ddd)  "**Properties**" has the meaning given to it in Section 2(a).

(eee)  "**Purchase Consideration**" has the meaning set forth in Section 3.

(fff)  "**Retained Liabilities**" means those liabilities and obligations of Sellers arising from the following: (i) all Claims arising out of, incident to or in connection with Sellers' failure to pay or incorrect payment of any Taxes relating to the Properties prior to the Assignment Effective Date (excluding any Sales Taxes arising from the transactions contemplated hereunder to occur at the Closing); (ii) Claims for bodily injury or death arising from operations on the Properties prior to the Assignment Effective Date; (iii) all Claims, violations, actions, assessments, obligations or other liabilities with respect to the ownership, operation or maintenance of any of the Properties prior to the

Assignment Effective Date, including, but not limited to, Claims related to the plugging and abandonment of wells that were plugged and abandoned prior to the Closing Date; and (iv) all Claims, violations, actions, assessments, obligations or other liabilities with respect to any of the Excluded Items whether or not attributable to periods before or after the Assignment Effective Date.

(ggg) **"Sale Procedures Motion"** has the meaning given to it in Section 11(a)(ii).

(hhh) **"Sale Procedures Order"** has the meaning given to it in the Plan.

(iii) **"Sales Tax"** means any and all transfer, sales, gross receipts, compensating use, use or similar taxes, and any associated penalties and interest.

(jjj) **"Section 6 JOA"** has the meaning given to it in the Plan.

(kkk) **"Seller"** or **"Sellers"** has the meaning given to it in the introductory paragraph.

(lll) **"Seismic"** has the meaning given to it in the definition of Properties.

(a) **"Standard Secured Claim"** has the meaning given to it in the Plan.

(b) **"Tax"** means all taxes, including income tax, surtax, remittance tax, presumptive tax, net worth tax, special contribution, production tax, pipeline transportation tax, value added tax, withholding tax and any gross receipts tax, windfall profits tax, profits tax, severance tax, personal property tax, real property tax, sale tax, ad valorem tax, transfer tax, use tax, excise tax, premium tax, environmental tax (including taxes under Section 59A of the Internal Revenue Code, as amended), customs duties, stamp tax, capital stock tax, franchise tax, occupation tax, payroll tax, employment tax, social security, unemployment tax, disability tax, alternative or add-on minimum tax, estimated tax, any similar tax or assessment imposed by any Governmental Authority thereof, together with any interest, fine or penalty or addition thereto, whether disputed or not.

(c) **"Third Party"** or **"third party"** (whether or not capitalized) means any Person other than Sellers and Buyer; provided that a Claim against a Party by an officer, director or employee of that Party, an Affiliate of that Party, or any officer, director or employee of such an Affiliate shall not be a Claim brought by or owed to a "third party". No Sellers' Affiliates shall be considered to be third parties for purposes of this Agreement. No Buyer Affiliates shall be considered third parties for the purpose of this Agreement.

(d) **"Title Defect"** has the meaning given it in Section 13.

(e) **"Units"** has the meaning given to it in the definition of Properties.

(f) **"Wells"** has the meaning given to it in the definition of Properties

(g) **"Working Interest Back-In"** has the meaning given it in Section 13.

(h) **References; Construction**. All references in this Agreement to Exhibits, Schedules, Sections, paragraphs, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Sections, paragraphs, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Sections, subsections or other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words "this Section" and "this subsection," and words of similar import, refer only to Section or subsection hereof in which such words occur. The word "or" is not exclusive, and the word "including" (in its various forms) means including without limitation. Each accounting term not defined herein, and each accounting term partly defined herein to the extent not defined, will have the meaning given to it under GAAP. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. When a term is defined as one part of speech (e.g., noun), any other part of speech (e.g., verb) with respect to the term has a comparable meaning.

## 2. Purchase and Sale.

(a) **Property Being Sold**. Subject to the terms and conditions of this Agreement, Sellers agree to sell and convey and Buyer agrees to purchase and accept the Property free and clear of all Liens and Claims for the Purchase Consideration as defined hereinafter. The term **"Property"** (or within context **"Properties"**) means all of Sellers' right, title and interest (real, personal, mixed, contractual or otherwise) in, to and under or derived from the following:

(i) **Leaseholds**. All of Sellers' right, title and interest in and to all oil and gas leases, including renewals, extensions, ratifications and amendments to such leases, and further including working interests, rights of assignment and reassignment, net revenue interests and undeveloped locations under or in oil, gas or mineral leases, and interests in rights to explore for and produce oil, gas or other minerals insofar and only insofar as such rights, titles and interests cover and include the lands, depths and rights described in **Exhibits A-1(a)** and **A-2(a)**, attached hereto and made a part hereof (collectively, the **"Leases"**);

(ii) **Wells**. All of Sellers' right, title and interest in and to the wells described in **Exhibits A-1(b)** and **A-2(b)**, attached hereto and made a part hereof (collectively, the **"Wells"**);

(iii) **Units**. All of Sellers' right to the unitization, communitization and pooling declarations, orders, agreements or designations (including all units formed by voluntary agreement and those formed under the rules, regulations, orders or other official acts of any Governmental Authority having jurisdiction) and statutorily, judicially or administratively created drilling, spacing and/or production units, whether recorded or unrecorded, to the extent they relate to the Leases and all of the interest of the Sellers in and to the properties covered or units created thereby (collectively, the **"Units"**);

(iv) **Rights in Production**. All of Sellers' right, title and interest in and to all (A) other rights to oil, gas and minerals in place and similar interests and the production of Hydrocarbons attributable thereto together with all rights that arise by operation of Law or otherwise in all properties and land unitized, communitized or pooled with therewith, and (B) rights and benefits arising from or in connection with any gas production, pipeline, storage, processing or other imbalance attributable to Hydrocarbons produced from the Leases or the Units as of the Assignment Effective Date; and it being expressly understood that Buyer shall have all rights to all oil inventory in tanks as of the Assignment Effective Date;

(v) **Proprietary Seismic**. An undivided interest in the following: (A) Sellers' intellectual property rights relating to the Properties, including the 2-D and 3-D seismic to include all prestack and poststack volumes and other generated data sets including but not limited to AVO volumes, all forms of Gathers, velocity volumes, and inversion volumes; (B) all original field data, tapes, field records and all other data generated during acquisition and processing of seismic (2-D and 3-D) and derivative volumes, as well as project work flows, notes and digital copies of the projects used to generate any of the aforementioned data created in-house by the Seller to the extent available; and (C) All other geotechnical data relating to the Properties (collectively, the **"Seismic"**);

(vi) **Contract Rights**. All of Sellers' right, title and interest in or derived from all water rights contracts or other contracts providing access to water, all joint operating agreements and operating agreements, all farm-in and farm-out contracts, all agreements containing area of mutual interest provisions, all exploration agreements, development agreements, joint venture agreements or participation agreements or similar agreements, in each case to the extent any such agreement burdens or benefits any of the Leases or the Units, or the production of Hydrocarbons from the Leases, the Permits, all access agreements, easements, servitudes, surface leases, subsurface

leases, licenses or right of way agreements or any other agreements relating to the Property to the extent such Contracts either: (x) are beneficial or would be reasonably expected to be beneficial in the operation or development of the Property or (y) are used in connection with, are intended to be used or reasonably expected to be used in connection with the Property (the **"Contracts"**);

(vii)  **Equipment**. All of Sellers' right, title and interest in and to the following:

    a.   All equipment, production facilities, meters, flow lines (extending to the meters or upstream thereof);

    b.   All water gathering lines, water transportation lines, water tanks and pumps (upstream to the Delivery Point); and

    c.   All machinery, fixtures, and other tangible personal property and improvements located on the Properties or used or held for use in connection with the operation of the Properties or the production of Hydrocarbons from the Properties, including, flow lines and gathering lines extending to the Properties described on **Exhibits A-1(a)** and **A-1(b)**, attached hereto, but excluding the office equipment of Sellers (collectively, the **"Equipment"**);

(viii)  **Easements**. All of Sellers' right, title and interest in and to all rights-of-way, easements, licenses, and servitudes (the **"Easements"**) appurtenant to or used in connection with those Properties described on **Exhibits A-1(a), A-1(b) , A-2(a) , and A-2(b)**, attached hereto;

(ix)  **Permits**. All of Sellers' right, title and interest in and to all permits and licenses of any nature owned, held or operated in connection with operations for the exploration and production of oil, gas or other minerals to the extent the same are used or obtained in connection with the Property (the **"Permits"**);

(x)  **Title Documents**. All of Sellers' interests in and to all orders, title opinions and documents, run sheets, ownership reports, abstracts of title, division of interest statements, and similar rights and interests, subject to the rights of Third Parties;

(xi)  **Insurance**. All insurance benefits arising after the Assignment Effective Date under existing policies of insurance, if any, relating to the foregoing Properties; and

(xii)  **Data**. All Data with respect to the Properties and all rights relating thereto.

(b) **No Assumption of Liabilities; Excluded Properties**. Buyer is not assuming any liabilities or obligations of Sellers related to the Properties or otherwise in connection with the transactions contemplated herein except as expressly provided for in this Agreement. Notwithstanding anything herein contained to the contrary and without limiting the preceding sentence, the Properties do not include, and there is hereby excepted and reserved unto Sellers, the following (the "**Excluded Items**"):

(i) All Vested Assets, as defined by the Plan;

(ii) All hedging transactions and any gains or losses attributable to any hedging activities, whether occurring before or after the Assignment Effective Date;

(iii) All ad valorem, property, production, excise, severance, and any other taxes (except income or franchise taxes) based upon or measured by the ownership of the Properties or the production of Hydrocarbons or the receipt of proceeds therefrom attributable to the period prior to the Assignment Effective Date; and

(iv) Those items listed on **Schedule 2(b)(iv)**.

3. **Consideration**. The consideration for the sale and transfer of the Properties (the "**Purchase Consideration**") shall be as follows:

(a) The assumption or other satisfaction of the DIP Claim as provided under the Plan;

(b) The satisfaction of the Allowed Standard Secured Claim as provided under the Plan;

(c) The assumption or other satisfaction of the Allowed Lender Secured Claim; and

(d) Working Interest Back-In, if any, to be assigned to HCL at Payout.

4. **Assignment Effective Date and Closing**. The closing shall occur two Business Days after satisfaction or waiver by the requisite Parties of the conditions to closing set forth in Section 11 (other than those conditions that by their nature cannot be satisfied until the time of closing) (the "**Closing**", or the "**Closing Date**"), unless an earlier time is mutually agreed upon. The conveyance of the Property to Buyer shall be effective as of the first day of the month in which the Closing takes place (the "**Assignment Effective Date**").

5. **Representations and Warranties of Sellers**. The Sellers, jointly and severally, hereby represent and warrant to Buyer as of the date hereof and will be deemed to represent and warrant to Buyer at the Closing, as follows:

(a)   **Corporate Authority.** HCL is a limited liability company duly organized and in good standing under the laws of the State of Texas. HSC is a corporation duly organized and in good standing under the laws of the State of Texas. Each Seller is duly qualified and in good standing to carry on its respective business in the state where the Property is located, and has all the requisite power and authority to enter into, deliver and perform this Agreement and carry out the transactions contemplated under this Agreement subject to Bankruptcy Court approval.

(b)   **Valid Agreement.** Subject to obtaining the approvals required under Section 11(a), this Agreement constitutes the legal, valid and binding Agreement of the Sellers.

(c)   **Authorization.** Subject to obtaining the approvals required under Section 11(a), this Agreement has been duly authorized, executed and delivered by the Sellers. Subject to obtaining the approvals required under Section 11(a), all instruments required to be delivered by the Sellers at the Closing shall be duly authorized, executed and delivered by the Sellers. Subject to obtaining the approvals required under Section 11(a), this Agreement and all documents executed by Sellers in connection with this Agreement shall constitute legal, valid and binding obligations of the Sellers, enforceable against each Seller in accordance with their terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect, as well as general principles of equity.

(d)   **Suits and Claims.** Seller shall prepare and deliver to Buyer no later than September 17, 2010, a list of all suits, actions, claims, or other proceedings that are currently pending, or to the Knowledge of Sellers, threatened before any court or governmental agency against Sellers that are attributable to Sellers' ownership or operation of any of the Properties. Furthermore, Seller shall notify Buyer in writing of additional pending or threatened suits, actions, claims, or other proceedings within three (3) business days of Seller's discovery of said pending or threatened suits, actions, claims, or other proceedings.

(e)   **Properties Conveyed.** Sellers are conveying to Buyer all of their interests in the oil and gas leases owned by Sellers in Sections 21, 22, 23, 24, and 25, Block C-23; Sections 1 and 2, Block C-24; Sections 6 and 9, Block 74; Section 1, Block 75; all Public School Land Surveys, Winkler and Loving Counties, Texas, and Section 21, Township 26 South, Range 35 East, Lea County, New Mexico, together with all of all of their interests in the wells located thereon, related Equipment, facilities, and contract rights, LESS AND EXCEPT the items listed on **Schedule 2(b)(iv)**.

(f)   **Maintenance of Interest.** On or before September 17, 2010, Sellers shall prepare and deliver to Buyer an accurate and complete list of any and all

{00085937.14}                                    13

US 515000v.2

interest in the Properties alienated or assigned by Sellers in the time period from October 30, 2008, through Closing;

(g) **Interest Conveyed.** The interests set forth on Exhibits A-1(a) and A-2(a) accurately reflect the ownership interests of Sellers in the Properties.

(h) **Environmental Matters.** On or before September 17, 2010, Sellers shall prepare and deliver to Buyer an accurate and complete list of all environmental issues related to the Properties (the **"List of Environmental Issues"**), together with a complete list of wells that have been plugged and abandoned by Sellers or their Affiliates on the Leases and copies of the Texas Railroad Commission forms W-3 (Plugging Record) and W-15 (Cementing Report) for each of these wells. Except as set forth on the List of Environmental Issues:

   (i) To the Knowledge of Sellers, the Properties are in material compliance with all applicable Environmental Laws or with all terms and conditions of all environmental Permits.

   (ii) To the Knowledge of Sellers, there has been no contamination of groundwater, surface water or soil on the lands covered by the Leases resulting from the operation of the Properties which requires notification to any Governmental Authority or remediation under applicable Environmental Laws. Any and all of the wells contained on any of the Properties that have been plugged and abandoned (temporarily or permanently) have been plugged in accordance with all applicable requirements of each Governmental Authority having jurisdiction over the Properties.

   (iii) To the Knowledge of Sellers, there are no civil, criminal or administrative actions, lawsuits, demands, litigation, claims or hearings or other proceedings relating to an Environmental Claim, and Sellers have not received any notice of any Environmental Claim or notice of any alleged violation or non-compliance with any Environmental Law or of non-compliance with the terms or conditions of any environmental Permits, arising from, based upon, associated with or related to the Properties or the ownership or operation of any thereof.

   (iv) To the Knowledge of Sellers, no pollutant, waste, contaminant or hazardous, extremely hazardous or toxic material, substance, chemical or waste identified, defined or regulated as such under any Environmental Law is present or has been handled, managed, stored, transported, processed, treated, disposed of, released, migrated or escaped on, in, from, under or in connection with the Properties or the ownership or operation of any thereof, such as to cause a condition or circumstance that would

reasonably be expected to result in an Environmental Claim or a violation of any Environmental Law.

(v)    The Sellers have made available to Buyer copies of all Third Party environmental audits, assessments and other similar reports and studies in Sellers' possession describing environmental conditions of the Properties.

(i)    **Planned Future Commitments**. Except for the obligations set forth in the Leases, Sellers have not and will not commit to expenditures relating to the Properties (drilling of wells, workovers, pipeline projects, production facilities, etc.) in excess of Ten Thousand Dollars ($10,000) in the aggregate.

(j)    **Hedges**. Neither the Properties nor the production therefrom are subject to any type of hedge or forward agreement with respect to which Buyer will have any obligations.

(k)    **Current Commitments**. On or before September 17, 2010, Sellers shall prepare and deliver to Buyer an accurate and complete list of all authorizations for expenditures applicable to the Properties, whether or not accepted by Sellers or any other Person.

(l)    **Brokers**. Except as approved by the Bankruptcy Court, no Seller has incurred any obligation or liability, contingent or otherwise, for brokers' or finders' fees with respect to this transaction for which Buyer shall have any obligation or liability.

(m)    **Data**. The Data is in the possession or control of Sellers.

(n)    **Foreign Person**. Each Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code.

(o)    **Material Documents.** On or before September 17, 2010, Sellers shall prepare and deliver to Buyer a complete and accurate list, to Sellers' Knowledge, of all Material Documents related to the Properties, including any amendments or other related documents. Sellers shall promptly provide Buyer with copies of any and all Material Documents but, in any event, no later than two (2) business days after receipt of a written request from Buyer. To Sellers' knowledge, except as may be noted in such list: the Material Documents are in all material respect in full force and effect in accordance with their respective terms, and there exist no material defaults by Sellers or by another party thereto in the performance of any material obligation thereunder and no event has occurred that with notice or lapse of time or both would constitute any default under any such Material Document.

6.    **Representations and Warranties of Buyer**. Buyer represents and warrants to Sellers as of the date hereof and will represent and warrant at the Closing, as follows:

(a) **Corporate Authority**. Buyer is a limited liability company duly organized and in good standing under the laws of the State of Delaware, is duly qualified and in good standing to carry on its business in the state where the Property is located and has all the requisite power and authority to enter into and perform this Agreement and carry out the transactions contemplated under this Agreement.

(b) **Valid Agreement**. This Agreement constitutes the legal, valid and binding Agreement of Buyer. At the Closing, all instruments required hereunder to be executed and delivered by Buyer shall be duly executed and delivered to Sellers and shall constitute legal, valid and binding obligations of Buyer. Buyer's execution and delivery of this Agreement, the consummation of the transactions set forth herein and Buyer's performance of Buyer's obligations hereunder have been duly and validly authorized by all requisite action on the part of Buyer. Buyer's execution and delivery of this Agreement and consummation of the transactions contemplated by this Agreement will not:

(i) conflict with or require consent of any Person under any terms, conditions or provisions of Buyer's formation documents;

(ii) violate any provision of, or require any consent or approval under any Law applicable to Buyer (except for consents and approvals of Governmental Authorities customarily obtained subsequent to transfer of title); or

(iii) conflict with, result in a breach of, constitute a default under or constitute an event that with notice or lapse of time, or both, would constitute a default under, accelerate or permit the acceleration of the performance required by, or require any consent, authorization or approval under: (i) any agreement of Buyer, or any mortgage, indenture, loan, credit agreement or other agreement evidencing indebtedness for borrowed money to which Buyer is a party, or (ii) any order, judgment or decree of any Governmental Authority.

(c) **Governmental Approvals**. Buyer shall obtain all local, state, federal governmental and agency permissions, approvals, permits, bonds and consents, required for Buyer to assume the Assumed Obligations as contemplated hereunder.

(d) **Independent Evaluation**. Buyer is an experienced and knowledgeable investor in the oil and gas business.

(e) **Financial Wherewithal**. Buyer has the financial wherewithal and resources to satisfy the commitments in this Agreement, including, without limitation, (i) the payment of all cash at Closing, and (ii) the funding of the sidetrack operations for the Pat Howell No. 1 Well.

(f) **Brokers**. Buyer has incurred no obligation or liability, contingent or otherwise, for brokers' or finders' fees with respect to this transaction for which Sellers shall have any obligation or liability.

7. **Environmental Inspection**. Prior to Closing and upon reasonable prior notice to Sellers, Buyer will have access to and the opportunity to inspect the Property for all purposes, including without limitation, for the purposes of detecting the presence of hazardous or toxic substances, pollutants or other contaminants, environmental hazards, naturally occurring radioactive materials (NORM), produced water, air emissions, and contamination of the surface and subsurface. Buyer shall coordinate any such inspections with Sellers and Sellers shall have the right to have their representatives present to observe any of Buyer's inspections of the Property.

8. **Casualty Loss**.

(a) **Notice of Loss**. Sellers shall promptly notify Buyer of all instances of Casualty Loss that occur and become known to Sellers between the Execution Date and the Closing.

(b) **Casualty Loss**. If, prior to the Closing any portion of the Properties suffers a material Casualty Loss, Sellers and Buyer shall meet to attempt to agree on an adjustment to the Purchase Consideration reflecting the "reduction in value" of the Properties because of such Casualty Loss. For this purpose, "reduction in value" is based on the principle that Sellers should generally bear the costs of repairing the Properties to the state existing immediately prior to the Casualty Loss. If the Parties are unable to agree on resolution of a Casualty Loss, then the reduction, if any, shall be determined by the Bankruptcy Court.

9. **Covenants Prior to Closing**.

(a) **Operations**. Until the Closing, subject to the financial limitations contained in any approved operating budget as well as Sellers' liquidity, Sellers shall do the following:

(i) Operate the Property in a good and workmanlike manner consistent with prudent oilfield practices;

(ii) Dispose of production from the Property;

(iii) Comply with all material covenants and conditions contained in agreements relating to the Property;

(iv) Maintain insurance now in force with respect to the Property;

(v) Notify Buyer of any material Claim which might adversely affect title to or operation of the Property;

(vi)    Pay postpetition taxes, costs and expenses attributable to the Property as they become due; and

(vii)    Advise and consult with Buyer on all material matters relating to the operation of the Property, including all authorizations for expenditures.

(b)    **Negative Covenants**. From the Execution Date until Closing Sellers shall not do any of the following with regard to the Property without Buyer's consent, which consent shall not be unreasonably withheld:

    (i)    Incur liabilities or obligations with respect to the Property for which Buyer would be responsible after the Closing other than transactions in the normal, usual and customary manner, of a nature and in an amount (not to exceed Ten Thousand Dollars ($10,000), counting liabilities or obligations arising from one transaction or a series of similar transactions, and all periodic installments or payments under any lease or other agreement providing for periodic installments or payments, as a single liability or obligation);

    (ii)    Cancel any indebtedness or waive any Claims or rights against third parties, which Claims or rights have a value, individually or in the aggregate, in excess of Ten Thousand Dollars ($10,000);

    (iii)    Make any material change in any method of accounting or accounting practice or policy consistent with past practices;

    (iv)    Voluntarily permit, without consultation with the Buyer or approval by the Bankruptcy Court, any Leases or other material rights with respect to the Property to expire, waive or release any material rights with respect to the Property, or relinquish its position as operator with respect to the Property;

    (v)    Except as otherwise provided in this Agreement, amend or terminate any Material Document;

    (vi)    Release all or any portion of a Lease, Contract or Easement;

    (vii)    Create a lien, security interest or other encumbrance on the Property;

    (viii)    Dispose of the Property;

    (ix)    Enter into, terminate or amend any contract or agreement affecting the Property;

    (x)    Waive, compromise or settle any claim that would adversely affect ownership, operation or value of any of the Property by an amount exceeding Ten Thousand Dollars ($10,000) before the Closing;

(xi)    Except upon Bankruptcy Court approval, enter into, terminate or amend any contract or commitment for capital expenditures or the acquisition or construction of fixed assets for which Buyer shall have financial responsibility after the Closing in an amount individually or in the aggregate in excess of Ten Thousand Dollars ($10,000), except in connection with situations believed in good faith by Sellers to constitute an emergency (in which case Sellers shall notify Buyer as soon as reasonably practicable of such emergency and obligations); or

(xii)    Agree, whether in writing or otherwise, to do any of the foregoing.

(c)    **Governmental Reviews**. Sellers and Buyer shall each in a timely manner make (i) all required filings, including (if applicable) filings required under the Hart-Scott-Rodino Act, and prepare applications to and conduct negotiations with, each Governmental Authority as to which such filings, applications or negotiations are necessary or appropriate in the consummation of the transactions contemplated hereby, and (ii) provide such information as the other may reasonably request in order to make such filings, prepare such applications and conduct such negotiations. Each Party shall cooperate with and use all reasonable efforts to assist the other with respect to such filings, applications and negotiations.

10.    **Additional Covenants**.

(a)    **Assumed Obligations and Retained Liabilities**. Upon the Closing the Buyer shall agree (and, upon the delivery by Sellers to Buyer of the Assignment and Bill of Sale, Buyer shall be deemed to have agreed) to assume the Assumed Obligations. At all times, the Sellers, either or both HSC or HCL, shall retain and be responsible for the Retained Liabilities, subject to the terms of the confirmed Plan and the Confirmation Order.

(b)    **Affiliate Contracts**. Except as otherwise provided under the Plan or the Confirmation Order, if requested by Buyer, Sellers will terminate or cause Affiliates to terminate, effective as of the Assignment Effective Date, any contracts or agreements between such Sellers and Affiliates to the extent they relate to or bind the Property.

(c)    **General Access**. In addition to the rights of Buyer set forth in Section 7, after execution and delivery of this Agreement, Sellers shall provide Buyer and Buyer's representatives, reasonable access to all Properties following reasonable notice to inspect the condition of the same. Sellers shall also make available to Buyer and to Buyer's representatives from the Execution Date, for examination and copying, all Data and other information relating to the Properties, including, but not limited to, those records required by Buyer to ascertain title, lease expirations, continuous drilling obligations, rental payments, lease extension payments, net revenue interest, surface restrictions,

water utilization rights, gathering/processing/ transportation/marketing arrangements, litigation files (including any potential conflicts, notices of violations or potential violations, or demands), regulatory compliance records, permits, environmental conditions and Sellers' corporate structure; provided Sellers may restrict access and provision of information to the extent it reasonably believes necessary to comply with existing confidentiality agreements with Third Parties (provided that Sellers shall use their best efforts to secure waivers of any such confidentiality agreements). All access to the foregoing shall be provided by and through the Sellers' Chief Restructuring Officer and/or Sellers' counsel. If any of the referenced Data and information in this Section is in possession of Persons other than Sellers, Sellers shall make reasonable efforts to cause such access to be provided by the appropriate Person.

(d) **Designation of Assumed Contracts**. On or before October 1, 2010, Buyer shall designate in writing to Sellers those Contracts which Buyer desires to have assumed by the applicable Seller(s) and assigned to Buyer by the applicable Seller(s) which designation shall include the maximum cure cost for each such Contract (each, a **"Designation"**). Sellers shall, promptly after receiving the Designation, file a motion pursuant to Section 365 of the Bankruptcy Code (unless such Contracts are identified in the Plan as Contracts to be assumed and assigned) to assume and assign the Contracts identified in the Designation as of the Closing Date, and shall use their commercially reasonable efforts to obtain the approval of such assumption and assignment on such terms and conditions designated by Buyer. If any Contract is required to be either assumed or rejected by any Seller prior to the Closing, the Sellers shall promptly notify Buyer in writing of such fact and, at the request of Buyer and upon the entry of a Bankruptcy Court order providing therefor, shall assume any such Contract. Nothing herein shall prevent the transfer and assignment to Buyer of any Contract that is not an executory contract or unexpired lease that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code.

11. **Conditions Precedent to Closing**.

(a) **Bankruptcy Proceedings**. This Agreement is entered into by all parties with the express understanding that it is subject to approval of the Bankruptcy Court, and all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

(i) **Plan**. The Sellers shall file the Plan seeking authority via a Confirmation Order, which Plan, Confirmation Order, and scope and manner of notice thereof shall be reasonably acceptable to Sellers, Buyer, and Lender, to consummate the transactions contemplated hereunder, including (i) authority to convey and assign the Properties to the Buyer free and clear of any Liens, Claims, and encumbrances, other than Permitted

Encumbrances, (ii) authority to permit the assumption of the Assumed Obligations by the Buyer, (iii) authority for Sellers to assume the Contracts and assign the same to the Buyer, (iv) authority to enter into each of the ancillary transactions, if any, contemplated by this Agreement and (v) authority to appoint the Buyer (or its assignee) as operator under the Section 6 JOAs, the Non-Section 6 JOAs, or the new joint operating agreements as provided under Article XI of the Plan, all pursuant to Sections 105, 363, and 365 of the Bankruptcy Code. Buyer shall have the right to review and reasonably designate additional parties and/or addressees for notice of the Plan and Confirmation Order prior to the filing with the Bankruptcy Court.

(ii) **Sale Procedures**. Within three (3) Business Days following the execution of this Agreement, Sellers shall file a motion (the **"Sale Procedures Motion"**) with the Bankruptcy Court seeking, among other things, (i) approval of the Break-Up Fee, the Expense Reimbursement, and the Sale Procedures.

(iii) The Plan, the Sale Procedures Motion, and the Sale Procedures Order shall be in form and substance reasonably acceptable to Buyer.

(iv) Sellers shall request that the Sale Procedures Motion be heard on an expedited basis.

(b) **Conditions Precedent to Sellers' Obligation to Close**. Sellers shall consummate the sale of the Properties on the Closing Date, provided the following conditions precedent have been satisfied or waived by Sellers at or prior to the Closing:

(i) The Confirmation Order (i) shall have been entered by the Bankruptcy Court, (ii) shall include a finding that the sale was negotiated at arms' length and in good faith, and that Buyer is deemed a good faith purchaser for value, and (iii) shall not be subject to a stay;

(ii) All representations and warranties of Buyer contained in this Agreement shall have been true and correct in all material respects when made and are true and correct in all material respects as of the time of the Closing as if then made; and

(iii) Buyer shall have complied in all material respects with all of Buyer's obligations and covenants in this Agreement to be performed or complied with at or prior to the Closing.

(c) **Conditions Precedent to Buyer's Obligation to Close**. Buyer shall consummate the purchase of the Properties contemplated by this Agreement

on the Closing Date provided the following conditions precedent have been satisfied or waived by Buyer at or prior to the Closing:

(i)     the Confirmation Order shall have been entered by the Bankruptcy Court, shall not be subject to a stay, and shall be a Non-Appealable Order;

(ii)    Buyer and Heritage Disposal Corporation shall have executed a Salt Water Disposal Agreement in form agreed to by the Parties on September 4, 2010 (the "**Disposal Agreement**");

(iii)   Buyer and Heritage Gathering Corp. shall have executed a Transportation Agreement in form agreed to by the Parties on September 4, 2010 (the "**Gathering Agreement**");

(iv)    On or before the Due Diligence Expiration Date, Buyer shall be satisfied (i) that the potential environmental liabilities associated with the Properties do not exceed Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate, and (ii) that Sellers have Marketable Title to at least ninety-five percent (95%) of the interests represented on Exhibits A-1(a), A-1(b), A-2(a), and A-2(b);

(v)     All representations and warranties of Sellers contained in this Agreement shall have been true and correct in all material respects when made and, as updated and amended by Sellers periodically prior to Closing, are true and correct in all material respects as of the time of the Closing as if then made;

(vi)    Sellers shall have complied in all material respects with all of Sellers' obligations and covenants in this Agreement to be performed or complied with at or prior to the Closing;

(vii)   Sellers will not have sold, assigned, transferred, encumbered, conveyed or otherwise disposed of any of the Properties;

(viii)  No injunction, order or award restraining, enjoining or otherwise prohibiting consummation of or granting material damages associated with the transactions contemplated by this Agreement or sale of any one or more of the Properties has been issued by any Governmental Authority or arbitrator of competent jurisdiction, and no suits, actions or other proceedings are pending before any such court, Governmental Authority or arbitrator in which a third party seeks to restrain, enjoin or otherwise prohibit consummation of or obtain material damages associated with the transactions contemplated by this Agreement or sale of any one or more of the Properties; provided, however, that notwithstanding the foregoing, if the Bankruptcy Court has issued a Non-Appealable Order authorizing the

transfer of the Properties to Buyer free and clear of all liens, claims and encumbrances then such restriction shall have no force and effect;

(ix) Sellers shall have demonstrated to Buyer that Sellers shall convey to Buyer at the Closing, Marketable Title, free and clear of all Liens other than Permitted Encumbrances, to Properties, for which all applicable preferential purchase rights have been waived or the time to elect under such preferential purchase rights has lapsed and all applicable consents to assignment have been obtained; and

(x) No Material Adverse Effect shall have occurred.

12. **Closing**. The Closing shall be held in Dallas, Texas, or such other place as the Parties shall mutually agree. At the Closing, the following shall occur:

(a) Sellers shall execute, acknowledge and deliver, in each case to the reasonably satisfaction of Buyer, the following:

(i) Four (4) originals of a certificate executed by an authorized officer of each Seller, dated as of the Closing, certifying on behalf of each Seller that the conditions set forth in Sections 11(c)(v), 11(c)(vi) and 11(c)(vii) have been fulfilled;

(ii) Four (4) originals of a certificate from each Seller pursuant to Internal Revenue Code Section 1445 certifying that such Seller is not a foreign person;

(iii) Four (4) originals of a certificate duly executed by the secretary or assistant secretary of each Seller, dated as of the Closing, certifying on behalf of each Seller the incumbency of each officer of such Seller executing this Agreement or any document delivered in connection with the Closing; and

(iv) An Assignment, Conveyance and Bill of Sale in a mutually satisfactory and recordable form containing a special warranty of title by, through and under Sellers, but not otherwise, of the Leases (the "**Assignment and Bill of Sale**").

(b) Buyer shall execute, acknowledge, and deliver, in each case to the reasonable satisfaction of Sellers, the following:

(i) Four (4) originals of a certificate executed by an authorized officer of each Buyer, dated as of the Closing, certifying on behalf of each Buyer that the conditions set forth in Sections 11(b)(ii) and 11(b)(iii) have been fulfilled; and

(ii) Four (4) originals of a certificate duly executed by the secretary or assistant secretary of each Buyer, dated as of the Closing, certifying on behalf of each Buyer the incumbency of each officer of such Buyer executing this Agreement or any document delivered in connection with the Closing.

(c) Payment of any portion of the Purchase Consideration payable at the Closing as required under the Plan or applicable order entered by the Bankruptcy Court shall be delivered by wire transfer in immediately available funds pursuant to wire instructions provided to Buyer by Sellers.

(d) Sellers shall deliver the Data (as defined above) to Buyer. Sellers shall deliver possession of the Property transferred as part of the Closing to Buyer. Sellers shall provide Buyer access to all relevant computers, databases, and servers so that Buyer has the ability to copy therefrom all lease files, land files, well files, regulatory files, operational files, and anything else related to the Properties and/or the operation thereof.

## 13. **Post Closing Obligations**.

(a) **Post Closing Assignment of Leases**. Sellers acknowledge that for the consideration received by Sellers under this Agreement, Buyer is entitled to acquire, and Sellers are obligated to sell to Buyer, any and all of Seller's oil and gas leases covering the following lands: (i) Sections 21, 22, 23, 24, and 25, Block C-23; Sections 1 and 2, Block C-24; Sections 6 and 9, Block 74; Section 1, Block 75, all Public School Land Surveys, Winkler and Loving Counties, Texas; and (ii) Section 21, Township 26 South, Range 35 East, Lea County, New Mexico. Therefore, from time to time following the Closing, should Sellers become aware of any additional oil and gas leases that Sellers did not disclose to or offer to Buyer prior to Closing, then, Sellers shall offer to assign such leases to Buyer, and if Buyer accepts such offer, such leases shall be deemed Leases for purposes of this Agreement and Sellers shall assign such Leases and all other Properties related to such Leases to Buyer for an additional consideration of Ten Dollars ($10.00). After the Closing, the acquisition of additional leases shall be at Buyer's sole option, and in no event shall Buyer be obligated to acquire such additional leases. In particular, Buyer shall have no obligations related to the items listed on **Schedule 2(b)(iv)**.

(b) **Post Closing Revenues**. Except as expressly provided otherwise in this Agreement and/or the Plan or order entered by the Bankruptcy Court: (i) Buyer shall pay Sellers any and all amounts received by Buyer attributable to the Properties and relating to the period prior to the Assignment Effective Date, and (ii) Sellers shall pay Buyer any and all amounts received by Sellers attributable to the Properties and relating to the period on and after the Assignment Effective Date. The Party responsible for the payment of amounts shall make full payment to the other Party within fifteen (15) Business Days after receipt of such amounts.

In no event shall Buyer be obligated to pay Sellers for crude oil inventory as of the Assignment Effective Date.

(c) **Post Closing Expenses**. Except as expressly provided otherwise in this Agreement and subject to Bankruptcy Court approval consistent with the terms of a confirmed Plan: (a) Sellers shall reimburse Buyer for any and all pre-approved reasonable costs and expenses paid by Buyer attributable to the Properties and relating to the period prior to the Assignment Effective Date, if any, and (b) Buyer shall reimburse Sellers for any and all pre-approved reasonable costs and expenses paid by Sellers attributable to ownership of the Properties and relating to the period on and after the Assignment Effective Date. The Party responsible for the payment of such costs and expenses shall make full payment to the other Party within fifteen (15) Business Days after receipt of an applicable invoice and proof that such invoice was paid. Neither Party shall agree to settle any audit with respect to periods for which the other is in part responsible without the prior written consent of the other, such consent not to be unreasonably withheld

(d) **Pat Howell Sidetrack**. In accordance with the Plan, on or before the expiration of ninety days after the Closing Date, Buyer shall commence the sidetrack of the Pat Howell #1 Well located in Section 6, Block 74, Winkler County, Texas  Buyer shall diligently pursue the completion and production and maintain operations and production as a prudent operator in accordance with industry standards and non-bankruptcy law.

(e) **Working Interest Back-In**. Upon the occurrence of the Payout Date, Buyer shall assign to HCL fifteen percent (15%) of its working interest in the Properties (the "**Working Interest Back-In**").

(f) **Title Defect or Environmental Liability Charged Against Working Interest Back-In**.

(i) Notwithstanding the provisions of Section 16(r), the representations and warranties set forth in Section 5(e), 5(f) and 5(g) shall survive for a period of one (1) year following the Closing.

(ii) Notwithstanding the provisions of Section 16(r), the representations and warranties set forth in Section 5(h) shall survive for a period of two (2) years following the Closing.

(iii) A "**Title Defect**" shall exist if the Sellers do not have Marketable Title to support the interests represented on Exhibits A-1(b) and A-2(b). If the value of the Title Defects on all of the Properties totals more than One Hundred Thousand Dollars ($100,000.00), any Title Defect value over and above One Hundred Thousand Dollars ($100,000.00), plus eighteen percent (18%) interest per annum, shall be recouped by Buyer from the production attributable to the Working Interest Back-In.

US 515000v.2

a. The value of the Title Defects shall be determined using the most recent third party reserve report, which, as of the Execution Date, is the report dated July 27, 2010, titled "Evaluation of the Oil and Gas Properties in Crittendon and Cheyenne Fields, Owned by Heritage Standard Corporation, Effective August 01, 2010," and signed by James L. Merkel, Principal Reservoir Analyst, RPS Group.

b. No assignment of the Working Interest Back-In shall be owed to HCL unless and until the value of all Title Defects over and above One Hundred Thousand Dollars ($100,000.00), together with interest, has been recouped by Buyer from the production attributable to the Working Interest Back-In, which recoupment shall begin at Payout.

(iv) Should Buyer discover environmental liabilities resulting from Sellers' operation of the Properties that are a breach of the representations and warranties set forth in Section 5(h), then the costs associated with any such liabilities, over and above One Hundred Thousand Dollars ($100,000.00), plus eighteen percent (18%) per annum shall be recouped from the production attributable to the Working Interest Back-In. No assignment of the Working Interest Back-In shall be owed to HCL unless and until the value of all costs associated with environmental liabilities over and above One Hundred Thousand Dollars ($100,000.00), together with interest, have been recouped by Buyer from the production attributable to the Working Interest Back-In, which recoupment shall begin at Payout.

(v) Disputes. In the event of any disputes between Buyer and HCL concerning the calculation of Net Cash Flow, Payout Obligations, the Working Interest Back-In, or any reductions to the Working Interest Back-In, the Parties shall first attempt to reach an amicable settlement of such dispute, and if they are unable to reach such a settlement, either party may submit the dispute to a mutually acceptable independent arbitrator for resolution. In the event that Sellers and Buyer are unable to mutually agree upon an independent arbitrator, Seller and Buyer shall each select an arbitrator, and an additional arbitrator shall be selected by the agreement of Parties' arbitrators.

14. **Independent Investigation and Disclaimer**. The express representations of Sellers set forth in this Agreement, and the Assignment and Bill of Sale are exclusive and in lieu of any and all other representations. **EXCEPT FOR THE EXPRESS REPRESENTATIONS SET FORTH IN THIS AGREEMENT, AND THE ASSIGNMENT AND BILL OF SALE, SELLERS DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY OTHER REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED, ORALLY OR IN WRITING, TO BUYER, INCLUDING ANY STATEMENTS,**

REPRESENTATIONS, OPINIONS, INFORMATION OR ADVICE WHICH MAY HAVE BEEN PROVIDED AS AN ACCOMMODATION TO THE BUYER BY AN OFFICER, SHAREHOLDER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF SELLERS, OR ANY ENGINEER OR ENGINEERING FIRM, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, AND THE ASSIGNMENT AND BILL OF SALE, SELLERS MAKE ABSOLUTELY NO REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR STATUTORY, AS TO:

- TITLE TO ANY OF THE PROPERTY;

- THE ABILITY OF ANY COMPONENT OF THE PROPERTY TO PRODUCE ANY HYDROCARBONS;

- THE AMOUNTS, QUALITY OR DELIVERABILITY OF HYDROCARBON RESERVES ATTRIBUTABLE TO THE PROPERTY, OR ANY PART THEREOF;

- GEOLOGICAL, GEOPHYSICAL OR OTHER INTERPRETATION OF ANY ECONOMIC EVALUATION;

- PRESENT OR FUTURE SALES PRICES, OPERATING COSTS, OR OTHER ECONOMIC FACTORS; OR

- THE REGULATORY STATUS OF THE PROPERTIES WITH RESPECT TO ACTIONS, PAST OR PENDING, BEFORE THE TEXAS RAILROAD COMMISSION.

15. **Termination**.

    (a)    **Termination**. This Agreement may be terminated at any time prior to the Closing:

        (i)    by the mutual prior written consent of Sellers and Buyer;

        (ii)    by either Sellers or Buyer, if the Closing has not occurred within fifteen (15) days of the Confirmation Date;

        (iii)    by either Party if the Bankruptcy Court has approved the sale or other disposition of the Properties to any entity other than Buyer or its Affiliates; or

        (iv)    by Buyer, by written notice to Seller prior to the expiration of the Due Diligence Expiration Date, if the condition set forth in Section 11(c)(iv) is not satisfied to the satisfaction of Buyer at or prior to such date;

provided, however, that no Party shall be entitled to terminate this Agreement under Sections 15(a)(ii) or 15(a)(iv) if the Closing has failed to occur because such Party failed to perform or observe in any material respect its covenants and agreements hereunder or such Party is in breach of its representations and warranties set forth in this Agreement

(b) **Effect of Termination**. If this Agreement is terminated pursuant to Section 15(a) prior to Closing, this Agreement shall become void and of no further force or effect (except for the provisions of the following Sections: 15, 16(f), 16(i), 16(l), 16(m), and 16(o), all of which shall continue in full force and effect). Notwithstanding anything to the contrary in this Agreement, the termination of this Agreement under Section 15(a) shall not relieve any Party from liability for any willful or negligent failure to perform or observe in any material respect any of its agreements or covenants contained herein that are to be performed or observed at or prior to the Closing. In the event this Agreement terminates under Section 15(a) and any Party has willfully or negligently failed to perform or observe in any material respect any of its agreements or covenants contained herein which are to be performed or observed at or prior to the Closing, then the other Party shall be entitled to all remedies available at law or in equity and shall be entitled to recover court costs and attorneys' fees in addition to any other relief to which such Party may be entitled; provided that, NO PARTY SHALL BE ENTITLED TO RECOVER ANY PUNITIVE DAMAGES OR ANY LOSS OF PROFITS, WHETHER ACTUAL OR CONSEQUENTIAL, OR ANY OTHER CONSEQUENTIAL DAMAGES suffered by such Party in connection with or as a result of any such termination.

(c) **Break-Up Fee and Expense Reimbursement**. So long as Buyer has not terminated this Agreement pursuant to Section 11(c)(iv), if either Party terminates this Agreement under Section 15(a)(iii), then Sellers shall pay to Buyer and Buyer shall be entitled to receive, as its sole and exclusive remedy, the following fees and expense reimbursements:

(i) A break-up fee (the "**Break-Up Fee**") in the amount of Eight Hundred Thousand Dollars ($800,000.00); and

(ii) The Expense Reimbursement; provided, however, that no Expense Reimbursement paid or payable by Sellers to Buyer pursuant to this Section 15(c), shall exceed Four Hundred Thousand Dollars ($400,000) (the "**Expense Reimbursement Cap**").

(d) **Payment of Break-Up Fee**. Sellers shall pay the Break-Up Fee, in cash, on the date of consummation of the sale to a party other than Buyer, or one business day thereafter, from the sale proceeds thereof or otherwise from the Sellers' cash balances in accordance the Sale Procedures Order. The Break-Up

Fee shall be paid without need for any further motion, application, notice, approval or order of the Court.

16.  **Miscellaneous**.

(a)  **Further Assurances**. The Parties agree to execute any documents, whether before or after the Closing to aid the other Party in fulfilling the purpose of this Agreement.

(b)  **Entire Agreement**. This Agreement together with the Exhibits and Schedules attached hereto, shall constitute the complete agreement between the Parties hereto and shall supersede all prior agreements, whether written or oral, and any representations or conversations with respect to the Property.

(c)  **Notices**. Any notice, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been given and received when (i) delivered personally, or (2) on the date of delivery when delivered prior to 5:00 p.m. local time on a Business Day by scanned email to the Party designated to receive such notice, otherwise on the next succeeding Business Day, or (3) on the date following the Day sent by overnight courier, or (4) on the third (3rd) Business Day after the same is sent by certified mail, postage and charges prepaid, directed to the following addresses or to such other or additional addresses as any Party might designate by written notice to the other Party:

Notices to Sellers:      Heritage Consolidated LLC
                         Heritage Standard Corporation
                         Turtle Creek
                         Dallas, Texas _____
                         Attn: _____
                         Telephone: (214) ___-____
                         Facsimile: (214) ___-____
                         Email: _____

                         And a copy to:

                         Joe E. Marshall
                         Munsch Hardt Kopf & Harr, P.C.
                         3800 Lincoln Plaza
                         500 North Akard Street
                         Dallas, Texas 75201-6659
                         Telephone:(214) 855-7500
                         Facsimile:(214) 978-4365
                         Email: jmarshall@munsch.com

                         -and-

{00085937.14}                    29

US 515000v.2

Kevin McCullough
Rochelle McCullough LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Telephone: (214) 953-0182
Facsimile: (214) 953-0185
Email:

Notices to Buyer:     Robert P. Munn
President and CEO
Permian Atlantis LLC
6630 Cypresswood Drive
Spring, Texas 77379
Telephone: (832) 559-6060
Facsimile: (832) 559-6088
Email: BobMunn@xcane.com

And a copy to:

J. Kirby Barry
Burleson Cooke, LLP
711 Louisiana Street
Houston, Texas 77002
Phone: (713) 358-1700
Email: kbarry@burlesoncooke.com

(d)    **Binding Effect**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, and their successors and assigns.

(e)    **Counterparts**.  This Agreement may be executed in any number of counterparts, which taken together shall constitute one instrument and each of which shall be considered legally enforceable.

(f)    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

(g)    **Headings**.  The headings of the articles and sections of this Agreement are for guidance and convenience of reference only and shall not limit or otherwise affect any of the terms and provisions of this Agreement.

(h)    **Timing**.  Time is of the essence in this Agreement.  If the date specified in this Agreement for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date that is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period

during which notice is required to be given or action taken) shall be the next Day which is a Business Day.

(i)     **Expenses**. All fees, costs and expenses incurred by the Parties in negotiating this Agreement and in consummating the transactions contemplated by this Agreement shall be paid by the Party that incurred such fees, costs and expenses.

(j)     **Amendment and Waiver**. This Agreement may be altered, amended or waived only by a written agreement executed by both Buyer and Sellers. No waiver of any provision of this Agreement shall be construed as a continuing waiver of the provision.

(k)     **Parties in Interest**. This Agreement is binding upon and shall inure to the benefit of the Parties and, except where prohibited, their successors, representatives or assigns.

(l)     **No Partnership Created**. It is not the purpose or intention of this Agreement to create (and it shall not be construed as creating) a joint venture, partnership or any type of association, and neither Party is authorized to act as an agent or principal for the other Party with respect to any matter related hereto.

(m)     **Third-Party Beneficiaries**. Unless expressly stated to the contrary, no third party is intended to have any rights, benefits or remedies under this Agreement, however, Sellers acknowledge that following each Closing, Buyer may offer to assign a portion of the Property to a third party.

(n)     **Severance**. If any provision of this Agreement is found to be illegal or unenforceable, the other terms of this Agreement shall remain in effect and this Agreement shall be construed as if the illegal or unenforceable provision had not been included.

(o)     **Not to be Construed Against Drafter**. Each Party has had an adequate opportunity to review each and every provision of this Agreement and to submit the same to legal counsel for review and advice. Based on the foregoing, the rule of construction, if any, that a contract be construed against the drafter shall not apply to interpretation or construction of this Agreement.

(p)     **Recordation**. The Assignment and Bill of Sale is intended to convey all of the Properties. Certain Properties or specific portions of the Properties that are leased from, or require the approval to transfer by, a Governmental Authority are conveyed under the Assignment and Bill of Sale and also are described and covered by separate assignments made by Sellers to Buyer on officially approved forms, or forms acceptable to such entity, in sufficient multiple originals to satisfy applicable statutory and regulatory requirements.

(q)  **Remedies Not Exclusive**.  The remedies set forth in this Agreement are intended to be cumulative and not exclusive and are intended to be in addition to any other rights a Party may have hereunder or under applicable Law.

(r)  **Survival of Certain Obligations**.  Except as expressly provided otherwise in this Agreement, representations and warranties, covenants, agreements, waivers, disclaimers, releases and obligations of indemnity and defense contained in this Agreement expire at Closing.

(s)  **Audit Rights**.  HCL or its assigns shall have the right, upon notice in writing to Buyer to audit Buyer's calculation of the Payout Obligations, Net Cash Flow, and Working Interest Back-In, including all accounts and records relating to such calculations. The audits will be conducted during the normal business hours and shall not be conducted more than once each year without prior approval of the Buyer.  Buyer shall reply in writing to an audit report within ninety (90) days after receipt of such report with any audit exception to be settled by the mutual agreement of the Parties within thirty (30) days of the date of the delivery of the audit report response.

(t)  **Conspicuousness of Provisions**.  Except as otherwise expressly provided for in this Agreement, the release, defense, indemnification and hold harmless provisions provided for in this Agreement shall be applicable whether or not the Claims, (including attorneys' fees and costs of litigation) in question arose solely or in part from the active, passive or concurrent negligence, strict liability, breach of duty (statutory or otherwise), violation of Law, or other fault of any Indemnified Party, or from any pre-existing defect.  The Parties agree that provisions of this Agreement in "bold" type satisfy any requirement of the "express negligence rule" and other requirement at law or in equity that provisions be conspicuously marked or highlighted.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed below by their duly authorized representatives.

| SELLERS | BUYER |
|---------|-------|

**HERITAGE CONSOLIDATED LLC**

**PERMIAN ATLANTIS LLC**

By: _____

By: _____

President

Robert P. Munn
President & CEO

Date: _____

Date: _9-/0-2010_

**HERITAGE STANDARD CORPORATION**

**PERMIAN PHOENIX LLC**

By: _____

By: _____

President

Robert P. Munn
President & CEO

Date: _____

Date: _9-/0-2010_

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed below by their duly authorized representatives.

**SELLERS**                          **BUYER**

HERITAGE CONSOLIDATED LLC            **PERMIAN ATLANTIS LLC**

By:_____          By:_____
Managing Member                      Robert P. Munn
                                     President & CEO

Date:___Sept. 14, 2010_____    Date:_____


HERITAGE STANDARD CORPORATION        **PERMIAN PHOENIX LLC**

By:_____          By:_____
President                            Robert P. Munn
                                     President & CEO

Date:___Sept. 14, 2010_____    Date:_____

| Lessor | Lessee | Lease Date | Expiration Date | Description | Book | Page |
|---|---|---|---|---|---|---|
| | | | | | | |
| Noesis Exploration Company | Heritage Standard Corporation | 2/1/2004 | | All of Section 6, Block 74, PSL Survey, Winkler County, Texas | 509 | 879 |
| Laura Korach Howell | Heritage Standard Corporation | 2/1/2004 | | All of Section 6, Block 74, PSL Survey, Winkler County, Texas | 509 | 895 |
| Elizabeth Fabian Howell | Heritage Standard Corporation | 2/1/2004 | | All of Section 6, Block 74, PSL Survey, Winkler County, Texas | 509 | 887 |
| Gwyneth Webster Howell | Heritage Standard Corporation | 2/1/2004 | | All of Section 6, Block 74, PSL Survey, Winkler County, Texas | 510 | 16 |
| Rosie Emily Howell | Heritage Standard Corporation | 2/1/2004 | | All of Section 6, Block 74, PSL Survey, Winkler County, Texas | 510 | 1 |

| Well | Lease Number | Lessor | Lessee | Lease Date | Expiration Date | Description | Book | Page |
|---|---|---|---|---|---|---|---|---|
| Tubb 75-1 | 190TX004B | Carrye C. Payton | Sinclair Oil & Gas Company | 9/8/1965 | | Section 1, Block C-24, PSL Survey, Winkler County, Texas | 212 | 83 |
| Tubb 75-1 | 225TX001 | Bank of America, N.A. Trustee of the Cathy J. Yarbrough Tr., Deborah J. Shannon Tr., James D. Jackson Tr., & Judy R. McCollum Tr. | Heritage Resources, Inc. | 9/17/1999 | | Section 1, Block 75, PSL Survey, Winkler County, Texas | 465W/10L | 682W/671 L |
| Tubb 75-1 | 225TX002 | William C. Eiland | Heritage Resources, Inc. | 12/8/1999 | | Section 1, Block 75, PSL Survey, Winkler County, Texas | 467 | 493 |
| Tubb 75-1 | 225TX003 | N. R. Rousselot & Sons, a General Partnership | Heritage Resources, Inc. | 12/8/1999 | | Section 1, Block 75, PSL Survey, Winkler County, Texas | 488 | 696 |
| Tubb 75-1 | 225TX004 | Edward D. Rhodes | Heritage Resources, Inc. | 12/9/1999 | | Section 1, Block 75, PSL Survey, Winkler County, Texas | 467 | 496 |
| Tubb 1 Unit #1, #2, #3, #4 | 190TX04B | Carrye Cowden Payton, et al | Sinclair Oil & Gas Company | 9/8/1965 | | Section 1, Block 75, PSL Survey, Winkler County, Texas | 212 | 83 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX029 | Citizens National Bank of Abilene | Marjorie M. Weaver | 4/8/1965 | | Section 1, Block C-24, PSL Survey, Winkler County, Texas | 208 | 379 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX030 | T. H. Neel and the First National Bank of Fort Worth, Independent Executors U/W/O J. B. Tubb, deceased | Marjorie M. Weaver | 4/15/1965 | | Section 1, Block C-24, PSL Survey, Winkler County, Texas | 208 | 633 |
| Tubb 1 Unit #1, #2, #3, #4 | Mineral Deed | Southland Royalty Company | Crittenden Acquisition Company, et al | 6/23/1987 | | SW/4 of Section 1, Block 75, PSL Survey, Winkler County, Texas | 369 | 24 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX031 | Evelyn Linebery, Individually and as Trustee and husband Tom Linebery | Bill Roden | 2/10/1966 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 214 | 527 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX048A | J. Winston Smith | Atlantic Richfield Company | 3/16/1987 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 370 | 302 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX048B | William S. Scarborough | Atlantic Richfield Company | 3/16/1987 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 370 | 750 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX048C | William S. Scarborough & William Francis Scarborough, Co-Trustees of the Estate of W. F. Scarborough, Deceased | Atlantic Richfield Company | 3/16/1987 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 370 | 758 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX048D | Deborah Scarborough Cleveland & Audrey Scarborough, Co-Trustees | Atlantic Richfield Company | 3/16/1987 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 370 | 766 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX048E | The Scarborough Foundation & Evelyn Linebery | Atlantic Richfield Company | 3/16/1987 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 371 | 531 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX048F | Winston R. Smith, Trustee for J. Winston Smith Trust | Atlantic Richfield Company | 3/16/1987 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 371 | 523 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX048G | Marie M. Rooney, Trustee for the Scarborough-Rooney Trust | Atlantic Richfield Company | 3/16/1987 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 371 | 515 |
| Tubb 1 Unit #1, #2, #3, #4 | 300TX048H | Texas Commerce Bank, El Paso, N. A., Trustee for the Esther S. Collier Trust, et al | Atlantic Richfield Company | 3/16/1987 | | Part of Section 2, Block WF, Scrap File 13022, Winkler County, Texas | 371 | 539 |
| Tubb 9 Units 1 & 2 | 190TX04B | Carrye Cowden Payton, et al | Sinclair Oil & Gas Company | 9/8/1965 | | SW/4 and S/2 SE/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 212 | 83 |
| Tubb 9 Units 1 & 2 | 300TX032 | Lela Cowden Brownlee, et vir | Roy E. Kimsey | 2/3/1964 | | N/2 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 200 | 278 |
| Tubb 9 Units 1 & 2 | 300TX033 | T. H. Neel and the First National Bank of Fort Worth, Independent Executors U/W/O J. B. Tubb, deceased | Roy E. Kimsey | 2/18/1964 | | N/2, SE/4 and SW/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 201 | 133 |
| Tubb 9 Units 1 & 2 | 300TX034 | Carrye Cowden Payton | Roy E. Kimsey | 2/3/1964 | | N/2 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 200 | 283 |
| Tubb 9 Units 1 & 2 | 300TX035 | Citizens National Bank in Abilene, Texas | Roy E. Kimsey | 2/3/1964 | | N/2, SE/4 and SW/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 200 | 299 |
| Tubb 9 Units 1 & 2 | 300TX037 | Paralee Manly Hays, et vir | Roy E. Kimsey | 2/3/1964 | | N/2 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 200 | 279 |
| Tubb 9 Units 1 & 2 | 300TX038 | Birdie Cowden Spaulding | Roy E. Kimsey | 2/3/1964 | | N/2 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 200 | 281 |
| Tubb 9 Units 1 & 2 | 300TX039 | Carrye Cowden Spaulding | Roy E. Kimsey | 7/9/1965 | | N/2 SE/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 210 | 212 |
| Tubb 9 Units 1 & 2 | 300TX040 | Parole Manly Hays, et vir | Roy E. Kimsey | 7/9/1965 | | N/2 SE/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 210 | 208 |
| Tubb 9 Units 1 & 2 | 300TX041 | Birdie Cowden Spaulding | Roy E. Kimsey | 7/9/1965 | | N/2 SE/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 210 | 210 |
| Tubb 9 Units 1 & 2 | 300TX042 | Lela Cowden Brownlee, et vir | Roy E. Kimsey | 7/9/1965 | | N/2 SE/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 210 | 206 |
| Tubb 9 Units 1 & 2 | 300TX043 | Foster Petroleum Corporation | Marjorie M. Weaver | 10/4/1965 | | SW/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 211 | 533 |
| Tubb 9 Units 1 & 2 | 300TX036 | Cities Service Oil Company | Atlantic Richfield Company | 11/8/1973 | | SW/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 273 | 171 |
| Tubb 9 Units 1 & 2 | Mineral Deed | Sunrise Energy Partners, Ltd VI. A Limited Partnership | Crittenden Corporation | 8/13/1996 | | SW/4 of Section 9, Block 74, PSL Survey, Winkler County, Texas | 439 | 82 |
| Tubb Estate 21 Units 1 & 2 | 190TX002A | InterFirst Ft. Worth (Tubb) | Lee House | 9/30/1982 | 9/30/1985 | All of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 320 | 295 |
| Tubb Estate 21 Units 1 & 2 | 190TX003A | InterFirst Abilene | Heritage Resources, Inc. | 4/23/1984 | 10/15/1986 | All of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 339 | 576 |

| Well | Lease Number | Lessor | Lessee | Lease Date | Expiration Date | Description | Book | Page |
|------|--------------|--------|--------|------------|-----------------|-------------|------|------|
| Tubb Estate 21 Units 1 & 2 | 190TX004A | Mbank Ft. Worth (McGinley Trust) | Heritage Resources, Inc. | 11/2/1984 | 7/7/1986 | SE/4 of Section 21, Block C-23, PSL Survey, to a depth of 19,018', Winkler County, Texas | 343 | 309 |
| Tubb Estate 21 Units 1 & 2 | 190TX004B | Carrye Cowden Payton, et al | Sinclair Oil and Gas Company | 9/8/1965 | 9/8/1975 | SE/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 212 | 83 |
| Tubb Estate 21 Units 1 & 2 | 190TX005A | Paralee Payton McMahon | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 84 |
| Tubb Estate 21 Units 1 & 2 | 190TX005B | Evelyn Harrison | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 90 |
| Tubb Estate 21 Units 1 & 2 | 190TX005C | Beth Brownlee | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 96 |
| Tubb Estate 21 Units 1 & 2 | 190TX005D | Annie Welch | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 102 |
| Tubb Estate 21 Units 1 & 2 | 190TX005F | Jake Harrison (AIF - Michael Harrison) | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 399 |
| Tubb Estate 21 Units 1 & 2 | 190TX005G | Patricia Crocker | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 114 |
| Tubb Estate 21 Units 1 & 2 | 190TX005H | InterFirst Abilene (AIF - Brownlee) | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 120 |
| Tubb Estate 21 Units 1 & 2 | 190TX005I | Ann Lankford | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 126 |
| Tubb Estate 21 Units 1 & 2 | 190TX005J | Ellen Brownlee | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 132 |
| Tubb Estate 21 Units 1 & 2 | 190TX005K | Marvin Welch | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 138 |
| Tubb Estate 21 Units 1 & 2 | 190TX005L | Ann Gray | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 144 |
| Tubb Estate 21 Units 1 & 2 | 190TX005M | Susan Barker-Benfield | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 150 |
| Tubb Estate 21 Units 1 & 2 | 190TX005N | Linda Richey | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 156 |
| Tubb Estate 21 Units 1 & 2 | 190TX005P | Paralee Hays | Lee House | 4/22/1982 | 1/24/1986 | SW/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 330 | 108 |
| Tubb Estate 21 Units 1 & 2 | 190TX013A | Paralee McMahon | Heritage Resources, Inc. | 3/12/1984 | 3/12/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 775 |
| Tubb Estate 21 Units 1 & 2 | 190TX013B | Ellen Roberts | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 797 |
| Tubb Estate 21 Units 1 & 2 | 190TX013C | InterFirst Abilene (AIF - Lela Brownlee | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 773 |
| Tubb Estate 21 Units 1 & 2 | 190TX013D | Ann Lankford | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 781 |
| Tubb Estate 21 Units 1 & 2 | 190TX013F | Susan Barker-Benfield | Heritage Resources, Inc. | 3/12/1984 | 3/12/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 339 | 128 |
| Tubb Estate 21 Units 1 & 2 | 190TX013G | Patricia Crocker | Heritage Resources, Inc. | 3/12/1984 | 3/12/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 799 |
| Tubb Estate 21 Units 1 & 2 | 190TX013H | Paralee Hays | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 339 | 126 |
| Tubb Estate 21 Units 1 & 2 | 190TX013I | Annie Welch | Heritage Resources, Inc. | 3/15/1984 | 3/15/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 805 |
| Tubb Estate 21 Units 1 & 2 | 190TX013J | Evelyn Harrison | Heritage Resources, Inc. | 3/15/1984 | 3/15/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 803 |
| Tubb Estate 21 Units 1 & 2 | 190TX013K | Beth Brownlee | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 783 |
| Tubb Estate 21 Units 1 & 2 | 190TX014A | Jake Harrison (AIF - Michael Harrison) | Heritage Resources, Inc. | 3/15/1984 | 3/15/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 801 |
| Tubb Estate 21 Units 1 & 2 | 190TX014B | Marvin Welch | Heritage Resources, Inc. | 3/15/1984 | 3/15/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 338 | 795 |
| Tubb Estate 21 Units 1 & 2 | 190TX014C | Ann Gray | Heritage Resources, Inc. | 3/15/1984 | 3/15/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 339 | 366 |
| Tubb Estate 21 Units 1 & 2 | 190TX014D | Linda Richey | Heritage Resources, Inc. | 3/15/1984 | 3/15/1987 | N/2 of Section 21, Block C-23, PSL Survey, Winkler County, Texas | 339 | 364 |
| Tubb Estate 21 Units 1 & 2 | 190TX015A | George Bristol | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | SE/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 338 | 528 |
| Tubb Estate 21 Units 1 & 2 | 190TX015B | Frederick Bristol | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | SE/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 338 | 531 |
| Tubb Estate 21 Units 1 & 2 | 190TX015C | Edwin Reynolds | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | SE/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 338 | 534 |
| Tubb Estate 21 Units 1 & 2 | 190TX015D | Marjorie Huszagh | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | SE/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 338 | 537 |
| Tubb Estate 21 Units 1 & 2 | 190TX015E | Dorothea W. Huszagh | Heritage Resources, Inc. | 8/7/1984 | 8/7/1987 | SE/4 of Section 21, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 353 | 557 |
| Tubb Estate 21 Units 1 & 2 | Assignment of Mineral Interests | Amarillo National Bank | Michael B. Wisenbaker as Agent | 5/12/1995 | | Section 21, Block C-23, PSL Survey, Winkler County, Texas | 428 | 136 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX011A | Clarence Cowden | Gary W. Whitlow | 2/6/1984 | | All of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 338 | 771 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX011B | Gulf Oil | Heritage Resources, Inc. | 1/10/1985 | | All of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to the base of the Fusselman Formation | 349 | 34 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX011C | Helen Cowden Buzbee, et vir | Atlantic Richfield Company | 10/3/1983 | | All of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 335 | 716 |

| Well | Lease Number | Lessor | Lessee | Lease Date | Expiration Date | Description | Book | Page |
|---|---|---|---|---|---|---|---|---|
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX011D | Interfirst Bank of Abilene | Atlantic Richfield Company | 11/22/1983 | | SE/4, SW/4 and NW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 336 | 817 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012A | Marjorie Weaver | Heritage Resources, Inc. | 5/24/1984 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 339 | 821 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012B | Mercantile Bank (Wolferman) | Heritage Resources, Inc. | 10/30/1984 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 343 | 868 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012C | Southland Royalty | Heritage Resources, Inc. | 6/19/1985 | | E/2 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,333' | 351 | 78 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012D | Cities Service Oil and Gas Corporation | Heritage Resources, Inc. | 6/17/1985 | | NW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,300' | 352 | 30 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012E | Doyle W. Cotton, Trustee | Heritage Resources, Inc. | 6/1/1985 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 354 | 93 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012F | Houston Royalty Company | Marjorie M. Weaver | 12/15/1965 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 214 | 393 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012G | Elsa Janet Vette, et vir | Atlantic Richfield Company | 10/7/1983 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 335 | 812 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012H | Luellen Clifton | Atlantic Richfield Company | 10/17/1983 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 335 | 791 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012I | First National Bank of Kansas City, Trustee | Atlantic Richfield Company | 10/28/1983 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 336 | 470 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012J | Mabel Buchanan | Atlantic Richfield Company | 12/20/1983 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 337 | 384 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX012K | Mabel C. Buchanan, Individually and Co-Executrix | Atlantic Richfield Company | 1/25/1984 | | NE/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 338 | 317 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX015A | George Bristol | Heritage Resources, Inc. | 3/9/1984 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 338 | 528 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX015B | Frederick Bristol | Heritage Resources, Inc. | 3/9/1984 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 338 | 531 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX015C | Edwin Reynolds | Heritage Resources, Inc. | 3/9/1984 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 338 | 534 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX015D | Marjorie Huszagh | Heritage Resources, Inc. | 3/9/1984 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 338 | 537 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX015E | Dorothea W. Huszagh | Heritage Resources, Inc. | 8/7/1984 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,806' | 353 | 557 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX015F | Charles B. Renaud | Heritage Resources, Inc. | 9/26/1986 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 362 | 320 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX017A | Interfirst Ft. Worth - Tubb Estate | Heritage Resources, Inc. | 4/6/1984 | | Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 20,012' | 339 | 332 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX017C | Caroline H. Schoellkopf and Loyd B. Sands | Heritage Resources, Inc. | 8/20/1986 | | Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,400' | 361 | 673 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX018A | Lennon & Interfirst | Heritage Resources, Inc. | 5/24/1984 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,400' | 340 | 200 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX018B | Louise Sylvia Allen, Individually and as Independent Executrix | Atlantic Richfield Company | 10/3/1983 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 335 | 701 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX018C | James Y. Phillips | Atlantic Richfield Company | 12/9/1983 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 336 | 815 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX018D | James Olcott Phillips, Individually and as Independent Executor | Atlantic Richfield Company | 11/30/1983 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 336 | 819 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX018E | David A. Phillips | Atlantic Richfield Company | 11/30/1983 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 337 | 32 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX018F | Texas American Bank/Trustee for Renaud Mineral Trust dated 08/30/85 | John W. B. Northington | 3/18/1986 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,164' | 357 | 230 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX018G | Texas American Bank, Ft. Worth, N.A., Trustee of the Bertha R. Koch Trust | John W. B. Northington | 3/18/1986 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 19,174' | 357 | 233 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX020A | Shannon, et al | Heritage Resources, Inc. | 8/31/1984 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 20,012' | 342 | 417 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | 190TX020B | M. M. Trammell | Heritage Resources, Inc. | 8/31/1984 | | SW/4 of Section 22, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 20,012' | 342 | 419 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | Mineral Deed | Southland Royalty Company | Crittendon Acquisition Company, et al | 6/23/1987 | | E/2 of Section 22, Block C-23, PSL Survey Winkler County, Texas | 369 | 24 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | Mineral Deed | Doyle W. Cotton, Jr. Trustee of the D.W.C. Trust dated 6/15/77 | Michael B. Wisenbaker | 1/3/1989 | | NE/4 Section 22, Block C-23, PSL Survey, Winkler County, Texas | 382 | 874 |

| Well | Lease Number | Lessor | Lessee | Lease Date | Expiration Date | Description | Book | Page |
|------|-------------|--------|--------|-----------|-----------------|-------------|------|------|
| Tubb Estate 22 - Units #1,#2,#3,#1R | Mineral Deed | C.J. Donally, Jr. as a Trustee of the Margaret Hunt Hill- Albert G. Hill III Trust, et al | Crittendon Corporation | 2/14/1995 | | All of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 426 | 444 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | Mineral Deed | Lyda Hill | Crittendon Corporation | 2/20/1995 | | All of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 426 | 456 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | | PT Investments | Headwaters Oil Company | 9/13/1984 | | All of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 343 | 6 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | Assignment of Mineral Interests | Amarillo National Bank | Michael B. Wizenbaker as Agent | 5/12/1995 | | Section 22, Block C-23, PSL Survey, Winkler County, Texas | 428 | 136 |
| Tubb Estate 22 - Units #1,#2,#3,#1R | Mineral Deed | U.S. Financial Corporation | Crittendon Corporation | 2/13/1995 | | All of Section 22, Block C-23, PSL Survey, Winkler County, Texas | 426 | 442 |
| Tubb Estate 25 - Units #1,#2, & #3 | 190TX04B | Carrye C. Payton, et al | Sinclair Oil & Gas Company | 9/8/1965 | | Section 25, Block C-23, PSL Survey, Winkler County, Texas | 212 | 83 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX014 | T. H. Neel and the First National Bank of Fort Worth, Independent Executors U/W/O J. B. Tubb, deceased | Roy E. Kimsey, Jr. | 2/18/1964 | | Section 25, Block C-23, PSL Survey, Winkler County, Texas | 201 | 127 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX015 | Citizens National Bank Abilene | Roy E. Kimsey, Jr. | 2/3/1964 | | Section 25, Block C-23, PSL Survey, Winkler County, Texas | 200/204 | 305/509 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX016 | Olive S. Molumphy, et vir | Marjorie M. Weaver | 1/11/1966 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 214 | 385 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX018 | Grace P. Lybrand | Marjorie M. Weaver | 12/3/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 213 | 437 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX019 | Frances G. Snyder | Marjorie M. Weaver | 1/11/1966 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 214 | 271 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX020 | Fay B. Brown | Marjorie M. Weaver | 1/11/1966 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 215 | 355 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX021 | Joseph M. Barnhill | Marjorie M. Weaver | 1/11/1966 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 215 | 357 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX022 | Marjorie O. Hopewell | Marjorie M. Weaver | 12/3/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 213 | 363 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX023 | M.M. Pfeifer, et vir | Marjorie M. Weaver | 9/21/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 481 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX024 | Hilda S. Perrine | Marjorie M. Weaver | 9/27/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 565 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX025 | Cleo R. Hill, et vir | Marjorie M. Weaver | 9/23/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 549 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX044 | Buttram Texhoma Co. | Marjorie M. Weaver | 9/16/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 475 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX045 | Louise L. Dunnam, et vir | Marjorie M. Weaver | 8/25/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 243 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX046 | Foster Petroleum Corporation | Marjorie M. Weaver | 10/4/1965 | | SW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 555 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX014A | Cities Service Oil Company | Caroline Hunt Trust Estate | 2/10/1968 | | SW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 232 | 446 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX017 | H. G. Banks, et ux | Marjorie M. Weaver | 12/3/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 213 | 359 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX027 | M. L. McLain | Marjorie M. Weaver | 9/21/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 479 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX028 | Fred P. Myers, et al | Marjorie M. Weaver | 11/3/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 212 | 434 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX047 | Mary M. Fox | Marjorie M. Weaver | 9/21/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 571 |
| Tubb Estate 25 - Units #1,#2, & #3 | 300TX026 | M. W. McLain | Marjorie M. Weaver | 9/21/1965 | | NW/4 Section 25, Block C-23, PSL Survey, Winkler County, Texas | 211 | 477 |
| Tubb Estate 23 - Unit #1 | 190TX013A | Paralee McMahon | Heritage Resources, Inc. | 3/12/1984 | 3/12/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 338 | 775 |
| Tubb Estate 23 - Unit #1 | 190TX013B | Ellen Roberts | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 338 | 797 |
| Tubb Estate 23 - Unit #1 | 190TX013C | InterFirst Abilene | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 338 | 773 |
| Tubb Estate 23 - Unit #1 | 190TX013D | Ann Lankford | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 338 | 781 |
| Tubb Estate 23 - Unit #1 | 190TX013F | Susan Barker-Benfield | Heritage Resources, Inc. | 3/12/1984 | 3/12/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 339 | 128 |
| Tubb Estate 23 - Unit #1 | 190TX013G | Patricia Crocker | Heritage Resources, Inc. | 3/12/1984 | 3/12/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 338 | 799 |
| Tubb Estate 23 - Unit #1 | 190TX013H | Paralee Hays | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 339 | 126 |
| Tubb Estate 23 - Unit #1 | 190TX013I | Annie Welch | Heritage Resources, Inc. | 3/15/1984 | 3/15/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 338 | 805 |
| Tubb Estate 23 - Unit #1 | 190TX013J | Evelyn Harrison | Heritage Resources, Inc. | 3/15/1984 | 3/15/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 338 | 803 |
| Tubb Estate 23 - Unit #1 | 190TX013K | Beth Brownlee | Heritage Resources, Inc. | 3/9/1984 | 3/9/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 338 | 783 |
| Tubb Estate 23 - Unit #1 | 190TX016A | Katherine LeBlond | Heritage Resources, Inc. | 3/20/1984 | 3/20/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 339 | 132 |
| Tubb Estate 23 - Unit #1 | 190TX016B | Interfirst Bank | Heritage Resources, Inc. | 3/26/1984 | 3/26/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 339 | 130 |
| Tubb Estate 23 - Unit #1 | 190TX016C | Roy E. Kimsey, Jr. | Heritage Resources, Inc. | 2/4/1986 | 8/4/1986 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 355 | 134 |
| Tubb Estate 23 - Unit #1 | 190TX016D | John H. Healey | Heritage Resources, Inc. | 2/10/1986 | 8/10/1986 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 355 | 132 |
| Tubb Estate 23 - Unit #1 | 190TX016E | Lee Caldwell | Heritage Resources, Inc. | 2/6/1986 | 2/6/1987 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 355 | 127 |
| Tubb Estate 23 - Unit #1 | 190TX016F | A. G. Hill, et al | Heritage Resources, Inc. | 3/12/1986 | 7/12/1986 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 14,497' | 356 | 647 |

| Well | Lease Number | Lessor | Lessee | Lease Date | Expiration Date | Description | Book | Page |
|------|-------------|--------|--------|-----------|-----------------|-------------|------|------|
| Tubb Estate 23 - Unit #1 | 190TX016G | Frontier Fuels, Inc. | Heritage Resources, Inc. | 1/23/1986 | 1/23/1987 | SE/4 of Section 23, Block C-23, PSL Survey, Winkler County, Texas, from a depth of 13,800' to a depth of 14,650' | 359 | 212 |
| Tubb Estate 23 - Unit #1 | 190TX016H | W. H. Hunt Trust Estate (Paul A. Hope, Trustee) | Heritage Resources, Inc. | 2/9/1986 | 8/9/1986 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 14,497' | 359 | 877 |
| Tubb Estate 23 - Unit #1 | 190TX016I | Charles B. Renaud | Heritage Resources, Inc. | 9/26/1986 | 9/26/1989 | SE/4 of Section 23, Block C-23, PSL Survey, Winkler County, Texas | 362 | 318 |
| Tubb Estate 23 - Unit #1 | 190TX016J | Anardarko Petroleum Corp. | Heritage Resources, Inc. | 9/19/1986 | 6/19/1987 | SE/4 of Section 23, Block C-23, PSL Survey, Winkler County, Texas, from a depth of 13,385' to a depth of 14,750' | 363/366 | 52/888 |
| Tubb Estate 23 - Unit #1 | 190TX017A | Interfirst Ft. Worth (Tubb) | Heritage Resources, Inc. | 4/6/1984 | 4/6/1985 | All of Section 23, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 14,447' | 339 | 332 |
| Tubb Estate 23 - Unit #1 | 190TX018A | Lennon & Interfirst | Heritage Resources, Inc. | 5/24/1984 | 5/24/1987 | SE/4 of Section 23, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 14,750' | 340 | 200 |
| Tubb Estate 23 - Unit #1 | 190TX018F | Texas American Bank/Trustee for Renaud Mineral Trust dated 08/30/85 | John W.B. Northington | 3/18/1986 | 3/18/1987 | SE/4 of Section 23, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 14,497' | 357 | 230 |
| Tubb Estate 23 - Unit #1 | 190TX018G | Texas American Bank/Ft. Worth, N.A., Trustee of the Bertha R. Koch Trust | John W.B. Northington | 3/18/1986 | 3/18/1987 | SE/4 of Section 23, Block C-23, PSL Survey, Winkler County, Texas, to a depth of 14,497' | 357 | 233 |
| Tubb Estate 23 - Unit #1 | Assignment of Mineral Interests | Amarillo National Bank | Michael B. Wisenbaker as Agent | 5/12/1995 | | Section 23, Block C-23, PSL Survey, Winkler County, Texas | 428 | 136 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 190TX004B | Carrye Cowden Payton, et al | Sinclair Oil & Gas Company | 9/8/1965 | | SE/4 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 212 | 83 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 190TX004C | Lydia P. Cowden, et al | B. H. Grube | 5/13/1946 | | SW/4 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 87 | 474 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 300TX012 | T. H. Neel and the First National Bank of Fort Worth, Independent Executors U/W/O J. B. Tubb, deceased | Roy E. Kimsey, Jr. | 2/18/1964 | | N/2 and S/2 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 201 | 131 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 300TX013 | Cities Service Oil Company | Caroline Hunt Trust Estate | 2/10/1968 | | SW/4 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 232 | 443 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 300TX013A | The Citizens National Bank in Abilene | Roy E. Kimsey, Jr. | 2/3/1964 | | N/2 and S/2 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 200 | 301 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 300TX032 | Lela Cowden Brownlee, et vir | Roy E. Kimsey, Jr. | 2/3/1964 | | N/2 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 200 | 278 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 300TX034 | Carrye Cowden Payton | Roy E. Kimsey, Jr. | 2/3/1964 | | N/2 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 200 | 283 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 300TX037 | Paralee Manly Hays, et vir | Roy E. Kimsey, Jr. | 2/3/1964 | | N/2 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 200 | 279 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | 300TX38 | Birdie Cowden Spaulding | Roy E. Kimsey | 02/0/64 | | N/2 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 200 | 281 |
| Wolfe Units #1,#2,#4,#5,#6,#7,#8 | Mineral Deed | Southland Royalty Company | Crittendon Acquisition Company, et al | 6/23/1987 | | SE/4 of Section 24, Block C-23, PSL Survey, Winkler County, Texas | 369 | 24 |
| Tubb Estates 2 - Unit 1 | 190TX002A | InterFirst Bank Ft. Worth (Tubb) | Lee House | 9/30/1982 | | All of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 74L | 245L |
| Tubb Estates 2 - Unit 1 | 190TX004B | Carrye C. Payton | Sinclair Oil & Gas Company | 9/8/1965 | | NE/4, SW/4, S/2 SE/4 and E/3 NW/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 212 | 83 |
| Tubb Estates 2 - Unit 1 | 190TX004C | Lydia P. Cowden, et al | B. H. Grube | 5/13/1946 | | NE/4, SW/4, S/2 SE/4 and E/3 NW/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 87 | 474 |
| Tubb Estates 2 - Unit 1 | 190TX007A | Beth Brownlee | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 556W/250L |
| Tubb Estates 2 - Unit 1 | 190TX007B | Paralee P. McMahon | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 550W/257L |
| Tubb Estates 2 - Unit 1 | 190TX007C | Paralee M. Hays | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 544W/264L |
| Tubb Estates 2 - Unit 1 | 190TX007D | Patricia M. Crocker | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 538W/271L |
| Tubb Estates 2 - Unit 1 | 190TX007F | Jake H. Harrison (AIF - Michael Harrison) | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 526W/285L |
| Tubb Estates 2 - Unit 1 | 190TX007G | Ann B. Lankford | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 520W/292L |
| Tubb Estates 2 - Unit 1 | 190TX007H | Ellen Brownlee Roberts | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 514W/299L |
| Tubb Estates 2 - Unit 1 | 190TX007I | Marvin L. Welch | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 508W/306L |
| Tubb Estates 2 - Unit 1 | 190TX007J | Ann W. Gray | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 502W/313L |
| Tubb Estates 2 - Unit 1 | 190TX007K | Susan M. Barker-Benfield | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/74L | 496W/320L |

| Well | Lease Number | Lessor | Lessee | Lease Date | Expiration Date | Description | Book | Page |
|---|---|---|---|---|---|---|---|---|
| Tubb Estates 2 - Unit 1 | 190TX007L | Linda H. Richey | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/741L | 490W/327 |
| Tubb Estates 2 - Unit 1 | 190TX007M | K. M. LeBlond | Heritage Resources, Inc. | 3/26/1984 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 339W/741L | 328W/711 |
| Tubb Estates 2 - Unit 1 | 190TX007N | Roy E. Kimsey, Jr. | Heritage Resources, Inc. | 5/2/1984 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 339W/741L | 617W/713 |
| Tubb Estates 2 - Unit 1 | 190TX007P | Lee Caldwell | Heritage Resources, Inc. | 5/2/1984 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 339W/741L | 619W/715 |
| Tubb Estates 2 - Unit 1 | 190TX007Q | John H. Healey | Heritage Resources, Inc. | 5/2/1984 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 339W/741L | 621W/717 |
| Tubb Estates 2 - Unit 1 | 190TX007R | InterFirst Bank (AIF - Lela Brownlee) | Lee House | 5/3/1982 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 331W/741L | 532W/278 |
| Tubb Estates 2 - Unit 1 | 190TX007S | W. H. Hunt Trust | Heritage Resources, Inc. | 7/20/1984 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 341W/741L | 393W/334 |
| Tubb Estates 2 - Unit 1 | 190TX008A | Elliott Davis, et al | Wisenbaker Production Company | 3/7/1988 | | W/2 NW/4 and N/2 SE/4 of Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 377W/831L | 382W/350 |
| Tubb Estates 2 - Unit 1 | 190TX008B | Elliott Davis, et al | Wisenbaker Production Company | 7/29/1982 | | Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas, from surface to the base of the Pennsylvanian Formation | 341W/641L | 539W/424 |
| Tubb Estates 2 - Unit 1 | 190TX008C | InterFirst Bank Abilene | Heritage Resources, Inc. | 2/13/1984 | | Section 2, Block C-24, PSL Survey, Winkler and Loving Counties, Texas | 337W/741L | 905W/679 |
| Mexico "P" Federal #1 | 120NM01 | The United States of America | Zonetta Dorland | 10/1/1963 | | W/2, W/2 E/2 and NE/4 NE/4 Section 21, Township 26 South, Range 35 East, N.M.P.M., Lea County, New Mexico | 227 | 250 |
| Mexico "P" Federal #1 | | The United States of America | Heritage Standard Corporation | 6/1/2002 | | SE/4SE/4 and E/2SE/4 Section 21, Township 26 South, Range 35 East, N.M.P.M., Lea County, New Mexico | 1196 | 708 |

# EXHIBIT A-1(b)
## Wells
## Winkler County, Texas

### *SECTION SIX WELLS*

### A.G. HILL #1 WELL
### (Before Payout Interests)

Location:                    Section 6, Block 74, Winkler County, Texas

Working Interest:       .79250000

Net Revenue Interest:        .59437500

### PAT HOWELL #1 WELL

Location:                    Section 6, Block 74, Winkler County, Texas

Working Interest:       .81250000

Net Revenue Interest:        .60937500

## EXHIBIT A-2(b)
## Wells
## Winkler and Loving Counties, Texas

### *NON- SECTION SIX WELLS*

### TUBB ESTATE 1-75

| | |
|---|---|
| Location: | Section 1, Block 75, Winkler County, Texas |
| Working Interest: | .52137040 |
| Net Revenue Interest: | .40769046 |

### TUBB 1 UNIT 1
### (Before Payout Interests)

| | |
|---|---|
| Location: | Section 1, Block C-24, Winkler County, Texas |
| Working Interest: | .43902300 |
| Net Revenue Interest: | .32974738 |
| Overriding Royalty Interest: | .03447237 |

### TUBB UNIT 2

| | |
|---|---|
| Location: | Section 1, Block C-24, Winkler County, Texas |
| Working Interest: | .61538450 |
| Net Revenue Interest: | .[_____] |

### TUBB UNIT 3

| | |
|---|---|
| Location: | Section 1, Block C-24, Winkler County, Texas |
| Working Interest: | .76178020 |
| Net Revenue Interest: | .47014510 |
| Overriding Royalty Interest: | .00500824 |

### TUBB UNIT 4

| | |
|---|---|
| Location: | Section 1, Block C-24, Winkler County, Texas |
| Working Interest: | .[_____] |
| Net Revenue Interest: | .[_____] |

{00088528.1}1

# EXHIBIT A-2(b)
## Wells
## Winkler and Loving Counties, Texas

### TUBB ESTATE 1-2

| | |
|---|---|
| Location: | Section 2, Block C-24, Winkler County, Texas |
| Working Interest: | .32035340 |
| Net Revenue Interest: | .24367000 |
| Royalty Interest: | .00244140 |
| Overriding Royalty Interest: | .01133333 |

### TUBB 9 UNIT 1

| | |
|---|---|
| Location: | Section 9, Block 74, Winkler County, Texas |
| Working Interest: | .46002810 |
| Net Revenue Interest: | .34864624 |
| Royalty Interest: | .00520833 |
| Overriding Royalty Interest: | .02573194 |

### TUBB 9 UNIT 2
### (Before Payout Interests)

| | |
|---|---|
| Location: | Section 9, Block 74, Winkler County, Texas |
| Working Interest: | .66856820 |
| Net Revenue Interest: | .56707949 |
| Royalty Interest : | .02083333 |

### TUBB ESTATE 1-21

| | |
|---|---|
| Location: | Section 21, Block C-23, Winkler County, Texas |
| Working Interest: | .54314870 |
| Net Revenue Interest: | .38445416 |
| Royalty Interest: | .00015129 |
| Overriding Royalty Interest: | .01698488 |

## EXHIBIT A-2(b)
### Wells
### Winkler and Loving Counties, Texas

#### TUBB ESTATE 2-21
#### (Before Payout Interests)

| | |
|---|---|
| Location: | Section 21, Block C-23, Winkler County, Texas |
| Working Interest: | .82883150 |
| Net Revenue Interest: | .60926349 |
| Overriding Royalty Interest: | .00200000 |

#### TUBB ESTATE 1-22
#### (Before Payout Interests)

| | |
|---|---|
| Location: | Section 22, Block C-23, Winkler County, Texas |
| Working Interest: | .79456000 |
| Net Revenue Interest: | .57145444 |
| Royalty Interest: | .01436362 |
| Overriding Royalty Interest: | .00525574 |

#### TUBB 22 UNIT 1R
#### (Before Payout Interests)

| | |
|---|---|
| Location: | Section 22, Block C-23, Winkler County, Texas |
| Working Interest: | .78262240 |
| Net Revenue Interest: | .57191524 |
| Royalty Interest: | .04101563 |
| Overriding Royalty Interest: | .00539367 |

#### TUBB ESTATE 22-2
#### (Before Payout Interests)

| | |
|---|---|
| Location: | Section 22, Block C-23, Winkler County, Texas |
| Working Interest: | .67201570 |
| Net Revenue Interest: | .49322037 |
| Royalty Interest: | .04101562 |
| Overriding Royalty Interest | .00226452 |

{00088528.1}3

## EXHIBIT A-2(b)
### Wells
### Winkler and Loving Counties, Texas

#### TUBB ESTATE 22-3

| | |
|---|---|
| Location: | Section 22, Block C-23, Winkler County, Texas |
| Working Interest: | .67844300 |
| Net Revenue Interest: | .48177409 |
| Royalty Interest: | .09520264 |
| Overriding Royalty Interest: | .00691996 |

#### TUBB 23 UNIT 1R

| | |
|---|---|
| Location: | Section 23, Block C-23, Winkler County, Texas |
| Working Interest: | .81854140 |
| Net Revenue Interest: | .60414037 |
| Royalty Interest: | .00234250 |
| Overriding Royalty Interest: | .00200000 |

#### TUBB ESTATE 1-23

| | |
|---|---|
| Location: | Section 23, Block C-23, Winkler County, Texas |
| Working Interest: | .62508890 |
| Net Revenue Interest: | .46812828 |
| Overriding Royalty Interest: | .00200000 |

#### WOLFE UNIT 1

| | |
|---|---|
| Location: | Section 24, Block C-23, Winkler County, Texas |
| Working Interest: | .47406050 |
| Net Revenue Interest: | .38608412 |
| Royalty Interest: | .01673542 |

{00088528.1}4

## EXHIBIT A-2(b)
### Wells
### Winkler and Loving Counties, Texas

#### WOLFE UNIT 2

| | |
|---|---|
| Location: | Section 24, Block C-23, Winkler County, Texas |
| Working Interest: | .61749300 |
| Net Revenue Interest: | .49067731 |
| Overriding Royalty Interest: | .00520459 |

#### WOLFE UNIT 3

| | |
|---|---|
| Location: | Section 24, Block C-23, Winkler County, Texas |
| Working Interest: | .45768990 |
| Net Revenue Interest: | .34375268 |
| Royalty Interest: | .02039342 |
| Overriding Royalty Interest: | .00328490 |

#### WOLFE UNIT 4

| | |
|---|---|
| Location: | Section 24, Block C-23, Winkler County, Texas |
| Working Interest: | .62741650 |
| Net Revenue Interest: | .50000000 |
| Overriding Royalty Interest: | .00520459 |

#### WOLFE UNIT 5

| | |
|---|---|
| Location: | Section 24, Block C-23, Winkler County, Texas |
| Working Interest: | .66491690 |
| Net Revenue Interest: | .51196278 |
| Royalty Interest: | .07031250 |
| Overriding Royalty Interest: | .00520459 |

### WOLFE UNIT 6

| | |
|---|---|
| Location: | Section 24, Block C-23, Winkler County, Texas |
| Working Interest: | .67476430 |
| Net Revenue Interest: | .53946278 |
| Overriding Royalty Interest: | .00520459 |

### WOLFE UNIT 7

| | |
|---|---|
| Location: | Section 24, Block C-23, Winkler County, Texas |
| Working Interest: | .74600640 |
| Net Revenue Interest: | .58545013 |
| Overriding Royalty Interest: | .00375990 |

### WOLFE UNIT 8

| | |
|---|---|
| Location: | Section 24, Block C-23, Winkler County, Texas |
| Working Interest: | .63376662 |
| Net Revenue Interest: | .[_____] |

### TUBB ESTATE 1 (SEC 25)
### (Before Payout Interests)

| | |
|---|---|
| Location: | Section 25, Block C-23, Winkler County, Texas |
| Working Interest: | .63636960 |
| Net Revenue Interest: | .51880071 |

### TUBB ESTATE 2 (SEC 25)

| | |
|---|---|
| Location: | Section 25, Block C-23, Winkler County, Texas |
| Working Interest: | .46429790 |
| Net Revenue Interest: | .38046994 |

# EXHIBIT A-2(b)
## Wells
## Winkler and Loving Counties, Texas

### TUBB ESTATE 3 (SEC 25)
### (Before Payout Interests)

Location:                                    Section 25, Block C-23, Winkler County, Texas

Working Interest:           .85781050

Net Revenue Interest:             .69842955

### MEXICO "P" FEDERAL 1

Location:                                    Section 21, Township 26 South, Range 35 East,
                                             N.M.P.M., Lea County, New Mexico

Working Interest:           .95725870

Net Revenue Interest:             .76098441

Overriding Royalty Interest:      .00500000

{00088528.1}7

## Schedule 2(b)(iv)

### Excluded Items

(a)  The surface lease dated May 15, 1975 initially by and between the City of Midland and Atlantic Richfield Company for the Crittendon Gas Plant together with all physical plant equipment, compressors, machinery, parts, tools, furniture, and improvements located in or on the leased property.

(b)  The following salt water disposal wells and remediation wells, together with any liability arising out of a Claim associated with those wells, the related facilities and equipment, or the operation thereof, to-wit:

   i)    Tubb 2 Unit #1 Well, in Section 2, Block 24-C, Winkler County, Texas;

   ii)   J.B. Tubb 1-A, remediation well, in Section 24, Block 23-C, Winkler County, Texas;

   iii)  HRW-1 recovery (remediation) well, in Section 24, Block 23-C, Winkler County, Texas; and

   iv)   HRW-2 recovery (remediation) well, in Section 24, Block 23-C, Winkler County, Texas.

   Parties shall agree to the appropriate form and structure of exclusion of these wells and dealing with the remediation obligations for which these wells are being used in agreements between the parties on mutually acceptable terms.

(c)  All wells and/or wellbores not within the boundaries of Properties conveyed in Sections 21, 22, 23, 24, 25, Block C-23; Sections 1 and 2, Block C-24; Sections 6 and 9, Block 74; Section 1, Block 75; all Public School Land Surveys, Winkler and Loving Counties, Texas and Section 21, Township 26 South, Range 35 East, Lea County, New Mexico.

TRANSPORTATION AGREEMENT

BETWEEN

PERMIAN ATLANTIS LLC

AND

HERITAGE GATHERING CORPORATION

Dated: [Effective date of Plan]

# Table of Contents

Page

ARTICLE I.      DEFINITIONS...................................................................... 1

ARTICLE II.     QUANTITY ............................................................................ 2

ARTICLE III.    POINTS OF DELIVERY, POINTS OF REDELIVERY AND
CONSTRUCTION OF FACILITIES ........................................ 4

ARTICLE IV.    DELIVERY PRESSURE ........................................................ 6

ARTICLE V.     RATES .................................................................................... 6

ARTICLE VI.    MEASUREMENT.................................................................... 6

ARTICLE VII.   QUALITY............................................................................... 8

ARTICLE VIII.  BILLING AND PAYMENT ................................................... 9

ARTICLE IX.    WARRANTY ......................................................................... 9

ARTICLE X.     DULY CONSTITUTED AUTHORITIES.............................. 10

ARTICLE XI.    TERM .................................................................................. 10

ARTICLE XII.   FORCE MAJEURE ............................................................. 10

ARTICLE XIII.  SHIPPER'S REPRESENTATIVE ........................................ 11

ARTICLE XIV.  NOTICES AND MISCELLANEOUS.................................... 11

TRANSPORTATION AGREEMENT

This Agreement, made and entered into this [Effective date of Plan], the Effective Date, by and between **Permian Atlantis LLC**, a Delaware limited liability company, hereinafter collectively referred to as "Shipper", and Heritage **Gathering Corporation**, a Texas Corporation, hereinafter referred to as "Transporter".

## WITNESSETH:

WHEREAS, Shipper desires to have natural gas transported from the Points of Delivery to the Points of Redelivery set forth herein; and

WHEREAS, Transporter has constructed, or will construct, a pipeline and appurtenant facilities between the Points of Delivery and the Points of Redelivery set forth herein; and

WHEREAS, Transporter agrees to accept and transport said gas for redelivery for the account of Shipper under the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

A.  The terms "gas" and "natural gas" shall mean natural gas produced from oil wells or gas wells or both, and residue gas resulting from the processing of gas well gas, oil well gas, or both.

B.  The term "taxes" shall mean any tax (other than ad valorem, income or excess profits taxes), license, gross receipts tax, fee or charge now or hereafter levied, assessed or made by any governmental authority on the act, right or privilege of transporting, handling, or delivering gas which is measured by the volume, value or sales price of the gas in question.

C.  The term "Contract Acreage" shall mean all of the lands described in Exhibit "A" attached hereto and made part hereof.

D.  The term "BTU" shall mean British Thermal Unit. The term "MMBTU" shall mean one million (1,000,000) Btu.

E.  The term "Gross Heating Value" shall mean the number of Btu's evolved by the complete combustion, at constant pressure, of the amount of gas which would occupy a volume of one (1) cubic foot at a temperature of sixty degrees (60°) Fahrenheit, if saturated with water vapor and under a pressure equivalent to that of thirty (30) inches of mercury at thirty-two degrees (32°) Fahrenheit, and under standard gravitational force (acceleration 980.665 cm per second) with air of the same temperature and pressure as the gas when the products of combustion are cooled to the initial temperature of the gas and air and when the water formed by combustion is condensed

to the liquid state. The gross heating value of the gas thus obtained shall be expressed on the measurement basis set forth in Article 6.A of this Agreement. ***[Conform as necessary to the Enterprise GC L.P. Gas Dedication Agreement (Enterprise Agreement")]***.

F.    The term "Mcf" shall mean one thousand (1,000) cubic feet of gas. The term "Bcf shall mean one billion cubic feet of gas.

G.    The term "Maximum Daily Volume" shall mean the maximum capacity of the Transportation System to transport gas.

H.    The term "Transportation System" or "Transporter's System" shall mean the pipeline and appurtenant facilities constructed, or to be constructed by Transporter, at its expense, between the Points of Delivery and Points of Redelivery set forth in Article III. The pipeline will be initially designed for a maximum allowable operating pressure of 1200 psig. ***[Conform as necessary to the Enterprise Agreement]***

I.    The term "Day" shall mean a period of twenty-four (24) consecutive hours beginning and ending at 7:00 a.m. local time.

J.    The term "Month" shall mean a period beginning at 7:00 a.m. local time on the first day of a calendar month and ending at 7:00 a.m. local time on the first day of the next succeeding calendar month.

K.    The term "Contract Year" shall mean the twelve (12) month period beginning on the Effective Date of this Agreement and each twelve (12) month period thereafter.

L.    The term "Affiliate" shall mean any Person which, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person. The term "Person" shall mean an individual, a corporation, voluntary association, joint stock company, business trust, partnership, proprietorship, or other legal entity (excluding any governmental body) however constituted.

### ARTICLE II.
### QUANTITY

*A.    Subject to the terms and conditions hereof:*

1.    Shipper will deliver, or cause to be delivered, to Transporter for transportation hereunder all gas that Shipper owns, controls or has the right to market which is produced from the Contract Acreage during the term of this Agreement.

2.    Transporter will accept for Shipper's account at the Points of Delivery the daily volume of gas tendered by Shipper up to the Maximum Daily Volume, and, subject to Paragraph 3. and Section B. herein, Transporter shall redeliver to Shipper at the Points of Redelivery, on each day a volume of gas equal to the volume of gas delivered by Shipper to Transporter on such day. Transporter shall not be obligated to maintain a pipeline

connection to any well or central field production facility when in Transporter's sole judgment, the continuation of such connection under the terms and conditions of this Agreement would no longer be profitable for Transporter. If Transporter discontinues the connection of any such well or central field production facility, such action shall immediately effect a release of the well(s) and the lease(s) on which the well(s) are located or which leases contribute to the production from such well(s) from the dedication under this Agreement.

    3.     *Imbalances*

Gas tendered by Shipper to Transporter for transportation hereunder at the Points of Delivery shall be delivered as nearly as practicable at uniform hourly rates of flow consistent with normal producing and pipeline operations. Gas redelivered at the Points of Redelivery by Transporter to Shipper shall be maintained as nearly as practicable at uniform hourly rates of flow approximately equal to the rates at which gas is received by Transporter from Shipper for transportation hereunder, consistent with normal pipeline operations.

It is recognized that because of dispatching and other variations certain imbalances may occur between the volumes of gas delivered hereunder by shipper and the volumes of gas redelivered hereunder by Transporter. Such imbalances shall be corrected, insofar as practicable, during the month following the month in which they occur.

    B.     *Allocated Volumes*

Gas other than Shipper's Gas may be transported through the Transportation System only in the event there is line capacity available on said Transportation System to receive third-party gas. In that event, then the total volume delivered at a Point of Redelivery will be allocated back to each Point of Delivery into the Transportation System based on the following formula:

$$A = B \ X \ C/T$$

Where:

A - Allocated volume (Mcf) at the Point of Delivery

B - Volume (Mcf) measured at the Point of Redelivery

T - Total volume (Mcf) measured at all Points of Redeliver

C - Volume (Mcf) measured at the Point of Delivery

At such time as Shipper requires any portion of the capacity being utilized by a third-party, Transporter shall decrease such third-parties volume so as to accommodate Shipper's requirement, even if such requirement equals the Maximum Daily Volume.

## ARTICLE III.
## POINTS OF DELIVERY,
## POINTS OF REDELIVERY AND CONSTRUCTION OF FACILITIES

A.   *Points of Delivery*

The Points of Delivery for gas delivered by or for the account of Shipper to Transporter hereunder, shall be at the outlet flange of the meter installed at or near each of the wells located on the contract acreage. Shipper shall have no access to the gas beyond the Points of Delivery, and any lease use gas to be used by Shipper shall be taken prior to any Point of Delivery. Notwithstanding the foregoing, Shipper shall have access to gas beyond the Points of Delivery as necessary to operate the compressors used in connection with the Transportation System.

B.   *Points of Redelivery*

The Points of Redelivery for all gas to be redelivered by Transporter to Shipper shall be at the inlet flange of the meter station located at the interconnection of either Enterprise's meter # 50623 and Transporter's pipeline in Section 6, Block 74, PSL Survey, Winkler County, Texas.

C.   *Construction of Facilities*

1.   Transporter will construct, operate, and maintain or cause to be constructed, operated, and maintained, at its expense, the Transportation System and all facilities necessary to receive delivery of gas for transportation hereunder at the Points of Delivery and to redeliver gas at the Point of Redelivery. The measurement facilities to be installed at each Point of Delivery and Point of Redelivery are set forth in Article VI.

2.   At Shipper's request Transporter will extend its Transportation System to other wells within the Contract Acreage, establishing additional Point(s) of Delivery, subject to the following conditions:

a.   Shipper's well must, in Transporter's judgment, be capable of producing at least five hundred (500) Mcf of initial daily deliverability.

b.   Shipper's well must, as defined by a third-party engineering report, have at least one-half (0.5) Bcf of recoverable reserves; and

c.   In no event will Transporter be allowed to refuse to connect any well in the Contract Acreage drilled by Shipper or a well in which Shipper has a working interest or a net revenue interest. In the event Transporter connects a well that produces less than two hundredths (0.02) Bcf during the economic life of the well, Shipper shall pay to Transporter an amount of money equal to cost of installation for the well.

d.    Transporter agrees to furnish invoices to Shipper supporting all costs associated with construction of lines, facilities, equipment, etc., associated with each well connected.

3.    Upon completion and testing of any well in the Contract Acreage, Shipper will furnish Transporter, as available, all information not considered confidential by Shipper, concerning third-party engineering reports and test data. If requested Shipper will supply copies of support data used in the third-party engineering analysis, subject to Transporter executing a confidentiality agreement covering the data provided and the Contract Area. Such data shall include, but is not limited to, all core analyses, sample logs, well logs, drilling and completion reports, pressure data, production data, flow potential data and acreage information. Within five (5) business days after receipt of such well data, Transporter will notify Shipper that either:

a.    Such well meets the criteria set forth above with an estimate by Transporter as to when Transporter expects its facilities will be completed; or

b.    Such well does not meet the criteria set forth above and the amount of aid-in-construction Shipper must pay Transporter for Transporter to proceed with the construction of such facilities. If Shipper agrees to pay Transporter the aid-in-construction, Transporter shall commence construction of such facilities upon receipt of such payment from Shipper.   Upon payout of Transporters initial investment, the gathering fee will be reduced to five cents ($0.05) per mcf until Shippers aid-in-construction cost is fully recouped.   At which time the full "Gathering Fee" will be reinstated and Transporter will have full ownership of the new line and facilities. If Shipper chooses not to pay Transporter the required aid-in-construction, then such well and each of the leases contributing to such well shall be released from this Agreement by written request from Shipper to Transporter.

4.    In the event Transporter required new easements and rights-of-way not currently in existence on Shipper's leases in the Contract Acreage for the addition of pipelines and related equipment to take Shipper's gas, to the extent it has the legal authority to do so, Shipper will grant such rights of ingress and egress to and from said premises as necessary for the carrying out of the terms of this Agreement.

D.    *Indemnification*

Transporter shall indemnify and hold Shipper harmless against any and all claims, demands, costs, expenses, losses and causes or suits for damages or otherwise arising out of the operations conducted hereunder by Transporter. Shipper shall indemnify and hold Transporter harmless against any and all claims, demands, costs, expenses, losses and causes or suits for

damages or otherwise arising out of the operations conducted hereunder by Shipper. As between Shipper and Transporter, Shipper shall be deemed to be in control and possession of the gas and responsible for damages or injuries caused thereby, prior to delivery of the gas hereunder to Transporter at the Point of Delivery and after redelivery of the gas to Shipper at the Point of Redelivery. Transporter shall be deemed to be in control and possession of the gas and responsible for damages or injuries caused thereby after delivery of said gas hereunder to Transporter at the Point of Delivery and prior to redelivery of the gas to Shipper at the Point of Redelivery.

## ARTICLE IV.
## DELIVERY PRESSURE

All gas delivered hereunder by Shipper shall be delivered at a pressure sufficient to permit the gas to enter the Transportation System at the operating pressure maintained therein from time to time, such operating pressure not to exceed twelve hundred (1200) pounds per square inch gauge. Transporter shall not be obligated to receive gas hereunder at pressures exceeding the maximum allowable operating pressures for the Transportation System prescribed under any applicable governmental regulations.

Subject to the foregoing, gas will be delivered by Transporter at the Points of Redelivery provided herein at such pressures as may exist in Transporter's System at that point from time to time.

Nothing herein shall be construed to obligate Transporter to install compression facilities in order to receive, transport or redeliver gas.

## ARTICLE V.
## RATES

A.     Shipper shall pay Transporter monthly thirty-seven and one-half cents ($0.375) per Mcf transportation fee for all volumes (Mcf) transported pursuant to this Agreement.

B.     Transporter agrees to pay all taxes which may be levied with respect to the transportation service performed hereunder or the business of performing such service.

C.     Shipper agrees that it shall be solely responsible for any and all compression needed to transport its Gas through Transporter's gathering system to the Points of Redelivery; and Shipper will negotiate all compression contracts to be in Shipper's name, maintain and operate compressors and agree to pay all compression costs associated with transporting Shipper's Gas through Transporter's gathering system from the Points of Delivery to the Points of Redelivery.

D.     The parties understand that the rate provided herein is freely negotiated between the parties and no party during the existence of this Agreement will seek to have the rate amended, modified, revised or otherwise changed by any regulatory authority.

## ARTICLE VI.
## MEASUREMENT

A.     The unit of volume for measurement of gas delivered hereunder shall be the quantity of gas contained in one (1) cubic foot of space at a base temperature of sixty degrees (60fl°) Fahrenheit and at a pressure of fourteen and sixty-five hundredths (14.65) psia, and otherwise, as provided by the Standard Gas Measurement Law of Texas. Except as provided by that law, all fundamental constants, observations, records, and procedures involved in determining and/or verifying the quantity and other characteristics of gas delivered hereunder shall, unless otherwise specified herein, be in accordance with the standards prescribed in Report No. 3 of the American Gas Association (ACGA) as reprinted and revised June 1991, and with any subsequent amendments or revisions thereto which may be acceptable to Shipper and Transporter. All measurements of gas shall be determined by calculation into terms of such unit. All quantities given herein, unless otherwise expressly stated, are in terms of such unit.

B.     Transporter, or its designee, shall install, maintain and operate, or cause to be done, at its own expense, a measuring station located at each new Point of Redelivery. The measuring station shall be so equipped with orifice meters, recording gauges, or other types of meter or meters of standard make and design commonly acceptable in the industry, as to accomplish the accurate measurement of gas delivered hereunder.

C.     Shipper, or its designee, shall install, maintain and operate, or cause to be done, at its own expense, measuring stations located at each new Point of Delivery. Each measuring station shall be so equipped with orifice meters, recording gauges, or other types of meter or meters of standard make and design commonly acceptable in the industry, as to accomplish the accurate measurement of gas delivered hereunder. The changing of the charts and calibrating and adjusting of meters shall be done by Shipper or Shipper's representative. .

D.     The temperature of gas flowing through the meter or meters shall be determined by the continuous use of a recording thermometer installed so that it will properly record the temperature of the gas flowing through the meter or meters, or at Transporter's option, by periodic tests conducted by Transporter with a mercury thermometer. The arithmetical average of the hourly temperature recorded each day during the time that gas was actually flowing through the meter shall be used in computing measurements for that day.

E.     Each party shall have the right to be present at the time of any installing, reading, cleaning, changing, repairing, inspection, testing, calibrating, or adjusting done in connection with the other's measuring equipment used in measuring deliveries hereunder. The records from such measuring equipment shall remain the property of their owner, but upon request, each will submit to the other its records and charts, together with calculations therefrom subject to return within fifteen (15) days after receipt thereof, after which the charts shall be kept on file for five (5) years.

F.     At least once each quarter, Shipper shall calibrate the meters and instruments or cause the same to be calibrated. Shipper shall give Transporter sufficient notice in advance of such tests so that Transporter may, at its election, be present in person or by its representative, to

observe adjustments, if any, which are made. For the purpose of measurement and meter calibration, the atmospheric pressure shall be assumed to be thirteen and two-tenths (13.2) psia, irrespective of variations in natural atmospheric pressure from time to time. Such information will be supplied to Transporter by Shipper, or by Shipper's representative monthly by the 20th day of the month following the month of delivery.

G.     If, upon any tests, the metering equipment in the aggregate is found to be inaccurate by two percent (2%) or more, registration thereof and any payment based upon such registration, shall be corrected at the rate of such inaccuracy for any period of inaccuracy which is definitely known or agreed upon, or if not known or agreed upon, then for a period extending back one-half (1/2) of the time elapsed since the last date of calibration. Following any tests, any metering equipment found to be inaccurate to any degree shall be adjusted immediately to measure accurately. If, for any reason, Transporter's meters are out of service or out of repair so that the amount of gas delivered cannot be ascertained or computed from the readings thereof or corrected, the gas delivered during the period such meters are out of service or out of repair shall be estimated and agreed upon by the parties hereto by using the registration of any check meter if installed and accurately registering or, in the absence of a check meter, by estimating the quantity based upon deliveries during periods under similar conditions when the meter was registering accurately, including, but not limited to individual meters at each well from which shipper is producing gas into Transporters' gas gathering system.

H.     The measurement hereunder shall be corrected for deviation from Boyle's Law at the pressure and temperatures under which gas is delivered hereunder.

## ARTICLE VII.
## QUALITY

The gas delivered at the Points of Delivery and Points of Redelivery shall be merchantable gas which shall:  [**Conform as necessary to the Enterprise Gas Dedication Agreement**].

1.     Contain not more than five (5) grains of total sulfur per one hundred (100) cubic feet, and shall not contain more than one-fourth (1/4) grain of hydrogen sulfide per one hundred (100) cubic feet;

2.     Have a gross heating value not less than nine hundred and fifty (950) British Thermal Units (BTU) per cubic foot of gas when saturated with water vapor. Transporter shall have the right, not the obligation , to accept deliveries of gas with a heating value less than nine hundred and fifty (950) BTU per cubic foot;

3.     Contain not more than three percent (3%) by volume of carbon dioxide;

4.     Have a temperature not greater than one hundred and ten degrees Fahrenheit (110°F.) or less than forty degrees Fahrenheit (40°F.);

5.     Contain no detectable oxygen;

6.      Be commercially free of all liquids, suspended matter, dust, all gums and gum forming constituents, and other objectionable substances and not exceed seven percent (7%) by volume of water content.

## ARTICLE VIII.
## BILLING AND PAYMENT

A.      On or before the twentieth (20th) day of each month, Transporter shall render to Shipper its bill for all gas transported hereunder during the preceding month.

B.      Shipper shall pay Transporter, at Transporter's address designated herein, in good funds on or before the last day of each month; provided, however, that if Transporter renders a bill after the twentieth (20th) day of the month, that due date shall be extended to ten (10) days after the bill is rendered for the gas transported for Shipper hereunder during the preceding month.

C.      Should Shipper fail to pay all of the amount of any bill as herein provided when such amount is due, interest on the unpaid portion of the bill shall accrue and be payable at the rate of JP Morgan Chase Bank, NA prime plus two percent (2%) from the due date until the date of payment; provided, however, that no interest rates or charges provided in this Agreement are intended to exceed the maximum allowed by law and any such rates or charges stated herein shall be conformed, if necessary, to the maximum rates or charges allowed by law. If such failure to pay continues for thirty (30) days after payment is due, Transporter in addition to any other remedy it may have under this Agreement, may suspend further transportation until such amount is paid; provided, however, that if Shipper in good faith shall dispute the amount of any such bill or part thereof and shall pay to Transporter such amounts as it concedes to be correct, and, at any time thereafter within thirty (30) days of a demand made by Transporter, shall furnish good and sufficient corporate undertaking acceptable to legal counsel for Transporter of the amount ultimately found due upon such bill after a final determination, which may be reached either by agreement or judgment of court, as the case may be, then no interest will be due on the unpaid portion of the bill.

D.      In the event an error is discovered in the amount billed in any statement rendered by Transporter, such error shall be adjusted within thirty (30) days of the determination thereof the amount of the discrepancy plus any interest accrued thereon or paid, provided that claim therefore shall have been made within twenty-four (24) months from date of payment.

E.      Transporter and Shipper shall each have the right to examine, at all reasonable times, the books, records, and charts of the other to the extent necessary to verify or audit the accuracy of any statement, bill, chart, or computation made under or pursuant to this Agreement.

## ARTICLE IX.
## WARRANTY

Shipper hereby warrants that at the time of delivery of gas to Transporter it will have good title or the good right to deliver such gas, and that such gas shall be free and clear of all liens and adverse claims; and agrees, with respect to the gas delivered by it, to indemnify Transporter against all suits, actions, debts, accounts, damages, costs (including attorneys' fees), losses and expenses arising from or out of any adverse claims of any and all persons to or against said gas.

## ARTICLE X.
## DULY CONSTITUTED AUTHORITIES

This Agreement and all operations hereunder are subject to the applicable federal and state laws and the applicable ordinances, orders, rules and regulations of any local, state or federal governmental authority having or asserting jurisdiction; but nothing contained herein shall be construed as a waiver of any right to question or contest any such law, ordinance, order, rule or regulation in any forum having jurisdiction in the premises. If any regulatory authority or governmental entity by statute, rule, regulation, or order dictates any action or requirement which prevents or materially impedes the performance of the transportation service, then Transporter shall not be liable to Shipper to the extent of such prevention or impedance. If, due to any governmental or regulatory agency action, Transporter is required to incur major unanticipated expenditures in connection with the transportation service to be rendered hereunder. Shipper agrees to enter into good faith negations with Transporter to determine the appropriate transportation fees to be paid in order to reflect such additional costs.

## ARTICLE XI.
## TERM

This Agreement shall be effective from the date first set forth herein and shall continue in full force and effect for a primary term of two (2) Contract Years, and year-to-year thereafter, unless Shipper provides Transporter ninety (90) days written notice of termination prior to the end of the primary term or term year thereafter. In the event Shipper chooses to renew this Agreement on a year to year basis, any adjustment to the transportation fee shall be based on the change in the Consumer Price Index ("CPI") over the rate in effect during the previous year. Notwithstanding the above, if an imbalance exists on the date of termination hereof between the total quantities of gas theretofore delivered hereunder, the term hereof shall be extended for a period sufficient to allow the party whose deliveries or redeliveries are in arrears to eliminate any deficit.

At the end of the term of this Agreement, either party has the right to cease operations and neither party will assert before any regulatory authority the right to service not explicitly provided for under the terms and condition of this Agreement.

## ARTICLE XII.
## FORCE MAJEURE

In the event of either party hereto being rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than to make payments due hereunder, it is agreed that on such party giving notice and full particulars of such force majeure in writing or by telegraph to the other party as soon as possible after the occurrence of the cause relied on, then the obligations of the party giving such notice as far as they are affected by such force majeure, shall be suspended from the commencement of and during the continuance of any inability so caused but for no longer period, and such cause shall as far as possible be remedied with all reasonable dispatch.

The term "force majeure" as employed herein shall mean acts of God, governmental action, strikes, lockouts or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, hurricanes, tornadoes, storms, storm warnings, floods, washouts, arrests and restraints of governments and people, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, the necessity for making repairs to or alterations of machinery of lines of pipe, freezing of wells or lines of pipe, partial or entire failure of wells or sources of supply of gas, and any other causes, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension and which by the control of the party claiming suspension and which by the exercise of due diligence such party is unable to prevent or overcome; such term shall likewise include: (a) in those instances where either party hereto is required to obtain servitudes, rights-of-way grants, permits or licenses to enable such party to fulfill its obligations hereunder, the inability of such party to acquire, or the delays on the part of such party in acquiring, at reasonable cost and after the exercise of reasonable diligence, such servitudes, rights-of-way grants, permits or licenses, and (b) in those instances where either party hereto is required to furnish materials and supplies for the purpose of constructing or maintaining facilities or is required to secure permits or permissions from any governmental agency to enable such party to fulfill its obligations hereunder, the inability of such party to acquire, or the delays on the part of such party in acquiring, at reasonable cost and after the exercise of reasonable diligence, such materials and supplies, permits and permissions.

It is understood and agreed that the settlement of strikes or lockouts shall be entirely within the discretion of the party having the difficulty, and that the above requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of any opposing party when such course is inadvisable in the discretion of the party having the difficulty.

## ARTICLE XIII.
## SHIPPER'S REPRESENTATIVE

Shipper shall appoint its chief financial officer to serve as its representative hereunder for the purpose of giving and receiving notices and requests, paying the transportation fees specified in Article V, delivering the quantities of gas deliverable hereunder, and doing and receiving all things provided for concerning Shipper in this Agreement. Transporter may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreement made with respect to all maters dealt with herein by such representative on behalf of the parties Shipper as fully and effectively as though each had done, performed, made

or executed the same. Shipper may change its representative and designate a new representative from time to time by delivery of written notice of change of designation to Transporter.

## ARTICLE XIV.
## NOTICES AND MISCELLANEOUS

A.    *Notices*

Any notice, request, demand, statement or payment provided for in this Agreement, or any notice which either Transporter or Shipper may desire to give to the other, shall be in writing and shall be considered as duly delivered when received by the party to whom addressed at the following addresses:

SHIPPER

Permian Atlantis LLC
6630 Cypresswood Dr., Suite 200
Spring, Texas 77379
Fax: (832) 559-6088

TRANSPORTER

Heritage Gathering Corporation
2911 Turtle Creek Blvd., Suite 850
Dallas, Texas 75219
Fax: (214) [_____]

B.    *Miscellaneous Provisions*

1.    No modification of the terms and provisions of this Agreement shall be made except by the execution of written agreements.

2.    No waiver by either Transporter or Shipper of any one or more defaults by the other in the performance of any provisions of this Agreement shall operate or be construed as a waiver of any future default or defaults, whether of a like or different character.

3.    Any party which shall succeed by purchase, merger, or consolidation to the properties, substantially as an entity of Transporter or of Shipper, as the case may be, shall be entitled to the rights and shall be subject to the obligations of its predecessor in title under this Agreement. Either party may, without relieving itself of its obligations under this Agreement, assign any of its rights hereunder to a company with which it is an Affiliate, but otherwise no assignment of this Agreement, or any of the rights or obligations hereunder shall be made by Transporter or Shipper unless there first shall have been obtained a consent thereto by the other party, which shall not be unreasonably withheld. Any attempted assignment in violation of this provision shall be void. it is agreed,

however, that the restriction on assignments contained in this paragraph shall not in any way prevent either party to this Agreement from pledging or mortgaging its rights hereunder as security for its indebtedness, without the assumption of obligations hereunder by the pledge or mortgagee.

4.     This Agreement may be executed in any number of counterparts, no one of which need be executed by all parties, or may be ratified, adopted, or consented to by separate instrument, in writing specifically referring hereto, and it shall be binding upon all parties who execute a counterpart, ratification, adoption, or consent with the same force and effect, and to the same extent as if all such parties had executed and signed the same document, with each separate counterpart, ratification, adoption or consent deemed to be and original.

5.     This Agreement contains the entire contract between the parties and there are no oral promises, agreements, or warranties affecting it.

6.     The descriptive headings of these general provisions are formulated and used for convenience only and shall not be deemed to affect the meaning or construction of any such provisions.

7.     This Agreement was prepared and negotiated jointly by both parties and shall not be construed as prepared by one party to the exclusion of the other.

8.     This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

9.     Neither party shall be liable in damages or have the right to terminate this Agreement for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its control including, but not limited to Acts of God, Government restrictions (including the denial or cancellation of any export or other necessary license), wars, insurrections and/or any other cause beyond the reasonable control of the party whose performance is affected.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed in duplicate originals, as of the date hereinabove written.

SHIPPER

Permian Atlantis LLC

By:
    Robert P. Munn

Title:  President

TRANSPORTER

Heritage Gathering Corporation

By:
    Michael B. Wisenbaker

Title:

STATE OF TEXAS                          §

COUNTY OF HARRIS                        §

This instrument was acknowledged before me this _____ day of _____, 2010, by Robert P. Munn, President of Permian Atlantis LLC on behalf of said organization.

My Commission Expires:

_____
Notary for the State of Texas

STATE OF TEXAS                          §

COUNTY OF DALLAS                        §

This instrument was acknowledged before me this _____ day of _____, 2010, by Michael B. Wisenbaker, _____ of Heritage Gathering Corporation on behalf of said corporation.

My Commission Expires:

_____
Notary for the State of Texas

## EXHIBIT "A"

Attached to that certain Transportation Agreement dated [Effective date of the Plan], between Permian Atlantis LLC, et al, Shipper, and Heritage Gathering Corporation, Transporter.

The Contract Acreage committed to this Transportation Agreement includes the acreage located in Loving County and Winkler County, Texas described below:

PSL SURVEY, BLOCK C-23, Sections 21, 22, 23, 24 and 25

PSL SURVEY, BLOCK C-24, Sections 1 and 2

PSL SURVEY, BLOCK 74, Section 9

PSL SURVEY, BLOCK 75, Section 1

## SALT WATER DISPOSAL AGREEMENT

This **SALT WATER DISPOSAL AGREEMENT** (the "*Agreement*"), which shall become effective the Effective date of Plan by and between **HERITAGE DISPOSAL CORPORATION** ("*Disposal*"), **PERMIAN ATLANTIS LLC and PERMIAN PHOENIX LLC** (each may be referred to individually as "*Operator*" and when referred to collectively as "*Operators*"). Each party to this Agreement is hereinafter referred to individually as "*Party*" and collectively as "*Parties*."

**WHEREAS**, Operators own or control salt water produced in association with oil and gas operations in acreage located in Loving County, Texas and Winkler County, Texas (the "*Operators' Fields*") as more particularly described on **Exhibit A**;

**WHEREAS**, Disposal will utilize its existing Salt Water Disposal System consisting of storage and injection facilities at the delivery points, injection wells and other equipment (the "*Disposal System*") located in Section 7, Block 74, PSL Survey, and Section 16, Block C-23, PSL Survey Winkler County, Texas (the "*Disposal Location*") for the purpose of accepting, transporting and disposing of Operators' salt water in the salt water injection well (the "*Disposal Well*".) at the Disposal Location; and

**WHEREAS**, Disposal has the ability to accept and dispose of all of Operators' salt water in the Disposal Well through its Disposal System.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants herein contained, the Parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS

Except as otherwise herein provided, the following words and/or terms as used in this Agreement shall have the following scope and meaning:

1.1     The term "*barrel*" shall mean 42 U. S. gallon equivalents.

1.2     The term "*day*" shall mean a period of twenty-four (24) consecutive hours beginning and ending at 9:00 a.m. Central Time.

1.3     The term "*month*" shall mean the period beginning at 9:00 A.M. Central Time on the first day of the calendar month and ending at 9:00 A.M. Central Time on the first day of the next succeeding calendar month.

1.4     The term "*Contract Year*" shall mean one-year periods with the first such contract year (i) beginning at 9:00 A.M. Central Time, on the In Service Date if such date is on the first of a month or (ii) beginning at 9:00 A.M. Central Time, on the first day of the month following date of Effective Date.

1.5     The term "***Delivery Point(s)***" shall mean the tanks and facilities located at the two Disposal wells, being The Black Kettle #1W located 1420' FEL & 2180' FSL of Section 7 and the Little Wolf #1W located1660' FEL & 223' FNL of Section 16, and to such other points as to which the Parties hereto may mutually agree.

1.6     The term "***Primary Term***" shall mean a term commencing on [the Effective date of Plan], the "Effective Date" and ending on the date two (2) years and zero (0) months thereafter.

1.7     The term "***Water***" shall mean any and all salt water produced in association with Operators' oil and gas operations in and around the Delivery Points.

1.8     The term "***Environmental Laws***" shall mean all applicable local, state, and federal laws, rules, regulations, and orders regulating or otherwise pertaining to (a) the use, generation, migration, storage, removal, treatment, remedy, discharge, release, transportation, disposal, or cleanup of pollutants, contamination, hazardous wastes, hazardous substances, hazardous materials, toxic substances or toxic pollutants, (b) the soil, surface waters, ground waters, land, stream sediments, surface or subsurface strata, ambient air and any other environmental medium on or off any Property or (c) the environment or health and safety related matters, including the following as from time to time amended and all others whether similar or dissimilar: the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act of 1976, as amended by the Used Oil Recycling Act of 1980, the Solid Waste Disposal Act Amendments of 1980, and the Hazardous and Solid Waste Amendments of 1984, the Hazardous Materials Transportation Act, as amended, the Toxic Substance Control Act, as amended, the Clean Air Act, as amended, the Clean Water Act, as amended, and all regulations promulgated pursuant thereto.

## ARTICLE II
## FACILITIES

2.1     Delivery of Water by Operators to Pipeline.  Operators shall deliver all Water generated for disposal from the wells in the Operators' Fields through Operators' pipelines and meters to the Delivery Points. Operators shall maintain and be responsible for their delivery lines and meters.

2.2     Pressure. Operators shall maintain and operate the Pipeline at the following pressure specifications:

    a.     Normal operating pressures of the Pipeline shall be 175 psig or less.

    b.     Maximum allowable operating pressure will be no greater than 200 psig.

## ARTICLE III
## DISPOSAL SERVICE DEDICATION & COMMITMENT

3.1     Firm Quantity.

a. Operators may deliver or cause to be delivered to Disposal for Operators' accounts at the Delivery Points a total or aggregate amount of up to 5,000 barrels of Water per day (the "***Firm Quantity***"), and Disposal shall accept, transport and properly dispose of such Water;

b. Depending on Disposal's operating capabilities and requirements, Disposal may accept and dispose of quantities greater than the Firm Quantity on any day as Disposal in its sole discretion determines that acceptance and disposal of such additional quantities at such Delivery points are mechanically feasible;

c. This Section 3.1 constitutes Disposal's agreement and covenant to accept delivery of at least the Firm Quantity of Water from Operators and such additional quantities of Operators' Water as provided in Section 3.1 during the Primary Term and any extension thereof, except for any other provision of this Agreement (including Section 4.6) permitting Disposal to temporarily suspend acceptance of Water. Disposal covenants to promptly remedy any situation requiring a temporary suspension of acceptance of Operators' Water that meets the water quality and pressure requirements set forth in this Agreement.

## ARTICLE IV
## FACILITIES & MEASUREMENT

4.1     Testing and Repair of Equipment at Delivery Points. The accuracy of Operators' measuring equipment shall be verified by Operators at reasonable intervals and, if requested, in the presence of Disposal's representatives; provided, however, Operators shall not be required to verify the accuracy of such equipment at its cost and expense more frequently than once in any three (3) month period. Testing will be done by comparing Operators' meters data to Disposal's check meter data over a continuous 24-hour period. In the event either Disposal or an Operator notifies the other Party that it desires a special test of any measuring equipment, Disposal and Operators shall cooperate to secure a prompt verification of the accuracy of such equipment. In the event that a special test is requested, and after such test, the equipment is determined to register no greater than two percent (2%) difference from Disposal's check meter, either high or low, the requesting Party shall pay all costs for said test.

4.2     Correction of Metering Equipment. Any meter found, by test, to register not more than two percent (2%) high or low shall be deemed to be correct as to past measurements but shall be corrected to record accurately. In the event any meter, by test, proves to be more than two percent (2%) high or low, adjustment shall be made to fully correct the readings of such meters; provided, however, that if the period in which the error occurred is not known or cannot be agreed upon, then the period shall be deemed to be the last half of the time elapsed since the last test, or forty-five (45) days, whichever is the lesser period. If an Operator's meter is out of repair or is being tested or in the event that Operator's meter otherwise becomes inoperative, then the quantity of Water delivered to the Delivery Point during the period Operator's meter or meters were inoperative or manifestly in error shall be determined using Disposal's check meter, or if that meter is also in error by two percent (2%) or more or out of service, by estimating as nearly as possible the quantity of Water delivered to the Delivery Point during like periods under similar conditions when such meter was registering accurately or correctly within the tolerance set forth herein. Corrective action will consist of internal inspection to ensure integrity of the meter body, and replacing the internals with a new turbine kit, plus re-calibration of the display/recording equipment to reflect the new kit's meter factor. The meter will be tagged with the new factor.

4.3     Inspection of Charts and Records. The charts and records from the measuring equipment shall remain the property of the Party operating the measuring equipment and shall be kept for a period of two (2) years. At any time within such period, upon written request of the Party not in possession, the Party in possession shall submit records and charts from the measuring equipment,

together with calculations there from, for inspection and verification subject to return within twenty (20) days from receipt thereof.

4.4     Water Quality. Operators shall make reasonable efforts to remove oil and other liquid contaminants from the Water by using normal field separation methods prior to pumping it into the Disposal System, but shall not be required to remove one hundred percent of such contaminants. Operators shall also install filtering equipment (with 100 micron or smaller particle removal capability) between its pump and meter (upstream of Disposal's check meter) at each Delivery Point. Operators shall install industry standard equipment at each Delivery Point to safe guard against over pressuring the Pipeline. Disposal shall not accept water from third parties which would prevent Disposal from accepting all of the Operators' Water. If the Water being produced and delivered by Operators hereunder should, at any time and in the exclusive judgment of Disposal, be unsatisfactory for injection purposes through the Disposal System, then Disposal shall have the right to refuse to accept delivery of any additional Water from Operators until Operators, at their sole risk, cost and expense, make such Water of a quality acceptable to Disposal. If Operators decline or is unable to alter the quality of the Water so as to render it acceptable to Disposal, Disposal may cancel this Agreement by giving thirty (30) days advance written notice to Standard.

## ARTICLE V
## FEES; COST REIMBURSEMENT

5.1     Fees. Operators shall pay to Disposal each month a fee equal to one dollar ($1.00) per barrel for each barrel of water delivered to and accepted by Disposal at the Delivery Points during the Primary Term.

5.2     Invoices. Disposal shall invoice Operators on or before the twentieth (20th) day of each month for the Water delivered by Operators in the prior month. The invoice shall include the amount of Water delivered at each Delivery Point as reported to Disposal by Operators, the rate at each Delivery Point, and the total amount owed.

5.3     Payments. Operators agree to make payment hereunder to Disposal for their respective accounts on or before the last day of the month in which the invoice is received the address indicated on the billing, or such other address as Disposal may designate in writing to Operators from time to time.

5.4     Purchase of Transportation Line. Disposal currently owns pipeline, rights of way, and equipment connecting the Pat Howell #1 Well, SE Quarter, Section 6, Block 74, Winkler County, Texas, to the Regency gathering system delivery point ("*Pat Howell Connection*"). Concurrently with the effective date of this Agreement, Disposal will assign, transfer and convey all of its interests in the Pat Howell Connection to the working interest owners in the Pat Howell #1 Well, by assignment in customary form and substance reasonably acceptable to the parties. The purchase price for the pipeline, rights of way and equipment relating to the Pat Howell Connection shall be [$150,000][1], which amount will be payable as follows:

> (i)     From Operator on behalf of its 81.25% working interest, [$121,875] payable in 12 equal installments of [$10,156.25] each on the first day of each of the 12 consecutive months commencing the third month following the effective date of this Agreement; and

---

[1] Purchase Price amount is subject to Operator's confirmation of actual costs

(ii)     From Pat Howell LLC on behalf of its 18.75% working interest, [$28,125], the receipt of which is hereby acknowledged by Disposal by its execution and delivery of this Agreement.

## ARTICLE VI
## TERM

6.1     Term. This Agreement shall become binding on the Parties hereto on the date first hereinabove written, and shall remain in full force and effect until the end of the Primary Term, and year-to-year thereafter, unless Operators provide Disposal ninety (90) days written notice of termination prior to the end of the Primary Term or term year thereafter. In the event Operators choose to renew this Agreement on a year to year basis, the charges hereunder shall adjust annually based on the change in the Consumer Price Index ("CPI") over the rates in effect during the prior year. .

6.2     Regulatory Filings. Each Party reserves the right to pursue any necessary regulatory filings with any governmental or regulatory body having jurisdiction which may be necessary to implement or continue this Agreement.

## ARTICLE VII
## NOTICES AND ADDRESSES

7.1     Notices. All notices are required to be given in writing. Any correspondence provided for in this Agreement shall be deemed sufficiently given when deposited in the United States mail, postage prepaid, and addressed to the respective Parties at such address or such other addresses as the Parties respectively shall designate by written notice; provided however, any notice to cancel this Agreement shall be sent by certified mail, postage prepaid.

7.2     Addresses.

a.     Notices and Correspondence to Disposal. Until an Operator is otherwise notified in writing by Disposal, notices and payments to Disposal shall he addressed to Disposal at the addresses set forth below or at such other addresses as Disposal may hereafter designate by notifying Operators in writing:

> Heritage Disposal Corporation
> 2911 Turtle Creek Blvd., Suite 850
> Dallas, Texas 75219

b.     Notices and Correspondence to Operators. Until Disposal is otherwise notified in writing by an Operator, notices and invoices to Operators shall be addressed to Operators at the address set forth below or at such other address as Operators may hereafter designate by notifying Disposal in writing:

> Permian Atlantis LLC
> 6630 Cypresswood Drive, Suite 200
> Spring, Texas 77379

> or

## ARTICLE VIII
## WARRANTIES AND INDEMNITIES

8.1     Warranty of Title. Operators warrant to Disposal that Operators have good title to, or the unqualified right to tender, the Water gathered hereunder. Operators hereby agrees to indemnify Disposal against all suits, actions, debts, accounts, damages, costs (including attorney's fees), losses and expenses arising from or out of any adverse claim of any and all persons to or against title and possession to said Water or any royalties, payments or taxes due thereon arising or accruing prior to or upstream of the Delivery Points. Such indemnification shall be provided to Disposal regardless whether Operators' liability for such suits, actions, debts, accounts, damages, costs (including attorney's fees), losses and expenses arise from joint, sole, concurrent, comparative or contributory fault or negligence, or fault impose by statute, rule or regulation or strict liability of Operators, their officers, agents, and/or employees. Notwithstanding anything in this Section 8.1 to the contrary, the warranty provided herein shall only be granted by Operators to the extent of the warranty, if any, of such warranty granted by Heritage Standard Corporation and Heritage Consolidated LLC to the Operators.

8.2     Liability. From and after the Effective date of Plan, Operators shall have responsibility for the Water upstream of each Delivery Point including responsibility for any spills that occur upstream of a Delivery Point. Water delivered by Operators to Disposal shall pass to Disposal at each Delivery Point. Disposal shall have responsibility for the Water at and downstream of the Delivery Point(s) including the responsibility for properly disposing of the Water and for any spills that occur at or downstream of a Delivery Point. Nothing herein will be construed to make any Party liable for consequential damages which may occur or be asserted by reason of events or occurrences related to this Agreement.

8.3     Operators' Indemnities. From and after the Effective date of Plan, each Operator agrees to defend, indemnify and hold Disposal harmless from and against any and all of its respective claims, demands, losses, damages, liabilities, judgments, causes of action, reasonable costs or expenses (including, without limitation, any and all reasonable costs, expenses, attorneys' fees, consequential damages and other costs incurred in defense of any claim or lawsuit arising therefrom), of whatsoever nature arising out of or relating to such Operators' ownership, operation or administration of the Water upstream of any Delivery Point, including without limitation, damages to persons or property, fines, penalties, monetary sanctions or other amounts payable for failure to comply with applicable Environmental Laws, securities, safety or health, requirements of law (whether federal, state or local) so long as the underlying actions or inactions therefor occurred after the Effective date of Plan. Each Operator shall be responsible **only** for the claims, demands, losses, damages, liabilities, judgments, causes of action, reasonable costs or expenses (including, without limitation, any and all reasonable costs, expenses, attorneys' fees and other costs incurred in defense of any claim or lawsuit arising therefrom) for its properties; and under no circumstance shall one Operator be held to be jointly and severally liability for the other Operators' properties.

8.4     Disposal's Indemnities. Disposal agrees to defend, indemnify and hold Operators harmless from and against any and all claims, demands, losses, damages, liabilities, judgments, causes of action, reasonable costs or expenses (including, without limitation, any and all reasonable costs, expenses, attorneys' fees, consequential damages and other costs incurred in defense of any claim, or lawsuit arising therefrom), of whatsoever nature arising out of or relating to Disposal's ownership,

operation or administration of the Disposal System, including, without limitation, damages to persons or property, fines, penalties, monetary sanctions or other amounts payable for failure to comply with applicable Environmental Laws, securities, safety or health law (whether federal, state or local).

8.5     Notification. As soon as reasonably practical after obtaining knowledge thereof, the indemnified party shall notify the indemnifying party of any claim or demand which the indemnified party has determined gives or could give rise to a claim for indemnification under this Article VIII. Such notice shall specify the agreement, representation or warranty with respect to which the claim is made, the facts giving rise to the claim and the alleged basis for the claim, and the amount (to the extent then determinable) of liability for which indemnity is asserted. In the event any action, suit or proceeding is brought with respect to which a party may be liable under this Article VIII, the defense of the action, suit or proceeding (including all settlement negotiations and arbitration, trial, appeal, or other proceeding) shall be at the discretion of and conducted by the indemnifying party. If an indemnified party shall settle any such action, suit or proceeding without the written consent of the indemnifying party (which consent shall not be unreasonably withheld), the right of the indemnified party to make any claim against the indemnifying party on account of such settlement shall be deemed conclusively denied. An indemnified party shall have the right to be represented by its own counsel at its own expense in any such action, suit or proceeding, and if an indemnified party is named as the defendant in any action, suit or proceeding, it shall be entitled to have its own counsel and defend such action, suit or proceeding with respect to itself at its own expense. Subject to the foregoing provisions of this Article VIII, neither party shall, without the other party's written consent, settle, compromise, confess judgment or permit judgment by default in any action, suit or proceeding if such action would create or attach liability or obligation to the other party. The parties agree to make available to each other, and to their respective counsel and accountants, all information and documents reasonably available to them which relate to any action, suit or proceeding, and the parties agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense of any such action, suit or proceeding.

## ARTICLE IX
## CHOICE OF LAW

9.1     Choice of Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without giving effect to principles of conflicts of laws.

## ARTICLE X
## MISCELLANEOUS

10.1     Modifications. No modifications of the terms and provisions of this Agreement shall be or become effective except by the execution of a supplementary written agreement executed by the parties.

10.2     Audit Rights. Either Party, upon notice in writing to the other Party, shall have the right to audit the other Party's accounts and records relating to this Agreement for any calendar year within the twenty-four (24) month period following the end of such calendar year. A Party shall bear no portion of the other Party's audit cost. The audits will be conducted during the normal business hours and shall not be conducted more than once each year without prior approval of the other Party. The non-auditing Party shall reply in writing to an audit report within ninety (90) days after receipt of such report with any audit exception to be settled by the mutual agreement of the Parties within thirty (30) days of the date of the delivery of the audit report response. In the event the mutual agreement cannot be reached within the aforesaid time period, the Parties agree to retain the services of an independent accounting/audit firm to review the audit, make such additional investigation as said firm deems necessary with respect to the audit, and within forty-five (45) days after the conclusion of its investigation, _____ (the independent

accounting Firm) shall render its determination with respect to the audit issues and the Parties shall be bound for all purposes by said determination.

        10.3     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall constitute an original and together a single instrument, with the same effect as if the signatures thereto and hereto were upon the same instrument. A copy transmitted via facsimile of this Agreement, bearing the signature of one or both parties shall be deemed to be of the same legal force and effect as an original of this Agreement bearing such signature(s) as originally written of such one or more parties.

        10.4     Further Assurances. Notwithstanding anything to the contrary contained herein, the Parties agree to execute and file as appropriate, any and all other documents, agreements or other instruments as may be necessary or appropriate to confirm the agreements reached by, and the obligations imposed on each of the Parties hereunder.

        10.5     Force Majeure. Neither party shall be liable in damages or have the right to terminate this Agreement for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its control including, but not limited to Acts of God, Government restrictions (including the denial or cancellation of any export or other necessary license), wars, insurrections and/or any other cause beyond the reasonable control of the party whose performance is affected.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, this Agreement is executed effective as of the date and year first above written.

PERMIAN ATLANTIS LLC

HERITAGE DISPOSAL CORPORATION

By:_____
Printed Name:_____
Title:_____

By:_____
Printed Name:_____
Title:_____

PERMIAN PHOENIX LLC

By:_____
Printed Name:_____
Title:_____

STATE OF TEXAS      §
COUNTY OF HARRIS     §

This instrument was acknowledged before me this ___ day of _____, 2010, by Robert P. Munn, the President of Permian Atlantis LLC on behalf of said organization.

_____
Notary Public in and for the State of Texas

STATE OF TEXAS      §
COUNTY OF HARRIS     §

This instrument was acknowledged before me this ___ day of _____, 2010, by Robert P. Munn, the President of Permian Phoenix LLC on behalf of said organization.

_____
Notary Public in and for the State of Texas

STATE OF TEXAS      §
COUNTY OF DALLAS     §

This instrument was acknowledged before me this ___ day of _____, 2010, by _____, the _____ of Heritage Disposal Corporation on behalf of Heritage Disposal Corporation.

_____
Notary Public in and for the State of Texas