Joe E. Marshall
Texas Bar No. 13031100
Kathleen M. Patrick
Texas Bar No. 24037243
Lee J. Pannier
Texas Bar No. 24066705
**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201-6659
Telephone:  (214) 855-7500
Facsimile:    (214) 978-4365
jmarshall@munsch.com
kpatrick@munsch.com
lpannier@munsch.com

**(PROPOSED) COUNSEL FOR HERITAGE CONSOLIDATED, LLC,
DEBTOR AND DEBTOR IN POSSESSION**

Kevin D. McCullough
Texas Bar No. 00788005
Kerry Ann Miller
Texas Bar No. 24050875
**ROCHELLE McCULLOUGH LLP**
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Telephone:   (214) 953-0182
Facsimile:     (214) 953-0185
kdm@romclawyers.com
kmiller@romclawyers.com

**(PROPOSED) COUNSEL FOR HERITAGE STANDARD CORPORATION,
DEBTOR AND DEBTOR IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § | |
| HERITAGE CONSOLIDATED, LLC; | § | Case No. 10-36484-HDH |
| HERITAGE STANDARD | § § | |
| CORPORATION, | § | Case No. 10-36485-HDH |
| | § | |
| Debtors. | § | Chapter 11 |
| | § § | |
| | § | (Joint Administration Requested) |
| | § | |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING: (I) SECURED POSTPETITION FINANCING; (II) RELATED PRIMING LIENS AND SUPER-PRIORITY ADMINISTRATIVE CLAIMS); (III) RELATED SECURED FINANCING AGREEMENT; AND (IV) SCHEDULING A FINAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Heritage Consolidated, LLC ("Consolidated") and Heritage Standard Corporation ("HSC" and together with Consolidated, the "Debtors"), the debtors and debtors-in-possession in the above-captioned bankruptcy cases, file their *Emergency Motion for Interim and Final Orders Approving: (I) Secured Postpetition Financing; (II) Related Priming Liens and Super-Priority*

*Administrative Claims; (III) Related Secured Financing Agreement and (IV) Scheduling a Final Hearing* (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

## I. SUMMARY OF RELIEF REQUESTED

1. By and through this Motion, the Debtors request authority to obtain credit pursuant to section 364 of the Bankruptcy Code. The Debtors require postpetition financing (the "DIP Financing") in order to preserve and maximize their assets, to preserve their going concern values, and to enable their proposed sale process and reorganization efforts for the benefit of their Estates and their creditors. Without postpetition financing, the Debtors will not be able to pay their employees, vendors, and lessors and otherwise continue their postpetition operations and effectuate their sale process and reorganization, which, among other things, will facilitate the drilling of the Pat Howell Well (defined hereinbelow) and provide them with an opportunity to generate revenues sufficient to satisfy all of the Debtors' obligations.

2. Pursuant to Rule 4001(b)(1)(B) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors provide the following summary of the key aspects of the relief sought:

Relevant Terms of the DIP Credit Facility[1]

(a) Borrowers. Heritage Consolidated, LLC and Heritage Standard Corporation.

(b) Proposed DIP Credit Agreement. Senior Secured Credit Agreement among the Debtors, the DIP Lender, the DIP Agent and those certain prepetition lenders (the "Prepetition Lenders") to the Credit Agreement dated October 30, 2008, with Consolidated and CIT Capital USA Inc. as administrative agent (the "Administrative Agent" and together with the DIP Agent, the "Agents") as parties thereto, as amended from time to time.

---

[1] The following summary is subject in all respects to the terms of the DIP Credit Agreement, interim Order approving the use of cash collateral and debtor-in-possession financing and final Order approving the use of cash collateral and debtor-in-possession financing.

(c) DIP Lender. CIT Capital USA Inc. (the "DIP Lender" and together with the Prepetition Lenders, the "Lenders").

(d) DIP Agent: CIT Capital Securities, LLC (the "DIP Agent").

(e) Loan Amount. The DIP Credit Facility shall be up to $4,600,000 (the "Commitment") for revolving loans (the "DIP Loans"), which shall consist of the following tranches: (i) an initial tranche in the principal amount of $2,600,000 ("Tranche A") to fund expenses set forth in the Operating Budget (the "Operating Expenses"); and (ii) an additional tranche in the principal amount of $2,000,000 ("Tranche B") to fund capital expenses covering sidetrack operations relating to the Pat Howell Well (the "Capital Expenses"). Tranche B may not be drawn until after the effective date (the "Effective Date") of a plan of reorganization for Consolidated that is supported by the DIP Lender, the Administrative Agent, and the Lenders.).

(f) Availability and Term. Borrowings shall be repaid in full and the Commitment shall terminate, on the earliest of (i) 120 days after Consolidated's petition date, (ii) thirty-five days after the entry of the first interim order approving the DIP Credit Facility (the "Interim Order") if the final order approving the DIP Credit Facility on a final basis (the "Final Order") has not been entered prior to the expiration of such thirty-five-day period, (iii) the consummation of any sale of substantially all of the Debtors' assets or of such assets in any of the Cases sufficient to repay in full all obligations to the Lenders, the Administrative Agent and the DIP Lender, (iv) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the effective date) of a plan of reorganization for the Borrowers that is confirmed pursuant to an order entered by the Bankruptcy Court, (v) the conversion of any of the Debtors' bankruptcy cases to Chapter 7 of the Bankruptcy Code, (vi) dismissal of any of the Debtors' bankruptcy cases, and (vii) the acceleration of the loans and the termination of the Commitment under the definitive agreement for the DIP Credit Facility (the "DIP Credit Agreement") (the earliest to occur of items (i) through (vii), being the "Maturity Date"). Debtors may request reasonable extensions of the Maturity Date and such request shall not be deemed a violation of any agreement, including the Plan Support Agreement, and the DIP Lender and DIP Agent may deny such request in their sole and absolute discretion.

During the period covered by the Interim Order, the amount available under the DIP Credit Facility and set forth on the initial Operating Budget (the "Initial Operating Budget"), which is attached hereto and incorporated herein as **Exhibit "A"**, for such period shall be limited to the difference between the Borrowers' Initial Operating Budget and the Borrowers' Cash

Collateral[2] (excluding reserves not to exceed $25,000) available to the Debtors.

(g) <u>Collateral</u>. The obligations under the DIP Credit Facility shall be secured by first priority security interests and liens to be granted by HSC in, to, and on all of its assets and first priority security interests and liens to be granted by Consolidated in, to, and on all of its assets; provided however that no security interests and liens shall be granted in any causes of action under Chapter 5 of the Bankruptcy Code. The collateral securing the obligations of the Borrowers under the DIP Credit Facility shall be referred to herein as the "<u>DIP Collateral</u>".

(h) <u>Use of Proceeds</u>. The DIP Credit Facility shall be used only to pay post-petition Operating Expenses set forth in the weekly budgets prepared by the Borrowers setting forth projections on a weekly basis for a rolling thirteen week period (each, an "<u>Operating Budget</u>") approved, except in the case of the Initial Operating Budget (as such term is defined above), by the DIP Lender.

Capital expenditures shall be in accordance with the Operating Budgets.

(i) <u>Carve-Out</u>. The DIP Lender's lien on the DIP Collateral and their super-priority administrative expense claim shall be subject to a Carve-Out for (i) the quarterly fees required to be paid under 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; (ii) the fees and expenses of the professionals of the Debtors and any official committee appointed in the Bankruptcy Cases incurred by the Debtors or any official committee prior to an Event of Default, up to the amount allocated for such fees and expenses in the Operating Budget; and (iii) allowed professional fees for the Debtors up to $75,000 (less the amount of any retainers held by such professionals as of the occurrence of such DIP Event of Default) for services rendered after a DIP Event of Default.

3. For additional detail regarding the DIP Credit Facility, parties in interest should review the DIP Term Sheet attached hereto and incorporated herein as **Exhibit "B."**

---

[2] "<u>Cash Collateral</u>" shall mean all cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits of property subject to a security interest, including the pre-petition collateral as provided in Section 552(b) of the Bankruptcy Code, whether existing before or after the commencement of the bankruptcy cases. For the avoidance of doubt, the Borrowers acknowledges that Cash Collateral does not include revenues attributable to the portion of its net revenue interest previously conveyed to CIT Capital USA Inc. pursuant to that certain Assignment of Term Overriding Royalty Interest, effective May 1, 2010

## II. JURISDICTION AND PROCEDURAL BACKGROUND

4.  On September 14, 2010 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code"), thereby initiating the above-captioned cases with this Court (the "Bankruptcy Cases").

5.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are operating and managing their business and properties as debtors-in-possession. No trustee or examiner has been appointed in the Bankruptcy Cases and no committees have yet been appointed or designated.

6.  This Court has jurisdiction over the Bankruptcy Cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This Motion involves a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Bankruptcy Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.  The statutory and legal predicates for the relief requested herein are sections 105, 364, and 503 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## III. STATEMENT OF FACTS

**A. The Debtors and Their Operations**

8.  The Debtors are privately-held companies that operate in the oil and gas industry. The Debtors' core operations consist of exploration for, and acquisition, production, and sale of, crude oil and natural gas. Consolidated is a Texas limited liability company that owns the majority of the oil and gas wells, leasehold interests, and mineral interests that allow the Debtors to conduct their oil and gas operations. Specifically, Consolidated, among other things: (i) acquires and owns the pertinent oil and gas leases; (ii) participates in drilling and completing oil

and gas wells on the properties covered by those leases; (iii) markets and sells oil, gas, and other hydrocarbons from those wells; and (iv) acquires and owns other oil and gas properties such as mineral interests and development and production rights. HSC, a Texas corporation, is an exploration and production company that develops oil and gas prospects owned by Consolidated and other working interest owners; it is also a lessee of certain oil and gas leases.

9. The Debtors focus their development efforts primarily on the Permian Basin in west Texas and southeastern New Mexico (the "Target Area"). The Debtors and their predecessors have been exploring and developing the Target Area since 1984.

10. As part of conducting their business, the Debtors are lessees under, or assignees of, oil and gas leases and are parties to certain operating agreements, farmout agreements, joint venture agreements, gas marketing agreements, gas transportation agreements, and other agreements.

### B. The CIT Prepetition Secured Debt

11. Consolidated is the borrower under that certain Credit Agreement, dated October 30, 2008 (as amended from time to time, the "CIT Credit Agreement"), among Consolidated, CIT Bank ("CIT"), the Administrative Agent, and other lenders from time to time thereto (together, with CIT, the "Prepetition Lenders"). The CIT Credit Agreement is a $30,000,000 revolving credit facility with an initial borrowing base limit of $18,000,000 and was intended to provide working capital for the Debtors' exploration and production operations. The aggregate principal and interest currently outstanding under the CIT Credit Agreement is approximately $18.5 million.[3]

---

[3] Additionally, Consolidated and HSC are jointly and severally liable pursuant to that certain promissory note dated July 30, 2010, by and between Consolidated, HSC and the Prepetition Lenders in the principal amount of $400,000.

12. The Prepetition Lenders allege that Consolidated's obligations under the CIT Credit Agreement are secured by a first lien on substantially all of Consolidated's oil and gas assets, and that the proceeds, products and offspring of the Prepetition Collateral constitute the Prepetition Lenders' Cash Collateral.

C. **Events Leading to the Chapter 11 Filing**

13. In August, 2009, HSC began operations on that certain oil and gas well in Winkler County, Texas, known as the Pat Howell well (the "Pat Howell Well"). The Pat Howell Well is located in the Permian Basin which has proven reserves of approximately 16.9 billion cubic feet ("bcf") of natural gas in the Atoka formation. Over the course of ten months, HSC conducted operations to re-enter the existing wellbore for the Pat Howell Well and then complete operations to the Atoka formation. Due to a series of operational mistakes and difficulties with the wellbore, the Pat Howell Well has not been completed and placed online and approximately $11.6 million in contractor and service debt has been accumulated as a result thereof. Most, if not all, of the problems encountered in these operations were the result of contractor negligence, which is now the subject of lawsuits initiated by HSC and pending in various Texas state courts. The significant debt incurred in connection with the operations on the Pat Howell Well, coupled with the lack of anticipated production therefrom, has negatively impacted the Debtors' ability to meet their ongoing obligations to trade creditors and its lenders. As a result, the Debtors determined that it was in the best interest of creditors to initiate the Bankruptcy Cases in order to protect and preserve their assets in order to implement a plan to successfully complete the Pat Howell operations, sell their oil & gas properties and interests and maximize the potential recoveries for the payment of its debt. The Debtors also intend to utilize the recoveries from the

pending suits involving the Pat Howell Well in its reorganization to satisfy all legitimate claims against their bankruptcy estates.

## IV. ARGUMENTS AND AUTHORITIES

14. By this Motion, the Debtors request authorization to obtain and access the DIP Credit Facility from the DIP Lender pursuant to the terms set forth in the DIP Credit Agreement and the proposed Interim and Final Orders. The proposed financing will be provided by the DIP Lender and is intended to preserve the Debtors' value by funding their operations pending consummation of the Debtors' plan of reorganization. The Debtors propose to give the DIP Lender a first priority lien on the DIP Collateral.

15. Pending entry of the Final Order, the Debtors request that the Court (A) authorize the Debtors, on an interim basis, to (i) borrow up to $2.6 million under Tranche A included in the DIP Credit Facility, and (ii) grant the lien and super-priority claims described herein to the DIP Lender, (B) approve the proposed notice of the Final Hearing, and (C) schedule the Final Hearing.

**A.     Prepetition Funding of the Debtors' Operations and Resulting Liens**

16. Since 2008, the funding provided by the Prepetition Lenders under the CIT Credit Agreement was the primary source of capital supporting the operations of Consolidated. With respect to the operations involving the Pat Howell Well, HSC contracted with service vendors which resulted in joint interest billings ("JIBs") to Consolidated aggregating approximately $16 million. Some of these trade creditors have asserted M&M liens against certain of the Debtors' assets. HSC also asserts an operator's lien pursuant to that certain Joint Operating Agreement under applicable state law.

B. **The Proposed Use of Postpetition Financing**

17. The Debtors' ability to pay its employees and maintain operations is essential to their ability to propose a plan of reorganization which they believe can satisfy all allowed claims. The Debtors have also requested access to cash collateral from existing operations to fund a portion of these expenses but additional funding is required.[4] Tranche A under the DIP Credit Facility in the amount of $ 2.6 million will be utilized to fund operations, including the payment of expenses ("Operating Expenses") for approximately thirteen (13) weeks pursuant to the Initial Operating Budget approved by the DIP Lender. Tranche B under the DIP Credit Facility in the amount of $2 million will be used to fund sidetrack operations relating to the Pat Howell Well (the "Capital Expenses"), and may not be drawn until after the effective date (the "Effective Date") of a plan of reorganization for Consolidated that is supported by the DIP Lender, the Administrative Agent, and the Lenders.).

C. **The Proposed DIP Credit Facility Should Be Approved**

18. Approval of the DIP Credit Facility will provide the Debtors with immediate and ongoing access to necessary capital to pay the Operating Expenses during the initial three months of the Bankruptcy Cases. Unless these expenditures are made, the Debtors could be forced to cease operations, which could result in irreparable harm to their businesses and substantial deterioration of the value of its enterprise to the detriment of their estates, its employees, its creditors, and its stakeholders.

19. As set forth above, the Debtors propose to obtain the proposed debtor-in-possession financing pursuant to sections 364(c)(1) and (2) of the Bankruptcy Code. The DIP

---

[4] Simultaneously herewith, the Debtors have filed their Emergency Motion for Order (A) Authorizing Interim and Final Use of Cash Collateral; and (B) Granting Adequate Protection, thereby seeking authorization to utilize cash collateral from operations. This cash collateral is subject to the liens of the Prepetition Lenders, the operator's lien of HSC and the putative liens of certain trade creditors.

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS APPROVING: (I) SECURED POSTPETITION FINANCING; (II) RELATED PRIMING LIENS AND SUPER-PRIORITY ADMINISTRATIVE CLAIMS; (III) RELATED SECURED FINANCING AGREEMENT AND (IV) SCHEDULING A FINAL HEARING– Page 9**

Lender is willing to provide debtor-in-possession financing to the Debtors in exchange for a super-priority administrative claim and a perfected first priority lien in the DIP Collateral. The Debtors have investigated all other available options to obtain either unsecured or secured financing on comparable or better terms but have been unsuccessful. The DIP Lender has offered to provide the debtor-in-possession on the most favorable terms possible and, therefore, such financing is in the best interest of the Estates and the creditors.

20. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit with priority over all administrative expenses of the debtor or incur debt secured by a lien on property of the estate that is not otherwise subject to a lien. 11 U.S.C. § 364(c)(1) and (2).

21. The Debtors' capital needs can be satisfied only if the Debtors are immediately authorized to borrow at least (i) $2.6 million under Tranche A of the DIP Credit Facility to fund the Operating Expenses, (ii) $2 million under Tranche B of the DIP Credit Facility to fund Capital Expenses in connection sidetrack operations on the Pat Howell Well. The Debtors submit that they are unable to obtain the funds to be provided under the DIP Credit Facility on more favorable terms than those contained in the DIP Credit Agreement and the DIP Orders. The Debtors believe that they could not (i) obtain the required funds in the ordinary course of business on an unsecured basis allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or (ii) obtain the required funds in the non-ordinary course as an administrative expense allowable under section 503(b)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 364(a),(b). The Debtors also believe that the terms offered by the DIP Lender are significantly more favorable than any terms that have been offered by other potential lenders.

The Debtors submit that the circumstances of this case require the Debtors to obtain financing from the DIP Lender under sections 364(c) of the Bankruptcy Code, and accordingly, the DIP Credit Facility reflects the exercise of its sound business judgment.

22. Courts grant a debtor considerable deference in exercising its sound business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). *See also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981). In determining whether to approve postpetition financing, courts generally require the following factors: (a) that the credit transaction is necessary to preserve assets of the debtor's estate; and (b) that the terms of the credit agreement are fair, reasonable, and adequate. *In re Crouse Group, Inc.*, 71 B.R. 544, 546, 549-50 (Bankr. E.D. Pa. 1987). Under this or any other standard, ample justification exists for the approval of the proposed DIP Credit Facility under sections 364(c) and 364(d) of the Bankruptcy Code.

23. Here, the Debtors have determined that financing is available only under section 364(c) of the Bankruptcy Code and that entering into the DIP Credit Facility is in the best interests of the Debtors and their estates. Thus, the Debtors can show "by a good faith effort that credit was not available" absent the protections of § 364(c). *Brav v. Shenandoah Federal Sav. and Loan Assn (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes

no duty to seek credit from every possible lender before concluding that such credit is unavailable"). *Accord In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sun Valley, Inc.*, 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

24. The Debtors negotiated with the DIP Lender at arms-length, in good faith and pursuant to their sound business judgment. The terms and conditions of the DIP Credit Agreement are fair and reasonable under the circumstances. Accordingly, the DIP Lender and all obligations incurred under the DIP Credit Facility should be afforded the benefits of section 364(e) of the Bankruptcy Code.

25. Similarly, the Court is authorized to approve postpetition financing secured by a priming lien if: (i) the Debtors cannot obtain credit otherwise; and (ii) the interests of the creditor whose lien is primed is adequately protected. *See* 11 U.S.C. § 364(d)(1); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). The DIP Lender will not extend financing without the security offered by a priming lien. The Debtors cannot obtain postpetition financing from any other source, and it is virtually certain that no party would extend credit to the Debtors unless it was secured by a priming lien. The Debtors, therefore, satisfy the first requirement.

26. With respect to adequate protection, the DIP Lender is the Administrative Agent for those Prepetition Lenders holding prepetition liens against the assets of Consolidated, and it would be their liens and security interests being primed, to which they consent. With respect to other secured claims, including the asserted operator's lien of Standard and various mechanics and materialmens' liens ("M&M Liens") asserted by various trade vendors, to the extent they are valid, have priority and have value, such liens are adequately protected through the total value of

all reserves and other assets of the Debtors. Moreover, the DIP Credit Facility will enable the Debtors to complete the Pat Howell Well and place it online for production, thereby further increasing the value of the Debtors' assets. Accordingly, the priming liens to be granted to the DIP Lender do not negatively affect the value of prepetition collateral, and instead enhance that value.

**D.     The Interim Approval Should Be Granted**

27.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

28.     Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court: (a) conduct an expedited preliminary hearing on the Motion and authorize the Debtors to borrow $2.6 under Tranche A of the DIP Credit Facility on an interim basis to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest; and (b) schedule a Final Hearing on the relief requested herein.

29.     Absent authorization from the Court to obtain the proposed interim DIP Loan pending a Final Hearing, the Debtors will be immediately and irreparably harmed. As set forth above, the Debtors' ability to enter into the DIP Credit Agreement is critical to the success of their chapter 11 cases and the ability to preserve any value for its creditors. Because existing cash collateral is insufficient, without immediate liquidity provided by access to the Interim DIP

Loan, the Debtors will be unable to conduct normal business operations, and their estates, creditors, employees, and equity holders will be immediately and irreparably harmed.

## V. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request that the Court enter an order substantially in the form of the proposed interim order attached hereto as **Exhibit "C"**: (i) authorizing the Debtors to execute the DIP Credit Agreement; (ii) authorizing the Debtors to immediately borrow $2.6 million, on an interim basis, from the DIP Lender under the terms of the DIP Credit Agreement; (iii) setting a final hearing on this Motion; (iv) after said final hearing, authorizing the Debtors to borrow the full amount of the DIP Credit Facility under the terms of the DIP Credit Agreement; (v) granting the DIP Lender priming liens and super-priority expense claims as security for any funds extended under the DIP Credit Agreement, whether on an interim basis or on a final basis, and (vi) providing the Debtors such other and further relief to which they may show themselves to be justly entitled.

Dated: September 15, 2010.  Respectfully Submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By:   /s/ Joe E. Marshall
    Joe E. Marshall
    Texas Bar No. 13031100
    Kathleen M. Patrick
    Texas Bar No. 24037243
    Lee J. Pannier
    Texas Bar No. 24066705
    3800 Lincoln Plaza
    500 North Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4365
    jmarshall@munsch.com
    kpatrick@munsch.com
    lpannier@munsch.com

(PROPOSED) COUNSEL FOR HERITAGE
CONSOLIDATED, LLC,
DEBTOR AND DEBTOR IN POSSESSION

-and-

**ROCHELLE McCULLOUGH LLP**

By:   /s/ Kevin D. McCullough
    Kevin D. McCullough
    Texas Bar No. 00788005
    Kerry Ann Miller
    Texas Bar No. 24050875
    325 N. St. Paul, Suite 4500
    Dallas, Texas 75201
    Telephone: (214) 953-0182
    Facsimile: (214) 953-0185
    kdm@romclawyers.com
    kmiller@romclawyers.com

**(PROPOSED) COUNSEL FOR HERITAGE
STANDARD CORPORATION,
DEBTOR AND DEBTOR IN POSSESSION**

## CERTIFICATE OF CONFERENCE

      I certify that I have contacted the U.S. Trustee, the Prepetition Lenders and the proposed DIP Lender concerning the relief sought herein.  I have also provided these parties with a copy of the Motion and proposed Interim Order.  The Debtors will conduct ongoing discussions regarding the requested relief with these parties and any other affected party.

                                                       /s/ Kevin D. McCullough
                                                    Kevin McCullough