# EXHIBIT B

*Heritage Consolidated LLC and Heritage Standard Corporation*

Summary of Terms and Conditions for Proposed DIP Facility
Dated as of September 7, 2010

This Term Sheet does not represent a commitment, obligation or understanding on the part of any putative lender party to provide any financing on such matters. No lender shall be so obligated unless and until all definitive documentation is negotiated and executed and all conditions precedent (including requisite bankruptcy court approval in form and substance satisfactory to the DIP Lender) are satisfied or waived. The definitive documentation may contain additional terms which do not vary materially from the terms described herein.

| | |
|---|---|
| Cases: | Heritage Consolidated LLC (the "**Consolidated**") and Heritage Standard Corporation ("**Standard**" and together with Consolidated, the "**Borrowers**") and each of the direct and indirect subsidiaries of the Borrowers in the event that they should become debtors (collectively the "**Debtors**") in Chapter 11 cases (collectively, the "**Cases**") under the Bankruptcy Code filed in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Bankruptcy Court**"). |
| Credit Agreement: | Credit Agreement dated as of October 30, 2008 among Consolidated, CIT Capital USA Inc., as administrative agent (the "**Administrative Agent**") and the lenders party thereto (the "**Lenders**"), as amended. |
| DIP Lender: | CIT Capital USA Inc. (the "**DIP Lender**") |
| DIP Agent and Arranger: | CIT Capital Securities LLC |
| Commitment and Availability: | The DIP Facility shall be up to $4,600,000 (the "**Commitment**") for revolving loans (the "**DIP Loans**"), which shall consist of the following tranches: (i) an initial tranche in the principal amount of $2,600,000 ("**Tranche A**") to fund expenses set forth in the Operating Budget (the "**Operating Expenses**"); and (ii) an additional tranche in the principal amount of $2,000,000 ("**Tranche B**") to fund capital expenses covering sidetrack operations relating to the Pat Howell Well (the "**Capital Expenses**"). Tranche B may not be drawn until after the effective date (the "**Effective Date**") of a plan of reorganization for Consolidated that is supported by the DIP Lender, the Administrative Agent, and the Lenders. |
| Term: | Borrowings shall be repaid in full and the Commitment shall terminate, on the earliest of (i) 120 days after Consolidated's petition date, (ii) thirty-five days after the entry of the first |

interim order approving the DIP Facility (the "**Interim Order**") if the final order approving the DIP Facility on a final basis (the "**Final Order**") has not been entered prior to the expiration of such thirty-five-day period, (iii) the consummation of any sale of substantially all of the Debtors' assets or of such assets in any of the Cases sufficient to repay in full all obligations to the Lenders, the Administrative Agent and the DIP Lender, (iv) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the effective date) of a plan of reorganization for the Borrowers that is confirmed pursuant to an order entered by the Bankruptcy Court, (v) the conversion of any of the Debtors' bankruptcy cases to Chapter 7 of the Bankruptcy Code, (vi) dismissal of any of the Debtors' bankruptcy cases, and (vii) the acceleration of the loans and the termination of the Commitment under the definitive agreement for the DIP Facility (the "**DIP Credit Agreement**") (the earliest to occur of items (i) through (vii), being the "**Maturity Date**"). Debtors may request extensions of the Maturity Date, such request shall not be deemed a violation of any agreement between the Debtors and the Lenders, including the Plan Support Agreement, and the DIP Lender and DIP Agent may deny any such request in their sole and absolute discretion.

Notwithstanding the foregoing, upon the Effective Date, one-half of the outstanding amount of the DIP Loans shall be applied against the payment to be made by a Cross Canyon entity to Standard on account of its Non-Section 6 Operator's Lien, one-quarter of the outstanding amount of the DIP Loans shall be assumed post-Effective Date by the Cross Canyon entity that will own the Non-Section 6 Assets, and one-quarter of the outstanding amount of the DIP Loans shall be assumed post-Effective Date by the Cross Canyon entity that will own the Section 6 Assets on terms acceptable to the DIP Agent and DIP Lender.

| Use of Facility: | Prior to the commencement of the Cases, the Borrowers shall provide the DIP Lender with a cash flow budget from the petition date through December 10, 2010 (the "**Global Budget**"). The Global Budget shall be in form and substance satisfactory to the DIP Lender. However, the DIP Facility shall be used only to pay post-petition Operating Expenses set forth in the weekly budgets prepared by the Borrowers setting forth projections on a weekly basis for a rolling thirteen week period ("**Operating Budgets**") approved, except in the case of the Initial Operating Budget (as such term is defined below), by the |

DIP Lender.

Operating Budgets shall be submitted on a weekly basis (i.e. calendar weeks) and shall show on a line-item basis budgeted cash receipts (including as a result of borrowings under the DIP Facility) and disbursements for each week within each such rolling thirteen (13) week period. Debtors' Operating Budgets shall contemplate and include timely payment of the reasonable pre- and post-petition legal and professional fees incurred by the Administrative Agent, the Lenders, the DIP Agent and the DIP Lender up to but not exceeding the amounts in the Operating Budget. As part of the Operating Budget process, the Borrower will be required to adhere to the respective Operating Budgets and variances to the respective Operating Budgets will only be permitted to the extent of 10% per category for each three week period (the "**Permitted Variance**").

As to professional fees and fees and expenses of any unsecured creditors' committee, the variance shall serve as a limit as to the consent of Lenders and DIP Lender to permit Debtors to fund such fees and expenses under the budget, with respect to use of cash collateral, but any such fees and expenses incurred in excess of the variance shall not serve as a default under the DIP Facility nor a limitation as to any claim such professionals or creditors may have against the Debtors' estate in regards to such excess amounts. No later than one week after the conclusion of each weekly period, the Borrowers shall (i) furnish the DIP Lender with weekly reconciliations of projected versus actual receipts and disbursements for that prior week in a form and manner acceptable to the DIP Lender in its sole and absolute discretion; and (ii) conduct a weekly telephone conference with the DIP Lender to discuss the receipts, disbursements, and reconciliations.

During the period covered by the Interim Order, the amount available under the DIP Facility and set forth on any initial Operating Budget for such period (the "**Initial Operating Budget**") shall be limited to the difference between the Borrowers' Initial Operating Budget and the Borrowers' Cash Collateral (as defined below) (excluding reserves not to exceed $25,000) available to the Debtors.

"**Cash Collateral**" shall mean all cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits of property subject to a

security interest, including the pre-petition collateral as provided in Section 552(b) of the Bankruptcy Code, whether existing before or after the commencement of the bankruptcy cases. For the avoidance of doubt, the Borrowers acknowledges that Cash Collateral does not include revenues attributable to the portion of its net revenue interest previously conveyed to CIT Capital USA Inc. pursuant to that certain Assignment of Term Overriding Royalty Interest, effective May 1, 2010.

Capital expenditures shall be in accordance with the Operating Budgets.

The Initial Operating Budget attached hereto as Schedule A has been approved by the DIP Lender. Subsequent Operating Budgets shall be delivered to the DIP Lender no later than by the end of the third week of each month covered by the then operative Operating Budgets.

Once approved by the DIP Lender, the Operating Budgets set forth therein (including, without limitation, the Initial Operating Budget) shall be deemed to be approved without further order of the Court. The Borrowers shall be required to re-submit both such a modified Operating Budget and the accompanying recast Global Budget for approval by the DIP Lender whenever there has been a sale of any asset or assets of the Borrower for a value in excess of $50,000. If approved by the DIP Lender, any such recast Global Budget (including the re-submitted Operating Budget(s) included therein) shall set forth the deemed approved Operating Budget going forward.

Closing Date:

Closing Date to occur as promptly as is practicable after the entry of the Interim Order. If the Interim Order is not entered prior to September 13, 2010, then the obligation of the DIP Lender shall terminate.

Collateral:

The obligations under the DIP Facility shall be secured by first priority security interests and liens to be granted by Standard in, to, and on all of its assets and first priority security interests and liens to be granted by Consolidated in, to, and on all of its assets; provided however that no security interests and liens shall be granted in any causes of action under Chapter 5 of the Bankruptcy Code. The collateral securing the obligations of the Borrowers under the DIP Facility shall be referred to herein as the "**DIP Collateral**".

Priority:

The obligations under the DIP Facility shall be authorized pursuant to Section 364(c)(1) of the Bankruptcy Code to be

incurred as, and shall constitute, claims with a priority over all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code. The security interests and liens in the DIP Collateral securing the obligations under the DIP Facility shall be authorized pursuant to Sections 364(c)(2), (3) and 364(d) of the Bankruptcy Code to constitute a lien on and in the DIP Collateral ranking prior to all other claims and liens including those securing debt owed by the Debtors, Heritage Disposal Corporation, and Heritage Gathering Corp. to related parties.

Specifically, such liens securing the DIP Facility (the "**DIP Priming Liens**") will be senior in priority to the security interests and liens securing the indebtedness and other obligations owing under the Credit Agreement and any other trade or other secured creditors.

The DIP Priming Liens shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the DIP Agent or the DIP Lender. Except for Permitted Liens (as defined below), no other security interests or liens (whether under Section 364 of the Bankruptcy Code or otherwise) shall be permitted to be granted by the Debtors on the DIP Collateral.

"**Permitted Liens**" shall mean (i) liens granted by the Debtors to secure the repayment of the DIP Facility, (ii) liens granted by the Debtors securing the repayment of the obligations under the Credit Agreement and/or providing a form of adequate protection of the interest of the Administrative Agent or the Lenders in their pre-petition collateral, (iii) the operator liens held by HSC pursuant to the joint operating agreements relative to the DIP Collateral, and (iv) valid, existing liens of creditors other than Agent and the Lenders (it being understood that the amount, validity, perfection, and seniority of any such pre-petition liens *vis a vis* the Administrative Agent ultimately must be established to be treated as constituting a "Permitted Lien" entitled to the priority described herein).

|   |   |
|---|---|
| <u>Use of Cash Collateral</u>: | The DIP Facility shall not be available for use by the Borrowers (including for the benefit of any of the other Debtors) unless the Court shall have authorized the use by the Debtors of proceeds of pre-petition collateral that constitutes "cash collateral" (within the meaning of the Bankruptcy Code) in respect of the liens granted pursuant to the Credit Agreement, the terms of which order must be satisfactory to the DIP Lender and the Lenders, it being contemplated that the terms and conditions of such cash |

collateral arrangement shall be set forth on an interim basis in the Interim Order and on a final basis in the Final Order. Without limiting the generality of the foregoing, the terms and conditions of such cash collateral arrangement shall include that (i) the Debtors shall use and exhaust the "cash collateral" on hand on the petition date and thereafter coming into the Debtors' possession (after establishment of reserves by the Debtors in an amount not to exceed $25,000 plus reserves for the carve-out rights established pursuant to the Interim Order or the Final Order, as applicable) (collectively, the "**Pre-Borrowing Cash Collateral**") before the Debtors shall be entitled to borrow any amounts under the DIP Facility, (ii) the Debtors shall not be entitled to use any of the Pre-Borrowing Cash Collateral until the "Conditions of Initial Extension of Credit" described below (other than the condition relating to the Pre-Borrowing Cash Collateral itself) have been satisfied, and (iii) the amount of Pre-Borrowing Cash Collateral that may be expended under the Initial Operating Budget for the period covered by the Interim Order shall not exceed the amounts set forth in the Initial Operating Budget or Operating Budgets, as the case may be, plus the Permitted Variance relating to such aggregate amount.

| DIP Facility Fees: | 2.5% of the amount of Tranche A payable at the closing of the DIP Facility. |
|---|---|

| Exit Fees: | 2.5% of the amount of Tranche A payable at final pay-down of the outstanding obligations under the DIP Facility, a closing relative to confirmation of any plan of Consolidated, or any other time of termination of the Commitments or closing of a sale of all or substantially all the assets of any of the Debtors, whichever is earlier. |
|---|---|

| Interest Rate: | With respect to the Tranche A of the DIP Loan, prior to the Effective Date, the non-default interest rate will be the DIP Agent's Rate (the same as the Prime Rate under the Credit Agreements, which shall be the interest rate publicly announced by JPMorgan Chase Bank, N.A. from time to time as its general reference rate of interest, which prime rate shall change upon any change in such announced or published general reference interest rate and which prime rate may not be the lowest interest rate charged by the Administrative Agent or the Lenders (provided that in no event shall such rate be less than 3.0%)) plus 8.0%. After the Effective Date, the non-default rate will be 10%. |
|---|---|

With respect to Tranche B of the DIP Loans, the non-default rate

will be 10%.

With respect to the DIP Loans, (i) there shall be no LIBOR Rate or other optional pricing option; (ii) interest on all loans shall be payable monthly in arrears and on the Maturity Date and shall be computed for the actual number of days elapsed on the basis of a year of 360 days; (iii) interest will be payable on or before the last business day of each month commencing on September 30, 2010; and (iv) in no event shall the Interest Rate exceed the highest lawful rate.

Default Interest:

Upon the occurrence and during the continuance of any default, including, without limitation, in the payment of principal, interest or other amounts due, under the definitive credit agreement for the DIP Facility (the "**DIP Credit Agreement**"), interest on all outstanding loans under the DIP Credit Agreement shall be payable on demand at 4.0% above the then-applicable rate.

Mandatory Permanent Prepayments and Cash Collateralization:

Mandatory prepayments (and concomitant Commitment reductions) shall also be required in connection with asset sales by either of the Borrowers under the following circumstances:

All Net Asset Sale Proceeds (as defined below) (other than proceeds realized from Permitted Asset Sales (as hereinafter defined) shall be paid to the DIP Lender until the obligations under the DIP Facility are paid in full in cash, with a concomitant permanent reduction in the amount of the Commitment. Thereafter, any remaining Net Asset Sale Proceeds shall be held in trust pending further order of the court. "**Net Asset Sale Proceeds**" shall mean proceeds arising from a sale not in the ordinary course of business less any (i) professional or management fees and expenses attributable to the pertinent sale for any professional whose retention for such purpose has been approved pursuant to an Order enforced by the Bankruptcy Court, including allowed and previously unpaid attorneys' fees and expenses related to that transaction, (ii) *only with respect to computing "Net Asset Sale Proceeds" for purposes of payment of the Pre-Petition Secured Obligations of the Administrative Agent and the Lenders*, proceeds not subject to valid, enforceable, perfected and unavoidable liens of the Administrative Agent and Lenders, if any, (as such proceeds are to be used first to pay down the DIP Facility), (iii) *only with respect to computing "Net Asset Sale Proceeds" for purposes of payment of the Pre-Petition Secured Obligations of the Administrative Agent and the Lenders,* amounts to be agreed upon with the Administrative Agent and the Lenders for

adjusted budgets (*i.e.*, Initial Operating Budget, Operating Budgets or Global Budget) post-sale, (iv) any amount accrued and unpaid, and not otherwise reserved and for which the Debtors do not already have available sufficient cash to fund, pursuant to any carve-out rights per the Interim Order or Final Order and (v) other ordinary and customary sale and transaction costs and expenses including applicable taxes related to that transaction.

Absent the occurrence of a DIP Event of Default (as hereinafter defined), Permitted Asset Sales (as hereinafter defined) shall not trigger the type of application described above, but instead, the proceeds of Permitted Asset Sales shall be applied against the DIP Loans, and, assuming that the Borrower is otherwise entitled to continue to borrow under the DIP Facility, such proceeds of Permitted Asset Sales shall be available for re-borrowing as DIP Loans. For these purposes, "**Permitted Asset Sales**" shall consist of: (i) sales of hydrocarbons produced from Debtors' properties in the ordinary course of business; and (ii) sales of other assets where the consideration received from all of such sales does not exceed $25,000 in the aggregate (or such greater aggregate amount, if any, agreed to pursuant to the provisions of the DIP Credit Agreement (as described herein)).

Proceeds from the sale of assets on which the lenders under the Credit Agreement do not have perfected non-avoidable liens shall be used first to pay the DIP Loans except as otherwise provided in a confirmed plan. After payment in full in cash of the obligations under the DIP Facility, all remaining Net Asset Sale Proceeds from the sale of assets subject to perfected non-avoidable liens which secure the pre-petition loans made under the Credit Agreement shall be held in trust pending further order of the court. Net cash proceeds from all asset sales (except with regards to sales of hydrocarbons produced from Debtors' properties) shall be used to repay the outstanding DIP Loans, with a concomitant reduction in the Commitment.

| | |
|---|---|
| Optional Prepayments: | Amounts may be prepaid in integral multiples of $50,000 without penalty. |
| Conditions of Initial Extension of Credit: | In addition to the conditions set forth below, the obligation to provide the initial extension of credit under the DIP Facility shall be subject to the satisfaction of the following conditions, unless otherwise waived by the DIP Agent and DIP Lender: |

487050v.4 CIT112/32000

A.  After appropriate notice and opportunity for a hearing, entry by the Court of the Interim Order by September 13, 2010 finding that all credit extended by the DIP Agent and the DIP Lender under the DIP Facility will be extended in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code, approving the DIP Facility, granting the superpriority claim and lien status described herein, and granting the protections to be afforded to DIP Agent and the DIP Lender, as described herein, in form and substance reasonably satisfactory to the DIP Lender and Borrowers and approved by the Bankruptcy Court, which shall not have been vacated, modified, amended, reversed or stayed. Such order shall include a deadline acceptable to the DIP Lender subject to approval of the Bankruptcy Court by which any creditors' committee or other parties-in-interest having standing must bring a challenge to any claims or liens, whether arising from the Credit Agreement or otherwise, of the Administrative Agent and the Lenders or be barred from subsequently doing so.  The Interim Order shall include a provision in which the Debtors stipulate to the claims and liens of the Administrative Agents and Lenders subject only to the challenge rights of the creditors' committee and other parties in interest having standing as provided in this paragraph.

B. Execution and delivery of related documentation by the Borrowers, including the DIP Credit Agreement (and related documents) and any necessary consents of the Lenders under amendments to the Credit Agreement (and related documents).

C.  All corporate and judicial proceedings and all instruments and agreements in connection with the transactions among the Debtors, the DIP Agent and the DIP Lender contemplated by the DIP Credit Agreement shall be reasonably satisfactory in form and substance to the DIP Agent and the DIP Lender and the DIP Agent and the DIP Lender shall have received all information and copies of all documents or papers reasonably requested by the DIP Agent and the DIP Lender.

D.  All of the other "first day orders" entered at the time of commencement of the Cases shall be in form and substance reasonably satisfactory to the DIP Lender.

E.  Receipt of closing documents (including security documents granting the liens in favor of the DIP Agent contemplated hereby if requested by the DIP Lender in addition to the granting of liens pursuant to the Interim Order or Final Order, as applicable) satisfactory in form and substance to the DIP

Lender.

F.   The DIP Agent and the DIP Lender shall have received such information (financial or otherwise) as may be reasonably requested by the DIP Agent or DIP Lender and shall have discussed the information with the Debtors' management and shall be satisfied with the nature and substance of such discussions.

G.   The DIP Agent and the DIP Lender shall have received from the Debtors, the Global Budget and the Initial Operating Budget, each of which shall be in satisfactory form and substance to the DIP Lender;

H.   No material adverse change in the operations of the business of the Debtors other than the filing of the Debtors' bankruptcy cases shall have occurred since July 31, 2010.

I.   The Borrowers shall have exhausted the Pre-Borrowing Cash Collateral in the payment of expenses under the Initial Operating Budget as described herein.

J.   The Debtors shall have retained Bridge Associates LLC ("**Bridge**") pursuant to that certain engagement letter dated as of [_____], 2010 (the "**Bridge Agreement**") or other mutually acceptable restructuring firm as restructuring advisors and a mutually agreeable individual as chief restructuring officer.

K.   No DIP Event of Default shall exist under the DIP Facility or the Interim Order.

L.   The Debtors shall have released all claims, if any, against the Agent, the Lenders, the DIP Agent and the DIP Lender subject to any challenge by the creditors' committee, if any; provided, however, that the Debtors reserve all challenges and rights with respect to the priority of liens.

M.   The Court shall have entered a sale procedures order in form and substance satisfactory to the DIP Lender.

N.   The Debtors shall have filed a plan, disclosure statement, and motion to approve the disclosure statement, which shall be in satisfactory form and substance to the DIP Lender.

O.   The Borrower shall have delivered an updated Reserve Report, in form acceptable to the DIP Lender.

P. Receipt by and approval of the DIP Agent and DIP Lender of the Global Budget and the initial Operating Budget.

Q. Payment of all reasonable costs and expenses (including pre- and post-petition attorneys and professional fees and expenses, including accountants, engineers, and other consultants) of the DIP Agent and DIP Lender then due and owing to DIP Agent or DIP Lender as described herein as provided in the budgets.

Such other reasonable and customary conditions as are reasonably required by the DIP Agent and the DIP Lender and reasonably acceptable to Borrower.

<u>Conditions of Each Extension of Credit</u>:

The obligation to provide each extension of credit under the DIP Facility also shall be subject to the satisfaction of the following conditions:

A. The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended or stayed, except for such modifications or amendments as may be acceptable to the DIP Lender, in its discretion.

B. Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date.

C. Receipt of a written notice of borrowing from the Borrowers.

D. The Debtors shall have paid the balance of all fees (including without limitation, the DIP Facility Fees) then payable to the DIP Agent and DIP Lender as referenced herein, provided that the DIP Facility shall as necessary be used for this purpose and this condition shall thereupon be satisfied upon the making of such payment from such DIP Facility.

E. The uses of such credit shall not be in violation of the pertinent Operating Budgets after taking into account: (i) the amount, if any, of the then unused portion of the Permitted Variance and (ii) the carryover provisions described herein.

F. Such other reasonable and customary conditions as are required by the DIP Agent and the DIP Lender and reasonably acceptable to Borrower.

487050v.4 CIT112/32000

G.   No DIP Event of Default shall exist under the DIP Facility, the Interim Order or the Final Order (if one has been entered).

H.   Payment of all reasonable costs and expenses (including pre- and post-petition attorneys and professional fees and expenses, including accountants, engineers, and other consultants) of the DIP Agent and DIP Lender then due and owing to DIP Agent or DIP Lender as described herein as provided in the budgets.

<table>
<tr><td>Representations and<br>Warranties:</td><td>Debtors shall make representations and warranties similar to those presently set forth in the Credit Agreement, except to the extent such representations and warranties need to take into account the pendency of the Cases (and the current financial condition of the Debtors).  Without limiting the generality of the foregoing, each Debtor shall represent and warrant in a manner satisfactory to the DIP Agent and the DIP Lender that:</td></tr>
</table>

A.  Upon receiving requisite governance approvals, no consent or approval is required other than the Interim Order and the Final Order with respect to the execution, delivery and performance under the DIP Credit Agreement.

B.  No liens on the assets of the Debtors except for Permitted Liens.

C.  No material adverse change in the operations of the business has occurred since July 31, 2010, other than those which customarily occur and as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code.

The DIP Credit Agreement shall include such other reasonable and customary representations and warranties as are satisfactory to the DIP Agent and the DIP Lender and reasonably acceptable to Borrower.

<table>
<tr><td>Affirmative Covenants:</td><td>The Debtors shall be obligated to comply with affirmative covenants similar to those presently set forth in the Credit Agreement, except to the extent such covenants need to take into account the pendency of the Cases (and the current financial condition of the Debtors).  Without limiting the generality of the foregoing, the Debtors shall:</td></tr>
</table>

A.  Furnish consolidated weekly cash flow reports, and reconciliations as elsewhere described herein, updates of any financial projections that may be reasonably requested by and that are satisfactory to the DIP Lender and other reports as may

be reasonably requested by the DIP Agent or the DIP Lender (including, without limitation, any closing summary relating to any proposed asset sale and any financial projections or other information underlying any plan of reorganization proposal advanced by any of the Debtors) in a manner satisfactory to the DIP Agent.

B. Furnish to the DIP Lender notice of default in payment and performance of post-petition obligations (when failure to do so could reasonably be expected to result in a material adverse effect).

C. Deliver all first-day pleadings to counsel for the Administrative Agent and DIP Lender and thereafter, via email and electronic service or other applicable service mechanism, promptly deliver to counsel for the Administrative Agent and DIP Lender as indicated in the applicable notice of appearance all pleadings, motions, applications, judicial information, notices of any lawsuits, actions or causes of actions instituted by or against the Debtors, financial information, and other documents filed by or on behalf of the Debtors with the Court.

D. Pay all post-petition taxes as and when due and pay other post-petition obligations in the ordinary course except where contested in good faith and by appropriate proceedings (if the Debtors shall have set aside on their books adequate reserves therefor).

E. Maintain all cash and depository accounts of the Debtors at or with the DIP Agent except as otherwise agreed with respect to local petty cash disbursement accounts.

F. Notify the DIP Agent of any DIP Event of Default or an event which with the giving of notice or the passage of time or both would constitute a DIP Event of Default.

G. Upon reasonable notice, permit the DIP Agent, DIP Lender and their respective agents and/or professional advisors to visit the premises of the Debtors during normal operating hours, confer with Bridge and review all of their books and records (subject to applicable privileges), and to conduct examinations of and to monitor the collateral held by the DIP Agent, all during regular business hours.

H. Comply with environmental obligations and furnish information related thereto.

487050v.4 CIT112/32000

I. Subject to the Carve-Out, the Debtors, on behalf of themselves and their respective bankruptcy estates, waive any and all claims, rights and powers under 11 U.S.C. § 506(c) against the DIP Lender, the Lenders and the Administrative Agent, and any other properties or assets of the Debtors subject in any manner whatsoever to the DIP Priming Lien of the DIP Lender, the Liens, Security Interests and the Adequate Protection Lien of the Administrative Agent and the Lenders which claims, rights or powers arise during or are related to the period from the petition date through the later to occur of (i) the termination of the Debtors' ability to borrow funds under the DIP Facility, and (ii) the termination of any right of the Debtors to use cash collateral. The foregoing waiver shall be binding upon any chapter 7 trustee, chapter 11 trustee or other similar Court appointed representative of the estate, but only with respect to professional fees and costs incurred during the course of the chapter 11 case prior to appointment of such chapter 7 trustee, chapter 11 trustee or other similar estate representative (provided that this provision shall only be proposed as part of the Final Order subject to Bankruptcy Court approval).

J. The Debtors will, subject to their rights under the Bankruptcy Code, comply with all oil and gas lease agreements and contracts necessary to preserve the existence and value of the collateral, including without limitation (i) timely performance of all obligations and (ii) payment of all pre- and post-petition royalty obligations, obligations pursuant to overriding royalty interests, severance obligations and other amounts that, if failed to pay, may result in termination or expiration of such collateral.

K. Comply with such other affirmative covenants as are required by the DIP Lender.

L. Except as otherwise provided in the Interim Order and Final Order (including $20,000 of the Carve-Out which may be used by any statutory committee to investigate liens), no proceeds of the DIP Facility shall be used to prosecute, investigate, or contest the liens and claims of the Lenders and the Administrative Agent.

M. The DIP Credit Agreement shall include such other reasonable and customary affirmative covenants as are satisfactory to the Borrower, DIP Agent and the DIP Lender.

<u>Negative Covenants:</u>

The Debtors shall be subject to negative covenants similar to those set forth in the Credit Agreement, except to the extent that

those covenants need to take into account the pendency of the Cases (and the current financial condition of the Debtors). Without limiting the generality of the foregoing, and absent the approval of the DIP Lender with respect to any changes in any of the negative covenants other than the one described in subparagraph (c) below, and absent the approval of the DIP Lender in the case of the one described in subparagraph (iii) below, none of the Debtors shall (and shall not apply to the Court for authority to):

A. Create or permit to exist any liens or encumbrances on any assets except for Permitted Liens.

B. Create or permit to exist any other superpriority claim which is *pari passu* with or senior to the claims of the DIP Agent and the DIP Lender under the DIP Credit Agreement except for the Carve Out (as defined below).

"**Carve Out**" shall mean (i) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court, (ii) the fees and expenses of the professionals engaged by the Debtors or any official committee, if appointed, as set forth in the Global Budget, as amended from time to time (as accrued and regardless of whether approved and unpaid or pending approval by the Bankruptcy Court) incurred by the Debtors or any official committee, if appointed, prior to a DIP Event of Default in an amount not to exceed the aggregate of the amounts allocated for such line items in the Global Budget, and (iii) allowed professional fees and expenses of the Debtors in the amount of $75,000 (less the amount of any retainers held by such professionals as of the occurrence of such DIP Event of Default) for services rendered after a DIP Event of Default.

C. Sell or otherwise dispose of any assets (including, without limitation, the stock of any subsidiary) without consultation without the prior written consent of the DIP Agent and DIP Lender, except for (i) the sale of hydrocarbons produced from Debtors' properties in the ordinary course of business, (ii) sales of other assets, including assets no longer used in operations for which total consideration (for all of such sales) shall not exceed $25,000 in the aggregate as determined by the DIP Lender, and (iii) a sale of substantially all of the assets of the Debtors pursuant to a Section 363 Sale that shall pay the DIP Lender and the Administrative Agent and the Lenders in full in cash.

D.  Modify or alter in any material manner the nature and type of its business or the manner in which such business is conducted, except as authorized or required by the Bankruptcy Code.

E.  Make aggregate expenditures in violation of any approved Operating Budget (after taking into account: the amount, if any, of the then unused portion of the Permitted Variance described above and the carryover provisions described herein).

F.  Violate the provisions of a cash collection covenant, which, in lieu of customary financial covenants, will be intended to measure and track acceptable cash receipt levels during the pertinent subperiods of the Operating Budgets based on the "Total Sources" projected (less a 10% permitted variance) and which will be tested monthly with a one-week "cure" right.

G.  The Debtors will not enter into agreements with affiliated parties unless such agreements are "arms-length" and on terms no more favorable than similar agreements with third parties.

H.  The Borrowers will not amend or terminate the Bridge Agreement without the consent the DIP Lender and approval of the Court.

The DIP Credit Agreement shall include such other reasonable and customary negative covenants as are satisfactory to the Borrower, DIP Agent and the DIP Lender.

<u>Events of Default:</u>

The occurrence and continuance of any of the following after notice of same to the Debtors by the DIP Lender in writing, shall each constitute a "**DIP Event of Default**":

A.  Failure by any of the Debtors to pay principal, interest or fees (including fees and expenses of the attorneys and financial advisors for the DIP Agent and the DIP Lender) when due (including, without limitation, on the Prepayment Date).

B.  Breach by any of the Debtors of any of the negative covenants described above.

C.  Breach by any of the Debtors of any other covenant or agreement contained in the DIP Credit Agreement or any other document delivered in connection therewith and such breach shall continue unremedied for more than five (5) business days;

D.  Any representation or warranty made by any of the Debtors shall prove to have been incorrect in any material respect when

16

made.

E. (i) The Chapter 11 proceedings of any Debtor shall be dismissed or converted to a Chapter 7 Case; (ii) a Chapter 11 Trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of any Debtor shall be appointed in the case and the order appointing such Trustee, responsible officer, or examiner shall not be reversed or vacated within five (5) business days after the entry thereof; (iii) or any other superpriority claim which is *pari passu* with or senior to the claims of the DIP Agent and the DIP Lender shall be granted in any of the Cases; or (iv) the Court shall enter an order terminating the use of cash collateral referred to above.

F. The Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest other than Permitted Liens to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors.

G. Any provision of the DIP Credit Agreement or any document delivered in connection therewith shall cease to be valid and binding on any of the Debtors, or any of the Debtors shall so assert in any pleading filed in any court.

H. An order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) business days, vacating or otherwise modifying the Interim Order or the Final Order.

I. Any judgment as to any post-petition obligation shall be rendered against any of the Debtors and the enforcement thereof shall not be stayed (by court-ordered stay or by consent of the party litigants); or there shall be rendered against any of the Debtors a non-monetary judgment with respect to a post-petition event which causes or reasonably could be expected to cause a material adverse change or a material adverse effect on the ability of the Debtors to perform their obligations under the DIP Credit Agreement.

J. Failure of any Debtor to comply with any of its obligations in connection with the DIP Credit Agreement or otherwise with respect to the DIP Facility.

K. Default in payment of post-petition debt with respect to a post-petition event which default in payment of a post-petition debt (excluding any default under the DIP Credit Agreement, the

Interim Order, or the Final Order) causes or reasonably could be expected to cause a material adverse change or a material adverse effect on the ability of the Debtors to perform their obligations under either of the DIP Credit Agreements.

L. Extension of the Debtors' plan proposal exclusivity without the consent of the DIP Lender, not to be unreasonably withheld.

M. Commencement by the Debtors of any proceedings challenging, in any fashion, the obligations under the Credit Agreement and/or under related loan documents (the "**Pre-Petition Obligations**") or any lien of the Agents or the Lenders.

N. The taking of any action by the Debtors, or any party with whom the Debtors have contracted with post-petition, to surcharge or otherwise recover any amounts from any property securing the Pre-Petition Obligations under Section 506(c) of the Bankruptcy Code to the extent of protection granted under the Final Order.

O. Any material adverse change in the operations of the business shall have occurred from that set forth in Debtors' financial statements for the period ended December 31, 2009 other than as disclosed to the DIP Lender and/or which customarily may occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code.

P. The filing and/or pursuing confirmation of any plan of reorganization that (i) is contested by the DIP Lender in a written notice sent to the Debtors or, (ii) unless otherwise waived by the DIP Lender, the Administrative Agent and the Lenders fails to preserve the DIP Lender' and the Administrative Agent's and the Lenders' ability to credit bid, as permitted under Section 363(k), in connection with any sale contemplated under such plan of reorganization.

Q. Such other reasonable and customary Events of Default as are reasonably required by the DIP Agent and the DIP Lender and reasonably acceptable to Borrower.

R. At any time, Bridge or another mutually acceptable restructuring firm shall cease to be the restructuring advisor on terms consistent with the Bridge Agreement.

S. The failure to obtain entry of a sale procedures order, in form and substance acceptable to the DIP Agent, or a failure to

comply with such sale procedures order.

T. The filing of any pleading by any Debtor or support of any pleading by any Debtor that, unless otherwise waived by the DIP Agent, Dip Lender, the Administrative Agent and the Lenders, would deny any of those parties' ability to credit bid, as permitted under Bankruptcy Code §363(k).

Upon the occurrence and continuance of any DIP Event of Default, the DIP Agent may, and, at the request of the DIP Lender, shall take all or any of the following actions without further order or application to the Court, provided that the DIP Agent shall provide the Debtors five (5) business days' prior written notice before taking any such acts:

(ii) declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable;

(iii) terminate any further commitment to lend to the Debtors;

(iv) setoff or otherwise apply any amounts held as cash collateral or in any accounts maintained with the DIP Agent or its affiliates (other than reserve accounts for professional fees and expenses and other reserve accounts) and terminate the Debtors' right to use any cash collateral;

(v) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Agent and the DIP Lender) permitted under the DIP Credit Agreement, or by applicable law without the necessity of obtaining further permission from the Bankruptcy Court.

If the DIP Agent or DIP Lender determines appropriate for any purpose, it shall be entitled to seek expedited relief relating to the Interim Order or Final Order from the Bankruptcy Court upon a five (5) business day expedited basis.

| | |
|---|---|
| Indemnity: | Substantially identical to indemnity provisions under the Credit Agreement. |
| Assignments: | Substantially identical to assignment provisions under the Credit Agreement except that the Borrower shall have no right to consent to any such assignment and debt under the DIP Credit Agreement. |
| Increased Costs, Taxes, etc.: | Substantially identical to provisions under Credit Agreement. |

19

| | |
|---|---|
| <u>DIP Agent's and DIP Lender's Costs, Expenses</u>: | The DIP Agent's and DIP Lender's reasonable costs and expenses (including attorneys' fees and expenses) shall be reimbursed by the Borrowers pursuant to the Interim Order and Final Order. |
| <u>Governing Law</u>: | Texas, except as governed by the Bankruptcy Code. |
| <u>Nature of Fees</u>: | All of these fees shall be non-refundable under all circumstances. |

<u>Additional Provisions</u>:

The Court, after appropriate notice and opportunity for hearing, shall issue, within the time period set forth above, the Final Order, satisfactory in form and substance to the DIP Agent and the DIP Lender, adopting and/or leaving undisturbed its finding in the Interim Order, including that credit extended by the DIP Agent and the DIP Lender under the DIP Facility will be extended in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code and approving the DIP Facility (including the granting of the liens and priority position to be provided in connection therewith), and the granting of protections to be accorded to the Administrative Agents and Lenders as described herein; and (ii) the Final Order shall not be subject to vacatur, amendment, modification, reversal, or stay. Such order shall include a deadline acceptable to the DIP Lender subject to approval of the Bankruptcy Court by which any creditors' committee or other parties-in-interest having standing must bring a challenge to any claims or liens, whether arising from the Credit Agreement or otherwise, of the Administrative Agent and the Lenders or be barred from subsequently doing so. The Final Order shall include a provision in which the Debtors stipulate to the validity, but not the priority, of the claims and liens of the Administrative Agents and Lenders subject only to the challenge rights of the creditors' committee and other parties in interest having standing as provided in this paragraph. The Final Order shall include a provision in which the Debtors waive any and all claims, rights and powers under 11 U.S.C. § 506(c) against the DIP Lender, the Lenders and the Administrative Agent, and any other properties or assets of the Debtors subject in any manner whatsoever to the DIP Priming Lien of the DIP Lender, the Liens, Security Interests and the Adequate Protection Lien of the Administrative Agent and the Lenders; provided, however, that the foregoing shall not limit the Carve-Out rights set forth herein. For the avoidance of doubt, nothing in this agreement affects, alters, hinders or waives the Debtors' right to challenge or contest, in any way, the priority of the claims and liens of the Administrative Agents and Lenders (except as to the priority of the liens and claims relating to the DIP Loans and the Promissory Note dated July 30, 2010 by Standard and Consolidated, as maker, and DIP Lender, as holder).

<u>Documentation</u>: Satisfactory in form and substance to the DIP Agent and the DIP Lender and the Borrower.

Notwithstanding the foregoing, the Debtors shall stipulate to the validity, enforceability, and priority of the claims and liens of the DIP Lender relating to the Promissory Note dated July 30, 2010 by Standard and Consolidated, as maker, and DIP Lender, as holder.

487050v.4 CIT112/32000