**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 10-36484-HDH-11** |
| | § | |
| | § | |
| **HERITAGE CONSOLIDATED LLC,** *et al.,* | § | **Chapter 11** |
| | § | |
| | § | **(Jointly Administered)** |
| **DEBTORS.** | § | |
| | § | |

**DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR THE DEBTORS**

| NOTICE |
|---|
| THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125.  THEREFORE, IT IS NOT TO BE RELIED UPON OR USED IN CONNECTION WITH THE SOLICITATION OF VOTES FOR OR AGAINST ANY CHAPTER 11 PLAN FILED IN THE BANKRUPTCY CASES. |

Dated: September 17, 2010

Joe E. Marshall
Texas Bar No. 13031100
Kathleen M. Patrick
Texas Bar No. 24037243
Lee J. Pannier
Texas Bar No. 24066705
**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201-6659
Telephone:    (214) 855-7500
Facsimile:    (214) 978-4365
jmarshall@munsch.com
kpatrick@munsch.com
lpannier@munsch.com

**COUNSEL FOR HERITAGE CONSOLIDATED, LLC,
DEBTOR AND DEBTOR IN POSSESSION**

Kevin D. McCullough
Texas Bar No. 00788005
Kerry Ann Miller
Texas Bar No. 24050875
**ROCHELLE McCULLOUGH LLP**
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Telephone:    (214) 953-0182
Facsimile:    (214) 953-0185
kdm@romclawyers.com
kmiller@romclawyers.com

**COUNSEL FOR HERITAGE STANDARD CORPORATION,
DEBTOR AND DEBTOR IN POSSESSION**

# TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................................1

II. PLAN OVERVIEW ......................................................................................................................2

III. VOTING PROCEDURES AND REQUIREMENTS.................................................................9

    A.    Ballots and Voting Deadline ................................................................................9

    B.    Voting by Holders of Claims Subject to Objection ...............................................9

    C.    Definition of Impairment ..................................................................................10

    D.    Classes Impaired Under the Plan ......................................................................10

    E.    Vote Required for Class Acceptance ..................................................................11

IV. CONFIRMATION OF THE PLAN ........................................................................................11

    A.    Confirmation Hearing ......................................................................................11

    B.    Requirements for Confirmation of the Plan........................................................12

    C.    Cramdown .......................................................................................................14

V. HISTORICAL AND BACKGROUND INFORMATION .........................................................15

    A.    Organizational Overview of the Debtors ............................................................15

    B.    The Debtors' Business and Operations...............................................................16

    C.    Events Leading to the Chapter 11 Filing ............................................................17

    D.    Management of the Debtors...............................................................................17

VI. SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE .......................................17

    A.    Employment of Professionals ...........................................................................18

    B.    Financing of Operations and Administration of the Estates ..................................18

    C.    Sales of Assets of the Debtors' Estates ..............................................................19

    D.    Bar Date .........................................................................................................19

VII. SUMMARY OF THE CLAIMS, CLASSIFICATION AND TREATMENT
UNDER THE PLAN.........................................................................................................19

    A.    Introduction.....................................................................................................19

B.     Classification of Claims and Equity Interests ..........................................................20

    1.    Classes of Claims Against and Equity Interests in Consolidated ............................................................................20

    2.    Classes of Claims Against and Equity Interests in Standard ....................20

C.     Treatment of Unclassified Claims Under the Plan ...............................................21

    1.    Treatment of Allowed Administrative Claims.........................................21

    2.    Treatment of Allowed Priority Tax Claims ..............................................21

D.     Treatment of Classified Claims Against and Equity Interests In Consolidated Under the Plan ...................................................................................21

    1.    Treatment of Allowed Ad Valorem Tax Claims (Class 1) ........................21

    2.    Treatment of Allowed Priority Claims (Class 2) ......................................21

    3.    Treatment of Allowed Lender Secured Claims (Class 3) .........................21

    4.    Treatment of Allowed Standard Secured Claim (Class 4).........................22

    5.    Treatment of Allowed Other Secured Claims (Class 5) ...........................22

    6.    Treatment of Class 6 .................................................................................22

    7.    Treatment of Allowed General Unsecured Claims (Class 7).....................22

    8.    Treatment of Allowed Subordinated Claims (Class 8) .............................23

    9.    Treatment of Allowed Equity Interests (Class 9) .....................................23

E.     Treatment of Classified Claims Against and Equity Interests In Standard Under the Plan ...........................................................................................23

    1.    Treatment of Allowed Ad Valorem Tax Claims (Class 1) ........................23

    2.    Treatment of Allowed Priority Claims (Class 2) ......................................23

    3.    Treatment of Allowed Lender Bridge Secured Claim (Class3) ..........................................................................................23

    4.    Reserved (Class 4) ....................................................................................23

    5.    Treatment of Other Secured Claims (Class 5) ..........................................24

    6.    Treatment of M&M Secured Claims (Class 6) .........................................24

    7.    Treatment of Allowed General Unsecured Claims (Class7).....................24

      8.      Treatment of Allowed Subordinated Claims (Class 8) ..............................24

      9.      Treatment of Allowed Equity Interests (Class 9) ......................................24

VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................25

    A.      The Plan Administrator .........................................................................25

    B.      Sale Procedures Order and Alternative Transactions ............................26

    C.      Plan is Motion to Transfer Transferred Properties ...............................26

    D.      Transfer of Transferred Properties ........................................................26

    E.      Oil and Gas Leases ................................................................................27

    F.      Satisfaction of the DIP Claim and Lender Secured Claim ...................27

      1.      DIP Facility ...............................................................................27

      2.      Sidetrack Drilling Operations with Respect to the Pat Howell #1 Well .................................................................................27

      3.      Section 6 Newco's Working Interests in the Pat Howell #1 Well and the A.G. Hill #1 Well ...................................................27

      4.      Pat Howell, LLC's Working Interest in the Pat Howell #1 Well    28

      5.      Reorganized Consolidated's Working Interest in Non-Section 6 Assets and Section 6 Assets .......................................28

      6.      Litigation Recoveries ................................................................28

      7.      Relationships with Disposal and Gathering ..............................28

    G.      Vesting of the Vested Assets ................................................................29

    H.      Preservation and Resolution of Causes of Action .................................29

    I.      Wind Up and Termination of the Debtors .............................................30

    J.      No Recourse to the Buyer and the Newco Entities ...............................31

    K.      Release of Liens ....................................................................................31

    L.      Authority ...............................................................................................31

    M.      Dissolution of Committee ......................................................................31

IX. LEGAL PROCEEDINGS AFFECTING THE DEBTORS AND ESTATES ........................31

A.      Preservation of Rights of Action; Settlement of Litigation Claims ......................32

B.      Settlement of Litigation Claims and Disputed Claims ...........................32

C.      Litigation Pending as of the Petition Date .................................................32

D.      Post-Petition Litigation ..............................................................................43

E.      Potential Litigation.....................................................................................43

      1.      Avoidance Causes of Action.................................................44

      2.      Subordination Causes of Action ...........................................44

      3.      Collection Causes of Action .................................................44

      4.      Notice of Preservation of Causes of Action..........................44

X. OTHER SIGNIFICANT PLAN PROVISIONS ...................................................45

A.      Treatment of Executory Contracts and Unexpired Leases .......................45

B.      Incorporation of Sale Motion.....................................................................46

C.      Distributions Under the Plan......................................................................46

      1.      Waterfall ...............................................................................46

      2.      Cash Distributions.................................................................47

      3.      Distributions by Agent or Servicer .......................................47

      4.      Means of Cash Payment........................................................47

      5.      Delivery of Distribution........................................................47

      6.      Fractional Dollars; *De Minimis* Distributions............................48

      7.      Withholding and Reporting Requirements ................................48

      8.      Setoffs. ..................................................................................48

      9.      Duty to Disgorge Overpayments ..........................................48

D.      Reserves Administered By the Reorganized Debtors.............................49

E.      Means for Resolving Disputed Claims ...................................................50

F.      Conditions to Confirmation and Effectiveness of the Plan......................51

G.      Effects of Confirmation of the Plan .........................................................52

|   |   | 1. | Discharge ....................................................................................................52 |
|---|---|----|
|   |   | 2. | Legal Binding Effect....................................................................................52 |
|   |   | 3. | Moratorium, Injunction and Limitation of Recourse for Payment....................................................................................................52 |
|   |   | 4. | Term of Injunction or Stays ........................................................................53 |
|   |   | 5. | Exculpation and Limitation of Liability ....................................................53 |
|   |   | 6. | Release and Covenant Not to Sue................................................................54 |
|   |   | 7. | Insurance ......................................................................................................55 |
|   |   | 8. | Insurance Policies Vested in Reorganized Standard...................................55 |
|   | H. | | Modification of the Plan ........................................................................................55 |
|   | I. | | Retention of Jurisdiction .......................................................................................56 |

XI. COMPARISON OF PLAN TO ALTERNATIVES ......................................................57

    A. Chapter 7 Liquidation ..........................................................................................57

    B. Alternative Plans...................................................................................................59

    C. Dismissal...............................................................................................................59

XII. MATERIAL UNCERTAINTIES AND RISKS ........................................................59

XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....................59

    A. Introduction...........................................................................................................59

    B. Federal Income Tax Consequences to the Debtors...............................................60

    C. Federal Income Tax Consequences Associated with Transfers to One or More of the Newco Entities .......................................................................60

    D. Additional Federal Income Tax Consequences ....................................................60

    E. Tax Withholding ...................................................................................................60

    F. Disclaimers ...........................................................................................................60

XIV. CONCLUSION.......................................................................................................61

# LIST OF EXHIBITS

**EXHIBITS**

**Exhibit A**:      Joint Plan of Reorganization for the Debtors

**Exhibit B**:      [reserved]

**Exhibit C**:      [reserved]

**Exhibit D:**      [Schedule of Potential Litigation Defendants] (to be supplemented)

**Exhibit E:**      [Schedule of Potential and Retained Causes of Action] (to be supplemented)

**Exhibit F:**      [Liquidation Analysis] (to be supplemented)

# INTRODUCTORY DISCLOSURES

THIS DISCLOSURE STATEMENT (THE "<u>DISCLOSURE STATEMENT</u>"), WHICH HAS BEEN JOINTLY FILED BY HERITAGE CONSOLIDATED, LLC ("<u>CONSOLIDATED</u>") AND HERITAGE STANDARD CORPORATION ("<u>STANDARD</u>" AND TOGETHER WITH CONSOLIDATED, THE "<u>DEBTORS</u>"), CONTAINS A SUMMARY OF MATERIAL PROVISIONS OF THE PLAN PROPONENTS' *JOINT PLAN OF REORGANIZATION FOR THE DEBTORS* (THE "PLAN"), INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THE SETTLEMENT AND TREATMENT OF SENIOR SECURED CLAIMS UNDER THE PLAN, AND THE MEANS OF IMPLEMENTATION OF THE PLAN. THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTORS AND THE CLAIMS ASSERTED AGAINST THE DEBTORS IN THESE JOINTLY ADMINISTERED BANKRUPTCY CASES. **WHILE THE DEBTORS BELIEVE THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS AND INFORMATION SUMMARIZED, CREDITORS AND EQUITY INTEREST HOLDERS SHOULD CAREFULLY REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN, AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL AND OTHER ADVISORS BEFORE CASTING THEIR BALLOTS ON THE PLAN.**

EXCEPT FOR THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO, NO REPRESENTATIONS CONCERNING THE DEBTORS, THE DEBTORS' ASSETS AND LIABILITIES, THE PAST OR FUTURE OPERATIONS OF THE DEBTORS, THE PLAN AND ITS TERMS, OR ALTERNATIVES TO THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY INFORMATION WITH RESPECT TO SUCH TOPIC AREAS THAT IS PROVIDED TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN AND THAT IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO IS UNAUTHORIZED AND SHOULD BE REPORTED IMMEDIATELY TO THE DEBTORS' RESPECTIVE COUNSEL.

STATEMENTS AND FINANCIAL INFORMATION HEREIN CONCERNING THE DEBTORS, INCLUDING, WITHOUT LIMITATION, HISTORICAL INFORMATION, INFORMATION REGARDING THE DEBTORS' ASSETS AND LIABILITIES, AND INFORMATION REGARDING CLAIMS AND EQUITY INTERESTS ASSERTED OR OTHERWISE EVIDENCED IN THE BANKRUPTCY CASES, HAVE BEEN DERIVED FROM NUMEROUS SOURCES INCLUDING, WITHOUT LIMITATION, THE DEBTORS' BOOKS AND RECORDS, THE DEBTORS' SCHEDULES AND STATEMENTS OF FINANCIAL AFFAIRS, AND COURT RECORDS. ALTHOUGH THE DEBTORS REASONABLY BELIEVE THAT THE HISTORICAL AND FINANCIAL INFORMATION SET FORTH HEREIN IS ACCURATE, COMPLETE AND RELIABLE, THE DEBTORS AND THEIR PROFESSIONALS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY, COMPLETENESS OR RELIABILITY OF SUCH HISTORICAL INFORMATION AND THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THEREFORE, NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE, ACCURATE AND RELIABLE. HOWEVER, THE DEBTORS HAVE REVIEWED THE INFORMATION SET FORTH HEREIN AND, BASED UPON THE SOURCES OF INFORMATION AVAILABLE, GENERALLY BELIEVE SUCH INFORMATION TO BE COMPLETE.

UNLESS INDICATED OTHERWISE, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF SEPTEMBER 17, 2010, AND NEITHER DELIVERY OF THIS

DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARING THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTORS, RECOVERIES UNDER THE PLAN, AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED UPON VARIOUS ASSUMPTIONS AND ESTIMATES AS OF SEPTEMBER 17 2010, OR SUCH OTHER TIME AS IS SPECIFIED. SUCH INFORMATION WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER SAID DATE(S), AND SUCH INFORMATION IS SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.

THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE PLAN PROPONENTS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED AS CONFERRING UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER. THE DISCLOSURE STATEMENT IS INFORMATIONAL ONLY. ADDITIONALLY, CREDITORS AND EQUITY INTEREST HOLDERS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH CREDITOR AND EQUITY INTEREST HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTER CONCERNING THE PLAN, THE EFFECTS OF IMPLEMENTATION OF THE PLAN, AND THE VOTING PROCEDURES APPLICABLE TO THE PLAN.

# I.
## INTRODUCTION

On September 14, 2010 (the "<u>Petition Date</u>"),[1] Consolidated and Standard (together, the "<u>Debtors</u>") Filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>"), thereby initiating their bankruptcy cases (collectively, the "<u>Bankruptcy Cases</u>"), which are being jointly administered by Order of the Bankruptcy Court.

On September 17, 2010, the Debtors, the Lender and CIT Capital (collectively, the "<u>Plan Proponents</u>") Filed their *Joint Plan of Reorganization for the Debtors* ("<u>Plan</u>"). The Plan proposes, among other things, the means by which all Claims against and Equity Interests in the Debtors will be finally resolved and treated for Distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code. Approval and consummation of the Plan will enable the Bankruptcy Cases to be concluded and closed.

The Debtors hereby submit this Disclosure Statement in connection with the solicitation of votes on the Plan. On October ___, 2010, after notice and a hearing, the Bankruptcy Court, the Honorable _____ presiding, signed an Order approving the Disclosure Statement as containing information of a kind and in sufficient detail to enable Creditors and Equity Interest holders whose votes on the Plan are being solicited to make an informed judgment on whether to accept or reject the Plan. The Bankruptcy Court's approval of the Disclosure Statement does not constitute the Bankruptcy Court's approval or disapproval of the Plan.

The Disclosure Statement, which includes the Plan as **Exhibit "A,"** is being mailed to each holder of a Claim against and each holder of an Equity Interest in the Debtors. However, the Debtors are only seeking votes on the Plan from Creditors and Equity Interest holders who are entitled to vote. With respect to voting on the Plan, pursuant to the Bankruptcy Code, only Creditors holding Claims and Equity Interests within impaired Classes under the Plan are entitled to vote.

The Debtors believe that they have promulgated the Plan consistent with the provisions of the Bankruptcy Code. The Debtors believe that the Plan provides affected Creditors and Equity Interest holders Distribution rights on account of their Claims and Equity Interests which are at least equal to, if not greater than, what they would obtain if the Bankruptcy Cases were converted to Chapter 7 liquidation cases or the Debtors were liquidated within the parameters of Chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan is fair and equitable to all Classes of Claims and Equity Interests under the Plan.

This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid and supplement in your review of the Plan, and attempts to explain the terms and implications of the Plan. Every effort has been made to fully explain the various aspects of the Plan as it may affect Creditors and Equity Interest holders. All Persons receiving this Disclosure Statement are urged to review all of the exhibits to this Disclosure Statement, in addition to reviewing the text of this Disclosure Statement. If you have any questions, you may contact counsel for either of the Debtors. Contact information for such counsel is set forth within this Disclosure Statement, as well as on the cover page hereof.

Creditors and Equity Interest holders should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure

---

[1] Capitalized terms used herein, if not separately defined, have the meanings assigned to them in the Plan, or if not defined in the Plan, then in the Bankruptcy Code or Bankruptcy Rules.

Statement, an Order of the Bankruptcy Court approving this Disclosure Statement, and section 1125 of the Bankruptcy Code. No other party has been authorized to utilize any information concerning the Debtors, their operations, and their assets and liabilities, other than the information contained in this Disclosure Statement, to solicit votes on the Plan. Creditors and Equity Interest holders should not rely on any information relating to the Debtors, their operations, and their assets and liabilities, other than the information contained in this Disclosure Statement and the exhibits attached hereto.

## II.
## PLAN OVERVIEW

The Plan is designed to accomplish five primary objectives: (a) implement the terms of the sale and transfer of certain assets of the Debtors' Estates, including, among others, the assumption of certain Claims and liabilities by the purchaser of the Debtors' assets (the "Buyer"); (b) the commencement of Sidetrack Drilling Operations on the Pat Howell #1 Well (as defined herein) by the Buyer or its designee as operator; (c) use of production proceeds from the Debtors' and the Buyer's assets to satisfy Claims in accordance with a waterfall mechanism for distribution set forth in the Plan; (d) subordination of certain Claim asserted against the Debtors; and (e) the making of distributions to holders of Allowed Claims consistent with the priorities mandated by the Bankruptcy Code. The Plan specifies the means for accomplishing each of these objectives, and pertinent provisions of the Plan in relation thereto are described in detail in this Disclosure Statement.

Focusing on Distributions to be made to Creditors and Equity Interest holders under the Plan, the Plan divides Claims against and Equity Interests in the Debtors into separate Classes of Claims[2] and Equity Interests, and then sets out the treatment to be provided to each such Class under the Plan. Sections 1122 and 1123 of the Bankruptcy Code require such classification, with each Class to contain Claims and Equity Interests that are substantially similar to one another. The Plan classifies Claims against the Debtors into nine (9) Classes for purposes of voting on and Distributions under the Plan. The various Classes of Claims and Equity Interests and the treatment provided under the Plan to each such Class are discussed in greater detail in later sections of this Disclosure Statement.

The following table sets out for each Debtor: (i) the estimates of the total number of Claims and Equity Interests per Class; (ii) an estimate of the total liquidated amount of Claims and Equity Interests falling within each Class (as asserted or scheduled); and (iii) a summary of the treatment afforded to each Class under the Plan. The information set forth within the table is qualified in its entirety by the more detailed information regarding the Plan set forth in this Disclosure Statement, the exhibits hereto (including the Plan itself), and the additional disclosures which follow the tables.

---

[2] There are two exceptions to the classification of Claims. Because Administrative Claims and Priority Tax Claims are subject to mandatory treatment under the Bankruptcy Code, they are not subject to classification.

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **CLAIMS AGAINST AND EQUITY INTERESTS IN CONSOLIDATED** | | |
| **Class** | **Estimated Amounts of Claims and Equity Interests Per Class** | **Treatment Under Plan** |
| 1 – Allowed Ad Valorem Tax Claims | Est. No. of Claimants: ___<br>Est. Amount of Claims:<br>Approximately $_____<br>Est. Allowable Claims: ___ | Each holder of an Allowed Ad Valorem Tax Claim against Consolidated's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Ad Valorem Tax Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Ad Valorem Tax Claim. |
| 2 – Allowed Priority Claims | Est. No. of Claimants: ___<br>Est. Amount of Claims:<br>Approximately $_____<br>Est. Allowable Claims: ___ | Each holder of an Allowed Priority Claim against Consolidated's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Priority Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Priority Claim. |
| 3 – Allowed Lender Secured Claim | Est. No. of Claimants: ___<br>Est. Amount of Claim:<br>Approximately $_____<br>Est. Allowable Claims: See description of Plan treatment for Allowed Administrative Claims | On the Effective Date, the Lender Secured Claims shall be Allowed in the aggregate amount of $18,035,100 of principal as of the date of the Plan, subject to upward adjustment based on, among other things, any and all interest, attorney's fees, and other fees and expenses to which the holder of the Lender Secured Claim may be entitled under the Lender Credit Agreement, the Plan, and Orders of the Bankruptcy Court. Included in the Allowed Lender Secured Claim shall be the Lender Bridge Secured Claim, which shall be $400,000 of principal as of the date of the Plan, subject to upward adjustment based on, among other things, any and all interest, attorney's fees, and other fees and expenses to which the holder of the Lender Bridge Secured Claim may be entitled under that certain Promissory Note dated July 30, 2010 by Standard and Consolidated, as maker, and CIT Capital, as holder, or any related Lender Credit Documents. On the Effective Date, one-half of the Allowed Lender Bridge Secured Claim shall be applied to reduce the Distribution to be made to the holder of the Allowed Lender Standard Secured Claim under Section 4.02(a)(iv) of the Plan. The unpaid portion of the Allowed Lender Bridge Secured Claim shall be satisfied by the Newco Entities on the terms set forth in Article VI the Plan. |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **CLAIMS AGAINST AND EQUITY INTERESTS IN CONSOLIDATED** | | |
| **Class** | **Estimated Amounts of Claims and Equity Interests Per Class** | **Treatment Under Plan** |
| 4 – Allowed Standard Secured Claim | Est. No. of Claimants: ___<br>Est. Amount of Claims:<br><br>Approximately $_____<br>Est. Allowable Claims: ___ | On the Effective Date, the Standard Secured Claim shall be Allowed in the aggregate amount of **no more than** $16,100,000. Standard, as holder of the Allowed Standard Secured Claim against Consolidated's Estate, shall be paid, by Non-Section 6 Newco the amount of $3.56 million (subject to the adjustments set forth in Sections 2.03, 4.02(a)(iv) (specifically, the second-to-last sentence of Section 4.02(a)(iv)), and 4.02(b)(iii) of the Plan) in one Cash payment on the Effective Date (or as soon as reasonably practicable thereafter); and (B) receive the treatment set forth in Article VI of the Plan. Subject to Section 6.06(c) of the Plan, Standard shall retain its liens in connection with the Allowed Standard Secured Claim against the Section 6 Assets until such Claim is satisfied as provided herein. This treatment shall be in exchange for and in full satisfaction and discharge of the Allowed Standard Secured Claim, which shall include any and all Cure Claims under the Non-Section 6 JOAs and Pat Howell JOA. As a result, Standard shall waive any and all deficiencies with respect to any Claim under the Non-Section 6 JOAs and the Pat Howell JOA. The Allowed Standard Secured Claim shall be reduced to the extent that the Allowed Standard Secured Claim exceeds the aggregate amount of Allowed Claims in Standard Classes 6 and 7, and such reduction shall be offset against any Distributions made to holders of Allowed Standard Secured Claim under Section 6.06(c). |
| 5- Allowed Other Secured Claims | Est. No. of Claimants: ___<br>Est. Amount of Claims:<br><br>Approximately $_____<br>Est. Allowable Claims: ___ | Each holder of an Allowed Other Secured Claim against Consolidated's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Other Secured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; (B) receive title to such holder's Collateral; (C) be paid by Reorganized Consolidated under the terms of the agreement under which the Other Secured Claim arose provided that Reorganized Consolidated shall cure any arrearages under such agreement on the later of (I) the Effective Date (or as soon as reasonably practicable thereafter) and (II) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order; or (D) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Other Secured Claim. |
| 6- Reserved | Est. No. of Claimants:<br>Est. Amount of Claims:<br><br>Approximately $_____<br>Est. Allowable Claims: ___ | Reserved. |
| 7- Allowed General Unsecured Claims | Est. No. of Claimants:<br>Est. Amount of Claims:<br><br>Approximately $_____<br>Est. Allowable Claims: ___ | Each holder of an Allowed General Unsecured Claim against Consolidated's Estate shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distributions of Available Cash from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed General Unsecured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan ; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder and the Plan Administrator. This treatment shall |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **CLAIMS AGAINST AND EQUITY INTERESTS IN CONSOLIDATED** | | |
| **Class** | **Estimated Amounts of Claims and Equity Interests Per Class** | **Treatment Under Plan** |
| | | be in exchange for and in full satisfaction and discharge of the holder's Allowed General Unsecured Claim. |
| 8-Allowed Subordinated Claims | Est. No. of Claimants: <br> Est. Amount of Claims: <br> Approximately $_____ <br> Est. Allowable Claims: ___ | Each holder of an Allowed Subordinated Claim shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distribution of Available Cash from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Subordinate Claim until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Subordinated Claim. |
| 9- Allowed Equity Interests | Est. Allowable Equity Interests: n/a | On the Effective Date, each then-issued and outstanding Equity Interest in Consolidated shall be cancelled and extinguished, and a New Consolidated Membership Interest shall be issued to such holder in place of the cancelled and extinguished Equity Interest in Consolidated. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Equity Interest. |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **CLAIMS AGAINST AND EQUITY INTERESTS IN STANDARD** | | |
| **Class** | **Estimated Amounts of Claims and Equity Interests Per Class** | **Treatment Under Plan** |
| 1 – Allowed Ad Valorem Tax Claims | Est. No. of Claimants: ___<br>Est. Amount of Claims:<br>Approximately $_____<br>Est. Allowable Claims: ___ | Each holder of an Allowed Ad Valorem Tax Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Ad Valorem Tax Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Ad Valorem Tax Claim. |
| 2 – Allowed Priority Claims | Est. No. of Claimants: ___<br>Est. Amount of Claims:<br>Approximately $_____<br>Est. Allowable Claims: ___ | Each holder of an Allowed Priority Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Priority Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Priority Claim. |
| 3 – Allowed Lender Bridge Secured Claim | Est. No. of Claimants: ___<br>Est. Amount of Claims:<br>Approximately $_____<br>Est. Allowable Claims: ___ | On the Effective Date, the Lender Bridge Secured Claim shall be Allowed in the aggregate amount of $400,000 of principal as of the date of the Plan, subject to upward adjustment based on, among other things, any and all interest, attorney's fees, and other fees and expenses to which the holder of the Lender Bridge Secured Claim may be entitled under that certain Promissory Note dated July 30, 2010 by Standard and Consolidated, as maker, and CIT Capital, as holder, or any related Lender Credit Documents. On the Effective Date, one-half of the Allowed Lender Bridge Secured Claim shall be applied to reduce the Distribution to be made to the holder of the Allowed Standard Secured Claim under Section 4.02(a)(iv) of the Plan. The unpaid portion of the Allowed Lender Bridge Secured Claim shall be satisfied by the Newco Entities on the terms set forth in Section 6.06 of the Plan. |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
| --- | --- | --- |
| **CLAIMS AGAINST AND EQUITY INTERESTS IN STANDARD** | | |
| **Class** | **Estimated Amounts of Claims and Equity Interests Per Class** | **Treatment Under Plan** |
| 4 – Reserved | Est. No. of Claimants: <br> Est. Amount of Claims: <br><br> Approximately $_____ <br><br> Est. Allowable Claims: ___ | Reserved. |
| 5- Allowed Other Secured Claims | Est. No. of Claimants: ____ <br> Est. Amount of Claims: <br><br> Approximately $_____ <br><br> Est. Allowable Claims: ___ | Each holder of an Allowed Other Secured Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Other Secured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; (B) receive title to such holder's Collateral; (C) be paid by Reorganized Standard under the terms of the agreement under which the Other Secured Claim arose provided that Reorganized Standard shall cure any arrearages under such agreement on the later of (I) the Effective Date (or as soon as reasonably practicable thereafter) and (II) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order; or (D) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Other Secured Claim. |
| 6- Allowed M&M Secured Claims | Est. No. of Claimants: ____ <br> Est. Amount of Claims: <br><br> Approximately $_____ <br><br> Est. Allowable Claims: ___ | Each holder of an Allowed M&M Secured Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distributions of Available Cash from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed M&M Secured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed M&M Secured Claim. |
| 7-Allowed General Unsecured Claims | Est. No. of Claimants: <br> Est. Amount of Claims: <br><br> Approximately $_____ <br><br> Est. Allowable Claims: ___ | Each holder of an Allowed General Unsecured Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distributions of Available Cash from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed General Unsecured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed General Unsecured Claim. |
| 8- Allowed Subordinated Claims | Est. No. of Claimants: <br> Est. Amount of Claims: <br><br> Approximately $_____ <br><br> Est. Allowable Claims: ___ | Each holder of an Allowed Subordinated Claim shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distribution of Available Cash from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Subordinate Claim until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan ; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder and the Plan Administrator. This |

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **CLAIMS AGAINST AND EQUITY INTERESTS IN STANDARD** | | |
| **Class** | **Estimated Amounts of Claims and Equity Interests Per Class** | **Treatment Under Plan** |
| | | treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Subordinated Claim. |
| 9- Allowed Equity Interests | Est. Allowable Equity Interests: n/a | On the Effective Date, each then-issued and outstanding Equity Interest in Standard shall be cancelled and extinguished, and a New Standard Equity Interests shall be issued to such holder in place of the cancelled and extinguished Equity Interest in Standard. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Equity Interest. |

## Factors and Assumptions Applied in Arriving at Estimates

The estimated Allowable Claims per Class in the foregoing table have been derived from the Schedules for the Debtors' Estates prepared by the Debtors' Professionals using information from the Debtors' books and records and other information available to them, as well as proofs of Claims Filed by Creditors in the Bankruptcy Cases.

With respect to Claims asserted in the Bankruptcy Cases, the Debtors scheduled Claims in excess of $_____, and expect additional Claims will be asserted in proofs of Claim before _____, which is the proposed deadline to file proofs of Claim in the Bankruptcy Cases. Applicable Bankruptcy Rules provide that for those Creditors who choose to File proofs of Claim, such proofs of Claim will supersede any amounts reflected in the Schedules. The estimates in the foregoing table take into account Claims scheduled in a liquidated, non-contingent and undisputed amount as well as those amounts asserted by Claimants which the Debtors scheduled in disputed amounts. Where Claims appear to have been Filed in duplicate or amended, including Scheduled Claims, the foregoing estimates assume that duplicates and superseded Claims will be disallowed in favor of, at most, a single surviving Claim.

The estimates also include the anticipated application of merit-based objections known to the Debtors and their counsel as of the date of this Disclosure Statement, and therefore, constitute the Debtors' best estimation, as of the date of filing of this Disclosure Statement, of the ultimate allowable amount of Claims in each such Class. An example of a merit based objection to Filed proofs of Claims would be that the amount of the Claim asserted should be offset by amounts owed to the Debtors.

With respect to Class 2, Allowed Priority Claims, certain Claims asserted by taxing authorities have been Filed as Secured Claims, and only in the alternative as Priority Tax Claims. Notwithstanding the assertion of such Claims as Secured Claims in the first instance, such Claims have been classified under the Plan for all purposes as Priority Tax Claims. Accordingly, such Claims have been reflected in the table above as Priority Tax Claims and not as Secured Claims.

The ultimate resolution of Claims is inherently uncertain. Moreover, the Debtors have not completed their evaluation of all Claims and cannot presume the validity of merit-based disputes or objections thereto. Any Claim which is a Disputed Claim may be Disallowed or reduced in amount if an objection has been, or is timely hereafter, Filed and sustained by the Bankruptcy Court. Because the resolution of Disputed Claims involves many factual and legal issues which may or may not be resolved

as anticipated, no assurance can be given that the anticipated amount of Allowable Claims in each Class would be achieved were these assumptions included in the foregoing estimates. The Debtors believe that the ultimate universe of Allowed Claims will be substantially lower than the face amount of the Filed proofs of Claims, and that the current estimates of Allowable Claims shown herein above in each Class are reasonably precise given the particular circumstances.

Notwithstanding, the foregoing estimates contained herein shall not be deemed as any admission on the part of the Debtors, the Post-Confirmation Debtors, the Estates or the Plan Proponents to the validity of any Claim. Similarly, the projected recovery levels reflected in the table above are estimates only, there is no guaranty that such levels of recovery will be achieved, and such estimates shall not constitute an admission on the part of the Debtors, the Post-Confirmation Debtors, the Estates or the Plan Proponents to the validity of any Disputed Claims. Except as otherwise provided in the Plan, all objections and other defenses to Disputed Claims are preserved under the Plan.

### III.
### VOTING PROCEDURES AND REQUIREMENTS

**A.    Ballots and Voting Deadline**

Each holder of a Claim in an Impaired Class and each holder of an Equity Interest is entitled to vote on the Plan and shall be provided a Ballot along with this Disclosure Statement. If a Creditor holds Claims in more than one Class entitled to vote under the Plan, such Creditor has been provided a separate Ballot for each such Class. The Ballot is to be used by the Creditor or Equity Interest holder to accept or reject the Plan.

To ensure that a Ballot is deemed timely and considered by the Debtors, a Creditor or Equity Interest holder must (a) carefully review the Ballot and the instructions set forth thereon, (b) provide all of the information requested on the Ballot, (c) sign the Ballot, and (d) return the completed and signed Ballot to the Debtors by the Voting Deadline.

By Order of the Bankruptcy Court, the Voting Deadline is 5:00 p.m. (prevailing Central Time), on _____, 2010. Therefore, in order for a Ballot to be counted for voting purposes, the completed and signed Ballot must be received at the address specified below by no later than such Voting Deadline:

**DEADLINE:  MUST BE <u>RECEIVED</u> BY 5:00 P.M. (PREVAILING CENTRAL TIME), ON _____, 2010 AT**

<u>Address Ballots to:</u>

Kerry Ann Miller
Rochelle McCullough, LLP
325 N. St. Paul Street, Suite 4500
Dallas, Texas 75201
Counsel for Heritage Standard Corporation

**B.    Voting by Holders of Claims Subject to Objection**

Each Creditor holding a Claim in a Class which is impaired under the Plan is being solicited to vote on the Plan. However, as to any Claim for which a proof of Claim was Filed and as to which an objection has been lodged, if such objection is still pending as of the Voting Deadline, the Creditor's vote associated with such Claim will not be counted to the extent of the objection to the Claim, unless and to

the extent the Bankruptcy Court temporarily allows the Claim upon motion by such Creditor in an amount which the Bankruptcy Court deems proper for the purpose of voting on the Plan. Such motion must be heard and determined by the Bankruptcy Court prior to the date and time established by the Bankruptcy Court for determination of confirmation of the Plan. In addition, a Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code, or that the Creditor is an insider of a Debtor within the meaning of section 101(31) of the Bankruptcy Code.

## C. Definition of Impairment

Pursuant to section 1124 of the Bankruptcy Code, except to the extent that the holder of a particular claim or equity interest within a class agrees to less favorable treatment of the holder's claim or equity interest, a class of claims or equity interests is impaired under a plan unless, with respect to each claim or equity interest of such class, the plan does at least one of the following two (2) things:

    **1.** The plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest; or

    **2.** Notwithstanding any contractual provision or applicable law that entitles the holder of such claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default, the plan:

        (a) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured;

        (b) reinstates the maturity of such claim or equity interest as such maturity existed before such default;

        (c) compensates the holder of such claim or equity interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

        (d) if such claim or such equity interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or equity interest (other then the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

        (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

## D. Classes Impaired Under the Plan

*Consolidated- Classes Impaired Under the Plan*

Classes 3, 4, and 7-9 are impaired Classes under the Plan. All holders of Claims or Equity Interests in such Classes are scheduled to receive on account of such Claims or Equity Interests at least some property interest having potential value under the Plan. Accordingly, holders of Claims within Classes 3, 4, 7 and 8, as well as holders of Equity Interests in Class 9, are being solicited to vote on the

Plan. Claims in Classes 1, 2 and 5 are unimpaired under the Plan. Therefore, Classes 1, 2 and 5 are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and Creditors holding Claims within such Classes are not being solicited to vote on the Plan.

*Standard- Classes Impaired Under the Plan*

Classes 6, 7, 8 and 9 are impaired Classes under the Plan. All holders of Claims or Equity Interests in such Classes are scheduled to receive on account of such Claims or Equity Interests at least some property interest having potential value under the Plan. Accordingly, holders of Claims within Classes 6, 7 and 8, as well as holders of Equity Interests in Class 9, are being solicited to vote on the Plan. Claims in Classes 1, 2, 3 and 5 are unimpaired under the Plan. Therefore, Classes 1, 2, 3 and 5 are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and Creditors holding Claims within such Classes are not being solicited to vote on the Plan.

With respect to the foregoing, the Plan Proponents specifically reserve the right to determine and contest, if necessary, (a) the impaired or unimpaired status of a Class under the Plan, and (b) whether any Ballots cast by Creditors holding Claims or holders of Equity Interests, within such a Class should be counted for purposes of confirmation of the Plan.

**E.     Vote Required for Class Acceptance**

Pursuant to section 1126(c) of the Bankruptcy Code, a Class of Claims under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by Creditors holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims within such Class held by Creditors that have accepted or rejected the Plan. Pursuant to section 1126(d) of the Bankruptcy Code, a Class of Equity Interests under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by holders holding at least two-thirds (2/3) of the amount of Allowed Equity Interests in such Class held by holders of Equity Interests that have accepted or rejected the Plan.

Pursuant to section 1126(e) of the Bankruptcy Code, on request of a party in interest in the Bankruptcy Case, and after notice and a hearing, the Bankruptcy Court may designate the vote of any Creditor whose acceptance or rejection of the Plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

# IV.
# CONFIRMATION OF THE PLAN

**A.     Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

By Order of the Bankruptcy Court entered on October __, 2010, the Confirmation Hearing has been scheduled to begin _____, 2010, at __:__0 __.m., in the United States Bankruptcy Court, Courtroom of The Honorable _____, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242. Any objection to confirmation must be made in writing, and such written objection must be Filed with the Bankruptcy Court and served on the following parties by not later than at 5:00 p.m. on _____, 2010.

**Heritage Consolidated, LLC:**
Joe E. Marshall
MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201-6659

**Heritage Standard Corp.**
Kevin D. McCullough
ROCHELLE McCULLOUGH L.L.P.
325 N. St. Paul Street. Suite 4500
Dallas, Texas 75201

**The Lender and CIT Capital**
Harry Perrin                                  Richard London
VINSON & ELKINS LLP              VINSON & ELKINS LLP
First City Tower                             Trammel Crow Center
1001 Fannin Street, Suite 2500     2001 Ross Avenue, Suite 3700
Houston, Texas 77002-6760    -and    Dallas, Texas 75201-2975

**United States Trustee:**
Office of United States Trustee
Attn: George F. McElreath
1100 Commerce Street, Room 976
Dallas, Texas 75242

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.      Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  Only in the event that all of these requirements have been satisfied, and that all other conditions to confirmation set forth in the Plan have been met, will the Bankruptcy Court enter an Order confirming the Plan under section 1129(a).  The requirements of section 1129(a) applicable to corporate debtors are as follows:

1.      The plan complies with the applicable provisions of the Bankruptcy Code.

2.      The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

3.      The plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

5.      The proponent of the plan has disclosed:

(a)    the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity interest holders and with public policy; and

(b)    the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

**6.** Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

**7.** With respect to each impaired class of claims or equity interests:

(a)    each holder of a claim or equity interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or equity interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

(b)    if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

**8.** With respect to each class of claims or equity interests, such class has accepted the plan or such class is not impaired under the plan.

**9.** Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a)    with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)    with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(c)    with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim regular installment payments in cash (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim, (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303 of the Bankruptcy Code, and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than

cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

(d)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in paragraph 9(c) above.

10.    If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11.    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12.    All fees payable under section 1930 of Title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

13.    The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

14.    All transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

If a sufficient number of Creditors and amounts of Claims in impaired Classes under the Plan vote to accept the Plan, the Debtors believe that the Plan will satisfy all of the applicable statutory requirements of section 1129(a) of the Bankruptcy Code. As discussed below, however, the Debtors believe that the Plan may be confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

## C.    Cramdown

Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan at the request of the Plan Proponents if: (a) all of the requirements of section 1129(a) of the Bankruptcy Code, with the exception of section 1129(a)(8) (set out in paragraph 8 above), are met with respect to the Plan; (b) at least one Class of Claims that is impaired under the Plan has accepted the Plan (excluding the votes of insiders); and (c) with respect to each impaired Class that has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable."

A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if the classification of claims under the plan complies with the Bankruptcy Code and no particular class will receive more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable," on the other hand, has a different meaning for classes of secured claims, classes of unsecured claims, and classes of equity interests, as described below:

With respect to a class of secured claims that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b) for the realization of such holders of the indubitable equivalent of such claims; or

(c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under (a) or (b) above.

With respect to a class of unsecured claims that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b) that the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

With respect to a class of equity interests that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that each holder of an equity interest of such class receive or retain on account of such equity interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such equity interest; or

(b) that the holder of any equity interest that is junior to the equity interests of such class will not receive or retain under the plan on account of such junior equity interest any property.

In the event that at least one impaired Class of Claims under the Plan accepts the Plan, the Plan Proponents request the Bankruptcy Court to confirm the Plan in accordance with the cramdown provisions of section 1129(b) of the Bankruptcy Code. The Plan Proponents believe that all of the requirements of section 1129(a) of the Bankruptcy Code (with the exception of section 1129(a)(8)) will be satisfied, that at least one Class of impaired Claims will accept the Plan (excluding the votes of insiders), and that the Plan does not unfairly discriminate against, and is fair and equitable in relation to each of the Classes that may vote to reject the Plan.

# V.
# HISTORICAL AND BACKGROUND INFORMATION

## A. Organizational Overview of the Debtors

Consolidated is a privately-held Texas limited liability company organized on or about October 27, 2008. Pursuant to its Limited Liability Company Agreement, Consolidated was organized to, among other things, acquire oil and gas leases and participate in the drilling and completion of wells on such oil

and gas leases. Pursuant to the Limited Liability Agreement, Consolidated's membership interests are divided among members according to their respective shares in the oil and gas leases and wells conveyed to the company. Consolidated is managed by Michael B. Wisenbaker ("Wisenbaker") as its Managing Member and the current members of Consolidated are Heritage Resources Corporation, Heritage Standard Corporation, The Chase Avenue Corporation, Case Inlet L.P., SSB L.P. and Heritage Oil, L.P.

Standard is a Texas corporation that shares common management with Consolidated. As of the date hereof, Wisenbaker owns one hundred percent (100%) of the outstanding Equity Interests in Standard.

## B.     The Debtors' Business and Operations

The Debtors are headquartered in Dallas, Texas. Since their formation, the Debtors have been engaged in the exploration for and acquisition, production and sale of crude oil and natural gas. The Debtors' operations are separated according to function: Consolidated owns the majority of the oil and gas wells, leasehold interests, and mineral interests that allow the Debtors to conduct their oil and gas operations; and Standard is an exploration and production company that develops wells and oil and gas prospects owned by Consolidated and other working interest owners; it is also a lessee under certain oil and gas leases.

The Debtors focus their development efforts primarily on the Permian Basin in west Texas and southeastern New Mexico (the "Target Area"). The Debtors and their predecessors have been exploring and developing the Target Area since 1984.

As part of conducting their business, the Debtors are lessees under, or assignees of, oil and gas leases and are parties to certain operating agreements, farmout agreements, joint venture agreements, gas marketing agreements, gas transportation agreements, and other agreements required for the operation of their businesses. As experienced veterans of the oil and gas industry, the Debtors participate in virtually every step of the process from developing oil and gas prospects to selling production at market.

As part of operating their businesses, the Debtors have significant working capital requirements. As part of meeting the Debtors' capital needs, Consolidated became the borrower under that certain Credit Agreement, dated October 30, 2008 (as amended from time to time, the "CIT Credit Agreement"), among Consolidated, CIT Capital USA Inc. ("CIT Capital"), as administrative agent, and other lenders from time to time thereto (together, with CIT Capital, the "Prepetition Lenders"). Under the terms of the CIT Credit Agreement, the Debtors had access to a $30,000,000 revolving credit facility with an initial borrowing base limit of $18,000,000 (the "CIT Facility"). As of the Petition Date, the aggregate principal amount of the advances outstanding under the CIT Credit Agreement was approximately $18.5 million. The obligations under the CIT Credit Agreement are secured by liens on all of the material assets of Consolidated.

To provide the Debtors the liquidity necessary for them to explore alternatives and prepare for the commencement of their Bankruptcy Cases, the following documents were executed: (i) Assignment of Term Overriding Royalty Interest dated June 1, 2010 executed by Consolidated; (ii) Letter Agreement dated June 16, 2010 by and among the CIT Capital, Consolidated, and Standard; and (iii) all related documents and instruments (collectively, the "ORRI Documents"). Under the ORRI Documents, CIT Capital provided Consolidated $800,000 in consideration for, among other things, a term overriding royalty interest equal to 50% of Consolidated's net revenue interest in certain of Consolidated's oil and gas properties. CIT Capital filed the appropriate ORRI Documents of record on or about June 17, 2010. As of the present date, $_____ is due and owing to CIT Capital under the ORRI Documents.

In addition, CIT Capital provided the Debtors $400,000 subject to that certain Promissory Note dated July 30, 2010 (the "Promissory Note") for the benefit of CIT Capital, as holder. The Debtors and the CIT Capital also executed that certain Subordination Agreement dated as of July 30, 2010 (the "Subordination Agreement") under which Standard agreed to, among other things, subordinate certain obligations owed to it by Consolidated to certain obligations owed to CIT Capital by Consolidated. As of the Petition Date, the aggregate principal amount of the advances outstanding under the Promissory Note was approximately $_____. The obligations under the CIT Credit Agreement are secured by (i) any and all of the properties and assets of Standard, both real or personal; and (ii) substantially all of the properties and assets of Consolidated, both real or personal, to the extent that they relate to the "Section 6 Assets."

## C.      Events Leading to the Chapter 11 Filing

In August, 2009, Standard began operations on that certain oil and gas well in Winkler County, Texas, known as the Pat Howell #1 well (the "Pat Howell #1 Well"). The Pat Howell #1 Well is located in the Atoka Formation of the Permian Basin, which has proven reserves of approximately 16.9 billion cubic feet ("bcf") of natural gas. Over the course of ten months, Standard conducted operations to re-enter the existing wellbore for the Pat Howell #1 Well and then complete operations to the Atoka formation.

Due to a series of mistakes and operational difficulties with the wellbore, the Pat Howell #1 Well has not been completed and placed online, thereby causing the accumulation of approximately $11.6 million in contractor and service debt. Most, if not all, of the problems encountered in these operations were the result of contractor negligence, which is the subject of lawsuits initiated by Standard and pending in various Texas state courts. The significant debt incurred in connection with the operations on the Pat Howell #1 Well, coupled with the lack of anticipated production therefrom, negatively impacted the Debtors' ability to meet their ongoing obligations to their vendors and the Lender.

As a result, the Debtors determined that it was in the best interest of creditors to initiate the Bankruptcy Cases in order to protect and preserve their assets.

## D.      Management of the Debtors

Throughout the course of the Bankruptcy Cases, the Debtors have been operating as debtors in possession under the Bankruptcy Code, meaning that the Debtors have continued to operate under the guidance and control of their officers, with the added assistance of Bridge Associates, LLC ("Bridge") and Scott Pinsonnault, the Financial Advisor and Chief Restructuring Officer for the Debtors. As of the date hereof, Consolidated is managed by its Managing Member, Michael B. Wisenbaker. Standard's primary remaining officers are: Michael B. Wisenbaker, Standard's President and Chief Executive Officer; Scott Pinsonnault, Chief Restructuring Officer; Gary L. Todd, VP Oil and Gas Operations; and Pamela Clements, Controller.

# VI.
## SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE

During the course of the Bankruptcy Cases, various pleadings have been Filed with the Bankruptcy Court and several hearings have been conducted. The following is a description of the more significant events which have transpired during the pendency of the Bankruptcy Cases to the extent not discussed elsewhere in this Disclosure Statement. For a comprehensive listing of the pleadings which have been Filed in the Bankruptcy Cases, the docket for the Bankruptcy Cases should be reviewed, and relevant pleadings referenced therein may be obtained from the Clerk's Office of the Bankruptcy Court, via the on-line PACER system.

## A.    Employment of Professionals

### 1.    Debtors' Counsel

On September 17, 2010, Consolidated Filed its *Application for Authority to Employ Munsch Hardt Kopf & Harr, P.C. As Counsel for Debtor and Debtor-in-Possession Heritage Consolidated, LLC* [Docket No. 36], as its bankruptcy counsel, which application was approved by the Bankruptcy Court, effective as of September ___, 2010 , by its Order dated _____, 2010 [Docket No. ___].

On September 17, 2010, Standard Filed its *Application to Employ Rochelle McCullough, LLP* [Docket No. 15 in *In re Heritage Standard Corporation*, case number 10-36485-hdh-11], as its bankruptcy counsel, which application was approved by the Bankruptcy Court, effective as of September _____, 2010, by its Order dated _____, 2010 [Docket No. ___].

### 2.    The Debtors' Other Professionals

On September 16, 2010, the Debtors Filed their *Application for Authority to: (A) Employ Bridge Associates, LLC Nunc Pro Tunc to the Petition Date As Financial Advisors and to Provide Interim Management Assistance; And (B) Designate Scott Pinsonnault As Interim Chief Restructuring Officer* (the "Bridge Application") [Docket No. 20] seeking Court approval of the Debtors' selection of Scott Pinsonnault as Chief Restructuring Officer for the Debtors and for Bridge to serve as the Debtors' financial advisors.  On September __, 2010, the Bankruptcy Court authorized the Debtors to employ Bridge, effective as of September _____, 2010, by its Order dated _____, 2010 [Docket No. ___].

On September __, 2010, the Debtors Filed their *Application to Employ Ordinary Course Professionals* [Docket No. ____], which application was granted by the Bankruptcy Court's Order entered on September __, 2010 [Docket No. ____].

## B.    Financing of Operations and Administration of the Estates

### 1.    Cash Management System and Maintenance of Accounts

On the Petition Date, the Debtors Filed their *Emergency Motion to Approve Maintenance of Prepetition Bank Accounts, Cash Management Systems and Business Forms* [Docket No. 7] seeking authority to utilize existing bank accounts for a limited period of time and to implement a cash management system to allocate costs between certain Debtors.  The Bankruptcy Court granted this request by its Order entered on September __, 2010 [Docket No. ___].

### 2.    Employee Stabilization

On September 15, 2010, the Standard Filed its *Motion to Pay Certain Employee Benefits and for Related Relief*  [Docket No. 11] seeking authority to pay pre-petition wages and continue pre-petition employee benefits though the pendency of Bankruptcy Cases.  The Bankruptcy Court granted this request by its Order entered on September __, 2010 [Docket No. ___].

### 3.    Authorization to Use Cash Collateral and Grant Adequate Protection and to Obtain DIP Financing

On the September 15, 2010, the Debtors Filed their *Emergency Motion for Order (A) Authorizing Interim and Final Use of Cash Collateral; and (B) Granting Adequate Protection* (the "Cash Collateral Motion") [Docket No. ____].  Therein, the Debtors sought the Bankruptcy Court's permission to use the

cash collateral of CIT and any other creditors holding perfected liens. On September 15, 2010, the Debtors Filed their *Emergency Motion for Interim and Final Orders Approving: (I) Secured Postpetition Financing; (II) Related Priming Liens and Super-Priority Administrative Claims; (III) Related Secured Financing Agreement and (IV) Scheduling a Final Hearing* [Docket No. ____]. Therein, the Debtors sought the Bankruptcy Court's permission to use obtain postpetition financing from the DIP Lenders and grant liens and other security in connection therewith. On September __, 2010, the Bankruptcy Court entered its *Interim Order Authorizing Limited Use of Cash Collateral, Obtaining Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. ___]. On _____, 2010, the Bankruptcy Court entered its *Final Order Authorizing Limited Use of Cash Collateral, Obtaining Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. ___].

### 4. Authority to Pay Certain Prepetition Obligations to Royalty and Working Interest Owners

On September 15, 2010, the Debtors filed their *Emergency Motion for Authority to Pay And/Or Offset Certain Obligations to Royalty and Working Interest Owners and Continue Such Payments And/Or Offsets In the Ordinary Course of Business* [Docket No. 10]. Therein, the Debtors sought the Bankruptcy Court's permission to pay undisputed prepetition amounts owed to owners of royalty interests in Consolidated's leases and working interests in Consolidated's wells. The Bankruptcy Court granted this request by its Order entered on September __, 2010 [Docket No. ___].

### C. Sales of Assets of the Debtors' Estates

On September 15, 2010, the Debtors Filed their *Expedited Motion for Order (A) Approving Plan Support Agreement, Sale Procedures and Bid Protections in Connection with Sale of Assets; (B) Approving Form and Manner of Notice of Sale and of Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "Sale Motion") [Docket No. 14] seeking Court approval of the Plan Support Agreement, the form and manner of notice of the Sale Procedures and the respective dates, times and places for an auction, if required, the form and manner of notice of the assumption and assignment of executory contracts and unexpired leases and the Sale Procedures, subject to higher and better offers. The Bankruptcy Court granted these requests by its Order entered on September __, 2010 [Docket No. ___].

### D. Bar Date

On September___, 2010, the Bankruptcy Court entered its *Order* [Docket No. _____] setting _____, 2010, and _____, 2010, as the last dates by which non-governmental entities and governmental entities, respectively, could timely File proofs of Claims or proofs of Equity Interests in the Bankruptcy Cases (as defined in the Plan, the "Bar Date"). As evidenced by the Certificate of Service Filed with the Bankruptcy Court on September _, 2010 [Docket No. ___], the Debtors served all parties listed on the then-current creditor matrix for the Bankruptcy Cases with notice of the Bar Date.

## VII.
## SUMMARY OF THE CLAIMS, CLASSIFICATION
## AND TREATMENT UNDER THE PLAN

### A. Introduction

A summary of the principal provisions of the Plan relating to the treatment of Classes of Claims and Equity Interests is set out herein. The summary is qualified in its entirety by the Plan itself, which is controlling in the event of any conflict. Additionally, the estimated amount of allowable Claims in the

various Classes are estimates only and are not intended to be exact determinations. While the Debtors have made every effort to reasonably estimate such amounts, there is no guarantee that such estimates are accurate. Moreover, none of the descriptions herein below in relation to such estimates shall constitute an admission on the part of the Plan Proponents to the validity of any Disputed Claims. Any Claim which is not Allowed by an Order of the Bankruptcy Court or pursuant to a settlement approved by an Order of the Bankruptcy Court may be Disallowed or reduced in amount if an objection has been, or is timely hereafter, Filed and sustained by the Bankruptcy Court.

**B.      Classification of Claims and Equity Interests**

The Plan provides for the division of Claims against and Equity Interests in each of the Debtors (except Administrative Claims and Priority Tax Claims) into Classes. A Claim is classified within a particular Class only to the extent that the Claim qualifies under the description of that Class. A proof of Claim asserting a Claim which is properly includable in more than one Class is only entitled to inclusion within a particular Class to the extent that it qualifies under the description of such Class, and shall be included within a different Class(es) to the extent that it qualifies under the description of such different Class(es). The Plan classifies Claims and Equity Interests as follows:

**1.      Classes of Claims Against and Equity Interests in Consolidated**

Unclassified Claims
> Allowed Administrative Claims
> Allowed Priority Tax Claims

Classified Claims and  Equity Interests
> Class 1:   Allowed Ad Valorem Tax Claims
> Class 2:   Allowed Priority Claims
> Class 3:   Allowed Lender Secured Claim
> Class 4:   Allowed Standard Secured Claim
> Class 5:   Allowed Other Secured Claims
> Class 6:   Reserved
> Class 7:   Allowed General Unsecured Claims
> Class 8:   Allowed Subordinated Claims
> Class 9:   Allowed Equity Interests

**2.      Classes of Claims Against and Equity Interests in Standard**

Unclassified Claims
> Allowed Administrative Claims
> Allowed Priority Tax Claims

Classified Claims and Equity Interests
> Class 1:   Allowed Ad Valorem Tax Claims
> Class 2:   Allowed Priority Claims
> Class 3:   Allowed Lender Bridge Secured Claim
> Class 4:   Reserved
> Class 5:   Other Secured Claim
> Class 6:   M&M Secured Claim
> Class 7:   Allowed General Unsecured Claims
> Class 8:   Allowed Subordinated Claims
> Class 9:   Allowed Equity Interests

### C. Treatment of Unclassified Claims Under the Plan

#### 1. Treatment of Allowed Administrative Claims

Except as otherwise provided herein, the holder of an Allowed Administrative Claim, in full satisfaction, settlement, release and discharge of, and in exchange for such Claim, shall be paid by the applicable Reorganized Debtor such holder's Allowed Claim in one Cash payment on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter) or (ii) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order; or (b) receive such other less favorable treatment that may be agreed upon in writing by the applicable Debtor, the Lender, and the holder of such Claim.

#### 2. Treatment of Allowed Priority Tax Claims

Each holder of an Allowed Priority Tax Claim shall be paid by the applicable Reorganized Debtor in Cash in full on the Effective Date. The Cash payment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Priority Tax Claim.

### D. Treatment of Classified Claims Against and Equity Interests In Consolidated Under the Plan

#### 1. Treatment of Allowed Ad Valorem Tax Claims (Class 1)

Each holder of an Allowed Ad Valorem Tax Claim against Consolidated's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Ad Valorem Tax Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Ad Valorem Tax Claim.

#### 2. Treatment of Allowed Priority Claims (Class 2)

Each holder of an Allowed Priority Claim against Consolidated's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Priority Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Priority Claim.

#### 3. Treatment of Allowed Lender Secured Claims (Class 3)

On the Effective Date, the Lender Secured Claims shall be Allowed in the aggregate amount of $18,035,100 of principal as of the date of the Plan, subject to upward adjustment based on, among other things, any and all interest, attorney's fees, and other fees and expenses to which the holder of the Lender Secured Claim may be entitled under the Lender Credit Agreement, the Plan, and Orders of the Bankruptcy Court. Included in the Allowed Lender Secured Claim shall be the Lender Bridge Secured Claim, which shall be $400,000 of principal as of the date of the Plan, subject to upward adjustment based on, among other things, any and all interest, attorney's fees, and other fees and expenses to which the holder of the Lender Bridge Secured Claim may be entitled under that certain Promissory Note dated July 30, 2010 by Standard and Consolidated, as maker, and CIT Capital, as holder, or any related Lender

Credit Documents. On the Effective Date, one-half of the Allowed Lender Bridge Secured Claim shall be applied to reduce the Distribution to be made to the holder of the Allowed Standard Secured Claim under Section 4.02(a)(iv) of the Plan. The unpaid portion of the Allowed Lender Bridge Secured Claim shall be satisfied by the Newco Entities on the terms set forth in Article VI of the Plan.

**4.      Treatment of Allowed Standard Secured Claim (Class 4)**

On the Effective Date, the Standard Secured Claim shall be Allowed in the aggregate amount of **no more than** $16,100,000. Standard, as holder of the Allowed Standard Secured Claim against Consolidated's Estate, shall (A) be paid, by Non-Section 6 Newco the amount of $3.56 million (subject to the adjustments set forth in Sections 2.03, 4.02(a)(iv) (specifically, the second-to-last sentence of Section 4.02(a)(iv)), and 4.02(b)(iii) of the Plan) in one Cash payment on the Effective Date (or as soon as reasonably practicable thereafter); and (B) receive the treatment set forth in Article VI of the Plan. Subject to Section 6.06(c) of the Plan, Standard shall retain its liens in connection with the Allowed Standard Secured Claim against the Section 6 Assets until such Claim is satisfied as provided herein. This treatment shall be in exchange for and in full satisfaction and discharge of the Allowed Standard Secured Claim, which shall include any and all Cure Claims under the Non-Section 6 JOAs and Pat Howell JOA. As a result, Standard shall waive any and all deficiencies with respect to any Claim under the Non-Section 6 JOAs and the Pat Howell JOA. The Allowed Standard Secured Claim shall be reduced to the extent that the Allowed Standard Secured Claim exceeds the aggregate amount of Allowed Claims in Standard Classes 6 and 7, and such reduction shall be offset against any Distributions made to holders of Allowed Standard Secured Claim under Section 6.06(c).

**5.      Treatment of Allowed Other Secured Claims (Class 5)**

Each holder of an Allowed Other Secured Claim against Consolidated's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Other Secured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; (B) receive title to such holder's Collateral; (C) be paid by Reorganized Consolidated under the terms of the agreement under which the Other Secured Claim arose provided that Reorganized Consolidated shall cure any arrearages under such agreement on the later of (I) the Effective Date (or as soon as reasonably practicable thereafter) and (II) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order; or (D) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Other Secured Claim.

**6.      Treatment of Class 6**

Reserved.

**7.      Treatment of Allowed General Unsecured Claims (Class 7)**

Each holder of an Allowed General Unsecured Claim against Consolidated's Estate shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distributions of Available Cash from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed General Unsecured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed General Unsecured Claim.

**8.**     **Treatment of Allowed Subordinated Claims (Class 8)**

Each holder of an Allowed Subordinated Claim shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distribution of Available Cash from Reorganized Consolidated out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Subordinate Claim until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder and the Plan Administrator.   This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Subordinated Claim.

**9.**     **Treatment of Allowed Equity Interests (Class 9)**

On the Effective Date, each then-issued and outstanding Equity Interest in Consolidated shall be cancelled and extinguished, and a New Consolidated Membership Interest shall be issued to such holder in place of the cancelled and extinguished Equity Interest in Consolidated.  This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Equity Interest.

**E.**     **Treatment of Classified Claims Against and Equity Interests In Standard Under the Plan**

**1.**     **Treatment of Allowed Ad Valorem Tax Claims (Class 1)**

Each holder of an Allowed Ad Valorem Tax Claim against Standard's Estate shall, at the election of the Plan Administrator, (A)  receive Distributions from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Ad Valorem Tax Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator.  This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Ad Valorem Tax Claim.

**2.**     **Treatment of Allowed Priority Claims (Class 2)**

Each holder of an Allowed Priority Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Priority Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator.  This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Priority Claim.

**3.**     **Treatment of Allowed Lender Bridge Secured Claim (Class 3)**

On the Effective Date, the Lender Bridge Secured Claim shall be Allowed in the aggregate amount of $400,000 of principal as of the date of the Plan, subject to upward adjustment based on, among other things, any and all interest, attorney's fees, and other fees and expenses to which the holder of the Lender Bridge Secured Claim may be entitled under that certain Promissory Note dated July 30, 2010 by Standard and Consolidated, as maker, and CIT Capital, as holder, or any related Lender Credit Documents.  On the Effective Date, one-half of the Allowed Lender Bridge Secured Claim shall be applied to reduce the Distribution to be made to the holder of the Allowed Standard Secured Claim under Section 4.02(a)(iv) of the Plan.  The unpaid portion of the Allowed Lender Bridge Secured Claim shall be satisfied by the Newco Entities on the terms set forth in Section 6.06 of the Plan.

**4.**     **Reserved (Class 4)**

Reserved.

### 5. Treatment of Other Secured Claims (Class 5)

Each holder of an Allowed Other Secured Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive Distributions from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Other Secured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; (B) receive title to such holder's Collateral; (C) be paid by Reorganized Standard under the terms of the agreement under which the Other Secured Claim arose provided that Reorganized Standard shall cure any arrearages under such agreement on the later of (I) the Effective Date (or as soon as reasonably practicable thereafter) and (II) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order; or (D) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Other Secured Claim.

### 6. Treatment of M&M Secured Claims (Class 6)

Each holder of an Allowed M&M Secured Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distributions of Available Cash from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed M&M Secured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder, the Lender and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed M&M Secured Claim.

### 7. Treatment of Allowed General Unsecured Claims (Class 7)

Each holder of an Allowed General Unsecured Claim against Standard's Estate shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distributions of Available Cash from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed General Unsecured Claim plus interest at the Plan Interest Rate from the Petition Date until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed General Unsecured Claim.

### 8. Treatment of Allowed Subordinated Claims (Class 8)

Each holder of an Allowed Subordinated Claim shall, at the election of the Plan Administrator, (A) receive its Pro Rata share of Distribution of Available Cash from Reorganized Standard out of its Senior Claim Distribution Reserve in the amount of such holder's Allowed Subordinate Claim until such Claim has been satisfied in full as and at the time provided under Article VIII of the Plan; or (B) receive such other less favorable treatment that may be agreed upon in writing by such holder and the Plan Administrator. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Subordinated Claim.

### 9. Treatment of Allowed Equity Interests (Class 9)

On the Effective Date, each then-issued and outstanding Equity Interest in Standard shall be cancelled and extinguished, and a New Standard Equity Interests shall be issued to such holder in place of the cancelled and extinguished Equity Interest in Standard. This treatment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Equity Interest.

# VIII.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**     **The Plan Administrator**

The Plan provides for the appointment of a Plan Administrator as representative of the Estates pursuant to Bankruptcy Code § 1123(b)(3)(B). The Plan Administrator shall administer the Plan on behalf of the Reorganized Debtors, take all actions in the name of the Reorganized Debtors and make all Distributions called for under the Plan.

*Duties of Plan Administrator*

The Plan Administrator shall be responsible for administering all unclassified Claims and Claims in Classes 1 through 9 of the Plan. Such responsibilities include, without limitation, reviewing, analyzing, prosecuting objections (if necessary) and making Distributions on account of such Claims. The Plan Administrator, on behalf of the Reorganized Debtors, shall have authority and standing to prosecute, enforce, pursue, sue on, settle or compromise (or decline to do any of the foregoing) such Excluded Causes of Action.

In the performance of his duties, the Plan Administrator shall have all the rights, powers and duties incident to causing performance of his or her obligations under the Plan or otherwise as may be reasonably necessary or appropriate for such purposes. The duties, responsibilities and powers of the Plan Administrator shall terminate after all Claims against the Debtors' Estates are fully resolved or satisfied in accordance with the Plan.

*Compensation of Plan Administrator and Professionals*

For services rendered in administering the Plan, the Plan provides that the Plan Administrator will be compensated on terms agreed upon by the Debtors and the Lender and disclosed in the Plan Supplement. Compensation to the Plan Administrator shall be made solely and exclusively from the Reorganized Debtors' Expense Reserves. Under the Plan, the Plan Administrator will also have the authority to employ such Persons as he or she deems necessary to assist him or her in the performance of his or her duties, and to compensate and reimburse such Persons for fees and out-of-pocket expenses incurred by them on reasonable terms without the need for Bankruptcy Court approval. Compensation and reimbursement of such Persons will be made solely and exclusively from the Reorganized Debtors' Expense Reserves.

*Limitation of Liability*

Under the Plan, the Plan Administrator shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Plan Administrator, other than acts or omissions resulting from such Person's willful misconduct, gross negligence or fraud. The Plan Administrator may, in connection with the performance of his or her functions, and in his or her sole, absolute discretion, consult with attorneys, accountants and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Plan Administrator shall be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in

imposition of liability on the Plan Administrator unless such determination is based on willful misconduct, gross negligence or fraud. The Reorganized Debtors shall indemnify and hold harmless the Plan Administrator and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Reorganized Debtors or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

## B.     Sale Procedures Order and Alternative Transactions

Pursuant to the Sale Procedures Order, the offers set forth in the Purchase and Sale Agreement are subject to higher and better offer on the terms set forth in the Sale Procedures Order. Under certain circumstances set forth in the Sale Procedures Order, the Plan may be withdrawn prior to Confirmation to effectuate a transaction under an Alternative Transaction Agreement.

## C.     Plan is Motion to Transfer Transferred Properties

The Plan shall be considered a motion pursuant to Bankruptcy Code §§ 105, 363, and 365 to transfer and assign to the Newco Entities Free and Clear, but subject to their obligations under the Plan, any and all Transferred Properties as of the Effective Date and with all benefits to the Estates under such sections of the Bankruptcy Code. Any objections to such transfer and assignment must be made as an objection to Confirmation of the Plan to be heard at the Confirmation Hearing.

## D.     Transfer of Transferred Properties

Except as otherwise set forth in the Plan or the Confirmation Order, on the Effective Date, (a) the Transferred Properties shall be transferred to the appropriate Newco Entities Free and Clear; and (b) the Designated Contracts shall be assumed by the respective Debtors as provided in Article XI of the Plan and assigned to the appropriate Newco Entities. On the Effective Date, Operator Newco shall be elected and/or designated as the operator under all Non-Section 6 JOAs and the Pat Howell JOA that are Assumed Contracts. The Confirmation Order shall contain findings and conclusions that Operator Newco has been so elected or designated as operator under such joint operating agreements, those findings and conclusions shall serve as the written consent of the counterparties to the Non-Section 6 JOAs and Pat Howell JOAs, and those findings and conclusions shall be binding on all parties to such joint operating agreement(s).

After the Effective Date, the Newco Entities may present such Order(s) or assignment(s) to the Bankruptcy Court, suitable for filing in the records of every county or governmental agency where the Transferred Properties is or were located, which provide that such property is conveyed to one or more of the Newco Entities. The Order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred and assigned. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished, and no notice, other than by the Plan, shall be given prior to the presentation of such Order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest in or against any Transferred Properties shall be conclusively deemed to have consented to the transfer and assignment of such Transferred Properties Free and Clear to the appropriate Newco Entities by failing to object to confirmation of the Plan, except as otherwise provided in the Plan; provided, however, nothing herein shall be deemed to be a release of any Lien, Claim, encumbrance or other interest on, in or against property that is not a Transferred Property or that is a Permitted Encumbrance.

### E. Oil and Gas Leases

To the extent any of the Oil and Gas Leases constitute executory contracts or unexpired leases of real property under Bankruptcy Code § 365, such Oil and Gas Leases shall be assumed by the respective Debtor and assigned to the appropriate Newco Entity and, unless otherwise ordered by the Bankruptcy Court and agreed to by the Buyer, the related cure amount shall be $0. To the extent any of the Oil and Gas Leases constitute contracts or other property rights not assumable under Bankruptcy Code § 365, such Oil and Gas Leases shall be transferred and assigned to the appropriate Newco Entity pursuant to Section 6.02 and 6.03 of the Plan. Except for the defaults of a kind specified in Bankruptcy Code §§ 365(b)(2) and 541(c)(1) (which defaults the Debtors and the appropriate Newco Entity will not be required to cure), or as otherwise provided herein, the legal, equitable and contractual rights of the counterparties to such Oil and Gas Leases shall be unaltered by the Plan.

### F. Satisfaction of the DIP Claim and Lender Secured Claim

#### 1. DIP Facility

On the Effective Date, (i) one-quarter of the outstanding balance of the DIP Claim shall be assumed by Section 6 Newco; and (ii) one-quarter of the outstanding balance of the DIP Claim shall be assumed by Non-Section 6 Newco. Non-Section 6 Newco shall guarantee the repayment and satisfaction of the DIP Claim assumed by Section 6 Newco under Section 6.06(a) of the Plan, and Section 6 Newco shall guarantee the repayment and satisfaction of the DIP Claim assumed by Non-Section 6 Newco under Section 6.06(a) of the Plan.

#### 2. Sidetrack Drilling Operations with Respect to the Pat Howell #1 Well

Section 6 Newco shall commence the Sidetrack Drilling Operations on or before the expiration of ninety days after Effective Date and diligently pursue the completion and production of the Sidetrack Drilling Operations and maintain operations and production as a prudent operator in accordance with industry standards and non-bankruptcy law. The Plan Administrator shall be entitled to assess to all books, records, reports and employees of Section 6 Newco for the purpose of monitoring compliance with the provisions hereof. Section 6 Newco is required to generate and provide the Plan Administrator with a third party audited reserve report with a reputable engineering firm mutually agreed upon by the parties. The Bankruptcy Court shall retain jurisdiction to hear and resolve any and all disputes related the parties' rights and obligations hereunder.

#### 3. Section 6 Newco's Working Interests in the Pat Howell #1 Well and the A.G. Hill #1 Well

Section 6 Newco's share of net proceeds of production from the operations of the Pat Howell #1 Well and the A.G. Hill #1 Well shall be paid as follows: (i) first, to the DIP Agent to satisfy the DIP Claim associated with Tranche B under the DIP Credit Agreement; (ii) second, to Section 6 Newco to reimburse it for that portion of the Sidetrack Costs that it paid (excluding that portion that was funded by Pat Howell LLC or under the DIP Credit Agreement); (iii) third, to the DIP Agent to satisfy the outstanding DIP Claim that was assumed by it pursuant to Section 6.06(a) of the Plan; (iv) fourth, to CIT Capital to satisfy any outstanding Allowed Lender Bridge Secured Claim (after application as provided under Section 4.02(a)(iii) and 4.02(b)(iii) of the Plan); (v) fifth, to Standard to satisfy the unpaid amount of the Allowed Standard Secured Claim; and (vi) sixth, to Section 6 Newco upon satisfaction in full of the DIP Claim, other Sidetrack Costs paid by Section 6 Newco as provided in Section 6.06(c) of the Plan, the Allowed Lender Bridge Secured Claim, and the Allowed Standard Secured Claim. The obligation to pay the unpaid Allowed Standard Secured Claim is non-recourse and secured by the Section 6 Assets, and Section 6 Newco shall not have any liability or obligation to the holder of the Allowed Standard Secured

Claim if Section 6 Newco's share of net proceeds of production from the Section 6 Assets (including the production from the operations of the Pat Howell #1 Well and A.G. Hill #1 Well) are insufficient to pay the Allowed Standard Secured Claim in full. Section 6 Newco is required to generate and provide the Plan Administrator with a third party audited reserve report with a reputable engineering firm mutually agreed upon by the parties.

### 4. Pat Howell, LLC's Working Interest in the Pat Howell #1 Well

Section 6 Newco acknowledges that Pat Howell LLC holds an 18.75% working interest in the Pat Howell #1 Well, and Pat Howell LLC shall be entitled to its share of net proceeds of production from the operation of the Pat Howell #1 Well subject to the Pat Howell JOA. Before commencing the Sidetrack Drilling Operations, Section 6 Newco shall issue an authority for expenditure to Pat Howell LLC and such other working interest owners that are party to the Pat Howell JOA. Pat Howell LLC shall timely pay its share of the authority for expenditure relating to the Sidetrack Drilling Operations pursuant to the terms of the Pat Howell JOA. Pat Howell LLC's share of proceeds from the operation of the Pat Howell #1 Well shall be paid as follows: (i) first, to Pat Howell LLC to reimburse it for that portion of the Sidetrack Costs that it paid to Section 6 Newco; (ii) second, to Standard to satisfy the unpaid Allowed Standard Secured Claim; (iii) third, to holders of Allowed General Unsecured Claims until all such Allowed General Unsecured Claims are paid or reserved in full, and (iv) fourth to Pat Howell LLC upon the satisfaction in full of all allowed claims of the estates.

### 5. Reorganized Consolidated's Working Interest in Non-Section 6 Assets and Section 6 Assets

After the Payout Date, the Newco Entities shall assign to Reorganized Consolidated the Working Interest Back-In on the terms provided under the Purchase and Sale Agreement or the Alternative Transaction Agreement (as applicable).

### 6. Litigation Recoveries

The net proceeds from settlements, proceeds from judgment and other recoveries associated with the Apollo Litigation and Pathfinder Litigation shall be applied and/or paid as follows: (i) first, to Reorganized Standard to satisfy the Allowed Claims (excluding Subordinated Claims) against Standard's Estate; and (ii) once the Allowed Claims (excluding Subordinated Claims) against Standard's Estate are satisfied in full pursuant to Section 4.02(b) of the Plan, 50% to Section 6 Newco and 50% to Reorganized Standard. The Plan Administrator shall be the appointed representative of Reorganized Standard and Section 6 Newco with respect to the Apollo Litigation and the Pathfinder Litigation. Except as otherwise ordered by the Bankruptcy Court, the Plan Administrator, on behalf of Reorganized Standard and Section 6 Newco, shall be vested with authority and standing to prosecute the Apollo Litigation and Pathfinder Litigation. The Causes of Action relating to the Eunice Litigation shall be a Vested Asset which shall vest in the respective Reorganized Debtors under Section 6.07 of the Plan.

### 7. Relationships with Disposal and Gathering

On the Effective Date, one or more of the Newco Entities and Disposal shall execute the Salt Water Disposal Agreement in substantially the form attached as <u>Exhibit 4-A</u> to the Plan. On the Effective Date, one or more of the Newco Entities and Transportation shall execute the Transportation Agreement in substantially the form attached as <u>Exhibit 4-B</u> to the Plan.

## G. Vesting of the Vested Assets

Except as otherwise set forth in the Plan or the Confirmation Order, on the Effective Date, the Vested Assets shall vest in the Reorganized Debtors which currently has an interest in such Vested Assets Free and Clear to the extent of such interest in such Vested Assets.

After the Effective Date, the Reorganized Debtors may present such Order(s) or assignment(s) to the Bankruptcy Court, suitable for filing in the records of every county or governmental agency where the Vested Assets is or were located, which provide that such property is conveyed to and vested in the respective Reorganized Debtor. The Order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred and assigned. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished, and no notice, other than by the Plan, shall be given prior to the presentation of such Order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any Vested Assets shall be conclusively deemed to have consented to the vesting of such Vested Assets Free and Clear to the applicable Reorganized Debtor by failing to object to confirmation of the Plan, except as otherwise provided in the Plan; provided, however, nothing herein shall be deemed to be a release of any Lien, Claim, encumbrance or other interest on, in or against property that is not a Vested Asset or that is a Permitted Encumbrance.

## H. Preservation and Resolution of Causes of Action

Under the terms of the Plan, on the Effective Date, all Causes of Action will vest in the Reorganized Debtors or, as applicable, be transferred to a Newco Entity. "Causes of Action" is defined under the Plan as "[a]ny and all rights, claims, causes of action, litigation, suits, proceedings, rights of setoff, rights of recoupment, complaints, defenses, counterclaims, cross-claims and affirmative defenses of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, currently existing or hereafter arising, whether set forth in the Bankruptcy Schedules, and whether arising under the Bankruptcy Code or other applicable law, in contract or in tort, in law, in equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including but not limited to claims pursuant to Bankruptcy Code § 362; (b) claims and defenses such as fraud, mistake, duress and usury; (c) claims under Bankruptcy Code § 510(c); and (d) all Avoidance Actions."

Specifically, the Plan provides that the Plan Administrator shall be appointed representative of the respective Estates pursuant to Bankruptcy Code § 1123(b)(3)(B) with respect to the Causes of Action which are Vested Assets, including the Apollo Litigation, the Pathfinder Litigation and the Eunice Litigation, and, except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, all Causes of Action shall vest in the respective Reorganized Debtors who may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided herein) settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action that are Vested Assets. Except as otherwise ordered by the Bankruptcy Court, the Plan Administrator, on behalf of the applicable Reorganized Debtors, shall be vested with authority and standing to prosecute any Causes of Action that are Vested Assets. The Plan Administrator and his or her attorneys and other professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action.

The Plan further provides that at any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors, with the consent of the Lender, may settle some or all of the Causes of Action that would be Vested Assets or the Disputed Claims subject to obtaining any necessary Bankruptcy Court approval. To the extent that they would be payable to one or more of the Reorganized Debtors, the proceeds from the settlement of a Cause of Action shall

constitute a Vested Asset that shall vest in the applicable Reorganized Debtor on the Effective Date in accordance with the Plan.

## I.       Wind Up and Termination of the Debtors

*Cancellation of Equity Interests and Issuance of New Equity Interests*

On the Effective Date, all Equity Interests in the Debtors (including those Equity Interests held in treasury by any of the Debtors) shall be terminated and extinguished and the certificates that previously evidenced ownership of those Equity Interests shall be deemed cancelled (all without further action by any Person or the Bankruptcy Court) and shall be null and void and such certificates shall evidence no rights or interests in any of the Debtors.  On the Effective Date, Reorganized Consolidated shall issue a New Consolidated Membership Interest to each holder of Equity Interests in Consolidated for each Equity Interest that shall be cancelled and extinguished, and Reorganized Standard shall issue one New Standard Equity Interests to each holder of Equity Interests in Standard for each Equity Interest that shall be cancelled and extinguished, and in each case such membership interests and equity interests shall be Free and Clear.

It is an integral and essential element of the Plan that the offer and issuance of New Consolidated Membership Interests and the New Standard Equity Interests pursuant to the Plan, to the extent such New Consolidated Membership Interests and the New Standard Equity Interests constitute securities under the 1933 Act, shall be exempt from registration under the 1933 Act and any State or local law, pursuant to Bankruptcy Code § 1145 or other applicable exemptions, without limitation.  The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Cases, the Debtors, the Reorganized Debtors, the U.S. Securities and Exchange Commission and all other federal, state and local regulatory enforcement agencies, to the effect that such offer and issuance, to the extent such New Consolidated Membership Interests and the New Standard Equity Interests constitute securities under the 1933 Act, fall within the exemption from registration under the 1933 Act and any State or local law pursuant to Bankruptcy Code § 1145.  In lieu of certificates evidencing the New Consolidated Membership Interests and the New Standard Equity Interests, the respective Reorganized Debtors may maintain a register of the names, addresses, and interest percentages of the holders of the New Consolidated Membership Interests and the New Standard Equity Interests.

*Termination of Directors, Officers, and/or Managers of the Debtors*

Effective as of the Effective Date, all of the directors, officers, and/or managers of the Debtors shall be deemed terminated.  On the Effective Date, Michael B. Wisenbaker shall be appointed as the sole manager of Reorganized Consolidated and as the sole director and officer of Reorganized Standard.

*Amendment of Debtors' Certificates and Agreements*

On the Effective Date, the Reorganized Debtors' certificates of incorporation or formation, articles of incorporation or organization, operating agreements, bylaws, and limited liability company agreements (as applicable) shall be amended and filed (both only as required) with the appropriate secretary of state's office on the Effective Date or as soon thereafter as is reasonably practicable.   All necessary action will be taken to prohibit the issuance of non-voting equity securities of the Reorganized Debtors to the extent required by Bankruptcy Code § 1123; provided that any such prohibition shall apply only for so long as Bankruptcy Code § 1123 is in effect and applicable to the Reorganized Debtors and will have no force and effect beyond that required by Bankruptcy Code § 1123.  Copies of the proposed form of the amendments to the Reorganized Debtors' certificates of incorporation or formation, articles of incorporation or organization, operating agreements, and limited liability company agreements shall be included in the Plan Supplement.

**J.      No Recourse to the Buyer and the Newco Entities**

Except as otherwise provided in the Plan and the Purchase and Sale Agreement, the Buyer, and the Newco Entities shall not have, and do not assume, any liability or obligation for any Claims or Liens and are not required or obligated to pay any such Claims or Liens under the Plan.

**K.      Release of Liens**

On the Effective Date, all Liens (except any Permitted Encumbrances) on the Transferred Properties, and any property of one or more of the Debtors (including the property transferred to one or more of the Newco Entities or vested in the respective Reorganized Debtors) that are asserted on account of or relating to one or more Claims against one or more of the Debtors shall automatically terminate, all Collateral or other property or interests in property subject to such Liens shall be automatically released, and all guarantees of the Debtors shall be automatically discharged and released. For the avoidance of doubt, this provision shall release any and all Liens against a non-debtor's working interest in the Non-Section 6 Assets and the Section 6 Assets when the alleged Liens are on account of or relating to one or more Claims against one or more of the Debtors.

**L.      Authority**

All actions and transactions contemplated under the Plan including, but not limited to, any certificates, agreements or other documents to be executed in connection with the transfer and assignment of the Transferred Properties to one or more of the Newco Entities shall be authorized upon Confirmation of the Plan without the need of further approvals, notices or meetings of the Debtors' directors, officers, managers, and/or members, other than the notice provided by serving the Plan on (a) all known holders of Claims against the Debtors' Estates; and (b) all current holders of Equity Interests in the Debtors. Specifically, all amendments to the certificates of incorporation or formation, articles of incorporation or organization, operating agreements, limited liability company agreements, and/or bylaws of the Debtors and all other corporate action on behalf of the Debtors or the Reorganized Debtors as may be necessary to put into effect or carry out the terms and intent of the Plan may be effected, exercised, and taken without further action by the Debtors' directors, officers, managers, and/or members with like effect as if effected, exercised, and taken by unanimous action of the directors, officers, managers, and/or members of the Debtors or the Reorganized Debtors (as applicable). The Confirmation Order shall include provisions dispensing with the need of further approvals, notices or meetings of the Debtors or holders of Equity Interests and authorizing and directing any director, officer, manager, or member of each respective Debtor to execute any document, certificate or agreement necessary to effectuate the Plan on behalf of such Debtor, which documents, certificates and agreements shall be binding on the Debtors, the Creditors, and all holders of Equity Interests.

**M.      Dissolution of Committee**

The Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code § 1103. Unless otherwise ordered by the Bankruptcy Court, on the Effective Date, (a) the Committee shall be dissolved and its members shall be released of all their duties, responsibilities and obligations in connection with the Cases, the Plan and the implementation of the same; and (b) the retention or employment of the Committee's Professionals and other agents shall terminate.

# IX.
## LEGAL PROCEEDINGS AFFECTING THE DEBTORS AND ESTATES

This Article of this Disclosure Statement contains a discussion of certain specific Causes of

Action held by the Estates and which shall be preserved under the Plan for assertion by the Reorganized Debtors and/or one or more of the Newco Entities.

## A.     Preservation of Rights of Action; Settlement of Litigation Claims

The Plan Administrator shall be appointed representative of the respective Estates pursuant to Bankruptcy Code § 1123(b)(3)(B) with respect to the Causes of Action which are Vested Assets, including the Apollo Litigation, the Pathfinder Litigation and the Eunice Litigation, and, except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, all Causes of Action shall vest in the respective Reorganized Debtors who may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided herein) settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action that are Vested Assets. Except as otherwise ordered by the Bankruptcy Court, the Plan Administrator, on behalf of the applicable Reorganized Debtors, shall be vested with authority and standing to prosecute any Causes of Action that are Vested Assets. The Plan Administrator and his or her attorneys and other professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action.

## B.     Settlement of Litigation Claims and Disputed Claims

At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors, with the consent of the Lender, may settle some or all of the Causes of Action that would be Vested Assets or the Disputed Claims subject to obtaining any necessary Bankruptcy Court approval. To the extent that they would be payable to one or more of the Reorganized Debtors, the proceeds from the settlement of a Cause of Action shall constitute a Vested Asset that shall vest in the applicable Reorganized Debtor on the Effective Date in accordance with the Plan.

**As noted above, the Plan preserves all Causes of Action, unless expressly provided otherwise, and provides for them to be asserted by the Reorganized Debtors and/or a Newco Entity from and after the Effective Date of the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Plan further provides that the Reorganized Debtors and one or more of the Newco Entities, as applicable, will have standing, on and after the Effective Date of the Plan, to pursue the Causes of Action transferred to them and will be deemed appointed as the representative of the Estates for the purpose of enforcing, prosecuting and settling such transferred Causes of Action.**

**The Plan expressly rejects any *res judicata* or preclusive effect that confirmation of the Plan might otherwise have on any such claims or Causes of Action that vest in the Reorganized Debtors or one or more of the Newco Entities, as applicable.**

## C.     Litigation Pending as of the Petition Date

As of the Petition Date, one or more Debtors were party to the following actions. The status of each is also noted below:

*Heritage Standard Corporation, individually and as Assignee of all the Working Interests in the Pat Howell Well #1 v. Pathfinder Energy Services, LLC, successor in interests to and/or d/b/a Pathfinder Energy Services, Inc.,* Case Number 15,830, pending in the 109th Judicial District Court, Winkler County, Texas.

<u>Status</u>: Standard, individually and as Assignee of all the Working Interests in the Pat Howell Well #1, initiated the above-referenced litigation against Pathfinder Energy Services, LLC ("<u>Pathfinder</u>") on May 3, 2010, asserting claims of negligence for

damages caused by misdirected drilling services provided by Pathfinder during the drilling of the Pat Howell Well #1.  Among other things, Pathfinder was negligent in that it assumed, in making its guiding plan, that the well bore was straight, by failing to incorporate new survey information into its guiding plan, by continuing to drill without incorporating new survey information into its guiding plan, and by failing to correctly determine the correct drilling location.  Due to Pathfinder's negligence, Standard has been damaged in excess of $700,000.00.

The lawsuit is currently in the discovery phase of the litigation.  Standard intends to continue pursuit of its claims and use its share of the proceeds to fund the Plan, as follows:

The net proceeds from settlements, proceeds from judgment and other recoveries associated with the Apollo Litigation and Pathfinder Litigation shall be applied and/or paid as follows: (i) first, to Reorganized Standard to satisfy the Allowed Claims (excluding Subordinated Claims) against Standard's Estate; and (ii) once the Allowed Claims (excluding Subordinated Claims) against Standard's Estate are satisfied in full pursuant to Section 4.02(b) of the Plan, 50% to Section 6 Newco and 50% to Reorganized Standard.  The Plan Administrator shall be the appointed representative of Reorganized Standard and Section 6 Newco with respect to the Apollo Litigation and the Pathfinder Litigation.  Except as otherwise ordered by the Bankruptcy Court, the Plan Administrator, on behalf of Reorganized Standard and Section 6 Newco, shall be vested with authority and standing to prosecute the Apollo Litigation and Pathfinder Litigation.

*Heritage Standard Corporation, individually and as Assignee of all the Working Interests in the Pat Howell Well #1 v. Apollo Perforators, Inc.*, Case Number 15,831, pending in the 109th Judicial District Court, Winkler County, Texas.

Status:  Standard, individually and as Assignee of all the Working Interests in the Pat Howell Well #1, initiated the above-referenced litigation against Apollo Perforators, Inc. ("Apollo") on May 3, 2010, asserting claims of negligence for damages caused by wire line services provided by Apollo during the drilling of the Pat Howell Well #1.  Among other things, Apollo was negligent in that it dumped an entire wire line spool down the Pat Howell Well #1, by failing to properly exercise its equipment, by failing to properly maintain its equipment, by failing to properly shift gears when unspooling the wire line, and by failing to apply the brakes properly when the wire line started unspooling into the Pat Howell Well.  Due to Apollo's negligence, Standard has been damaged in excess of $5,000,000.00.

The lawsuit is currently in the discovery phase of the litigation.  Standard intends to continue pursuit of its claims and use its share of the proceeds to fund the Plan, as follows:

The net proceeds from settlements, proceeds from judgment and other recoveries associated with the Apollo Litigation and Pathfinder Litigation shall be applied and/or paid as follows: (i) first, to Reorganized Standard to satisfy the Allowed Claims (excluding Subordinated Claims) against Standard's Estate; and (ii) once the Allowed Claims (excluding Subordinated Claims) against Standard's Estate are satisfied in full pursuant to Section 4.02(b) of the Plan, 50% to Section 6 Newco and 50% to Reorganized Standard.  The Plan Administrator shall be the appointed representative of Reorganized Standard and Section 6 Newco with respect to the Apollo Litigation and the Pathfinder Litigation.  Except as otherwise ordered by the Bankruptcy Court, the Plan

Administrator, on behalf of Reorganized Standard and Section 6 Newco, shall be vested with authority and standing to prosecute the Apollo Litigation and Pathfinder Litigation.

*Heritage Standard Corporation and Heritage Consolidated, LLC. v. Rock Tool, Ltd., and Sonic Petroleum Services, Ltd., v. Michael Wisenbaker, Lakehills Production, Inc., Stratco Operating Company, Inc., Thomas J. Stratton, Jan Stratton, Staley Operating Company, George G. Staley, Trius Energy, LLC, J. Scott Tyson, Dennis Rosini, Thomas Hayley, Jeff Ragland, and JR Operating Company,* Case Number 15,732, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: Standard and Consolidated initiated the above-referenced litigation against Rock Tool, Ltd. ("Rock Tool") and Sonic Petroleum Services, Ltd. ("Sonic") on October 20, 2009, asserting claims for a declaratory judgment that former orders purporting to allow foreclosing of Rock Tool and Sonic's mineral liens on the A.G. Hill, Well No. 1, Section 6, Block 74, PSL Survey, Winkler County, Texas are improper, action to quiet title, trespass to try title, and violations of the Texas Civil Practice and Remedies Code § 12.002. Rock Tool and Sonic have clouded title on the oil and gas interest the A.G. Hill Well No. 1, Section 6, Block 74, PSL Survey, Winkler County, Texas (the "A.G. Hill Well No. 1") by attempting to foreclose invalid mineral liens on the A.G. Hill Well No. 1, when neither Standard nor Consolidated contracted with either Rock Tool or Sonic, and therefore, the alleged liens could not and did not attach to Standard and/or Consolidated's interests in the A.G. Hill Well No. 1. The mineral liens asserted by Rock Tool and Sonic were further invalid because Standard and Consolidated were never given notice of the alleged mineral liens.

> Rock Tool and Sonic have filed a counterclaim against Standard and Consolidated, among others, for breach of contract, quantum meruit, unjust enrichment, fraud and conspiracy to defraud, single business enterprise and alter ego, declaratory judgment, foreclosure of mineral liens, and the appointment of a receiver. Rock Tool and Sonic formerly contracted with Stratco Operating Company, Inc. ("Stratco"). Stratco failed to pay Rock Tool and Sonic for the work allegedly performed and seek to hold Standard and Consolidated liable for Stratco's failure to make payment to Rock Tool and Sonic. In the counterclaim, Rock Tool is seeking damages of $130,050.52 and Sonic is seeking damages of $37,063.07. Rock Tool and Sonic are further seeking to foreclose the mineral lien they are asserting on all of Section 6, Block 74 PSL Survey in Winkler County, Texas. Standard and Consolidated vigorously dispute any wrongdoing, that any amounts owed to Rock Tool and Sonic are owed by Standard and Consolidated, and that any mineral liens asserted by Rock Tool and Sonic attached to any interests owned by Standard and Consolidated.

> The lawsuit and the counterclaims are currently in the discovery phase of the litigation. Standard intends to continue pursuit of its claims and use its share of the proceeds to fund the Plan.

*ABC Rental Tools, Inc. and Eunice Well Servicing Co. v. Heritage Standard Corporation, Individually and as Assignee of All the Working Interests in Tubb Estate 22 #2 v. ABC Rental Tools, Inc., Eunice Well Serving Co. and Teaco Energy Service, Inc.,* Case Number 15,484, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by vendors. ABC Rental Tools, Inc. ("ABC") and Eunice Well Servicing Co. ("Eunice") initiated the above-referenced litigation against Standard on May 19, 2008 asserting claims of breach of contract and suit on a sworn account for

Standard's alleged failure to pay for materials, machinery, supplies, services and/or performance of labor and services provided by ABC and Eunice, used in connection with the operation and maintenance of oil and gas wells.

ABC is seeking damages of $889,182.35. ABC further asserts its entitlement to mineral liens on the Tubb Estate 22-2 well, Section 22, Block C-23, PSL Survey in Winkler County, Texas, the Tubb Estate 22-3 well, Section 22, Block C-23, PSL Survey in Winkler County, Texas, the Little Wolf #8 well, Section 16, Block C-23, PSL Survey in Winkler County, Texas, the Tubb Estate 75-1 well, Section 1, Block 75, PSL Survey in Winkler County, Texas, the Tubb Unit 9-1 well, Section 9, Block 74, PSL Survey in Winkler County, Texas, and the Tubb Unit 9-2 well, Section 9, Block 74 PSL Survey in Winkler County, Texas.

Eunice is seeking damages of $1,607,800.53. Eunice further asserts its entitlement to mineral liens on the Tubb Estate 22-2 well, Section 22, Block C-23, PSL Survey in Winkler County, Texas, the Tubb Estate 22-3 well, Section 22, Block C-23, PSL Survey in Winkler County, Texas, the Little Wolf #8 well, Section 16, Block C-23, PSL Survey in Winkler County, Texas, the Tubb Estate 75-1 well, Section 1, Block 75, PSL Survey in Winkler County, Texas, the Tubb Unit 9-1 well, Section 9, Block 74, PSL Survey in Winkler County, Texas, the Tubb Unit 9-2 well, Section 9, Block 74 PSL Survey in Winkler County, Texas, the Little Wolf #5 well, Section 16, Block C-23, PSL Survey in Winkler County, Texas, the Black Kettle #1-A well, Section 7 Block 74, PSL Survey in Winkler County, Texas, the Black Kettle #5 well, Section 7 Block 74, PSL Survey in Winkler County, Texas, the Wolfe Unit #2 well, Section 24, Block C-23, PSL Survey, Abstract 1393, in Winkler County, Texas, the Wolfe Unit #4 well, Section 24, Block C-23, PSL Survey, Abstract 1393, in Winkler County, Texas, the Wolfe Unit #6 well, Section 24, Block C-23, PSL Survey, Abstract 1393, in Winkler County, Texas, the Wolfe Unit #8, Section 24, Block C-23, PSL Survey, Abstract 1393, in Winkler County, Texas, the Tubb 1 Unit #1, Section 1, Block C-24, PSL Survey, Abstract 1395, in Winkler County, Texas, the Tubb Estate 22 #1 well, Section 22, Block C-23, PSL Survey, Abstract 1414, in Winkler County, Texas, the Tubb Estate 25 #1 and #3 wells, Section 25, Block C-23, PSL Survey, in Winkler County, Texas, and the Tubb Estate 21 #2 well, Section 21, Block C-23, PSL Survey, Abstract 1391, in Winkler County, Texas.

Standard denies either Eunice or ABC are entitled to recover in this lawsuit. On June 18, 2010, Standard filed its Third Amended Counterclaim in the lawsuit against ABC, Eunice and Teaco Energy Service, Inc. ("Teaco"), asserting counterclaims for negligence, breach of contract, and breach of warranty. Standard has been damaged in excess of $10,000,000.00. Standard's damages result from services provided by ABC, Eunice and Teaco during the drilling of the Tubb Estate 22 #2 well in 2007, which resulting in the destruction of the Tubb Estate 22 #2 well, including the wellbore. Among other things, Eunice, ABC and Teaco failed to fit the tube together property so that it separated in the well hole, failed to set the slips before releasing the elevator, thereby dropping the fishing string almost two miles down the hole, smashing the tube that had separated in the hole, and dropped the tube on several occasions thereafter. ABC, Eunice and Teaco's acts significantly damaged the Tubb Estate 22 #2 well, resulting in permanent loss of the value of the well and permanent reduction in the capability of production from the well.

The lawsuit and the counterclaims are currently in the discovery phase of the litigation. Standard intends to continue pursuit of its claims and use its share of the proceeds to fund the Plan.

*Acme Energy Services, Inc. d/b/a Big Dog Drilling v. Heritage Standard Corporation, Heritage Consolidated, LLC, George G. Staley, Trius Energy, LLC, Brian Kerrigan, as Trustee for the Benefit of CIT Capital USA, Inc., and CIT Capital USA, Inc., on its own behalf and as Administrative Agent for Undisclosed Lenders,* Case Number 15,681, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. Acme Energy Services, Inc. d/b/a Big Dog Drilling ("Big Dog") initiated the above-referenced litigation against Standard and Consolidated on July 16, 2009 asserting claims for quantum meruit and foreclosure of its alleged mineral liens for Standard and Consolidated's alleged failure to pay for the hauling and furnishing of materials, machinery, or supplies and/or performance of labor and services provided by Big Dog, used in connection with the operation and maintenance of oil and gas wells. Big Dog is seeking damages of $862,725.85 plus attorney's fees. Big Dog is further seeking to foreclose the mineral lien it is asserting on all of Section 6, Bock 74, PSL Survey, in Winkler County, Texas. Standard and Consolidated deny liability and deny that Big Dog is entitled a lien, as Big Dog did not contract with either Standard or Consolidated in connection with the services and materials Big Dog furnished. This lawsuit is currently in the discovery phase of the litigation when it was stayed as a result of the bankruptcy filing.

*Acme Energy Services, Inc. d/b/a Rig Movers Express v. Heritage Standard Corporation, Heritage Consolidated, LLC, George G. Staley, Trius Energy, LLC, Brian Kerrigan, as Trustee for the Benefit of CIT Capital USA, Inc., and CIT Capital USA, Inc., on its own behalf and as Administrative Agent for Undisclosed Lenders,* Case Number 15,687, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. Acme Energy Services, Inc. d/b/a Rig Movers Express ("Rig Movers") initiated the above-referenced litigation against Standard and Consolidated on July 21, 2009 asserting claims for quantum meruit and foreclosure of its alleged mineral liens for Standard and Consolidated's alleged failure to pay for the hauling and furnishing of materials, machinery, or supplies and/or performance of labor and services provided by Rig Movers, used in connection with the operation and maintenance of oil and gas wells. Rig Movers is seeking damages of $146,744.75 plus attorney's fees. Rig Movers is further seeking to foreclose the mineral lien it is asserting on all of Section 6, Bock 74, PSL Survey, in Winkler County, Texas. Standard and Consolidated deny liability and deny that Rig Movers is entitled a lien, as Rig Movers did not contract with either Standard or Consolidated in connection with the services and materials Rig Movers furnished. This lawsuit was in the discovery phase of the litigation when it was stayed as a result of the bankruptcy filing.

*Endeavor Energy Resources, L.P. v. Heritage Standard Corporation, Heritage Consolidated, LLC, George G. Staley, Trius Energy, LLC, Brian Kerrigan, as Trustee for the Benefit of CIT Capital USA, Inc., and CIT Capital USA, Inc., on its own behalf and as Administrative Agent for Undisclosed Lenders,* Case Number 15,682, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. Endeavor Energy Resources, L.P. ("Endeavor") initiated the above-referenced litigation against Standard and Consolidated on July 16, 2009, asserting claims for quantum meruit and foreclosure of its alleged mineral liens for Standard and Consolidated's alleged failure to pay for the hauling and furnishing of materials, machinery, or supplies and/or performance of labor and services provided by Endeavor, used in connection with the operation and maintenance of oil and

gas wells.  Endeavor is seeking damages of $168,824.11, plus attorney's fees.  Endeavor is further seeking to foreclose the mineral lien it is asserting on all of Section 6, Bock 74, PSL Survey, in Winkler County, Texas.  Standard and Consolidated deny liability and deny that Endeavor is entitled a lien, as Endeavor did not contract with either Standard or Consolidated in connection with the services and materials Endeavor furnished.  This lawsuit was in the discovery phase of the litigation when it was stayed as a result of the bankruptcy filing.

*Nova Mud, Inc. v. Heritage Standard Corporation, Heritage Consolidated, LLC, George G. Staley, Trius Energy, LLC, Brian Kerrigan, as  Trustee for the Benefit of CIT Capital USA, Inc., and CIT Capital USA, Inc., on its own behalf and as Administrative Agent for Undisclosed Lenders,* Case Number 15,683, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status:  This is a lawsuit filed by a vendor.  Nova Mud, Inc. ("Nova") initiated the above-referenced litigation against Standard and Consolidated on July 17, 2009, asserting claims for quantum meruit and foreclosure of its alleged mineral liens for Standard and Consolidated's alleged failure to pay for the hauling and furnishing of materials, machinery, or supplies and/or performance of labor and services provided by Nova, used in connection with the operation and maintenance of oil and gas wells.  Nova is seeking damages of $146,744.75 plus attorney's fees.  Nova is further seeking to foreclose the mineral lien it is asserting on all of Section 6, Bock 74, PSL Survey, in Winkler County, Texas.  Standard and Consolidated deny liability and deny that Nova is entitled to a lien, as Nova did not contract with either Standard or Consolidated in connection with the services and materials Nova furnished.  This lawsuit was in the discovery phase of the litigation when it was stayed as a result of the bankruptcy filing.

*Frac Tech Services, LLC v. Heritage Standard Corporation,* Case Number 15,774, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status:  This is a lawsuit filed by a vendor.  Frac Tech Services, LLC ("Frac Tech") initiated the above-referenced litigation against Standard on February 12, 2010 asserting claims for breach of contract/suit on a sworn account for Standard's alleged failure to pay for oil-well simulation services provided by Frac Tech.  Frac Tech is seeking damages of $153,720.95, plus attorney's fees.  This lawsuit was in the discovery phase of the litigation when it was stayed as a result of the bankruptcy filing.

*W&W Energy Services v. Heritage Standard Corporation and Heritage Resources, Inc.,* Case Number 15,833, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status:  This is a lawsuit filed by a vendor.  W&W Energy Services ("W&W") initiated the above-referenced litigation against Standard on May 7, 2010 asserting claims for breach of contract, suit on a sworn account, foreclosure of its alleged mineral liens, and quantum meruit for Standard's alleged failure to pay for material, labor, equipment machinery and/or supplies provided by W&W, used in connection with the transportation or hauling of equipment used in mineral activities.  W&W is seeking damages of $4,006.80, plus attorney's fees.  W&W is further seeking to foreclose the mineral lien it is asserting on Well #1022, Tubb Estate #22, Section 22, Block C-23, PSL Survey, in Winkler County, Texas.  This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Suttles Logging, Inc. v. Heritage Standard Corporation*, Case Number 15,829, pending in 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. Suttles Logging, Inc. ("Suttles") initiated the above-referenced litigation against Standard on April 30, 2010 asserting claims for breach of contract, suit on a sworn account, quantum meruit, unjust enrichment and foreclosure of its alleged mineral liens for Standard's alleged failure to pay for material and services provided by Suttles, used in connection with the operation and maintenance of oil and gas wells. Suttles is seeking damages of $93,820.00 plus attorney's fees. Suttles is further seeking to foreclosure the mineral lien it is asserting on the Pat Howell # 1 Well, SLI-455, Section 6, Block 74, Abstract #521, PSL Survey, in Winkler County, Texas. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*O-Tex Pumping, LLC v. Heritage Standard Corporation,* Case Number 15,843, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. O-Tex Pumping, LLC ("O-Tex") initiated the above-referenced litigation against Standard on June 3, 2010 asserting claims for breach of contract, suit on a sworn account, quantum meruit and foreclosure of its alleged mineral lien for Standard's alleged failure to pay for material and services provided by O-Tex used in connection with the operation and maintenance of oil and gas wells. O-Tex is seeking damages of $184,947.65, plus attorney's fees. O-Tex is further seeking to foreclose the mineral lien it is asserting on Section 6, Block 74, PSL/Moreland Survey, in Winkler County, Texas. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Unicom Services, Inc. v. Lakehills Production, Inc., Stratco Operating Company, Heritage Standard Corporation, Heritage Consolidated, LLC and Trius Energy,* Case Number 15,813, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. Unicom Services, Inc. ("Unicom") initiated the above-referenced litigation against Standard and Consolidated on March 31, 2010, asserting claims for breach of contract, suit on a sworn account, quantum meruit and foreclosure of its alleged mineral liens in connection with Standard and Consolidated's alleged failure to pay for rental, transportation charges, repairs, interest and maintenance on certain equipment provided by Unicom, used in connection with the operation and maintenance of oil and gas wells. Unicom is seeking damages of $8,116.03, plus attorney's fees. Unicom is further seeking to foreclose the mineral lien it is asserting on Section 6, Block 74, PSL/Moreland Survey, in Winkler County, Texas. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*J.G. Solis Corporation v. Heritage Standard Corporation*, Case Number 15,844, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. J.G. Solis Corporation d/b/a Liberty Pump and Supply Company ("J.G. Solis") initiated the above-referenced litigation against Standard on June 3, 2010 asserting claims for suit on a sworn account and quantum meruit for Standard's alleged failure to pay for goods, services or merchandise provided by J.G. Solis. J.G. Solis is seeking damages of $147,594.63, plus attorney's fees. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Foundation Energy Fund II, LLC v. Heritage Standard Corporation,* Case Number DC-09-15873, pending in the 68th Judicial District Court, Dallas County, Texas.

> Status: Foundation Energy Fund II, LLC ("Foundation Energy") initiated the above-referenced litigation against Standard on November 25, 2009 asserting claims for breach of a contract (a joint operating agreement), negligence, gross negligence and a declaratory judgment. Foundation Energy alleges it owns a working interest and a revenue interest in a well in Winkler County, Texas known as Tubb Estate 1-25, located in Section 25, Block C-23, PSL Survey in Winkler County, Texas. Foundation Energy alleges Standard breached a joint operating agreement by failing to obtain Foundation Energy's written consent before reworking, plugging, backing or deepening the well in which Foundation Energy alleges it maintains an interest. Foundation Energy has not alleged a certain dollar amount of damages it is seeking. Standard maintains that written consent was properly obtained from Foundation Energy. The lawsuit was set for a default judgment and/or dismissal hearing on October 11, 2010 at 9:00 a.m., when it was stayed as a result of the bankruptcy filing.

*JMR Industries, LTD v. Heritage Standard Corporation,* Case Number DC-10-06637, pending in the 298th Judicial District Court, Dallas County, Texas.

> Status: This is a lawsuit filed by a vendor. JMR Industries, LTD ("JMR Industries") initiated the above-referenced litigation against Standard on June 7, 2010 asserting claims for breach of a lease agreement for various equipment, including portable generators, portable light towers and related items. JMR Industries is seeking damages of $95,687.39, plus attorney's fees. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Coastal Chemical Co., LLC v. Heritage Standard Corp.*, Case Number DC-10-06682, pending in the 192nd Judicial District Court, Dallas County, Texas.

> Status: This is a lawsuit filed by a vendor. Coastal Chemical Co., LLC ("Coastal Chemical") initiated the above-referenced litigation against Standard on June 7, 2010 asserting a claim for a suit on a sworn account in connection with Standard's alleged failure to pay for various chemical products provided by Coastal Chemical. Coastal Chemical is seeking damages of $244,723.48, plus attorney's fees. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Simons Petroleum, Inc. v. Heritage Standard Corporation,* Case Number DC-10-07768-A, pending in the 14th Judicial District Court, Dallas County, Texas.

> Status: This is a lawsuit filed by a vendor. Simons Petroleum, Inc. ("Simons") initiated the above-referenced litigation against Standard on June 10, 2010 asserting claims for breach of contract, suit on a sworn account, unjust enrichment, quantum meruit, and foreclosure of its alleged mineral lien in connection with Standard's alleged failure to pay for labor, services or materials provided by Simons, used in connection with the operation and maintenance of oil and gas wells. Simons is seeking damages of $274,698.95, plus attorney's fees. Simons is further seeking to foreclose the mineral lien it is asserting on Section 6, Block 74, PSL/Moreland Survey, in Winkler County, Texas. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Lonnie McDade v. Michael B. Wisenbaker, Heritage Standard Corporation, Heritage Resources, Inc., Heritage Gathering Corporation, Heritage Disposal Corporation, Heritage Oil, L.P., Case Inlet, L.P., SSBW, L.P., Chase Avenue Corporation, Rancho Heilo Brazos, L.P.,* Case Number DC-10-09517, pending in the 116th Judicial District Court, Dallas County, Texas.

> Status: Lonnie McDade ("McDade") initiated the above-referenced litigation against Standard and several other affiliated companies on August 4, 2010, asserting claims of breach of contract, request for declaratory relief and an application for temporary injunction against Standard related to his former employment with Standard. On August 30, 2010, Standard filed various counterclaims against McDade, including breach of agreement, fraud and fraudulent misrepresentations and unjust enrichment in connection with McDade's former employment. The lawsuit and the counterclaims were in the early stages of litigation when it was stayed as a result of the bankruptcy filing.

*Texas Energy Services, LLC, a Delaware Limited Liability Company, d/b/a Texas Energy Services, successor in interest to Texas Energy Services, L.P. v. Heritage Standard Corporation,* Case Number 10-02-48821-CV, pending in the 79th Judicial District Court, Jim Wells County, Texas.

> Status: This is a lawsuit filed by a vendor. Texas Energy Services, LLC, a Delaware Limited Liability Company, d/b/a Texas Energy Services, successor in interest to Texas Energy Services, L.P. ("Texas Energy") initiated the above-referenced litigation against Standard on February 25, 2010, asserting claims for breach of contract, suit on a sworn account, quantum meruit, unjust enrichment and foreclosure of alleged mechanics liens in connection with Standard's alleged failure to pay for oilfield well services provided by Texas Energy, used in connection with the operation and maintenance of oil and gas wells. Texas Energy is seeking damages of $61,212.38, plus attorney's fees. Texas Energy is further seeking to foreclose the mechanics lien it is asserting on the Tubb Estate Well #25-1, in Winkler County, Texas. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Forbes Energy Services, LLC, successor in interest to CC Forbes Company, L.P. v. Heritage Standard Corporation,* Case Number 10-02-48822-CV, pending in the 79th Judicial District Court, Jim Wells County, Texas.

> Status: This is a lawsuit filed by a vendor. Forbes Energy Services, LLC, successor in interest to CC Forbes Company, L.P. ("CC Forbes") initiated the above-referenced litigation against Standard on February 25, 2010, asserting claims for breach of contract, suit on a sworn account, quantum meruit, unjust enrichment and foreclosure of alleged mechanics liens in connection with Standard's alleged failure to pay for oilfield well services provided by CC Forbes, used in connection with the operation and maintenance of oil and gas wells. CC Forbes is seeking damages of $793,844.84, plus attorney's fees. CC Forbes is further seeking to foreclose the mechanics lien it is asserting on the Tubb Estate Well #25-1, in Winkler County, Texas. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*EXPRO Americas, LLC v. Heritage Standard Corp.,* Case Number 962853, pending in the County Court at Law Number 1, Harris County, Texas.

> Status: This is a lawsuit filed by a vendor. EXPRO Americas, LLC ("EXPRO") initiated the above-referenced litigation against Standard on May 20, 2010 asserting a claim of a suit on a sworn account in connection with Standard's alleged failure to pay for services

provided by EXPRO. EXPRO is seeking damages of $48,621.99, plus attorney's fees. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Kuykendall Bottom Hole Pressure, Inc. v. Heritage Standard Corp.*, Case Number CC15685, pending in the County Court at Law No. 1, Midland County, Texas.

> Status: Kuykendall Bottom Hole Pressure, Inc. ("Kuykendall") initiated the above-referenced litigation against Standard on July 12, 2010 asserting a claim of a suit on a sworn account in connection with Standard's alleged failure to pay for services provided by Kuykendall. Kuykendall is seeking damages of $11,638.50, plus attorney's fees. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Warrior Energy Services Corporation d/b/a Bobcat Pressure Control v. Heritage Standard Corporation,* Case Number 3:09-cv-02086-L, pending in the United States District Court for the Northern District of Texas, Dallas Division.

> Status: This is a lawsuit filed by a vendor. Warrior Energy Services d/b/a Bobcat Pressure Control ("Warrior Energy") initiated the above-referenced litigation against Standard on November 3, 2009, asserting claims for breach of contract, open account, account stated, promissory estoppel, unjust enrichment and quantum meruit in connection with Standard's alleged failure to pay for well related services and equipment provided by Warrior Energy, used in connection with the operation and maintenance of oil and gas wells. Warrior Energy sought damages of $240,005.07 plus attorney's fees. On or around June 8, 2010, the parties settled Warrior Energy's claims and agreed to administratively close the above-referenced case pending Standard's satisfaction of an agreed payment schedule, and granting Warrior Energy a Stipulated Final Judgment in the amount of $105,514.57. The Court entered the order closing the case on June 22, 2010. However, Standard failed to comply with the terms of the agreed payment schedule, and on August 13, 2010, Warrior Energy filed a Motion to Reopen Administratively Closed Case for the purpose of entering the Stipulated Final Judgment. To date, the case has not been reopened.

*ITS Rental and Sales, Inc. v. Heritage Standard Corporation,* Case Number DC-10-09664-A, pending in the 14th Judicial District Court, Dallas County, Texas.

> Status: This is a lawsuit filed by a vendor. ITS Rental and Sales, Inc. d/b/a International Tubular Services ("ITS") initiated the above-referenced litigation against Standard on August 6, 2010, asserting claims for breach of contract, suit on a sworn account, and quantum meruit, in connection with Standard's alleged failure to pay for services, equipment and supplies provided by ITS, used in connection with the operation and maintenance of oil and gas wells. ITS is seeking damages of $224,917.97, plus attorney's fees. Standard's answer or otherwise responsive was not yet due when the litigation was stayed as a result of the bankruptcy filing.

*Arguijo Oilfield Services, Inc. v. Heritage Standard Corporation,* Case Number 15,885, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. Arguijo Oilfield Services, Inc. ("Arguijo") initiated the above-referenced litigation against Standard on August 12, 2010, asserting a claim for a suit on a sworn account in connection with Standard's alleged failure to pay

for services provided by Arguijo, used in connection with the operation and maintenance of oil and gas wells. Arguijo is seeking damages of $193,414.52, plus attorney's fees. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Aries Well Service, Inc. v. Heritage Standard Corporation,* Case Number 15,882, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. Aries Well Service, Inc. ("Aries") initiated the above-referenced litigation against Standard on August 5, 2010, asserting claims for breach of contract, suit on a sworn account, quantum meruit, promissory estoppel and foreclosure of alleged mineral liens in connection with Standard's alleged failure to pay for maintenance and repair services provided by Aries, used in connection with the operation and maintenance of oil and gas wells. Aries is seeking damages of $469,997.28, plus attorney's fees. Aries is further seeking to foreclose the mineral liens it is asserting on the Pat Howell #1 well, Section 6, Block 74, PSL/Moreland Survey, in Winkler County, Texas, the Tubb "9" Unit #2 well, Section 9, Block 74 PSL/Moreland Survey in Winkler County, Texas, the Tubb Estate 22 #2 well, Section 22, Block C-23, PSL Survey in Winkler County, Texas, the Tubb Estate #3 well, Section 22, Block C-23, PSL Survey in Winkler County, Texas, the Tubb Estate 25 #1 well, Section 25, Block C-23 PSL Cowden CC Survey in Winkler County, Texas, the Tubb Estate 25 #3 well, Section 25, Block C-23 PSL Cowden CC Survey in Winkler County, Texas, the Tubb Estate 75 #1 well, Section 1, Block 75 PSL/C.C. Cowden Survey in Winkler County, Texas, the Wolfe Unit #2 well, Section 24, Block C-23, PSL/C.C. Cowden Survey in Winkler County, Texas, the Wolfe Unit #4 well, Block C-23, PSL/C.C. Cowden Survey in Winkler County, Texas, the Wolfe Unit #5 well, Block C-23, PSL/C.C. Cowden Survey in Winkler County, Texas, the Wolfe Unit #5 well, Block C-23, PSL/C.C. Cowden Survey in Winkler County, Texas, the Wolfe Unit #6 well, Block C-23, PSL/C.C. Cowden Survey in Winkler County, Texas, and the Wolfe Unit #7 well, Block C-23, PSL/C.C. Cowden Survey in Winkler County, Texas. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*4-Star Tank Rental, L.P. v. Heritage Standard Corporation,* Case Number 15,886, pending in the 109th Judicial District Court, Winkler County, Texas.

> Status: This is a lawsuit filed by a vendor. 4-Star Tank Rental, L.P. ("4-Star") initiated the above-referenced litigation against Standard on August 12, 2010, asserting claims for breach of contract and foreclosure of alleged mechanics liens in connection with Standard's alleged failure to pay for services, labor and materials provided by 4-Star, used in connection with the operation and maintenance of oil and gas wells. 4-Star is seeking damages of $61,813.60, plus attorney's fees. 4-Star is further seeking to foreclose the mechanics liens it is asserting on all of Section 22, Block C-23, PSL Survey, in Winkler County, Texas, all of Section 9, Block 74, PSL Survey in Winkler County, Texas and all of Section 6, Block 74, PSL Survey in Winkler County, Texas. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Aquila Drilling Co., L.P. v. Heritage Standard Corporation and Heritage Consolidated, LLC,* Case Number 172,966-B, pending in the 78th Judicial District Court, Wichita County, Texas.

> Status: This is a lawsuit filed by a vendor. Aquila Drilling Co., L.P. ("Aquila") initiated the above-referenced litigation against Standard on July 16, 2010, asserting claims for

breach of contract, suit on a sworn account, and quantum meruit in connection with Standard and Consolidated's alleged failure to pay for labor, materials, machinery and supplies provided by Aquila, used in connection with the operation and maintenance of oil and gas wells. Aquila is seeking damages of $5,114,093.47, plus attorney's fees. This lawsuit was in the early stages of the litigation when it was stayed as a result of the bankruptcy filing.

*Butch's Rat Hole & Anchor Service, Inc. v. Heritage Standard Corporation*, Case Number 10-03-22079, pending in the 286th Judicial District Court, Hockley County, Texas.

    Status: This is a lawsuit filed by a vendor. Butch's Rat Hole & Anchor Service, Inc. ("Butch's Rat Hole") initiated the above-referenced litigation against Standard on March 23, 2010 asserting a claim of a suit on a sworn account in connection with Standard's alleged failure to pay for goods and services provided by Butch's Rat Hole. Butch's Rat Hole is seeking damages of $14,526.00, plus attorney's fees. On August 24, 2010, Butch's Rat Hole filed its Motion for Summary Judgment on all claims against Standard based on the admissions deemed admitted pursuant to TEX. R. CIV. P. 198 and uncontroverted affidavit evidence. Butch's Rat Hole's Motion for Summary Judgment has been adjourned as a result of the bankruptcy filing.

*Well Foam, Inc. v. Heritage Standard Corporation*, Case Number 15,728, pending in the 109th Judicial District Court, Winkler County, Texas.

    Status: This is a lawsuit filed by a vendor. Well Foam, Inc. ("Well Foam") initiated the above-referenced litigation against Standard on December 3, 2009, asserting claims for suit on a sworn account and quantum meruit for Standard's alleged failure to pay for goods, services or merchandise provided by Well Foam. Well Foam is seeking damages of $156,660.05, plus attorney's fees. This lawsuit was in the discovery stage of litigation when it was stayed as a result of the bankruptcy filing.

*Professional Fluid Services, LLC v. Heritage Standard Corp.*, Case Number 2009-7723-A, pending in the 78th Judicial District Court, Lafayette Parish, Louisiana.

    Status: This is a lawsuit filed by a vendor. Professional Fluid Services, Inc. ("Professional Fluid") initiated the above-referenced litigation against Standard on December 3, 2009, asserting a claim for a suit on an open account for Standard's alleged failure to pay for equipment and services provided by Professional Fluid. Standard and Professional Fluid entered into a settlement of the litigation, with a Consent Judgment in the amount of $73,200.00 which required an initial payment of $35,000.00 in May 2010 and the remaining balance to be paid by July 15, 2010. To date, Standard has not made the payment due July 15, 2010. This litigation was stayed as a result of the bankruptcy filing.

**D. Post-Petition Litigation**

As of the date of this Disclosure Statement, the Debtors have not commenced any post-petition litigation.

**E. Potential Litigation**

As noted above, the Plan preserves all Causes of Action, unless expressly provided otherwise and provides for them to be transferred to the Reorganized Debtors, or where applicable, the Newco Entities.

In addition to the Causes of Action which have already been asserted by the Estates (discussed in prior sections of the Disclosure Statement), the Estates do or may hold the following Causes of Action:

**1.      Avoidance Causes of Action**

Pursuant to Sections 547 and 550 of the Bankruptcy Code, a trustee (or debtor in possession pursuant to Section 1107 of the Bankruptcy Code) may avoid and recover any transfer of an interest of the debtor in property to or for the benefit of a creditor if such transfer (i) was for or on account of an antecedent debt owed by the debtor before the transfer was made, (ii) was made while the debtor was insolvent, (iii) was made within ninety (90) days of the bankruptcy filing, and (iv) resulted in the creditor receiving more on account of the debt than if the transfer had not been made, the debtor were liquidated under Chapter 7 of the Bankruptcy Code, and the creditor were limited to recovery on the debt through the Chapter 7 process.

The Estates may hold such claims against the recipients of payments reflected on the Statement of Financial Affairs Filed for the Debtors on September_____, 2010 [Docket No. _____], in response to Item No. 3 (the "Lookback Payment Listings"). The Lookback Payment Listings are incorporated herein, by reference, for all intents and purposes. **Creditors shown on the Lookback Payment Listings are hereby notified that the Plan preserves the Estates' rights to pursue claims and Causes of Action for the avoidance and recovery of actually or constructively fraudulent transfers for the benefit of the Estates following confirmation of the Plan**.

**2.      Subordination Causes of Action**

Pursuant to section 510(c) of the Bankruptcy Code, after notice and a hearing, a bankruptcy court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim. Causes of action under Section 510(c) of the Bankruptcy Code are referred to as "Subordination Causes of Action." The Debtors do or may hold Subordination Causes of Action, which are specifically reserved and will vest in the Reorganized Debtors.

**3.      Collection Causes of Action**

As of the date hereof, numerous parties owe amounts to the Debtors on account of the Debtors oil and gas operations. To the extent that amounts owing to the Debtors are currently past due or may hereafter become past due, the Estates may hold various claims against such parties for collection of the amounts owing. Any claims arising from such obligations shall constitute part of the Causes of Action specifically reserved and will vest in the Reorganized Debtors.

**4.      Notice of Preservation of Causes of Action**

The Debtors believe that substantial Causes of Action exist which could be asserted by the Debtors and/or the Estates against third parties. In addition to claims and Causes of Action held by the Estates and specifically referenced in the Plan or this Disclosure Statement, the additional persons presently known to the Debtors who may constitute defendants to claims or Causes of Action preserved or reserved under the Plan are listed in the *Schedule of Potential Litigation Defendants*, attached as **Exhibit "D"** (to be supplemented) to this Disclosure Statement. The potential Causes of Action presently known to the Debtors which may have arisen under contract, tort, general corporate or securities laws are listed in the *Schedule of Potential and Retained Causes of Action*, attached as **Exhibit "E"** (to be supplemented) to this Disclosure Statement. It is possible that Estate representatives and their successors may discover other Persons who may be liable beyond those listed in Exhibit D as well as other Causes of Action beyond those listed in the Exhibit E. The fact that Causes of Action and Persons may be currently unknown to the Debtors does not evidence any intention to waive or release them. The Debtors wish to

make clear that they wish to invoke all doctrines available which may expand statutes of limitations including, but not limited to, the discovery rule.

**PLEASE TAKE NOTICE: WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTORS AND THEIR ESTATES, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE REORGANIZED DEBTORS, OR AS APPLICABLE, ONE OR MORE OF THE NEWCO ENTITIES. THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT BE DEEMED TO PRECLUDE OR CONSTITUTE *RES JUDICATA,* RELEASE OR WAIVER OF ANY SUCH CAUSE OF ACTION, IT BEING THE INTENTION OF THE PLAN PROPONENTS FOR THE PLAN TO PRESERVE AND TRANSFER TO THE REORGANIZED DEBTORS, OR AS APPLICABLE, ONE OR MORE OF THE NEWCO ENTITIES, ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTORS OR THEIR ESTATES PRIOR TO AND/OR AS OF THE EFFECTIVE DATE OF THE PLAN, AND ANY CAUSES OF ACTION OF THE DEBTORS OR ESTATES WHICH COME INTO BEING THEREAFTER.**

The Debtors cannot presently estimate the amount of recovery which might be made on these Causes of Action to be preserved and transferred to the Reorganized Debtors, or as applicable, one or more of the Newco Entities.

# X.
## OTHER SIGNIFICANT PLAN PROVISIONS

### A.    Treatment of Executory Contracts and Unexpired Leases

Section 365 of the Bankruptcy Code sets out various provisions regarding executory contracts and unexpired leases. Pursuant to the Plan, all contracts and leases constituting executory contracts or unexpired leases under the provisions of section 365 of the Bankruptcy Code as of the Effective Date of the Plan which (a) have not been assumed or rejected prior to the Effective Date, (b) are not approved for assumption by the Bankruptcy Court at the Confirmation Hearing, or (c) are not listed on **Exhibit 5** of the Plan, will be deemed rejected as of the Effective Date in accordance with the provisions of section 365 of the Bankruptcy Code

On the Effective Date, executory contracts and unexpired leases identified on **Exhibit** 5 of the Plan (the "Designated Contracts"), shall be assumed by the applicable Reorganized Debtor and assigned to one or more of the Newco Entities pursuant to the terms of the Purchase and Sale Agreement and the Plan. Any Cure Claims relating to the assumption and transfer of an executory contract or unexpired lease and ordered to be paid by the Bankruptcy Court shall be paid by one or more of the Newco Entities on or as soon as reasonably practicable after the Effective Date.

Except as otherwise set by Order of the Court, any objection to the assumption and vesting of, or the proposed cure amount under, the Designated Contracts must be made as an objection to Confirmation of the Plan. If no objection to the assumption and vesting of, or the proposed cure amount under, any particular Designated Contract is Filed and timely served, an Order (which may be the Confirmation Order) that approves the assumption and assignment of, and the proposed cure amount under, each respective Designated Contract may be entered by the Bankruptcy Court. If any such objections are Filed and timely served, a hearing with respect to the assumption and assignment or cure of any of the Designated Contracts, and the objections thereto, shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing. Any holder of such a

rejection damages Claim that fails to File and serve an objection to Confirmation of the Plan on or before said deadline shall be deemed to have waived such Claim in full, and such Claim shall be deemed Disallowed and discharged.

In the event that any of the Non-Section 6 JOAs or the Pat Howell JOA is not an Assumed Contract, then Standard and Consolidated agree to execute one or more new joint operating agreements naming Operator Newco as the operator on terms reasonably acceptable to Operator Newco, which new joint operating agreements shall constitute Transferred Properties which shall be assigned and transferred to Operator Newco on the Effective Date. The Confirmation Order shall contain findings and conclusions that Operator Newco has been elected and/or designated as operator under such joint operating agreement(s), and those findings and conclusions shall be binding on all parties to the joint operating agreement(s). The form of joint operating agreement shall be included in the Plan Supplement.

## B. Incorporation of Sale Motion

The Plan provides that the Plan itself shall constitute shall be considered a motion pursuant to sections 105, 363 and 365 requesting the Bankruptcy Court to authorize the Debtors on the Effective Date to: (i) sell the Transferred Properties Free and Clear to one or more of the Newco Entities, but subject to the Newco Entities' respective obligations under the Plan; and (ii) to assume and assign the Designated Contracts to one or more of the Newco Entities. Any objection to such sale, transfer, assumption and assignment, must be filed as an objection to Confirmation of the Plan. Any Person having an interest in or against any Transferred Properties shall be conclusively deemed to have consented to the transfer and assignment of such Transferred Properties Free and Clear to one or more of the Newco Entities by failing to object to confirmation of the Plan.

## C. Distributions Under the Plan

Distributions under the Plan will only be made to Creditors holding Allowed Claims and Allowed Equity Interests. A Claim is "Allowed" under the Plan: (a) to the extent that it is listed in the Schedules in a liquidated, non-contingent, and undisputed amount, but only if no proof of Claim is Filed with the Bankruptcy Court to evidence such Claim on or before the Bar Date; or (b) as evidenced by a proof of Claim Filed on or before the Bar Date, but only to the extent asserted in a liquidated amount, and only if no objection to the allowance of the Claim, and no motion to expunge the proof of Claim, is Filed on or before the Claims Objection Deadline;[3] or (c) to the extent allowed by a Final Order of the Bankruptcy Court.

### 1. Waterfall

Distributions of Cash of the respective Reorganized Debtors shall be made to holders of Allowed Claims in Classes 1, 2, 5, 6 (with respect to Reorganized Standard), 7, and 8 against the respective Reorganized Debtors as follows:

- first, to holders of Allowed Ad Valorem Tax Claims (or, with respect to Ad Valorem Tax Claims that are Disputed Claims, to the Senior Claim Distribution Reserve as provided in Section 9.03 of the Plan) until all such Allowed Ad Valorem Tax Claims are paid or reserved in full;

---

[3] The "Claims Objection Deadline" is defined in the Plan as ninety (90) days after the Effective Date of the Plan, unless extended by the Bankruptcy Court, for cause shown, upon motion Filed with the Bankruptcy Court on or prior to such date.

- second, to holders of Allowed Priority Claims (or, with respect to Priority Claims that are Disputed Claims, to the Senior Claim Distribution Reserve as provided in Section 9.03 of the Plan) until all such Allowed Priority Claims are paid or reserved in full;

- third, to holders of Allowed Other Secured Claims (or, with respect to Other Secured Claims that are Disputed Claims, to the Senior Claim Distribution Reserve as provided in Section 9.03 of the Plan) until all such Allowed Other Secured Claims are paid or reserved in full;

- fourth, to holders of Allowed M&M Secured Claims (or, with respect to M&M Secured Claims that are Disputed Claims, to the Senior Claim Distribution Reserve as provided in Section 9.03 of the Plan) until all such Allowed M&M Secured Claims are paid or reserved in full;

- fifth, to holders of Allowed General Unsecured Claims (or, with respect to General Unsecured Claims that are Disputed Claims, to the Senior Claim Distribution Reserve as provided in Section 9.03 of the Plan) until all such Allowed General Unsecured Claims are paid or reserved in full;

- sixth, to holders of Allowed Subordinated Claims (or, with respect to Subordinated Claims that are Disputed Claims, to the Senior Claim Distribution Reserve as provided in Section 9.03 of the Plan) until all such Allowed Subordinated Claims are paid or reserved in full;

Only after the Allowed Claims against the respective Reorganized Debtors' Estates as set forth in this Section 8.01 are paid in Cash in full as provided under the Plan shall the holders of the New Consolidated Membership Interests and New Standard Equity Interests be entitled to any Distributions, transfers, or other payments by the respective Reorganized Debtors.

### 2. Cash Distributions

At any time that the Plan Administrator determines that sufficient Cash exists in the Distribution Reserve Accounts and the General Account to make a Distribution to holders of Allowed Claims pursuant to the provisions of the Plan, including Section 8.01 of the Plan, the Plan Administrator shall make such Cash Distribution Pro Rata to holders of Allowed Claims on a Class-by-Class basis.

### 3. Distributions by Agent or Servicer

The Plan Administrator or either of the Newco Entities (as applicable) shall make all Distributions required under the Plan, except with respect to a Claim whose Distribution is governed by an agreement and is administered by an agent or servicer, which Distributions shall be deposited with the appropriate agent or servicer, who shall deliver such Distributions to the holders of Claims in accordance with the provisions of the Plan.

### 4. Means of Cash Payment

Cash payments made pursuant to the Plan shall be in U.S. funds, by appropriate means, including by check or wire transfer.

### 5. Delivery of Distribution

Distributions to holders of Allowed Claims shall be made (a) at the addresses set forth on the Proofs of Claim Filed by such holders (or at the last known address of such holders if no Proof of Claim is Filed or if the Debtor has been notified of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Debtors, Plan Administrator, or the Newco Entities (as applicable) after the date of any related Proof of Claim; or (c) if no Proof of Claim has been Filed and the Debtors, Plan Administrator, or the Newco Entities (as applicable) have not received a written notice of a change of address, at the addresses reflected in the Bankruptcy Schedules, if any.

### 6. Fractional Dollars; *De Minimis* Distributions

Notwithstanding any other provision of the Plan, payments of fractions of dollars shall not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down). No payment of less than $25.00 with respect to any Claim shall be made unless a request therefor is made in writing to Reorganized Consolidated or Reorganized Standard (as applicable). Notwithstanding the foregoing, the Plan Administrator may, in his or her discretion, make payments of fractions of dollars and/or of less than $25.00.

### 7. Withholding and Reporting Requirements

In connection with the Plan and all Distributions hereunder, the Plan Administrator or the Newco Entities (as applicable) shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Plan Administrator or the Newco Entities (as applicable) shall be authorized to take any and all actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements.

### 8. Setoffs.

The Plan Administrator or the Newco Entities (as applicable) may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that Reorganized Consolidated, Reorganized Standard, or the Newco Entities (as applicable) may have against the holder of such Claim; provided, however, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Administrator or the Newco Entities (as applicable) of any such Claim that Reorganized Consolidated, Reorganized Standard, or the Newco Entities (as applicable) may have against such holder, unless otherwise agreed to in writing by such holder and the Plan Administrator or the Newco Entities (as applicable).

### 9. Duty to Disgorge Overpayments

To the extent that a Claim may be an Allowed Claim in more than one Class, the holder of such Claim shall not be entitled to recover more than the full amount of its Allowed Claim. The holder of an Allowed Claim that receives more than payment in full of its Allowed Claim shall immediately return any excess payments to the Plan Administrator or the Newco Entities (as applicable). In the event that the holder of an Allowed Claim fails to return an excess payment, the Plan Administrator or the Newco Entities (as applicable) may bring suit against such holder for the return of the overpayment in the Bankruptcy Court or any other court of competent jurisdiction.

**D.      Reserves Administered By the Reorganized Debtors**

The Plan Administrator shall establish an Undeliverable Distribution Reserve, Senior Claim Distribution Reserve, Expense Reserve, and General Account (which, notwithstanding anything to the contrary contained in the Plan, may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator) for each Reorganized Debtor.

*Undeliverable Distribution Reserve*

The Plan provides that if a Distribution to any holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such Distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such holder until such time as such Distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Section 9.02(b) of the Plan.

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an Undeliverable or Unclaimed Distribution within one year after the first Distribution is made to such holder shall be deemed to have forfeited its claim for such Undeliverable or Unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for the Undeliverable or Unclaimed Distribution against any Debtor, any Reorganized Debtor, any Estate, the Plan Administrator, or their respective properties or assets.  In such cases, any Cash or other property held in the Undeliverable Distribution Reserve for distribution on account of such claims for Undeliverable or Unclaimed Distributions, including the interest that has accrued on such Undeliverable or Unclaimed Distribution while in the Undeliverable Distribution Reserve, shall become the property of the applicable Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary, and shall be available for immediate distribution by the applicable Reorganized Debtor according to the terms of the Plan.

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Claim holder, or (ii) obtain an executed Internal Revenue Service Form W-9 from any Claim holder.

Within fifteen Business Days after the holder of an Allowed Claim satisfies the requirements of the Plan, such that the distribution(s) attributable to its Claim is no longer an Undeliverable or Unclaimed Distribution (provided that satisfaction occurs within the time limits set forth in Section 9.02(b) of the Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the Undeliverable or Unclaimed Distribution attributable to such Claim, including the interest that has accrued on such Undeliverable or Unclaimed Distribution while in the Undeliverable Distribution Reserve to the General Account.

*Senior Claim Distribution Reserve*

The Plan provides that the Plan Administrator shall establish the Senior Claim Distribution Reserve by depositing Cash received by the applicable Reorganized Debtors in the amount estimated by the Bankruptcy Court to be necessary to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Ad Valorem Tax Claims, Allowed Priority Claims, Allowed Other Secured Claims, Allowed M&M Secured Claims, Allowed General Unsecured Claims, and the U.S. Trustee Fees payable or to be paid.

The Plan Administrator shall establish the Senior Claim Distribution Reserve by depositing Cash received by the applicable Reorganized Debtors in the amount estimated by the Bankruptcy Court to be necessary to satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Ad Valorem Tax Claims, Allowed Priority Claims, Allowed Other Secured Claims, Allowed M&M Secured

Claims, Allowed General Unsecured Claims, and the U.S. Trustee Fees payable or to be paid. The Plan Administrator shall use the Senior Claim Distribution Reserve to pay Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Ad Valorem Tax Claims, Allowed Priority Claims, Allowed Other Secured Claims, Allowed M&M Secured Claims, Allowed General Unsecured Claims, and the U.S. Trustee Fees payable or to be paid. If all or any portion of an Administrative Claim, Priority Tax Claim, Ad Valorem Tax Claim, Priority Claim, Other Secured Claim, Allowed M&M Secured Claims, or General Unsecured Claim shall become a Disallowed Claim, the amount on deposit in the Senior Claim Distribution Reserve attributable to such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Senior Claim Distribution Reserve, shall remain in the Senior Claim Distribution Reserve or be transferred out of the Senior Claim Distribution Reserve, as determined by the Plan Administrator, as follows:

       (a)    it shall remain in the Senior Claim Distribution Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Senior Claim Distribution Reserve is sufficient to ensure that all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Ad Valorem Tax Claims, Allowed Priority Claims, Allowed Other Secured Claims, Allowed M&M Secured Claims, Allowed General Unsecured Claims, and U.S. Trustee Fees payable or to be paid will be paid in accordance with the Plan;

       (b)    to the extent not required to remain in the Senior Claim Distribution Reserve pursuant to clause (a), it shall be transferred to the General Account.

Beginning on the Effective Date and thereafter, on each anniversary of the Effective Date, the Plan Administrator shall evaluate, deposit or remove Cash in or from the Senior Claim Distribution Reserve in an amount that he or she estimates will be sufficient to pay U.S. Trustee Fees incurred during each twelve-month period beginning on the Effective Date or the anniversary thereof, as applicable.

*Expense Reserve*

The Plan Administrator shall establish the Expense Reserve by depositing Cash received by the applicable Reorganized Debtors in the amount of $600,000.00. The Expense Reserve shall be funded prior to the funding of the Senior Claim Distribution Reserve. The funds constituting the Expense Reserve are to be used by the Plan Administrator solely to satisfy the expenses of the Plan Administrator and applicable Reorganized Debtor to comply with its obligations and duties under the Plan. In no event shall the Plan Administrator be required or permitted to use his or her personal funds or assets for such purposes.

Periodically, the Plan Administrator shall evaluate, deposit or remove from the General Account and deposit in or from the Expense Reserve Cash in an amount that he or she estimates will be sufficient to pay expenses of the Plan Administrator and applicable Reorganized Debtor to comply with its obligations and duties under the Plan incurred during each twelve (12) month period following such anniversary, as applicable.

## E.    Means for Resolving Disputed Claims

Pursuant to the Plan, all objections to Claims must be Filed on or before the Claims Objection Deadline. Any Disputed Claim as to which an objection is not Filed on or before the Claims Objection Deadline will be deemed to constitute an Allowed Claim under the Plan following the Claims Objection Deadline.

The Plan further provides that the Plan Administrator shall File objections to Claims and serve such objections upon the holders of each of the Claims to which objections are made. Subject to the

limitations set forth in the Plan, the Plan Administrator shall be authorized to resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having competent jurisdiction the validity, nature, and/or amount thereof. If the Plan Administrator and the holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such holder an Allowed Claim in the amount of $50,000 or less, then the Plan Administrator may compromise, settle, and/or resolve such Disputed Claim without further Bankruptcy Court approval; provided, however, that the Plan Administrator shall File a notice with the Bankruptcy Court advising that the Allowed Claim has been compromised, settled, and/or resolved. Otherwise, the Plan Administrator may only compromise, settle, and/or resolve such Disputed Claim with Bankruptcy Court approval.

Any Proofs of Claim that are Filed after the applicable Bar Date, including amendments to existing Proofs of Claim, or applications for the allowance of an Administrative Claim that are Filed after the Post-Confirmation Bar Date shall be deemed invalid and Disallowed unless consented to by the Reorganized Debtors or authorized by Order of the Bankruptcy Court.

Notwithstanding any other provision of the Plan, no payments or Distribution by the Plan Administrator, Reorganized Consolidated, Reorganized Standard, or the Newco Entities (as applicable) shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Non-Appealable Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

## F.    Conditions to Confirmation and Effectiveness of the Plan

In addition to meeting the requirements of section 1129 of the Bankruptcy Code, each of the following events shall occur on or before the Effective Date; provided however, except as otherwise provided in Section 6.01 of the Plan, the Plan Proponents may waive in writing any or all of the following events, whereupon the Effective Date shall occur without further action by any Person:

(a)    the Confirmation Order, in a form and substance reasonably acceptable to each of the Plan Proponents and the Buyer shall have been entered by the Bankruptcy Court on or before December 1, 2010 and shall not be subject to a stay and shall include one or more findings that (i) the Plan is confirmed with respect to the Debtors; (ii) the Plan Proponents and the Buyer have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code as set forth in Bankruptcy Code § 1125(e); (iii) the Purchase and Sale Agreement are approved; and (iv) the Debtors are authorized to take all actions and consummate all transactions contemplated under the Purchase and Sale Agreement and the Plan;

(b)    each of the conditions to closing set forth in the Purchase and Sale Agreement or Alternative Transaction Agreement (as applicable) shall have occurred (or occur on the Effective Date) or have been waived in accordance with such agreement;

(c)    all documents, instruments, and agreements provided under, or necessary to implement, the Plan and the Purchase and Sale Agreement or Alternative Transaction Agreement (as applicable) shall have been executed and delivered by the applicable parties (except with respect to such documents, instruments, and agreements contemplated to be executed at the Closing);

(d)    all other documents required to be included in the Plan Supplement, each in form and substance reasonably acceptable to the Plan Proponents, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived;

(e)    the Bankruptcy Court shall have approved the transfer of the Transferred Properties to the respective Newco Entities Free and Clear, the cancellation and issuance of Equity Interests in the Debtors, and the assumption of the Designated Contracts by the respective Debtors and the assignment of the same to the respective Newco Entities;

(f)    all necessary material consents and approvals have been obtained from, among others, governmental authorities, to transfer to the appropriate Newco Entities all permits, approvals, franchises, licenses or other rights granted by any governmental authority and necessary for the lawful ownership of any of the Transferred Properties or other lawful conduct of the Debtors' respective businesses as currently conducted; and

(g)    all material documents, instruments, and agreements provided under, or necessary to implement, the Plan, including, but not limited to, one or more bills of sale and assignment and assumption agreements providing for the assignment and conveyance by the respective Debtors of all of the Transferred Properties, special warranty deeds, and intellectual property assignment agreements (all of which shall be in a form and substance acceptable to the Buyer) shall have been executed and delivered by the applicable parties.

## G.    Effects of Confirmation of the Plan

### 1.    Discharge

On the Effective Date, the Debtors, their Estates, the Reorganized Debtors and their respective assets and properties are automatically and forever discharged and released from all Claims and vested Free and Clear to the fullest extent permitted under Bankruptcy Code § 1141.  Except as otherwise set forth in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims, including any interest accrued on any Claims, against the Debtors, the Estates and the Reorganized Debtors.  Except as set forth in the Plan or the Confirmation Order, Confirmation shall discharge the Debtors and the Reorganized Debtors from all Claims or other debts that arose before the Effective Date, and all debts of a kind specified in Bankruptcy Code §§ 502(g), (h), or (i), whether or not (i) a Proof of Claim based on such debt is Filed or deemed Filed under Bankruptcy Code § 501; (ii) a Claim based on such debt is Allowed; or (iii) the holder of a Claim based on such debt has accepted the Plan.

### 2.    Legal Binding Effect

The provisions of the Plan shall bind all holders of Claims and Equity Interests and their respective successors and assigns, whether or not they accept the Plan.  On and after the Effective Date, except as expressly provided in the Plan, all holders of Claims, Liens and Equity Interests shall be precluded from asserting any Claim, Cause of Action or Liens against the Debtors, the Estates, the Reorganized Debtors, CIT Capital, the Lender, Cross Canyon, the Buyer (if the Permian Entities are not the Successful Bidder), the Permian Entities, the Newco Entities and any of their affiliates or their respective property and assets based on any act, omission, event, transaction or other activity of any kind that occurred or came into existence prior to the Effective Date.

### 3.    Moratorium, Injunction and Limitation of Recourse for Payment.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR BY SUBSEQUENT ORDER OF THE BANKRUPTCY COURT, UPON CONFIRMATION OF THE PLAN (AND FROM AND AFTER THE EFFECTIVE DATE) ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR LIENS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS OR**

THEIR PROPERTIES ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE DEBTORS, THE ESTATES, THE REORGANIZED DEBTORS, THE PLAN ADMINISTRATOR, CIT CAPITAL, THE LENDER, CROSS CANYON, THE BUYER (IF THE PERMIAN ENTITIES ARE NO THE SUCCESSFUL BIDDER), THE PERMIAN ENTITIES, THE NEWCO ENTITIES, OR ANY OF THEIR RESPECTIVE MANAGERS, FORMER AND CURRENT OFFICERS (EXCEPT LONNIE MCDADE), FORMER AND CURRENT DIRECTORS, AFFILIATES AGENTS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, FINANCIAL ADVISORS, OR OTHER PROFESSIONALS, OR ANY OF THEIR RESPECTIVE PROPERTY OR OTHER ASSETS ON ACCOUNT OF ANY SUCH CLAIMS OR EQUITY INTERESTS: (A) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE; (D) ASSERTING A SETOFF, RIGHT OF SUBROGATION, NETTING OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO THE DEBTORS, THE REORGANIZED DEBTORS, OR THE NEWCO ENTITIES; AND (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN OR IN THE CONFIRMATION ORDER SHALL ENJOIN OR PRECLUDE (Y) SUCH PERSONS FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN; AND (Z) THE REORGANIZED DEBTORS, THE LENDER, CIT CAPITAL, CROSS CANYON, THE BUYER (IF THE PERMIAN ENTITIES ARE NOT THE SUCCESSFUL BIDDER), OR THE NEWCO ENTITIES IN ANY MANNER FROM ENFORCING OR EXERCISING THEIR RIGHTS OR REMEDIES PURSUANT TO OR ARISING OUT OF THE PLAN, THE CONFIRMATION ORDER, THE PURCHASE AND SALE AGREEMENT OR THE PLAN DOCUMENTS. SUCH INJUNCTION SHALL EXTEND TO AND FOR THE BENEFIT OF ANY SUCCESSORS OR ASSIGNEES OF THE DEBTORS, REORGANIZED DEBTORS, THE LENDER, CIT CAPITAL, CROSS CANYON, THE BUYER (IF THE PERMIAN ENTITIES ARE NOT THE SUCCESSFUL BIDDER), THE NEWCO ENTITIES, AND THEIR RESPECTIVE PROPERTIES AND INTEREST IN PROPERTIES. <u>SUCH INJUNCTION SHALL NOT PRECLUDE ANY RIGHT OF AN ENTITY TO ASSERT A SEPARATE AND DIRECT CLAIM THAT IS NOT PROPERTY OF THE ESTATE AGAINST A PARTY THAT IS NOT A DEBTOR OR A REORGANIZED DEBTOR.</u>

THE CONFIRMATION ORDER SHALL, AMONG OTHER THINGS, CONTAIN, DIRECT AND PROVIDE FOR THE FOREGOING INJUNCTION.

4.      Term of Injunction or Stays

ANY INJUNCTION OR STAY ARISING UNDER OR ENTERED DURING THE CASE UNDER BANKRUPTCY CODE §§ 105 AND 362 OR OTHERWISE THAT IS IN EXISTENCE ON THE CONFIRMATION DATE SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE LATER OF THE EFFECTIVE DATE AND THE DATE INDICATED IN THE ORDER PROVIDING FOR SUCH INJUNCTION OR STAY.

5.      Exculpation and Limitation of Liability

NOTWITHSTANDING ANYTHING SET FORTH HEREIN, NO HOLDER OF ANY CLAIM OR EQUITY INTEREST SHALL HAVE ANY RIGHT OF ACTION AGAINST THE DEBTORS, THE ESTATES, THE REORGANIZED DEBTORS, THE PLAN ADMINISTRATOR,

CIT CAPITAL, THE LENDER, CROSS CANYON, THE BUYER (IF THE PERMIAN ENTITIES ARE NOT THE SUCCESSFUL BIDDER), THE PERMIAN ENTITIES, AND THE NEWCO ENTITIES, OR ANY OF THEIR RESPECTIVE MANAGERS, FORMER AND CURRENT OFFICERS (EXCEPT LONNIE MCDADE), FORMER AND CURRENT DIRECTORS, AFFILIATES, AGENTS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, FINANCIAL ADVISORS, OTHER PROFESSIONALS, OR ANY OF THEIR RESPECTIVE PROPERTY AND ASSETS FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE ADMINISTRATION OF THE CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, THE PREPARATION AND DISTRIBUTION OF THE DISCLOSURE STATEMENT, THE PURCHASE AND SALE AGREEMENT, THE ALTERNATIVE TRANSACTION AGREEMENT (AS APPLICABLE), THE ADMINISTRATION OF THE PLAN, OR THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY OFFERED OR SOLD UNDER THE PLAN, PROVIDED SUCH EXCULPATED PERSON DID NOT AND DOES NOT ENGAGE IN WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR FRAUD AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND PROVIDED FURTHER THAT SUCH EXCULPATION SHALL NOT EXTEND TO SUCH EXCULPATED PERSON'S RIGHTS AND OBLIGATIONS UNDER THE PLAN, THE PURCHASE AND SALE AGREEMENT, THE ALTERNATIVE TRANSACTION AGREEMENT (AS APPLICABLE), OR THE PLAN DOCUMENTS.

6.      **Release and Covenant Not to Sue.**

NOTWITHSTANDING ANYTHING SET FORTH HEREIN, ON THE EFFECTIVE DATE, EACH OF THE RELEASED PARTIES SHALL BE DEEMED TO HAVE IRREVOCABLY RELEASED AND DISCHARGED THE OTHER RELEASED PARTIES AND ALL MANAGERS, FORMER AND CURRENT OFFICERS (EXCEPT LONNIE MCDADE), CURRENT AND FORMER DIRECTORS, AFFILIATES, AGENTS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, FINANCIAL ADVISORS, AND PROFESSIONALS, IF ANY, EMPLOYED BY ANY OF THE RELEASED PARTIES (BUT SOLELY IN THE CAPACITIES SO EMPLOYED) OF AND FROM ANY CLAIM OR CAUSE OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR NOT ASSERTED, SCHEDULED OR NOT SCHEDULED, NOW EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, AND WHETHER ARISING UNDER THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW, ARISING FROM OR RELATED TO ACTS OR OMISSIONS OCCURRING ON OR BEFORE THE EFFECTIVE DATE IN CONNECTION WITH, BASED ON, RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE CASES, THE NEGOTIATION OF ANY SETTLEMENT OR AGREEMENT IN THE CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY RELATING TO THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CASES, THE NEGOTIATION, FORMULATION, PREPARATION OR DISTRIBUTION OF THE PLAN AND THE DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, AND THE RELEASED PARTIES COVENANT NOT TO SUE ANY OF THE OTHER PARTIES IDENTIFIED IN THIS SECTION WITH RESPECT TO THE CLAIMS AND CAUSES OF ACTION RELEASED HEREIN (ALL OF THE FOREGOING BEING HEREIN CALLED THE "<u>RELEASED CLAIMS</u>"); <u>PROVIDED</u>, <u>HOWEVER</u>, THAT (I) NOTWITHSTANDING THE FOREGOING, THE RELEASED PARTIES SHALL NOT

RELEASE AND DISCHARGE THE MANAGERS, FORMER AND CURRENT OFFICERS, CURRENT AND FORMER DIRECTORS, AGENTS, AND ACCOUNTANTS, IF ANY, EMPLOYED BY ONE OR MORE OF THE DEBTORS OF AND FROM ANY CLAIM OR CAUSE OF ACTION; AND (II) NO RELEASED PARTIES SHALL BE RELEASED AND DISCHARGED FROM (AND THE RELEASED CLAIMS SHALL NOT INCLUDE) OBLIGATIONS UNDER THE PLAN, THE PURCHASE AND SALE AGREEMENT, OR ANY CLAIM OR CAUSE OF ACTION ARISING FROM OR RELATED TO ACTS OR OMISSIONS INVOLVING FRAUD OR WILLFUL MISCONDUCT.  EACH OF THE RELEASED PARTIES REPRESENTS AND WARRANTS THAT EACH SUCH RELEASED PARTY HAS NOT TRANSFERRED, PLEDGED OR OTHERWISE ASSIGNED TO ANY OTHER PERSON OR ENTITY ALL OR ANY PORTION OF ANY CLAIM RELEASED UNDER THIS SECTION 0 OR ANY RIGHTS OR ENTITLEMENTS WITH RESPECT THERETO AND THE EFFECTUATION OF THIS RELEASE DOES NOT VIOLATE OR CONFLICT WITH THE TERMS OF ANY CONTRACT TO WHICH SUCH RELEASED PARTY IS A PARTY OR BY WHICH SUCH RELEASED PARTY OTHERWISE IS BOUND.

THE RELEASES IN THIS <u>SECTION 6</u> ARE SPECIFICALLY INTENDED TO OPERATE AND BE APPLICABLE EVEN IF IT IS ALLEGED, CHARGED OR PROVEN THAT ALL OR SOME OF THE CLAIMS OR DAMAGES RELEASED WERE SOLELY AND COMPLETELY CAUSED BY ANY ACTS OR OMISSIONS, WHETHER NEGLIGENT OR GROSSLY NEGLIGENT OF OR BY ONE OR MORE OF THE RELEASED PARTIES.

7.      **Insurance**

Except to the extent that an insurance policy is an Assumed Contract or Transferred Property, confirmation and consummation of the Plan shall have no effect on insurance policies of any of the Debtors or their current or former directors and officers (including, but not limited to, director and officer liability policies to the extent that the Debtors or their current or former directors and officers have any rights under such policies) in which any of the Debtors or their current or former directors and officers are or were an insured party.  Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage for any Debtors (or their current or former directors and officers) or Reorganized Debtors on any basis regarding or related to any of the Debtors' Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan for insured Claims.

8.      **Insurance Policies Vested in Reorganized Standard**

The Federal Insurance Policies shall be a Vested Asset, which shall vest in Reorganized Standard Free and Clear on the Effective Date under the terms of the Plan.  On and after the Effective Date, the Federal Insurance Policies shall not be subject to any reservation of rights by Federal Insurance Company, and Federal Insurance Company shall be prohibited from commencing any actions to recover benefits previously paid by Federal Insurance Company pursuant to the Federal Insurance Policies.  Federal Insurance Company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage under the Federal Insurance Policies on any basis regarding or related to any of the Debtors' Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan for insured claims.

**H.      Modification of the Plan**

With the prior, written consent of all Plan Proponents, the Plan Proponents may alter, amend, or modify the Plan or any Plan Documents under Bankruptcy Code § 1127(a) at any time prior to the Confirmation Date.  With the prior, written consent of all Plan Proponents, after the Confirmation Date

and prior to Substantial Consummation of the Plan, the Plan Proponents may, under Bankruptcy Code § 1127(b), (a) amend the Plan so long as such amendment shall not materially and adversely affect the treatment of any holder of a Claim; (b) commence proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order; and (c) amend the Plan as may be necessary to carry out the purposes and effects of the Plan so long as such amendment does not materially or adversely affect the treatment of holders of Claims or Equity Interests under the Plan; <u>provided, however</u>, prior notice of any amendment shall be served in accordance with the Bankruptcy Rules or Order of the Bankruptcy Court.

## I.      Retention of Jurisdiction

Under Bankruptcy Code §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Cases, the Plan, the Purchase and Sale Agreement, the Alternative Transaction Agreement (as applicable), and the other Transaction Documents, to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any application or request for payment of any Administrative Claim, and the resolution of any objections to the allowance or priority of Claims or Equity Interest;

(b)      hear and determine all Fee Applications;

(c)      determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim or Causes of Action;

(d)      enter such orders as may be necessary or appropriate to construe, execute, implement, or consummate the provisions of the Plan, the Purchase and Sale Agreement, the Alternative Transaction Agreement (as applicable),  the other Transaction Documents, and all property, contracts, instruments, releases, and other agreements or documents transferred, vested, or created in connection therewith;

(e)      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, the other Transaction Documents, the Purchase and Sale Agreement, the Alternative Transaction Agreement (as applicable), the Confirmation Order, any transactions or payment contemplated hereby, or any disputes arising under agreements, documents or instruments executed in connection therewith;

(f)      consider any modifications of the Plan, the Disclosure Statement, the Purchase and Sale Agreement, the Alternative Transaction Agreement (as applicable), and the other Transaction Documents, in each case to the extent requiring the approval of the Bankruptcy Court, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(g)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan, the Purchase and Sale Agreement, the Alternative Transaction Agreement (as applicable), the Confirmation Order or any other order of the Bankruptcy Court;

(h)	hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, the Purchase and Sale Agreement, the Alternative Transaction Agreement (as applicable), the other Transaction Documents, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, the Confirmation Order, the Purchase and Sale Agreement, the Alternative Transaction Agreement (as applicable), or the other Transaction Documents;

(i)	enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Cases;

(j)	hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code §§ 346, 505 and 1146 (including the expedited determination of taxes under Bankruptcy Code § 505(b);

(k)	hear and determine all matters related to the property of the Estates, the Debtors, or the Reorganized Debtors from and after the Effective Date;

(l)	hear and determine such other matters as may be provided in the Confirmation Order and as may be authorized under the provisions of the Bankruptcy Code;

(m)	hear and determine all matters with respect to the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts;

(n)	enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(o)	hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

(p)	determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplements;

(q)	hear any other matter not inconsistent with the Bankruptcy Code; and

(r)	enter final decrees closing the Case.

Nothing contained in this Section I shall be construed so as to limit the rights of the Reorganized Debtor, the Buyer, or the Newco Entities to commence or to prosecute any Cause of Action (in which it has an interest), in any court of competent jurisdiction.

# XI.

## COMPARISON OF PLAN TO ALTERNATIVES

## A.	Chapter 7 Liquidation

The most realistic alternative to the Plan is conversion of the Bankruptcy Cases from proceedings under Chapter 11 of the Bankruptcy Code to proceedings under Chapter 7 of the Bankruptcy Code. A Chapter 7 case, sometimes referred to as a "straight liquidation," requires the liquidation of all of the debtor's assets by a Chapter 7 trustee. The cash realized from liquidation is subject to distribution to creditors in accordance with section 726 of the Bankruptcy Code. Whether a bankruptcy case is one

under Chapter 7 or Chapter 11, allowed secured claims, allowed administrative claims and allowed priority claims, unless subordinated pursuant to section 510 of the Bankruptcy Code, are entitled to be paid in cash, in full, before unsecured creditors and equity interest holders receive anything. Thus, in a Chapter 7 case, the recovery, if any, to creditors holding non-priority unsecured claims will depend upon the net proceeds left in the estate after all of the debtor's assets have been reduced to cash and all claims of higher priority have been satisfied in full.

Chapter 7 liquidation theoretically adds an additional layer of expense. As referenced above, conversion of a bankruptcy case to Chapter 7 will trigger the appointment of a Chapter 7 trustee having the responsibility of liquidating the debtor's assets. Pursuant to sections 326 and 330 of the Bankruptcy Code, the Chapter 7 trustee will be entitled to reasonable compensation in relation to the level of disbursements made to creditors, as follows: (a) up to 25% of the first $5,000 disbursed; (b) up to 10% of the amount disbursed in excess of $5,000 but not in excess of $50,000; (c) up to 5% of any amount disbursed in excess of $50,000 but not in excess of $1,000,000; and (d) up to 3% of any amount disbursed in excess of $1,000,000. Additionally, the Chapter 7 trustee will be entitled to retain his or her own professionals to assist in the liquidation and administration of the estate. The fees and expenses of such professionals, to the extent allowed, are also entitled to priority in payment as administrative claims. Chapter 7 administrative costs are entitled to priority in payment over Chapter 11 administrative costs. Nevertheless, Chapter 11 administrative costs continue to have priority over all other non-administrative priority claims and non-priority unsecured claims in the bankruptcy case.

Also, conversion to Chapter 7 could result in the appointment of a trustee having no experience or knowledge of the prior proceedings in the bankruptcy case or of the debtor's business, its books and records and its assets.

The Debtors are opposed to conversion of the Bankruptcy Cases to Chapter 7 for several reasons. First, the Debtors believe that conversion of the Bankruptcy Cases could lead to additional layers of expense for the reasons stated above. Second, by maintaining the Bankruptcy Cases in Chapter 11 and confirming the Plan, the assertion of additional claims can be prevented. Third, a substantial amount of time would be required in order for the Chapter 7 trustee to become familiar with the Debtors, their prior business operations, assets, and pending litigation in order to wind the case up effectively.

Finally, conversion of the Bankruptcy Cases to Chapter 7 will not otherwise materially alter the path of the Debtors. In this regard, often creditors will seek conversion of a Chapter 11 case in order to force a liquidation of the debtor's assets instead of the reorganization of the debtor's business. Here, the Plan provides for the structured liquidation of the Debtors' assets; therefore, conversion will not lead to a different ultimate result.

With respect to the "best interest of creditors" test of section 1129(a)(7) of the Bankruptcy Code, the Debtors do not believe that Creditors will achieve a greater recovery under Chapter 7 than under the Plan. Inasmuch as the Plan is a plan of liquidation, the comparison of likely distributions to holders of Allowed Claims under the Plan to likely distributions to holders of Allowed Claims in a Chapter 7 proceeding is similar, except that the Debtors contend that the Plan incorporates beneficial compromises which may not be available in chapter 7, and in a Chapter 7 proceeding the potential for additional administrative expense and additional Claims demonstrates that distributions under the Plan are likely to exceed, or at least be equal to, the distributions that would be made under Chapter 7.

Attached to the Disclosure Statement as **Exhibit "F"** is the *Liquidation Analysis* (to be supplemented), which quantifies the foregoing and other related, forward looking projections in comparing the Plan to an alternative chapter 7 liquidation. *See also* Article XIII (Material Risks and Uncertainties). As evidenced by the Liquidation Analysis, the anticipated range of recoveries under the Plan are greater than under a chapter 7 liquidation.

**B.    Alternative Plans**

To date, no other proposed Chapter 11 plans have been Filed in the Bankruptcy Cases, and it is not anticipated that any other proposed Chapter 11 plan will be Filed.

**C.    Dismissal**

The most remote alternative possibility is dismissal of the Bankruptcy Cases.  If dismissal were to occur, the Debtors would no longer have the protection of the automatic stay and other applicable provisions of the Bankruptcy Code.  Dismissal would force a race among Creditors to take control and dispose of the Debtors' available assets, and unsecured creditors, on an aggregate basis, would very likely fail to realize any recovery on their Claims.  Furthermore, the receivership would continue, but without the benefit of a federal Bankruptcy forum and rights for either the Debtors' Estates or their Creditors, Preferred Stock Interest holders, or Other Equity Interest holders.

# XII.
## MATERIAL UNCERTAINTIES AND RISKS

In considering whether to vote to accept or reject the Plan, Creditors and Equity Interest  holders entitled to vote should consider the following risks associated with the Plan: (a) that all of the conditions to confirmation of the Plan are not satisfied or waived (as applicable); (b) that all of the conditions to the effectiveness of the Plan are not satisfied or waived (as applicable) or that such conditions are delayed by a significant period of time; (c) that estimations and projections may ultimately prove to be materially inaccurate; and (d) that the prosecution of Causes of Action does not result in significant recoveries.

There can also be no assurance that the Plan will not be modified up to and through the Confirmation Date, and the Plan Proponents reserve the right to modify the Plan, subject to compliance with the Bankruptcy Code, in the event the modification becomes warranted or necessary in furtherance of confirmation.

# XIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**A.    Introduction**

Implementation of the Plan may have federal, state and local tax consequences to the Debtors and their Estates, as well as to Creditors and Equity Interest holders of the Debtors.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure does not constitute and is not intended to constitute either a tax opinion or tax advice to any Person.

This disclosure is provided for informational purposes only.   Moreover, this disclosure summarizes only certain of the federal income tax consequences associated with the Plan's confirmation and implementation and does not attempt to comment on all such aspects.  Similarly, this disclosure does not attempt to consider any facts or limitations applicable to any particular Creditor or Equity Interest holder that may modify or alter the consequences described below.  This disclosure does not address state, local or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

This disclosure is based upon the provisions of the Internal Revenue Code of 1986, as amended, the regulations promulgated thereunder, existing judicial decisions, and administrative rulings.  In light of the expansiveness of such authorities, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below.  Any such

changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof. Finally, the tax consequences of certain aspects of the Plan are uncertain due to a lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

CREDITORS AND EQUITY INTEREST HOLDERS, THEREFORE, ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTORS OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

**B.      Federal Income Tax Consequences to the Debtors**

Under the terms of the Plan, all Assets of the Debtors and the Estates, and all Claims against the Debtors, will vest in the Reorganized Debtors, or as applicable, be transferred to one or more of the Newco Entities. On the Effective Date, and thereafter, the Debtors will have no continuing liability on such Claims. To the extent the Reorganized Debtors realize income as a result of the debt forgiveness associated with such transfers, such income will not constitute taxable income to the Reorganized Debtors because the debt forgiveness arises in connection with a bankruptcy case under Title 11 of the United States Code.

**C.      Federal Income Tax Consequences Associated with Transfers to One or More of the Newco Entities**

The Plan provides for the purchase and eventual transfer of a portion of the Debtors' Assets, including Causes of Action, to one or more of the Newco Entities.

**D.      Additional Federal Income Tax Consequences**

Equity Interest holders may, at some point in time, be required to recognize income or be allowed a deduction as a result of the implementation of the Plan. The exact tax treatment depends on each Equity Interest holder's method of accounting, the basis of the amount of Distributions received, and whether and to what extent such Equity Interest holder has taken a bad debt reduction in prior taxable years with respect to a particular debt owed to it by a Debtor.

**EACH CREDITOR, EQUITY INTEREST HOLDER AND PARTY IN INTEREST IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE PARTICULAR TAX CONSEQUENCES OF ITS CLAIM OR INTEREST UNDER THE PLAN.**

**E.      Tax Withholding**

The Plan provides for the Plan Administrator to comply with all tax withholding and reporting requirements validly imposed on them by any governmental authority. Accordingly, it provides that Distributions made pursuant thereto shall be subject to such withholding and reporting requirements, and authorizes the Plan Administrator to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, payment of applicable withholding taxes from a Claimant's or Equity Interest holder's Distribution, and conditioning a Person's Distributions upon receipt of necessary tax reporting information from a Claimant or Equity Interest holder.

**F.      Disclaimers**

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTORS

MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THAT THEY MAY WISH TO CONSIDER. THE DEBTORS CANNOT, AND DO NOT, REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE DEBTORS INFORM ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT THAT ANY U.S. TAX INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS HERETO) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE, OR (B) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

## XIV.
## CONCLUSION

The Debtors believe that the Plan complies with section 1129 of the Bankruptcy Code and is fair and equitable and in the best interests of the Debtors, their Estates and Creditors. Accordingly, the Debtors urge Creditors and Equity Interest holders receiving Ballots to vote to accept the Plan.

DATED: September 17, 2010

**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

By:    /s/ Joe E. Marshall
    Joe E. Marshall
    Texas Bar No. 13031100
    Kathleen M. Patrick
    Texas Bar No. 24037243
    Lee J. Pannier
    Texas Bar No. 24066705

**ATTORNEYS FOR HERITAGE
CONSOLIDATED, LLC**

**ROCHELLE MCCULLOUGH, LLP**
325 N. Saint Paul Street
Suite 4500
Dallas, Texas 75201
Telephone: 214.953.0182
Facsimile: 214.953.0185


By:     /s/ Kevin D. McCullough
    Kevin D. McCullough, SBT # 00788005
    Kerry Ann Miller, SBT # 24050875

**COUNSEL FOR HERITAGE STANDARD
CORPORATION**

# EXHIBIT "A"

# JOINT PLAN OF REORGANIZATION FOR DEBTORS'

## EXHIBIT "B"

[Reserved]

# EXHIBIT "C"

[Reserved]

# EXHIBIT "D"

**SCHEDULE OF POTENTIAL LITIGATION DEFENDANTS**

**[TO BE SUPPLEMENTED]**

**EXHIBIT "E"**

**SCHEDULE OF POTENTIAL AND RETAINED CAUSES OF ACTION**

**[TO BE SUPPLEMENTED]**

## EXHIBIT "F"

**LIQUIDATION ANALYSIS**

**[TO BE SUPPLEMENTED]**