

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Honorable De Wayne Hale*

**United States Bankruptcy Judge**

**Signed November 03, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

In re:

**HERITAGE CONSOLIDATED LLC**, *et al.*,

Debtors.

Case No. 10-36484-HDH
(Chapter 11)

(Jointly Administered)

### SECOND INTERIM ORDER AUTHORIZING LIMITED USE OF CASH COLLATERAL, OBTAINING CREDIT SECURED BY SENIOR LIENS, AND GRANTING ADEQUATE PROTECTION TO EXISTING LIENHOLDERS

At a hearing on October 27, 2010 (the "Hearing"), the Court considered the *Emergency Motion for Order (A) Authorizing Interim and Final Use of Cash Collateral; and (B) Granting Adequate Protection* [Docket No. 16] and *Emergency Motion for Interim and Final Orders Approving: (I) Secured Postpetition Financing; (II) Related Priming Liens and Super-Priority Administrative Claims; (III) Related Secured Financing Agreement and (IV) Scheduling a Final*

*Hearing* [Docket No. 17] (collectively, the "Motions")[1] filed by Heritage Consolidated LLC ("Heritage Consolidated") and Heritage Standard Corporation ("Heritage Standard" and together with Heritage Consolidated, the "Debtors").

## INTERIM ORDER AND FINAL HEARING

1.      This Court held an interim hearing on the Motions on October 21, 2010 (the "Interim Hearing") and an interim order was entered on the 26th day of October [Docket No. 192] (the "Interim Order"), granting, on an interim basis, the relief sought in the Motions and scheduling a final hearing on the Motions (the "Final Hearing"). Pursuant to the Interim Order, any objections to the relief requested in the Motions were to be filed and served on or before 4:00 p.m. (prevailing Central time) by October 22, 2010.

2.      On the agreement of the Debtors, the Committee, the Lenders and the Agents (as defined herein), the Final Hearing on the Motions originally scheduled for October 27, 2010, was converted to a second interim hearing (the "Second Interim Hearing").

3.      The Final Hearing on the Motions shall be held on November 23, 2010, at 9:30 a.m., prevailing Central time, before the Honorable Harlin D. Hale, United States Bankruptcy Judge, at the United States Bankruptcy Court, 1100 Commerce Street, 14th Floor, Dallas, TX 75242. Except to the extent the Debtors have agreed to extend the objection deadline, parties shall not be entitled to file objections to the Motions. Parties that have filed an objection to the Motion may supplement or amend their existing objections if such supplement or amendment is filed and served on or before November 19, 2010 at 4:00 p.m., prevailing Central time.

---

[1] Capitalized terms not defined herein shall have the meaning given to them in the *Emergency Motion for Interim and Final Orders Approving: (I) Secured Postpetition Financing; (II) Related Priming Liens and Super-Priority Administrative Claims; (III) Related Secured Financing Agreement and (IV) Scheduling a Final Hearing* [Docket No. 17].

## FACTUAL BACKGROUND

### The Commencement of the Cases

4.      Each of the Debtors filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 14, 2010 (the "Petition Date").   Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5.      The filing of the Debtors' voluntary petitions commenced the bankruptcy cases styled *In re Heritage Consolidated LLC, et al.*; Case No. 10-36484-HDH (collectively, the "Bankruptcy Cases") which are pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court").

### Jurisdiction and Venue

6.      This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Venue is appropriate in the Northern District of Texas, Dallas Division.  Consideration of the Motions constitutes a core proceeding as set forth in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (O).

### Pre-Petition Lenders' Claims and Collateral

7.      Heritage Consolidated, CIT Capital USA, Inc. (in its capacity as agent, the "Pre-Petition Agent"), and the lenders party thereto from time to time (collectively, the "Pre-Petition Lenders") executed that certain Credit Agreement dated as of October 30, 2008  (as amended, supplemented, and modified from time to time, the "Credit Agreement").   In addition, the Debtors, as makers, are parties to that certain Promissory Note dated July 30, 2010 in the amount of $400,000 (the "Promissory Note") for the benefit of the Pre-Petition Agent, as holder.  The Debtors and the Pre-Petition Agent also executed that certain Subordination Agreement dated as of July 30, 2010 (the "Subordination Agreement") under which Heritage Standard agreed to,

among other things, subordinate certain obligations owed to it by Heritage Consolidated to certain obligations owed to the Pre-Petition Agent by Heritage Consolidated. In connection with or relating to the Credit Agreement and the Promissory Note, the Debtors or other parties executed certain other instruments or documents (together with the Credit Agreement, Promissory Note, and Subordination Agreement, the "Pre-Petition Claim Documents"), including notes, facility letters, security agreements, assignments, pledges, mortgages, deeds of trust, and/or guaranties.

### Debtors' Stipulations regarding Pre-Petition Lenders' Claims and Collateral

8.     Subject only to paragraph 72 below, the Debtors stipulate as follows:

    (a)     Pursuant to the Pre-Petition Claim Documents and applicable law and as of the Petition Date, the Pre-Petition Lenders hold valid, enforceable, and allowable claims (collectively, the "Pre-Petition Claims") against (i) Heritage Consolidated in an aggregate amount equal to at least $18,035,100.00 in unpaid principal plus $1,024,188.40 in accrued but unpaid interest, plus any and all other actual and reasonable fees, costs, expenses, charges, other debts or obligations of Heritage Consolidated under the Pre-Petition Claim Documents and applicable law; and (ii) Heritage Standard in an aggregate amount equal to at least $400,000.00 in unpaid principal plus $5,733.33 in accrued but unpaid interest, plus any and all other fees, cost, expenses, charges, other debts or obligations of Heritage Standard under the Pre-Petition Claim Documents and applicable law.

    (b)     The (i) Assignment of Term Overriding Royalty Interest dated June 1, 2010 executed by Heritage Consolidated; (ii) Letter Agreement dated June 16, 2010 by and among the Pre-Petition Agent, Heritage Consolidated, and Heritage Standard; and (iii) all related documents and instruments (collectively, the "ORRI Documents"), constitute and reflect allowed, legal, valid, binding, enforceable, and non-avoidable instruments, documents, and transfers, evidence the Pre-Petition Agent's unencumbered and superior interest in the property conveyed under the ORRI Documents, and shall not be subject to any challenge, offset, defense, counterclaim, avoidance, re-characterization, or subordination pursuant to the Bankruptcy Code or any other applicable law.

    (c)     The Pre-Petition Claims constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of Heritage Consolidated and Heritage Standard, as applicable, and shall not be subject to any challenge,

offset, defense, counterclaim, avoidance, re-characterization, or subordination pursuant to the Bankruptcy Code or any other applicable law.

(d)     The Pre-Petition Claims remain due and owing and the Debtors do not possess and shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Claims and the ORRI Documents.[2]

(e)     The Debtors are in default of their debts and obligations to the Pre-Petition Lenders under the terms and provisions of the Pre-Petition Claim Documents. These defaults have not been timely cured and are continuing.

(f)     To the extent that they were not already accelerated, the filing of these Bankruptcy Cases has accelerated the Pre-Petition Claims for all purposes in these Bankruptcy Cases and in connection with the Pre-Petition Lenders' enforcement of their rights and remedies under applicable non-bankruptcy law.

(g)     The Pre-Petition Claim Documents and the ORRI Documents are genuine, valid, existing, and legally enforceable.

(h)     With respect to the Pre-Petition Claims under the Credit Agreement and associated Pre-Petition Claim Documents, the Pre-Petition Claims are secured by enforceable and properly perfected liens and security interests in, among other things, substantially all of the personal property and real estate (including all accounts, chattel paper, copyrights, patents, trademarks, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, cash, cash equivalents, letters of credit, letter-of-credit rights, supporting obligations, deposit accounts with any bank or other financial institution, commodity accounts with any bank or other financial institution, securities accounts with any bank or other financial institution, commercial tort claims, farm products, and all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any general intangibles at any time evidencing or relating to any of the foregoing) of Heritage Consolidated to the extent of and as more fully described in the Pre-Petition Claim Documents (the "October 30, 2008 Collateral").

---

[2] Heritage Consolidated shall escrow any payments and/or transfers contemplated under the ORRI Documents, whether relating to pre- or post-petition periods. The Debtors shall not utilize the escrow funds and those funds shall not be distributed absent further Order of the Court.

**SECOND INTERIM ORDER AUTHORIZING LIMITED USE OF CASH COLLATERAL, OBTAINING CREDIT SECURED BY SENIOR LIENS, AND GRANTING ADEQUATE PROTECTION TO EXISTING LIENHOLDERS**                    **Page 5**

169984_666204.docUS 612424v.1

(i)  With respect to the Pre-Petition Claims under the Promissory Note and associated Pre-Petition Claim Documents, the Pre-Petition Claims are secured by properly perfected liens and security interests in, among other things, (A) any and all of the properties and assets of Heritage Consolidated, both real or personal excluding the properties and assets located in, or that are proceeds of the properties and assets located in, the Crittendon Field (as such term is defined in Exhibit A to the First Winkler Deed of Trust (as defined below)); and (B) substantially all of the personal property and real estate (including all accounts, chattel paper, copyrights, patents, trademarks, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, cash, cash equivalents, letters of credit, letter-of-credit rights, supporting obligations, deposit accounts with any bank or other financial institution, commodity accounts with any bank or other financial institution, securities accounts with any bank or other financial institution, commercial tort claims, farm products, and all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any general intangibles at any time evidencing or relating to any of the foregoing) of Heritage Standard to the extent of and as more fully described in the Pre-Petition Claim Documents (together with the October 30, 2008 Collateral, the "Pre-Petition Collateral").

(j)  On November 7, 2008, the Deed of Trust, Fixture Filing, Assignment of As-Extracted Collateral, Security Agreement and Financing Statement (the "First Winkler Deed of Trust") from Heritage Consolidated, as grantor, to Brian Kerrigan, as the trustee for the benefit of the Pre-Petition Agent, was filed in the Clerk's Office for Winkler County, Texas.

(k)  On November 17, 2008, the Deed of Trust, Fixture Filing, Assignment of As-Extracted Collateral, Security Agreement and Financing Statement (the "Loving Deed of Trust") from Heritage Consolidated, as grantor, to Brian Kerrigan, as the trustee for the benefit of the Pre-Petition Agent, was filed in the Clerk's Office for Loving County, Texas.

(l)  On August 2, 2010, the Deed of Trust, Fixture Filing, Assignment of As-Extracted Collateral, Security Agreement and Financing Statement (together with the First Winkler Deed of Trust and the Loving Deed of Trust, the "Deeds of Trust") from Heritage Consolidated, as grantor, to George McKean, as the trustee for the benefit of the Pre-Petition Agent, was filed in the Clerk's Office for Winkler County, Texas.

(m)  On October 30, 2008, a Uniform Commercial Code financing statement for Heritage Consolidated, as debtor, and the Pre-Petition Agent, as secured party, was filed with the Texas Secretary of State.

(n) On October 30, 2008, a Uniform Commercial Code financing statement for Heritage Standard, as debtor, and the Pre-Petition Agent, as secured party, was filed with the Texas Secretary of State.

(o) On July 30, 2010, a Uniform Commercial Code financing statement for Heritage Standard, as debtor, and the Pre-Petition Agent, as secured party was filed with the Texas Secretary of State.

(p) Pursuant to the Deeds of Trust and other Pre-Petition Claim Documents, the Pre-Petition Agent, on behalf of the Pre-Petition Lenders, was granted a lien on and security interest in, among other things, Heritage Consolidated's interest in, among other property, (i) the real property, oil and gas leases, and oil, gas and other mineral leases and other interests and estates and the lands and premises covered or affected thereby which are described on **Exhibit "1"** hereto; and (ii) the wells in at least the working interests and net royalty interests described on **Exhibit "1"** hereto.

(q) The Pre-Petition Agent, on behalf of the Pre-Petition Lenders, holds, or will hold as a result of this Second Interim Order enforceable and perfected liens and security interests (collectively, the "Pre-Petition Lenders' Interests") in the Pre-Petition Collateral and Cash Collateral (as defined below), plus any and all other property of the Debtors' estates, real and personal, to the extent provided under Bankruptcy Code § 552(b), any other provision of the Bankruptcy Code, this Second Interim Order, and applicable law to secure the Pre-Petition Claims, plus, without limitation, any other amounts allowable under the Bankruptcy Code and applicable law.

(r) The following agreements (collectively, the "Joint Operating Agreements") relate to the following wells in which one or more of the Debtors have an interest:

| Agreement | Well |
|---|---|
| Operating Agreement dated February 10, 1966 initially by and between Roden Oil Company, as Operator, and Sinclair Oil and Gas Company and Others, as Non-Operators | Tubb Estate # 1 (Sec. 25) Tubb Estate # 2 (Sec. 25) Tubb Estate # 3 (Sec. 25) Tubb Estate 1-75 Wolfe Unit # 1 Wolfe Unit # 2 Wolfe Unit # 3 Wolfe Unit # 4 Bell Canyon Wolfe Unit # 5 Bell Canyon Wolfe Unit # 6 Bell Canyon Wolfe Unit # 7 Wolfe Unit 8H |

| Agreement | Well |
|---|---|
| Operating Agreement dated September 12, 1968 initially by and between Sinclair Oil and Gas Company, as Operator, and Getty Oil Company and Others, as Non-Operators | Tubb "9" Unit # 2<br>Tubb 9 Unit 1 |
| Operating Agreement dated February 1, 1977 initially by and between Atlantic Richfield Company, as Operator, and Superior Oil Company and Others, as Non-Operators | Tubb "1" Unit 3<br>Tubb 1 Unit 1<br>Tubb 1 Unit 2<br>Tubb 1 Unit 3<br>Tubb 1 Unit 4 |
| Operating Agreement dated May 15, 1984 initially by and between Heritage Resources, Inc., as Operator, and Wisenbaker Production Company and Others, as Non-Operators | Tubb Estate 1-2 |
| Operating Agreement dated November 23, 1984 initially by and between Heritage Resources, Inc., as Operator, and Tribal Drilling Company and Others, as Non-Operators | Tubb 22 Unit 1R<br>Tubb Estate 1-22 Brushy Canyon<br>Tubb Estate 22-2<br>Tubb Estate 22-3 |
| Operating Agreement dated October 23, 1985 initially by and between Heritage Resources, Inc., as Operator, and A.G. Hill Oil Producer and Others, as Non-Operators | Tubb Estate # 2-21<br>Tubb Estate 1-21 |
| Operating Agreement dated January 25, 2008 initially by and between Stratco Operating Company, Inc., as Operator, and George G. Staley and Others, as Non-Operators | A.G. Hill No. 1- Re-Entry<br>Pat Howell # 1 |
| Operating Agreement dated February 1, 1986 initially by and between Heritage Resources, Inc., as Operator, and Jack C. Bestram & Associates and Others, as Non-Operators | Tubb 23 Unit 1R<br>Tubb Estate 1-23 |

(s)     The amounts owed by Heritage Consolidated to Heritage Standard under or relating to the Joint Operating Agreements is no more than $16,100,000 as of the Petition Date.

(t)     There are no joint operating agreements to which one or more of the Debtors are a party other than the Joint Operating Agreements.

(u)     The Pat Howell #1 Well was re-entered by Heritage Standard on or about July 31, 2009, and operations on that well did not commence prior to July 31, 2009.

9.     Pat Howell LLC and Michael B. Wisenbaker stipulate that the Assignment and Bill of Sale dated April 13, 2010 by and between Heritage Consolidated, as assignor, and Pat Howell, LLC, as assignee, and all real and personal property associated therewith, are subject to

the Pre-Petition Agent and Pre-Petition Lenders' interests pursuant to the Winkler Deed of Trust.[3]

## CASH COLLATERAL AND DEBTOR IN POSSESSION FINANCING

### Cash Collateral

10.     All cash of the Debtors' estates and all cash equivalents, whether in the form of negotiable instruments, documents of title, securities, deposit accounts, investment accounts, or in any other form, which represent income, proceeds, products, rents, or profits of property or which represent income, proceeds, products, offspring, rents, or profits of such property (excluding, however, causes of action under chapter 5 of the Bankruptcy Code ("Chapter 5 Actions")), wherever located and whenever acquired, in which one or more of the Debtors' estates and (a) an entity other than a Debtor's estate that is entitled to a valid, enforceable, and perfected security interest (an "Other Secured Creditor"), (b) the Pre-Petition Agent, or (c) Pre-Petition Lender, shall constitute the cash collateral of the Pre-Petition Agent, Pre-Petition Lenders, and/or Other Secured Creditors (collectively, the "Cash Collateral"), as applicable.[4]

11.     The Debtors shall segregate and account to the Pre-Petition Agent and the Other Secured Creditors for all Cash Collateral that they now possess, that they have permitted to be transferred into the possession of others (if any), that is being held by those in privity with the Debtors, or that the Debtors might hereafter obtain or have any interest in.  The Debtors shall account to the Pre-Petition Agent and the Other Secured Creditors for the receipt and use, if any, of the Cash Collateral received by the Debtors since the Petition Date and prior to the entry of

---

[3] The rights of the Pre-Petition Agent, Pre-Petition Lenders, and Official Committee of Unsecured Creditor (the "Committee") with respect to this assignment are reserved in their entirety.
[4] Subject to the challenge rights set forth in paragraph 72 of this Final Order, the Pre-Petition Agent and the Pre-Petition Lenders have an interest in the Cash Collateral.  Other parties, including the Other Secured Creditors also assert interests in the Cash Collateral.  Nothing herein shall be deemed a finding that any of the Other Secured Creditors have such an interest in the Cash Collateral and any such alleged interest shall be subject to challenge by parties in interest.

this Second Interim Order.  Absent a further Order of this Court or the consent of the Pre-Petition Lenders, the Debtors are strictly prohibited from using the Cash Collateral except as expressly provided for herein.

### Debtor in Possession Credit Agreement

12.    The Debtors, as borrowers, CIT Capital USA Inc. (the "DIP Lender" and together with the Pre-Petition Lenders, the "Lenders") and CIT Capital Securities LLC (in its capacity as agent, the "DIP Agent" and together with the Pre-Petition Agent, the "Agents") entered into that certain Senior Secured, Superpriority Debtor in Possession Credit Agreement dated October __, 2010 (the "DIP Credit Agreement") under which the DIP Lender agreed to, among other things, provide a facility to the Borrowers (the "DIP Facility").  Under the DIP Facility, the DIP Lender agrees to make loans of up to $373,201 for the period commencing on October 30, 2010 and ending on November 30, 2010 (the "Period") on the terms set forth in the DIP Credit Agreement, this Second Interim Order and a final Order to be entered by this Court.

13.    The DIP Credit Agreement and any instruments or documents relating thereto (if any) (collectively, the "DIP Facility Documents"), including notes, facility letters, security agreements, assignments, pledges, mortgages, deeds of trust, and/or guaranties are hereby approved, on a final basis.

### Need For and Consent to Limited Use of Cash Collateral and DIP Financing

14.    The Pre-Petition Agent and Pre-Petition Lenders do not consent to the Debtors' use of Cash Collateral and the DIP Facility except in strict accordance with the terms and conditions contained in this Second Interim Order.  The Debtors have requested that they be entitled to use Cash Collateral and the DIP Facility for the purposes set forth in the budget [Docket No. ___] incorporated herein as **Exhibit "2"** (the "Budget") and such other purposes as required by this Second Interim Order, a final Order to be entered by this Court and the DIP

Credit Agreement and to which the Agents consent in writing. The Debtors have sought to obtain financing from other sources and are unable to obtain credit allowable under Bankruptcy Code § 503(b)(1), or pursuant to Bankruptcy Code §§ 364(a) and (b), and the Debtors have determined that no source of credit for the Debtors on terms more favorable to the Debtors than the terms of the DIP Facility exists at this time.

15. Without the use of Cash Collateral and the DIP Facility, the Debtors will not have the funds necessary to maintain their assets and pay payroll, payroll taxes, inventory suppliers and other vendors, overhead, costs to administer the Debtors' estates, and other expenses necessary to maximize the value of the Debtors' assets. Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein. The use of Cash Collateral and the DIP Facility will benefit the Debtors and their estates. The ability of the Debtors to maximize the value of their assets depends upon the Debtors' ability to use Cash Collateral and the DIP Facility. Accordingly, the use of Cash Collateral and the DIP Facility by the Debtors is actual and necessary to preserving their estates.

### Authorization for Use of Cash Collateral and DIP Financing

16. The Debtors are hereby authorized to use Cash Collateral and the DIP Financing only in strict accordance with the terms and conditions provided in this Second Interim Order (including the Budget) and the DIP Credit Agreement. Furthermore, the Debtors are authorized and hereby agree to perform any and all acts reasonably required by the Agents to comply with the terms and conditions of this Second Interim Order and the DIP Credit Agreement.

17. The Debtors shall use and exhaust, first, any unencumbered cash on hand on the Petition Date and thereafter coming into the Debtors' possession, and second, any Cash Collateral on hand on the Petition Date and thereafter coming into the Debtors' possession (after establishment

of a reserve by the Debtors in an amount not to exceed $25,000) before the Debtors shall be entitled to borrow any amounts under the DIP Facility.

**Superpriority Liens and Administrative Claims of the DIP Agent and DIP Lender**

18.     The DIP Agent, on behalf of the DIP Lender, is extending credit under the DIP Facility in good faith, and it is entitled to and is hereby granted first priority claims, priming liens and the protections of good faith credit providers under Bankruptcy Code §§ 364(c)(1), (c)(2), and (c)(3), 364(d)(1), and 364(e) to secure the DIP Facility, senior to all other liens and security interests, including adequate protection and replacement liens granted pursuant to the terms of this Second Interim Order to or on behalf of the Pre-Petition Lenders, which liens and security interests shall secure all DIP Facility amounts (including principal, interest, fees, expenses, and other costs of the DIP Lenders in these Cases, however incurred), but subject only to the Carve-Out (as each term is defined below).

19.     The liens and security interests securing the DIP Facility shall be valid and automatically perfected first priority priming liens and security interests, subject only to the Carve-Out, in and any and all of the properties and assets of the Debtors, both real or personal, including, but not limited to, those assets described in the Pre-Petition Claim Documents, this Second Interim Order, and the DIP Facility Documents, together with tax refunds of any nature, insurance proceeds, insurance premium refunds, deposits of any kind, security deposits, utility deposits, bonds and proceeds of same, causes of action (whether by contract or tort, common law or statutory, equitable or otherwise) and customer lists, whether acquired before or after the Petition Date, whether now owned and existing or hereafter acquired, created, or arising, and all products and proceeds thereof (including, without limitation, claims of the Debtors against third parties for loss or damage to such property), and all accessions thereto, substitutions and replacements therefor, and wherever located, and all assets acquired by the Debtors post-petition

and recoveries by the estates under any provision of the Bankruptcy Code or other applicable law, but excluding Chapter 5 Actions (collectively, the "DIP Collateral", and together with the Pre-Petition Collateral, the "Collateral").

20. Additionally, on account of the DIP Facility, the DIP Lender is hereby granted superpriority administrative claims and all other benefits and protections allowable under Bankruptcy Code §§ 507(b) and 503(b)(1), senior in right to all other administrative claims against the Debtors' estates, including those of the Pre-Petition Lenders to the extent set forth in this Second Interim Order, except for the Carve-Out.

## Cash Collateral Accounts

21. The Debtors shall segregate, remit, and deposit all Cash Collateral in the Debtors' accounts, possession, custody or control and which any Debtor may receive in the future, in accordance with the applicable cash management orders entered by this Court, and consistent with the Debtors' past and ordinary business practices. The bank accounts of the Debtors (collectively, the "Cash Collateral Accounts") shall be in the name of the Debtors, but by virtue of this Order, the Agents, Lenders, and Other Secured Parties shall have a valid and perfected lien against the Cash Collateral Accounts to secure their respective interests in the Cash Collateral and no further actions are required by the Agents, Lenders, or Other Secured Parties to perfect such liens.

22. Following the occurrence of an Event of Default (as defined below), the DIP Agent, in its sole and absolute discretion, may apply any Cash Collateral and Collateral proceeds collected or otherwise received to the DIP Facility obligations or to such other obligations as provided in further Order of the Court subject to the Carve-Out.

23. The Debtors shall be prohibited from withdrawing funds from the Cash Collateral Accounts, except in strict compliance with the terms of this Second Interim Order, the DIP

Facility, the DIP Credit Agreement and the Budget. The Debtors shall comply with any cash management order entered by the Court in connection with the accounts referenced above.

## ADEQUATE PROTECTION OF THE PRE-PETITION LENDERS' INTERESTS
### Budgeted Cash Collateral Usage

24.     As adequate protection of the Pre-Petition Lenders' Interests in the Collateral and for the Debtors' use of Cash Collateral and only so long as an Event of Default shall not have occurred, the Debtors are authorized to and shall use the Cash Collateral (including the advances under the DIP Facility) strictly in accordance with the Budget; provided, however, that there shall be a permitted variance of 10% for any amounts listed in the Budget for a particular category for each three-week period.

25.     The Lenders' consent to use of Cash Collateral and the agreement to extend credit applies only to (a) availability under the DIP Facility; and (b) amounts actually incurred in accordance with the Budget. Upon the occurrence of an Event of Default, the Lenders' consent to use of Cash Collateral and the agreement to extend credit shall automatically and immediately terminate and any consent for use of Cash Collateral and agreement to extend credit to satisfy projected, budgeted expenditures shall be immediately terminated and deemed withdrawn, except that the Debtors may continue to use Cash Collateral and funds under the DIP Facility to pay expenses that were actually incurred prior to an Event of Default to the extent identified in the Budget, but which remain unpaid at the time of an Event of Default, and in no event will expenses or Budget amounts be considered incurred until the week such expense or budgeted amount is listed in the Budget.

26.     Except as may specifically be provided in the Budget including, without limitation, for ordinary course payroll, benefits, and expense reimbursements, the Debtors agree that no transfer of Cash Collateral shall be made to any of the Debtors' insiders, as that term is

defined in Bankruptcy Code § 101. Any budgeted transfers to insiders shall be so identified in the Budget.

27.     The Debtors, Committee, and Lenders may extend the term of the DIP Financing Facility or otherwise modify the Budget, without further notice to creditors or order of this Court, provided that a Stipulation Extending Cash Collateral Order signed by counsel to the Debtors, Committee, and Lenders is filed together with a copy of a budget if there are changes from the Budget. The Stipulation Extending Cash Collateral Order shall become effective three (3) business days after notice of the Stipulation Extending Cash Collateral Order has been served on all parties on the Official Shortened Service List.

28.     As adequate protection of the Pre-Petition Lenders' Interests in the Collateral and the Cash Collateral, and as a condition to the DIP Lender making any post petition loans, advances, or providing the Debtors with any other financial or credit accommodations under the DIP Facility, Net Asset Sale Proceeds[5] (other than proceeds realized from Permitted Asset Sales)[6] shall be paid to the DIP Lender until the outstanding obligations under the DIP Facility are paid in full in cash, with a concomitant permanent reduction in the amount of the Commitment (as defined in the DIP Credit Agreement). Thereafter, any remaining Net Asset Sale Proceeds shall constitute Cash Collateral and be utilized by the Debtors upon consent by the

---

[5] "Net Asset Sale Proceeds" shall mean proceeds arising from a sale not in the ordinary course of business less any (a) professional or management fees and expenses attributable to the pertinent sale for any professional whose retention for such purpose has been approved pursuant to an Order enforced by the Court, including allowed and previously unpaid attorneys' fees and expenses related to that transaction, (b) *with respect to computing "Net Asset Sale Proceeds" for purposes of payment of the Pre-Petition Claims of the Pre-Petition Agent and the Pre-Petition Lenders*, amounts to be agreed upon with the Pre-Petition Agent and the Pre-Petition Lenders for adjusted budgets post sale, (c) any amount accrued and unpaid, and not otherwise reserved and for which the Debtors do not already have available sufficient cash to fund, pursuant to any carve-out rights per this Final Order, and (d) other ordinary and customary sale and transaction costs and expenses including applicable taxes related to that transaction.

[6] "Permitted Asset Sales" shall consist of: (a) sales of hydrocarbons produced from Debtors' properties in the ordinary course of business; and (b) sales of other assets where the consideration received from all of such sales does not exceed $25,000 in the aggregate (or such greater aggregate amount, if any, agreed to pursuant to the provisions of the DIP Credit Agreement.

Agents and Lenders and any other parties claiming an interest in such Cash Collateral or upon further Order of the Court.

<u>**Replacement Liens and Superpriority Administrative Claims**</u>

29.     Taking into account all factors in these Bankruptcy Cases, as adequate protection of the Pre-Petition Lenders' Interests and for the Debtors' use of Cash Collateral, the Pre-Petition Agent, on behalf of the Pre-Petition Lenders, is hereby granted, effective as of the Petition Date, valid and automatically perfected replacement liens and security interests in and upon the Collateral to the extent of any diminution in the value of the Pre-Petition Lenders' Interests during these Bankruptcy Cases.

30.     To the extent such adequate protection is insufficient to adequately protect the Pre-Petition Lenders' Interests, the Pre-Petition Lenders are hereby granted superpriority administrative claims and all of the other benefits and protections allowable under Bankruptcy Code § 507(b) on a *pro rata* basis as determined under the Credit Agreement, junior only in right to any superpriority administrative claims granted to the DIP Lender and the Carve-Out.

31.     To the extent that any Other Secured Creditor is entitled to a valid, perfected security interests in any property of the Debtors' respective estates (the "<u>Other Secured Creditor Collateral</u>"), as adequate protection of each Other Secured Creditors' respective interest in such Other Secured Creditor Collateral and for the Debtors' use of the respective Cash Collateral, each Other Secured Creditor is hereby granted, effective as of the Petition Date, valid and automatically perfected replacement liens and security interests in and upon their respective Other Secured Creditor Collateral, but only to the extent of any diminution in the value of their respective interests in the Other Secured Creditor Collateral during these Bankruptcy Cases and that the Other Secured Creditor Collateral is (a) owned by the Debtor(s) against which such Other Secured Creditor has a valid lien; or (b) owned by any of the Debtors who own an interest

in Other Secured Creditor Collateral to which the applicable lien of such Other Secured Creditor attaches under applicable non-bankruptcy law.

32.     To the extent such adequate protection is insufficient to adequately protect the Other Secured Creditors' respective interests in the Other Secured Creditor Collateral, the Other Secured Creditors are hereby granted superpriority administrative claims and all of the other benefits and protections allowable under Bankruptcy Code § 507(b) junior only in right to any superpriority administrative claims granted to the DIP Lender and the Carve-Out.

33.     Notwithstanding anything contained herein to the contrary, the liens of the Pre-Petition Agent (on behalf of the Pre-Petition Lenders) and the Other Secured Creditors that are granted in paragraphs 29 and 31 of this Second Interim Order shall be of the same priority as their respective pre-petition liens on, and security interests in, any property of the Debtors' estates (if any such liens and security interests exist).

## AUTOMATIC PERFECTION

34.     This Second Interim Order, the Pre-Petition Claim Documents, and the DIP Facility Documents shall be sufficient and conclusive evidence of the perfection, attachment, and validity of all of the Lenders' and Other Secured Creditors' security interests in and liens on the Collateral, and the liens and security interests granted and created by this Second Interim Order, constitute valid, automatically perfected and unavoidable security interests, with the priorities granted hereunder and thereunder, without the necessity of creating, filing, recording, or serving any financing statements or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect (a) the security interests and liens granted to Lenders or the Other Secured Creditors by this Second Interim Order and the DIP Facility Documents; or (b) the adequate protection and replacement liens and security interests granted herein to the Pre-Petition Lenders and the Other Secured Creditors.

35.     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the Lenders' or Other Secured Creditors' liens and security interests authorized, ratified, or created by this Second Interim Order or otherwise would impose filing or registration requirements with respect to such liens, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of the Court.

36.     If the Agents shall, in their respective discretion, elect for any reason to file any Uniform Commercial Code financing statements or other recordable documents to evidence perfection of their interests in property of these estates, the respective Agent or, upon the respective Agent's request, the Debtors, are authorized and directed to execute, or cause to be executed, all such financing statements or other documents, and the filing, recording, or service (as the case may be) of such financing statements or similar documents shall be deemed to have been made at the time of and on the Petition Date, and the signature(s) of any person(s) designated by the Debtors, whether by letter to the respective Agent or by appearing on any one or more of the agreements or other documents respecting the security interests and liens of the Lenders granted hereunder, shall bind the Debtors and their estates.  The respective Agent may, in its sole and absolute discretion, file a certified copy of this Second Interim Order in any filing or recording office in any county or other jurisdiction in which any Debtor has real or personal property, and, in such event, the subject filing or recording officer is authorized and directed to file or record such documents or certified copy of this Second Interim Order.

## AUTHORIZATION TO ACT

37.     The Debtors are hereby authorized and directed to perform all acts, take any action, and execute and comply with the terms of such other documents, instruments and agreements, as the respective Agent may reasonably require as evidence of and for the protection

of the Collateral, or that may be otherwise reasonably deemed necessary by the respective Agent to effectuate the terms and conditions of this Second Interim Order and the DIP Credit Agreement.

38.     Unless all obligations under the DIP Facility Documents and the Pre-Petition Claims shall have been indefeasibly paid and satisfied in full by their terms, (a) the Debtors shall use the DIP Facility proceeds and all Cash Collateral strictly in accordance with the terms of the Budget requirements and other terms of this Second Interim Order; (b) the Debtors shall not, absent Order of the Court after notice to the Agents, engage in any transaction that is not in the ordinary course of the Debtors' business; and (c) the Debtors shall timely comply with all of the covenants set forth in the DIP Facility Documents.

## PRIOR LIENS; NO ADDITIONAL LIENS

39.     The security interests and liens of the Lenders and the Other Secured Creditors granted pursuant to the terms of this Second Interim Order shall not have priority over: (a) the quarterly fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930; (b) the fees and expenses of the Clerk of this Court; and (c) the Carve-Out.

40.     Until the obligations under the DIP Facility Documents are fully satisfied by their terms, the Debtors shall not be authorized to obtain credit secured by a lien or security interest in the Pre-Petition Collateral, Cash Collateral, or DIP Collateral, other than the DIP Facility, without the prior, written consent of the Pre-Petition Agent or order of the Court upon reasonable notice. Except as might otherwise be provided in the plan support agreement, nothing herein shall be deemed to waive the Debtors and the Committee's rights to seek approval of alternative debtor in possession financing arrangements and the Debtors and the Committee fully reserve their rights surrounding the same. The Agents and Lenders shall not be deemed to waive any events of default, rights, and remedies under this Second Interim Order or the DIP Financing

Documents with respect to such alternative financing arrangements. Nothing herein shall be deemed to be the Agents and Lenders' consent to a request to obtain credit secured by a lien or security interest in the Pre Petition Collateral, or DIP Collateral, and the Agents and Lenders reserve their rights with respect to the same.

## NO LIABILITY

41.     From and after the Petition Date, no act committed or action taken by the Agents, the Lenders, or any of their respective affiliates under the Interim Order or this Second Interim Order, shall be used, construed, or deemed to hold the Agents, Lenders or any of their respective affiliates to be in "control" of or participating in the governance, management, or operations of the Debtors for any purpose, without limitation, or to be acting as a "responsible person(s)" or "owner(s) or operator(s)" or a person(s) in "control" with respect to the governance, management, or operation of the Debtors or their business (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, Comprehensive Environmental Response, Compensation and Liability Act, or the Bankruptcy Code, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon the Agents, Lenders, or any of their respective affiliates under the Pre-Petition Claim Documents, the DIP Facility Documents, the Interim Order or, this Second Interim Order including, without limitation, such rights and remedies as may be exercisable by the Lenders, the Agents, or any of their respective affiliates in connection with the Interim Order or this Second Interim Order.

## AUTOMATIC STAY

42.     The automatic stay is hereby vacated and modified to the extent necessary to permit (a) the Debtors, the Lenders, and the Agents to commit all acts and take all actions necessary to implement the DIP Facility and this Second Interim Order; (b) all acts, actions, and

transfers contemplated herein, including, without limitation, transfers of Cash Collateral and other funds to the Agents for the benefit of the Lenders by the Debtors and the application by the Agents of same as provided herein; and (c) consistent with the terms of this Second Interim Order, to permit the Agents or Lenders to, at their option, pursue their rights and remedies as to the Collateral in accordance with the Pre-Petition Claim Documents, the DIP Facility Documents, and applicable law.

## COLLATERAL INSURANCE, MAINTENANCE, TAXES, AND DEPOSITS

43.     The Debtors shall maintain, with financially sound and reputable insurance companies, insurance of the kind covering the Collateral, and in accordance with the Pre-Petition Claim Documents and the DIP Facility Documents (covering such risks in amounts as shall be satisfactory to the Agents and shall name the Agents as loss payee thereunder), including, without limitation, insurance covering the Collateral and such other collateral of the Lenders, if any, as the Agents may from time to time reasonably request; and, at the Agents' request, the Debtors shall deliver to the Agents evidence of the maintenance of such insurance.

44.     Upon receipt of notification (written or oral) that an insurance policy issued prior to the Petition Date covering any Collateral will not be renewed by the respective carrier, the Debtors will immediately notify the Agents in writing of such occurrence and thereafter provide the Agents with the status of all negotiations, if any, regarding such policy on a weekly basis.

45.     To the extent permitted by the Budget, the Debtors shall make any and all payments necessary to keep the Collateral and their other property in good repair and condition and not permit or commit any waste thereof.  The Debtors shall exercise their business judgment and, in so doing shall preserve, maintain, and continue all material patents, licenses, privileges, franchises, certificates and the like necessary for the operation of their business.

46.    To the extent the Debtors have made or make any deposits for the benefit of utility companies or any other entity (and the Debtors shall not make any such deposits which are not included in the Budget without first obtaining consent of the Agents), such deposits shall be, and hereby are, upon any return of same to the Debtors, subject to first priority, perfected liens and security interests of the DIP Lender in respect of the DIP Facility and the Debtors' use of Cash Collateral granted by the Interim Order and this Second Interim Order.

## REPORTING REQUIREMENTS

47.    The Debtors are authorized and directed to provide to the Agents all of the documentation and reports required under the DIP Facility Documents, and schedules, assignments, financial statements, insurance policies, endorsements, reserve reports, title opinions, reports of payables on a well-by-well basis, other reports of payables, production reports, and LOE reports (collectively, the "Reporting Information"), unless the Agents waive or modifies such requirements in writing.

48.    The Reporting Information shall include: (a) weekly reports of receipts and budgeted cash usage; (b) copies of all reports filed with the Office of the United States Trustee within two (2) days after such filing; and (c) such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of the Debtors, or concerning any matter that may affect the administration of the estates, as the Agents may from time to time reasonably request.  All Reporting Information shall be in accordance with accounting principles and bookkeeping practices consistently applied with past accounting principles and bookkeeping practices and reporting of the Debtors to the Agents and Lenders.

49.    Subject to all applicable privileges and reasonable notice, the Agents and their respective agents and advisors shall have full access, upon reasonable notice during normal

business hours, to the Debtors' business records, business premises, and to the Collateral to enable the Agents or their agents and advisors to (a) review, appraise, and evaluate the physical condition of the Collateral; (b) inspect and review the financial records and all other records of the Debtors concerning the operation of the Debtors' businesses; and (c) evaluate the Debtors' overall financial condition and all other records relating to the operations of the Debtors. The Debtors shall fully cooperate with the Agents regarding such reviews, evaluations, and inspections, and shall make their employees and professionals available to the Agents and their professionals and consultants, by and through Debtors' Chief Restructuring Officer, to conduct such reviews, evaluations, and inspections.

### INTEREST, FEES, COSTS AND EXPENSES OF THE AGENTS AND LENDERS

50.     During the Bankruptcy Cases, as additional adequate protection and as an inducement to extend credit, all interest, fees, costs, and expenses, including reasonable attorneys' fees and expenses, due to the DIP Agent or DIP Lenders under the DIP Facility Documents or that are incurred as a result of the Debtors' Bankruptcy Cases shall be promptly paid by the Debtors up to the amounts set forth in the Budget; *provided however*, that such payment shall not constitute satisfaction of any fees of such professionals other than those actually paid.

51.     Each calendar month, the DIP Lenders shall provide copies of invoices for the previous month or months to counsel for the Debtors, counsel for the Official Committee of Unsecured Creditors (the "Committee"), and the U.S. Trustee. The Debtors, the Committee and the U.S. Trustee shall have fourteen (14) days after the delivery of such invoice to object in writing to such fees and expenses. However, any such objection need not be filed with the Court. If a timely, written objection is delivered to the DIP Agent or DIP Lenders and if the DIP Lenders, DIP Agents, and objecting party are unable to resolve the objection, (a) the undisputed

portion of the DIP Lenders and the DIP Agent's professional fees and expenses shall be promptly paid, and (b) the disputed portion of the DIP Lenders and the DIP Agent's professional fees and expenses shall not be paid absent the agreement of the Debtors, DIP Agent, DIP Lenders, U.S. Trustee, and the Committee or further Order of the Court.

## PROFESSIONAL FEES OF THE ESTATES

52.     The Agents and Lenders additionally consent, subject to the terms and conditions set forth in this Second Interim Order, to a carve out of their Collateral interests and claims for the payment of (a) the quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6); (b) any fees payable to the clerk of the Bankruptcy Court; and (c) the allowed professional fees and expenses of those professionals retained pursuant to an Order of this Court by the Debtors or the Committee (collectively, the "Estate Professionals"), all to the extent set forth in the Budget during the Period and approved by an Order of this Court, and only so long as such fees and expenses are incurred and earned prior to the occurrence of an Event of Default (the "Carve-Out").  So long as no Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. §330 and §331, as the same may be due and payable and set forth in the Budget, and the same shall not reduce the Carve-Out.

53.     Notwithstanding the foregoing, and irrespective of the Carve-Out, in no event shall Cash Collateral, or the proceeds of any loans, advances, or other funds made available by Agents and Lenders to or for the benefit of Debtors, ever be used for the payment or reimbursement of any fees, expenses, costs, or disbursements of any of the professionals incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or contested matter, the purpose of which is to seek any order, judgment, determination, or similar relief (a) invalidating, setting aside, avoiding, or

subordinating in whole or part the ORRI Documents or the interests conveyed thereunder or the Agents' or Lenders' liens and security interests provided by the Pre-Petition Claim Documents or this Second Interim Order; (b) seeking any monetary damages or asserting a claim against the Agents or any Lender; or (c) preventing, hindering or delaying, whether directly or indirectly, the Agents' and Lenders' assertion, enforcement, or realization upon any Collateral; provided, however, that notwithstanding anything to the contrary herein, $30,000 of the Carve-Out may be used by the Committee to investigate the matters described in the foregoing clauses (a), (b) and (c).

## EVENTS OF DEFAULT AND REMEDIES

### Events of Default

54.     The occurrence of any of the following shall constitute an Event of Default under this Second Interim Order upon notice to the Debtors by the DIP Agent:

(a)     the occurrence of the Expiration Date (as defined below), maturity, termination, expiration, or non-renewal of this Second Interim Order or the DIP Facility as provided for herein or in the DIP Facility Documents;

(b)     any default, violation, or breach of any of the terms of the Second Interim Order , the final Order or the DIP Facility Documents by the Debtors;

(c)     conversion of any Debtor's Bankruptcy Case to a bankruptcy case under chapter 7 of the Bankruptcy Code or the dismissal of any Debtor's Bankruptcy Case;

(d)     the appointment of a trustee, a responsible person, or an examiner with expanded powers relating to the operation of the business of any of the Debtors in any Debtor's Bankruptcy Case without the consent of the Agents and the Lenders;

(e)      the entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending this Second Interim Order without the express prior, written consent of the Agents and the Lenders;

(f)      the entry of an Order terminating any of the Debtors' use of Cash Collateral;

(g)      the withdrawal of the *Joint Plan of Reorganization for the Debtors* which is attached as Exhibit A to the *Disclosure Statement for the Joint Plan of Reorganization for the Debtors* [Docket No. 38] (the "Plan") other than with the prior, written consent of the Agents and the Lenders or pursuant to the terms of an Order approving sale procedures in form and substance agreeable to the Agents and Lenders (the "Sale Procedures Order");

(h)      the failure to obtain entry of an Order confirming the Plan or one or more sales of substantially all of the Debtors' assets pursuant to the Sale Procedures Order on or before January 31, 2011;

(i)      the Sale Procedures Order is withdrawn, amended, or otherwise modified without the consent of the Agents and the Lenders;

(j)      the Debtors file or support any pleading that seeks to interfere with the Agents and the Lenders' ability to credit bid, as permitted under Section 363(k);

(k)      except as permitted under this Second Interim Order, any other security interest, lien, claim, or encumbrance shall be granted in any of the Collateral which is *pari passu* with or senior to the claims of the Agents or Lenders;

(l)     the entry of an Order granting relief from the automatic stay to the holder or holders of any other security interest or lien (other than to Agents or Lenders or, with respect to an asset encumbered by a Permitted Lien, the holder of that Permitted Lien) in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Collateral;

(m)     any challenge to the extent, validity, or unavoidability of the Lenders' liens is commenced by the Debtors or an Order is entered sustaining any such challenge commenced by any party other than the Debtors; or

(n)     the entry of an Order granting any claim a priority administrative claim status that is equal or superior to the superpriority status granted to the Lenders herein except as provided in this Second Interim Order; or

(o)     the Debtors shall fail to obtain, on or before December 15, 2010, entry of an Order by the court approving the DIP Financing Facility and an associated credit agreement on a final basis in form and substance satisfactory to the Agents and Lenders in their sole discretion.

Any of the foregoing events of shall be referred to in this Second Interim Order, individually, as an "Event of Default", or severally, as "Events of Default".

## Remedies

55.     Upon the occurrence and continuance of any Event of Default, the Agents may, and, at the request of the Lenders, shall take all or any of the following actions without further order or application to the Court provided that the Agents shall file a written notice with the Court and provide the Debtors, the Committee, and the United States Trustee with three business days' prior written notice before taking such action: (a) declare the principal of and accrued

interest under the DIP Facility to be immediately due and payable; (b) terminate any further commitment to lend to the Debtors; (c) terminate the Debtors' authority to use Cash Collateral; (d) setoff or otherwise apply any amounts held as Cash Collateral or in any accounts maintained with the Agents, the Lenders, or any of their respective affiliates; and (e) take any and all actions and exercise any other right or remedy permitted under the DIP Credit Agreement, this Second Interim Order or applicable law, provided that the Lenders or the Agents shall not be obligated to take title to any of the Collateral in the pursuit of the Lenders' rights and remedies.

56.     Upon or after the occurrence of any Event of Default, the DIP Lender may, in its sole and absolute discretion, advance funds to the Debtors, and all such advances (a) shall not constitute a waiver, limitation, or modification of the Lenders' rights and remedies under the Pre-Petition Claim Documents, the DIP Facility Documents, this Second Interim Order, and applicable law; and (b) shall be and hereby are granted all of the protections granted to the Lenders under this Second Interim Order in connection with the DIP Facility.

## OTHER TERMS

57.     Notwithstanding any other provision of this Second Interim Order, the liens currently held by Wink-Loving ISD and Winkler County for ad valorem taxes shall neither be primed by, nor subordinated to, any liens granted pursuant to this Second Interim Order.

58.     Other than the Carve-Out or as otherwise provided in this Second Interim Order, no priority claims shall be allowed that are or will be prior to or on parity with the superpriority claims or secured claims of the Lenders against the Debtors and their estates arising out of the Pre-Petition Claim Documents, the DIP Facility Documents, and this Second Interim Order.

59.     No costs or expenses of administration or other costs or expenses of the Debtors or their estate that have been or may be incurred in these Cases, or in any subsequent chapter 7 cases of the Debtors or other proceedings or matters related hereto, shall be charged

against the Agents, Lenders, or any of the Cash Collateral of the Agents or Lenders pursuant to Bankruptcy Code § 506(c) or otherwise. No obligations incurred or payments or other transfers made by or on behalf of the Debtors to the Agents or Lenders pursuant to this Second Interim Order shall be avoidable or recoverable from the Agents or Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law.

60. Except for the sale of inventory in the ordinary course of the Debtors' businesses and as may be provided for in the Budget and consistent with the terms of the DIP Facility Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any of the Collateral, without the prior, written consent of the Agents and/or an Order of the Court, after notice and hearing, approving such disposition.

61. The terms hereunder and under the DIP Facility Documents, the security interests and liens granted to the Lenders under this Second Interim Order, and the rights of the Agents and the Lenders pursuant to this Second Interim Order with respect to the Collateral, and treatment of the Pre-Petition Claims shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of any Debtor without the prior, written consent of the Agents.

62. The terms and provisions of this Second Interim Order and any actions taken pursuant hereto shall survive entry of any order that may be entered converting to chapter 7 or dismissing a Debtor's Bankruptcy Case, except for the Debtors' authority to use Cash Collateral and any obligations of the DIP Agent or DIP Lender under the DIP Facility Documents (all of which shall immediately terminate upon entry of such an Order). The terms and provisions of this Second Interim Order, as well as the priorities in payment, liens, and security interests granted pursuant to this Second Interim Order and the DIP Facility Documents, shall continue in

these or any superseding cases under the Bankruptcy Code of the Debtors, and such priorities in payment, liens, and security interests shall maintain their priority as provided by this Second Interim Order until the Pre-Petition Claims and the DIP Facility are indefeasibly paid and satisfied in full by their terms and discharged and the Agents and Lenders shall have no further obligation or financial accommodation to the Debtors.

63.     The provisions of this Second Interim Order shall inure to the benefit of the Debtors, the Lenders, and the Agents, and they shall be binding upon (a) the Debtors and their respective successors and assigns, including any trustees or other fiduciaries hereafter appointed as legal representatives of any Debtor or with respect to property of the estate of any Debtor, whether under chapter 11 of the Bankruptcy Code, any confirmed plan, or any subsequent chapter 7 case; and (b) all creditors of the Debtors and other parties in interest.

64.     If any or all of the provisions of this Second Interim Order are hereafter modified, vacated, or stayed without the prior, written consent of the Agents, such modification, vacation, or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the Agents or any Lender before the effective date of such modification, vacation, or stay; or (b) the validity or enforceability of any security interest, lien, priority or other protection authorized, created, or confirmed hereby or pursuant to the DIP Facility Documents. Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the Debtors to the Agents or any Lender before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Second Interim Order, and the Agents and the Lenders shall be entitled to all the rights, remedies, privileges, and benefits granted herein and pursuant to the DIP Facility Documents with respect to all such indebtedness, obligations, or liabilities.

65. To the extent the terms and conditions of the DIP Facility Documents are in conflict with the terms and conditions of this Second Interim Order, the terms and conditions of this Second Interim Order shall control.

66. No approval, agreement, or consent requested of the Lenders or Agents by the Debtors pursuant to the terms of this Second Interim Order or otherwise shall be inferred from any action, inaction, or acquiescence of the Lenders or Agents other than a writing acceptable to the Agents that is signed by the Agents and expressly shows such approval, agreement or consent, without limitation.

67. Nothing herein shall be deemed or construed to waive, limit, or modify the rights of the Agents or the Lenders or the other secured lenders to obtain further adequate protection and other statutory protections for the use of the Collateral and Cash Collateral, or to seek other relief in these Bankruptcy Cases in accordance with any provision of the Bankruptcy Code or applicable law, and all of the Debtors' rights to contest any such requests are preserved.

68. Unless expressly and specifically provided otherwise herein, nothing herein shall be deemed or construed to waive, limit, modify or prejudice the claims, rights, protections, privileges and defenses of the Agents and Lenders or any other parties-in-interest afforded pursuant to title 11 of the United States Code including, without limitation, those claims, rights, protections, privileges and defenses afforded the Agents and Lenders pursuant to Bankruptcy Code §§ 361, 363, 506, 507, 546, 547, 548, 549, 550, 553, 555, 556, 559, 560, 561 and 562.

69. This Court hereby expressly retains jurisdiction over all persons and entities, co-extensive with the powers granted to the Bankruptcy Court under the Bankruptcy Code, to enforce the terms of this Second Interim Order and to adjudicate any and all disputes in connection therewith.

70.     All headings in this Second Interim Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

## RELEASE AND WAIVER OF CLAIMS

**71.     Except as to challenges to lien priority, and subject to the challenge provisions provided in paragraph 72 of this Second Interim Order, the Debtors, in their own right and on behalf of their respective estates, representatives, directors, officers, employees, managers, members, independent contractors, attorneys, professionals, and agents, and their successors and assigns, in each case to the extent permitted by applicable law (collectively, the "Releasing Parties") hereby release, acquit, forever discharge and covenant not to sue each and every Lender and Agent, and their respective affiliates, representatives, directors, officers, employees, independent contractors, attorneys, professionals, and agents, and their successors and assigns (collectively, the "Released Parties") from any and all acts and omissions of the Released Parties, and from any and all claims, causes of action, avoidance actions, counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description which the Releasing Parties have or may come to have against the Released Parties through the date of this Second Interim Order, to the extent such claims relate to or arise out of the DIP Facility or the Pre-Petition Claims Documents or the matters, transactions or documents related hereto or thereto, at law or in equity, by statute or common law, in contract, in tort, including Bankruptcy Code Chapter 5 causes of action, whether the law of the United States or any other country, union, organization of foreign countries or otherwise, known or unknown, suspected or unsuspected, but excluding obligations under the DIP Facility arising after the date of this Second Interim Order.  This**

**paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties.**

### CHALLENGE TO PRE-PETITION LENDERS' LIENS AND CLAIMS

72.     Notwithstanding anything to contrary herein, neither the Committee nor any other party in interest (including any subsequently appointed chapter 7 or 11 trustee) is bound by the stipulations set forth in paragraphs 8 and 9, or the release set forth in paragraph 71, of this Second Interim Order and the Committee and any other party in interest (including any subsequently appointed chapter 7 or 11 trustee) shall have the right to challenge or file any action, claim, proceeding, motion, objection or contested matter, as appropriate, relating to any or all of the stipulations set forth in paragraphs 8 and 9, or the matters the subject of the release set forth in paragraph 71, of this Second Interim Order or to the extent or validity of the security interest and liens of the Pre-Petition Agent and the Pre-Petition Lenders in these Bankruptcy Cases, provided that any such action, claim, proceeding, motion, objection or contested matter is filed on or before December 15, 2010 (the "Challenge Period"); *provided however*, that the Committee may request in writing an extension of the Challenge Period which the Pre-Petition Lenders may, agree to by a *Stipulation Extending Challenge Period* that will be signed by counsel and filed on or before the expiration of the Challenge Period; *provided further*, that the Pre-Petition Lenders' agreement to such an extension shall not be unreasonably withheld.  If a challenge to any or all of the stipulations set forth in paragraphs 8 and 9, or the release set forth in paragraph 71, of this Second Interim Order or to the extent or validity of the security interests and liens of the Pre-Petition Agent and Pre-Petition Lenders in these Bankruptcy Cases is not timely filed (as provided for in this paragraph) by such parties in interest with proper standing to assert such complaint or the Committee, (a) the Pre-Petition Claims and the Pre-Petition Lenders' Interests in and liens upon the Pre-Petition Collateral shall be recognized and allowable

as valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses, and perfected against the Pre-Petition Collateral to the extent provided herein, and the Pre-Petition Claims shall be allowed in the full amount specified in paragraph 8 hereof, (b) the acknowledgements and stipulations contained in paragraph 8 shall be binding on all parties in interest, and (c) the release set forth in paragraph 71 shall be binding on all parties in interest; *provided however*, that the rights of the Debtors, Committee, and parties in interest to challenge the priority of the Pre-Petition Lenders' liens shall not be affected by this Second Interim Order.

## NOTICE

73.     The Debtors' proposed counsel shall serve this Second Interim Order on all of the following parties: (a) the Office of the United States Trustee; (b) the attorneys for the Agents; (c) the attorneys for the Committee; (d) all creditors known to Debtors who have or may assert liens against any Debtor's assets; (e) the United States Internal Revenue Service; (f) the twenty (20) largest unsecured creditors of the Debtors; and (f) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy Procedure or the Local Rules of the Northern District of Texas.

74.     Any notice, report, or other document required to be given hereunder may be given by U.S. mail, overnight courier, hand delivery, facsimile or e-mail addressed to the following parties.

*Counsel to Heritage Consolidated:*

Joe E. Marshall
Munsch Hardt Kopf & Harr PC
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
(f) 214.978.4365
jmarshall@munsch.com

*Counsel to Heritage Standard:*

Kevin D. McCullough
Rochelle McCullough, LLP
325 N. Saint Paul Street, Suite 4500
Dallas, Texas 75201
(f) 214.953.0185
kdm@romclawyers.com

*Counsel to the Lenders:*

Richard H. London
Vinson & Elkins LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
(f) 214.999.7823
rlondon@velaw.com

*Counsel to the Committee:*

Brian A. Kilmer
Okin Adams & Kilmer LLP
3102 Maple Avenue, Suite 240
Dallas, Texas 75201
(f) 888.865.2118
bkilmer@oakllp.com

*United States Trustee:*

Office of The United States Trustee
Earle Cabell Federal Building
1100 Commerce Street, Room 976
Dallas, TX  75242
(f) (214) 767-8971

## EXPIRATION DATE/MATURITY

75.     The Lenders' consent, and Debtors' authority, to use Cash Collateral and the Lenders' commitment to provide credit under the DIP Facility and this Second Interim Order, subject to the funding and Budget limitations above, shall be effective upon entry of this Second Interim Order  to and including the earlier of: (a) notice of the occurrence of an Event of Default; or (b) December 31, 2010, at 5:00 p.m., prevailing Central time, at which time all of the Debtors' authority to use Cash Collateral and to obtain credit under the DIP Facility and this Second Interim Order shall terminate, as shall the DIP Lender' obligation to provide the DIP Facility, unless extended by written agreement of the parties hereto, a copy of which shall be promptly filed with this Court by the Debtors (the "Expiration Date").

### # # # END OF ORDER # # #

Submitted By:

Joe E. Marshall
Munsch Hardt Kopf & Harr PC
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
(f) 214.978.4365
jmarshall@munsch.com

**COUNSEL FOR**
**HERITAGE CONSOLIDATED LLC**