Holland Neff O'Neil (14864700)
Michael S. Haynes (24050735)
**GARDERE WYNNE SEWELL LLP**
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201-4761
Telephone:  (214) 999-3000
Facsimile: (214) 999-4667
honeil@gardere.com
mhaynes@gardere.com

And

Terry W. Rhoads (16811750)
Matt Catalano (24003918)
**COTTON BLEDSOE TIGHE & DAWSON, PC**
500 West Illinois, Ste. 300
Midland, Texas 79701
Telephone:  (432) 897-1440
Facsimile:  (432) 682-3672
trhoads@cbtd.com
mcatalano@cbtd.com

COUNSEL FOR CITY OF MIDLAND

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| **HERITAGE CONSOLIDATED, LLC et al.,**[1] | § | **CASE NO. 10-36484-hdh-11** |
| | § | |
| | § | **(Jointly Administered)** |
| **DEBTORS.** | § | |

### CITY OF MIDLAND'S OBJECTION TO DISCLOSURE STATEMENT
### FOR THE JOINT PLAN OF REORGANIZATION FOR THE DEBTORS
### (RE: DOCKET NO. 38)

---

[1] Pursuant to the Court's September 22, 2010, *Order Directing Joint Administration of Bankruptcy Cases*, Heritage Consolidated, LLC's case was jointly administered with Heritage Standard Corporation's case no. 10-26485-hdh (collectively, the "**Debtors**").

The City of Midland ("**Midland**"), by and through its undersigned counsel, hereby files this objection (the "**Objection**") to approval of the Debtors' *Disclosure Statement for the Joint Plan of Reorganization for the Debtors* [Docket No. 38] (the "**Disclosure Statement**"). In support of this Objection, Midland respectfully states as follows:

## I.
## PRELIMINARY STATEMENT

1.      With the possible exception of the Debtors' secured lender, Midland is the largest creditor in these bankruptcy cases. Yet, there is no mention in the Disclosure Statement of Midland or its claims. In addition to that glaring omission, approval of the Disclosure Statement must be denied for myriad reasons.

2.      First, the Disclosure Statement must contain "adequate information." "In general terms, 'adequate information' means that information which 'clearly and succinctly inform[s] the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.'"[2] Here, the Plan[3]—and by extension the accompanying Disclosure Statement—is so complicated and convoluted that the average unsecured creditor cannot possibly determine what it is going to get, when it is going to get it, or what contingencies exist to distribution. For that reason alone, the Disclosure Statement must not be approved.

3.      Second, a disclosure statement should not be approved when the underlying plan is patently unconfirmable.[4] Here, the Plan cannot be confirmed because, among other things, it

---

2 *In re Williams*, 1992 WL 521537, *2 (D. Md. 1992) (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr.D.N.H.1991)).
3 The "Plan" is the Debtors' *Joint Plan of Reorganization for the Debtors* , which is attached to the Disclosure Statement as Exhibit A.
4 *See, e.g., In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991) ("It is permissible, moreover,

grants impermissible third-party releases, violates the absolute priority rule, and is not feasible. Therefore, the Disclosure Statement must not be approved.

4.      In addition to the above-listed flaws, the Disclosure Statement contains numerous inadequacies that prevent approval of the Disclosure Statement.  Such inadequacies include: (a) incomplete background information related to the Debtors' assets and liabilities (including, in particular, the Claims of Midland and the required remediation efforts); (b) no description of the sale process; (c) no description of anticipated allowed claim amounts and probable distribution to creditors; (d) inadequate description of the overly-complicated process for implementing the Plan; (e) a failure to show that the Plan is feasible; (f) a lack of a liquidation analysis and other proposed exhibits to the Disclosure Statement; (g) deficient disclosures regarding insider claims and amounts to be received by insiders under the Plan; and (h) an inadequate description of risks associated with the Plan.

## II.
## SUMMARY OF MIDLAND'S CLAIMS

5.      The Debtors, themselves and through their predecessors, have been engaged in the exploration, acquisition, production and sale of crude oil and gas in West Texas since 1984. Part of those operations was in the Crittendon field in Winkler County, Texas.  Sometime in 2005, it became clear that one (or more) of the Debtors' underground injection wells in the Crittendon field leaked.   The leaks resulted in the release of a tremendous amount of water contaminated with chloride (and other harmful elements) into the Cenozoic Pecos Alluvium

---

for the court to pass upon confirmation issues where, as here, it is contended that the plan is so fatally and obviously flawed that confirmation is impossible."); *In re Miller*, 2008 WL 191256, *3 (Bankr. W.D. La. 2008) ("The Court may disapprove a disclosure statement that contains adequate information, when the proposed plan 'cannot possibly be confirmed.' *In re CRIIMI MAE, INC.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000.") (quoting *El Comandante Management Co. LLC*, 359 B.R. 410 (Bankr. D.P.R. 2006)).

Aquifer (the "**Aquifer**"). The rights to the fresh water in the Aquifer are owned by Midland and the water is intended to be a source of drinking water for the citizens of Midland, Texas.

6. Because of these leaks, the Aquifer is now contaminated with a "plume" of chloride infested water that is (and has been for some time) migrating through the Aquifer; thereby continually contaminating more-and-more fresh water. Midland's experts currently estimate the plume has contaminated approximately 19,000-acre feet (**approximately 6.2 billion gallons**) of water within the Aquifer. Midland has suffered damages in at least two forms as a result of the Debtors' discharge of contaminated water into the Aquifer: (a) the anticipated costs of remediating the Aquifer from the ongoing contamination (the "**Remediation Claim**") and (b) the irreparable damage and loss of water suffered by Midland as a result of the contamination (the "**Damage Claim**" and, with the Remediation Claim, the "**Claims**").

7. The Debtors' on-going obligations to comply with applicable state law and to remediate the Aquifer give rise to an administrative expense claim. Therefore, the Remediation Claim is entitled to administrative-expense priority pursuant to 11 U.S.C. § 503(b)(1)(A). Midland files this Objection as both an administrative-expense claimant and a general unsecured creditor.

## III.
## SUMMARY OF OBJECTIONS

8. Provided below is a chart summarizing Midland's objections to the Disclosure Statement as more fully described in this Objection:

| Document Reference | Objection |
|---|---|
| **Background Information** | |
| DS Art. V | No description of environmental claims of Midland; no description of environmental claims of Texas Railroad Commission. |

**CITY OF MIDLAND'S OBJECTION TO DISCLOSURE STATEMENT**
**FOR THE JOINT PLAN OF REORGANIZATION FOR THE DEBTORS**          Page 4

| Document Reference | Objection |
|---|---|
| DS Art. V | No description of the Debtors' pre-petition efforts to remediate the contamination. |
| DS Art. VI | No description of the Debtors' post-petition efforts to remediate the contamination. |
| DS Art. V.C | Disclosure Statement lacks a description of the history of the Pat Howell[5] well, what went wrong, and the events that lead to the bankruptcy. |
| DS Art. V | The history of CIT debt is deficient; inadequate description of CIT debt, which assets are encumbered, and how the debt is allocated across the Debtors and the assets. |
| DS Art. V.B | Inadequate description of the transfer of assets from Heritage Standard to Heritage Consolidated. Inadequate description of what precipitated the transfer and the consideration given by Heritage Consolidated. |
| DS Art. VI | No description of Baker Hughes' motion to appoint an examiner. |
| **Explanation of Assets** | |
| DS Art. V.B | Inadequate description of the difference between the Section 6 and Non-Section 6 assets (particularly the Pat Howell well and A.G. Hill well). What is the Debtors' asserted value of the various assets?<br>    *Inadequate description of various assets value, location, and productivity (no description is currently provided). |
| DS Art. VII | Inadequate description of Heritage Standard's Operators' lien (no description is currently provided).<br>    *What is the amount of the lien, how is it calculated, which properties are encumbered by the lien, and as to which properties is the Operators' lien senior to CIT's mortgages? |
| DS Art. IX.E | Incomplete description of litigation assets; inadequate description of value of "Chapter 5" causes of action. |
| DS Art. VIII | Incomplete description of insurance assets.<br>    *There is currently no description of insurance available to pay for environmental liabilities, amounts paid by insurance company and how the money has been spent, or positions taken by insurance company as to future payments for environmental remediation. |
| **Explanation of Liabilities** | |
| DS Art. VII.C.1 | No description of anticipated administrative expenses. |
| DS Art. VII.C.1 | No description of Midland's Remediation Claim or Damages Claim. |
| DS Art. II | Other than secured debt to CIT, no claim amounts or number of claimants are provided. |
| DS Art. VII.D.4 | Inadequate explanation of how the Standard Secured Claim is calculated.<br>    *Is it senior to CIT?<br>    *Inadequate breakdown of the Standard Secured Claim between Section 6 and Non-Section 6 assets. |
| DS Art. VII.E.6 | There is no description of what wells / leases the M&M liens encumber or the anticipated value of the asserted M&M liens (i.e., what are expected to be senior secured liens and what will be unsecured claims). |
| DS Art. VII.E | Lack of description of what, potentially unsecured claims, will be resolved through assumption and assignment of joint operating agreements? |
| DS Art. VII | Greatly inadequate description of intercompany and insider claims. |
| **Sale Process** | |
| DS Art. VIII.B; Plan Art. 6.02 | The Plan and Disclosure Statement do not contemplate a sale of assets; rather, the Disclosure Statement contains only a cursory reference to the sale process. The Disclosure Statement fails to state how claims are treated if there is a sale, rather than an assumption of debt and payout from the Pat Howell well? |
| DS Art. V | No description of the Debtors' prepetition marketing efforts. |

---

[5] Capitalized terms not otherwise defined herein have the definitions ascribed in the Disclosure Statement and Plan.

| Document Reference | Objection |
|---|---|
| DS Arts. VI, VIII.B | No description of the Debtors' postpetition marketing efforts.<br>*Nothing describes bid procedures, deadline for submitting bid, minimum bid to be "qualified," auction date, anticipated closing date, etc. |
| **Claim Satisfaction / Distribution Percentages** | |
| DS Art. II | There is no description of anticipated distribution percentages. |
| DS Arts. II, VIII.B | There is no description of how sale price will impact distribution percentages. |
| DS Art. VIII | There is no estimation on how long it will take for claims to be paid. |
| DS Art. VIII.F | Disclosure Statement is confusing as to treatment of CIT debt. Cannot determine if CIT debt is considered satisfied in full on Effective Date or if is considered reinstated. |
| DS Art. VII D.4 | Cannot determine the amount of JOA cure claims being released under the Non-Section 6 JOA and Pat Howell JOA. |
| DS Art. VIII.K; Plan Art. 6.13 | M&M Liens against non-Debtor working interests are being released under the plan. The non-Debtor working interests could otherwise be used to satisfy M&M Lien claims thereby reducing the pool of general unsecured claims.<br>*There is no description of the consideration non-Debtor working interest owners are providing to get a release of M&M Liens against their interests. |
| **Plan Implementation / Effectuation** | |
| DS Art. VIII | Greatly inadequate description of the Section 6 assets that will be providing the source of recovery (primarily Pat Howell well).<br>*How much has been spent on the PH well?<br>*How much will it cost to complete the PH well?<br>*How long will it take to complete the PH well?<br>*Who is in charge of overseeing completion the PH well?<br>*How much is the PH well expected to generate to the Debtors' interests? Over what period of time? |
| DS Art. VIII | No description of anticipated cash on hand on the effective date of the Plan.<br>*How much cash will the Debtors have on the effective date?<br>*How much cash on hand must be used immediately to pay the secured debt to CIT?<br>*Will there be enough cash to pay administrative expenses and priority tax claims on the effective date?<br>*How much cash will be set aside for other reserves?<br>*Where is the source of the cash on hand (operating revenue, DIP loan, etc.)? |
| DS Art. VIII | Disclosure Statement fails to state how much cash the Debtors' existing assets are generating? Disclosure Statement fails to state how the cash from existing assets will be used to pay claims or is the PH well the only source of recovery? |
| DS Art. VIII | Disclosure Statement fails to state how much cash will be generated by the Newco entities between the effective date of the Plan and completion of the PH well? |
| **Feasibility** | |
| DS Arts. II, VII, VIII, X.C.1 | The Plan and Disclosure Statement are too complicated to decipher how much money is being paid and from what source.<br>*The Disclosure Statement needs an understandable waterfall (i.e., a simple exhibit/chart to show how much cash must be generated, and where that cash will be spent). |
| DS Art. II; Plan Arts. II, IV, VI | Inadequate claim estimates for each class to determine feasibility, particularly administrative expenses.<br>*Inadequate proof that insurance or other funds will be sufficient to satisfy administrative expenses on the effective date. |

| Document Reference | Objection |
| --- | --- |
| DS Art. VIII | Disclosure Statement fails to show that there will be sufficient cash on effective date to meet § 1129 requirements.  Readers cannot tell from the Disclosure Statement how much cash will be available on the effective date to pay non-CIT debt. |
| DS Art. VIII | Disclosure Statement does not describe the effect of completion of the PH well taking longer than expected. |
| DS Art. VIII; Plan Art. VI | Disclosure Statement fails to describe what happens if the PH well does not produce? <br> *It appears that all assets go to a CIT entity and the lien on Section 6 assets is nonrecourse. Thus, if completion of PH well is unsuccessful, CIT entity gets all of the Debtors' assets, but there is no source of recovery for other creditors. |
| DS Art. VIII | Disclosure Statement fails to state Debtors' estimates on commodity prices to think that PH well can generate enough cash to pay creditors? |
| DS Art. VIII | Disclosure Statement fails to state Debtors' estimates on amount of time that PH well must produce in paying quantities, and at what production level, to pay all creditors in full? |
| **Exhibits to Disclosure Statement** | |
| DS Ex. F | Liquidation Analysis is not provided.  This exhibit is crucial to analyzing the plan. |
| DS Exs. D, E | Litigation Defendants not provided. |
| **Insider Disclosures** | |
| DS Art. VIII | No disclosure of how the Newco equity recipient is affiliated with the Debtors and/or CIT. |
| DS Arts. VII, VIII.I; Plan Arts. 6.08, 6.10 | Violates the absolute priority rule as all creditors will not be paid in full on the effective date. There is no disclosure on compensation that will be paid to officers / employees of the Reorganized Debtors. <br> * Michael Wisenbaker—a principal of the Debtors—is retaining equity in the Reorganized Debtors. |
| Plan Arts. 1.114, 12.06 | Improper releases are being given to CIT, CIT affiliates, Mr. Wisenbaker, and entities owned by Mr. Wisenbaker. <br> *The releases are not permissible under *Pacific Lumber*.[6] <br> *No description of what consideration (if any) is being provided by released parties in return for the releases. <br> *No description of investigation into claims that are being released. |
| DS Art. VII | Inadequate description of insider claims and how they are being treated (e.g., claims by Mr. Wisenbaker, Heritage Disposal, Heritage Gathering, etc.). |
| **Risks of the Plan** | |
| DS Art. XII | Plan does not assume substantive consolidation and fails to describe what happens if the Plan for one Debtor is confirmed but not other the Debtor? |
| DS Art. XII | The Disclosure Statement fails to describe the risks associated with trying to complete the PH well and the impact that failure to complete the well (or its failure to produce in large quantities) will have on creditor recoveries. |

---

6 *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009).

# IV.
# BACKGROUND

**A.     Pre-Petition Contamination**

9.      As briefly stated above, the Debtors have been engaged in the exploration, acquisition, production and sale of crude oil and gas since 1984.  A byproduct of oil and gas operations is water containing various contaminates, including chloride.  The contaminated water (referred to as "salt water" in the oil and gas industry) must be disposed of in a method that does not contaminate fresh water sources.  A common method of disposing of salt water in oil and gas operations is to (a) convert an oil and gas well that is no longer producing into a salt water disposal well (a "**SWD well**"), and (b) pump the salt water down the SWD well into an underground formation.

10.     As stated herein, at least one of the Debtors' wells began to leak causing contamination.  Midland believes the Debtors tendered to their insurance carrier—Chubb Group of Insurance Companies' ("**Chubb**")—a claim in 2005 based on the contamination.  On October 11, 2005, Chubb transmitted to the Debtors a letter reserving all rights of Chubb to dispute that the contamination is covered by certain insurance policies and outright denied coverage as to one insurance policy.  On information and belief, Chubb has funded approximately $2.1 million toward monitoring the contamination and toward limited remediation steps; such funding has been, and continues to be, subject to Chubb's reservation of rights.[7]

---

[7] To date, Midland is not aware of the actual costs incurred by the Debtors applicable to the contamination, nor is it aware of the exact amount of insurance paid by Chubb.

**CITY OF MIDLAND'S OBJECTION TO DISCLOSURE STATEMENT**
**FOR THE JOINT PLAN OF REORGANIZATION FOR THE DEBTORS**                    Page 8

**B.    Efforts by Midland at Obtaining Agreement on Remediation Plan**

11.    In 2007, Midland requested that the Texas Railroad Commission ("**TRC**")
address Heritage Standard Corporation's ("**Heritage Standard**") operations in view of the recent
discovery of the failed integrity of the Debtors' SWD well, and after Heritage Standard
continued to deny responsibility.  In early 2008, experts for both Midland and Heritage Standard
met jointly with the TRC to explain to each other and to the TRC their findings at that time.  At
the meeting in February of 2008, Heritage Standard denied responsibility for any far-reaching
plume or contamination, other than a limited area near the source SWD well.

**C.    The Bankruptcy Case**

12.    The Debtors commenced their chapter 11 bankruptcy proceedings on
September 14, 2010.  Pursuant to 11 U.S.C. §§ 1107 and 1108, the Debtors are operating their
business and properties as debtors-in-possession.

13.    On September 17, 2010, the Debtors filed the Disclosure Statement, which
contained the Plan as an exhibit.  The Plan provides that allowed administrative expenses shall
be paid in full on the "Effective Date" of the Plan.[8]  *See* Plan, § 2.01.  At present, the Court has
set a hearing for December 15, 2010, to consider approval of the Disclosure Statement.  On
October 26, 2010, the Court entered the *Order (A) Approving Plan Support Agreement, Sale
Procedures and Bid Protections in Connection with Sale of Assets; (B) Approving Form and
Manner of Notice of Sale and of Assumption and Assignment of Executory Contracts and*

---

[8] The "Effective Date" is defined in the Plan as "the later of (a) the first Business Day on which all conditions
precedent to the effectiveness of the Plan have been satisfied or waived as provided in Section 6.01 of this Plan; and
(b) such other date agreed to by all of the Plan Proponents; provided, however, that the Effective Date shall occur
simultaneously with the Closing Date."  *Plan*, § 1.53.  Section 6.01 of the Plan contains numerous conditions
including (a) that the Confirmation Order shall have been entered by the Bankruptcy Court on or before December
8, 2010, and (b) the Bankruptcy Court shall have approved the transfer of assets to the Newco Entities.  *Plan*,
§ 6.01(a), (e).

*Unexpired Leases; and (C) Granting Related Relief* [Docket No. 193] (the "**Sale Procedures**

**Order**"), authorizing procedures by which the Debtors propose to sell substantially all of their

assets for a credit bid by a special purpose subsidiary of its secured lender, subject to higher and

better offers.   Pursuant to the Sale Procedures Order, an auction of the Debtors' assets is

scheduled for January 24, 2011, with the sale to be consummated shortly thereafter.   The Debtors

have stated their intent to seek confirmation of their Plan contemporaneously with approval of

the sale; consequently, the Debtors are driving toward a confirmation hearing by the end of

January 2011.

14.    On November 15, 2010, Midland filed the *City of Midland's Motion for*

*Estimation of Claims for Purpose of Allowance, Voting, and Determining Plan Feasibility, and*

*Request for Determination that Remediation Claim is Entitled to Administrative Expense Priority*

[Docket No. 256] (the "**Estimation Motion**").   On November 24, 2010, the Court entered an

agreed scheduling order [Docket No. 282] (the "**Scheduling Order**") on the Estimation Motion.

Pursuant to the Scheduling Order, the Estimation Motion is set to be heard the week of

January 10, 2011.

15.    On December 6, 2010, Midland, the Debtors, the Debtors' insurer, CIT, the

Unsecured Creditors Committee, Michael Wisenbaker, and Heritage Disposal all participated in

a mediation of the Estimation Motion.   While negotiations continue, to date, no agreement has

been reached on the Claims.

# V.
## OBJECTIONS TO DISCLOSURE STATEMENT

### A.    No Description of City of Midland's Claims

16.    First and foremost, the Disclosure Statement fails to contain any reference to the Claims of the largest creditor in these Cases—the Claims of Midland.[9]  It is perplexing that the Disclosure Statement makes no reference to the contamination of the Aquifer, the Debtors' post-petition obligation to remediate the Aquifer, Midland's Remediation Claim that is entitled to administrative-expense priority, or Midland's Damage Claim.   The Disclosure Statement is clearly inadequate in that it fails to account, or provide notice to other creditors, of the substantial administrative-expense claim asserted by Midland.

17.    Depending on the outcome of the hearing on the Estimation Motion, it is probable that Midland's Claims make the Plan entirely infeasible.   The Disclosure Statement must be amended to provide a fulsome description of the contamination, requirement to remediate, Claims of Midland, and the impact of those Claims on the Plan.

### B.    Plan Is So Complicated / Convoluted That Disclosure Statement Cannot Be Deemed to Contain "Adequate Information."

18.    Section 1125(b) governs approval of the Disclosure Statement and provides:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a

---

9 It is arguable that the Debtors' secured lender—CIT—is the largest creditor in these Cases with a claim of approximately $18 million.  As described in the Estimation Motion, Midland's Claims range from approximately $14 million to $50 million, depending on the method utilized to remediate and the method of calculation of Midland's Damage Claim.

disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.[10]

19.     "Adequate information" means:

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.[11]

20.     "In general terms, 'adequate information' means that information which 'clearly and succinctly inform[s] the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.'"[12]  Here, the Plan and accompanying Disclosure Statement are so complicated that the average creditor cannot determine when, or if, its claim will be paid.  The documents contain a tremendous amount of defined terms that require a complete review of the Disclosure Statement, Plan and the Debtors' sale documents.[13]  Even the most sophisticated creditors are likely to have extreme difficulty

---

10 11 U.S.C. § 1125(b).

11 11 U.S.C. §1125(a)(1); *see also In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("'Adequate information' is defined in 11 U.S.C. § 1125(a) as being 'information of a kind, and in sufficient detail, ... that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.'").

12 *In re Williams*, 1992 WL 521537, *2 (D. Md. 1992) (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr.D.N.H.1991)).

13 *See, e.g.,* Plan §§ 1.83 (directing reader to Purchase and Sale Agreement); 1.133 (directing reader to Purchase and Sale Agreement); 1.134 (same); 1.132 (directing reader to Sale Procedures Order for definition of "Successful Bidder") and *Order (A) Approving Plan Support Agreement, Sale Procedures and Bid Protections in Connection*

**CITY OF MIDLAND'S OBJECTION TO DISCLOSURE STATEMENT**
**FOR THE JOINT PLAN OF REORGANIZATION FOR THE DEBTORS**                    Page 12
DALLAS 2187018v.3

deciphering the numerous definitions and following the complicated flow of assets from the Debtors, to the Newco Entities, to the Distribution Reserve Accounts, to the Plan Administrator, to the Reorganized Debtors, and (hopefully) ultimately to creditors.   Because the average unsecured creditor cannot make an informed decision about the Plan (because it cannot understand the Plan), the Disclosure Statement cannot be approved.

**C.      Disclosure Statement Cannot Be Approved Because Plan is Patently Unconfirmable.**

21.     A disclosure statement should not be approved when the underlying plan is patently unconfirmable.[14]   Thus, the Disclosure Statement should not be approved because the Plan is not confirmable.   For example, the Plan contains impermissible third-party releases. Sections 1.114 of the Plan defines "released parties" to include "the Debtors, the Debtors' present directors and officers, the Estates, the Reorganized Debtors, Michael B. Wisenbaker, the Plan Administrator, the Lender, CIT Capital, Cross Canyon, [Heritage] Gathering, [Heritage] Disposal, Permian Atlantis LLC, Permian Phoenix LLC, the Buyer . . . and the Newco Entities." Section 12.06 of the Plan provides for <u>extremely</u> broad releases of each of the released parties, including for gross negligence.   Additionally, the third-party releases are not permissible under

---

with Sale of Assets; (B) Approving Form and Manner of Notice of Sale and of Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief [Docket No. 193] (the "Sale Procedures Order"), which contains no definition of "Successful Bidder"; 1.142 (directing reader to Purchase and Sale Agreement).

14 See, e.g., In re Miller, 2008 WL 191256, *3 (Bankr. W.D. La. 2008) ("The Court may disapprove a disclosure statement that contains adequate information, when the proposed plan 'cannot possibly be confirmed.' In re CRIIMI MAE, INC., 251 B.R. 796, 799 (Bankr.D.Md.2000).") (quoting El Comandante Management Co. LLC, 359 B.R. 410 (Bankr.D.P.R. 2006)); In re Bjolmes Realty Trust, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991) ("It is permissible, moreover, for the court to pass upon confirmation issues where, as here, it is contended that the plan is so fatally and obviously flawed that confirmation is impossible.").

*In re Pacific Lumber.*[15]   Therefore, the inclusion of such releases makes the Plan patently unconfirmable and the Disclosure Statement must not be approved.

22.     Additionally, the Plan cannot be confirmed because it violates the absolute priority rule.  Although difficult to decipher, the Plan provides that creditors will be paid over time from production of the Pat Howell well.  Thus, it is clear that creditors will not be paid in full on the effective date of the Plan.  Despite this, equity in the "Reorganized Debtors" will be issued to the Debtors' existing equity holders.[16]   On the Effective Date of the Plan, the "Reorganized Debtors" will be vested with, among other things, litigation assets.  For example, Plan § 1.139 vests with the Reorganized Debtors the Apollo Litigation, Eunice Litigation, and Pathfinder Litigation, "subject to Section 6.06(f) of [the] Plan."   Section 6.06(f) of the Plan provides that the Eunice Litigation "shall vest in the respective Reorganized Debtors"[17] without any requirement that proceeds of such litigation go toward creditor recoveries.  Such an impermissible transfer of assets—both in the form of equity in the Reorganized Debtors and in the form of assets vesting in such entities—to the Debtors' existing equity holders without a prior payment in full of all allowed claims makes the Plan unconfirmable on its face.  For that reason, the Disclosure Statement cannot be approved.

23.     The Plan cannot be confirmed because the Plan is not feasible.  Sections 2.01 and 2.04 of the Plan provide that administrative expenses and priority taxes will be paid in full on the Effective Date.  It is not clear from the Plan or Disclosure Statement the source of cash for

---

15 *In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) ("These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. . . . The fresh start §524(e) provides to debtors is not intended to serve this purpose.").

16 *See* Plan, §§ 6.08, 6.10 (providing that equity in Reorganized Consolidated and Reorganized Standard shall be issued to existing equity holders) and (providing that Michael B. Wisenbaker (the Debtors' current principal) will be the sole director and officer of Reorganized Standard).

17 Plan, § 6.06(f).

payment of administrative expenses and priority taxes, but it appears that the source of payment

will be from "Available Cash" as defined in the Plan.  On information and belief, the Debtors'

"Available Cash" means any remaining cash available under the post-petition financing facility.

Because the post-petition financing facility is equal to approximately $4.6 million, and $2

million of such financing is earmarked for the Pat Howell well, it can be presumed that

"Available Cash" will not exceed $2.6 million.[18]  Yet, the administrative-expense claim of

Midland (i.e., the Remediation Claim) is at least $12.7 million.  Even if the Debtors' insurance

carrier tendered policy limits for the Remediation Claim (which it has far refused to do thus far),

the Debtors will not have sufficient cash to pay all administrative expenses in full on the

Effective Date.  Therefore, the Plan is not feasible and may not be confirmed.[19]  Consequently,

the Disclosure Statement should not be approved.

**D.      Disclosure Statement Contains Insufficient Background Information.**

24.      "To provide 'adequate information,' a disclosure statement should include the

events which led to the filing of chapter 11, a description of the available assets and their value,

the scheduled claims, the estimated return to creditors under a chapter 7 liquidation, and

litigation likely to arise in a non-bankruptcy context."[20]  While the Disclosure Statement contains

some required information, the description is insufficient.  Specifically, the Disclosure Statement

contains no description of (a) the pre-petition contamination giving rise to Midland's Claims; (b)

any pre-petition remediation efforts; (c) any post-petition remediation efforts; or (d) Midland's

---

18 *See Debtors Emergency Motion for Interim and Final Orders Approving: (I) Secured Postpetition Financing; (II) Related Priming Liens and Super-Priority Administrative Claims; (III) Related Secured Financing Agreement and (IV) Scheduling a Final Hearing* [Docket No. 17], ¶ 17.
19 *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full in cash of administrative expenses).
20 *Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993).

Claims or the Estimation Motion.  The Disclosure Statement should be amended to provide the above-listed information.

25.     Page 17 of the Disclosure Statement only provides a cursory overview of the events leading to bankruptcy.  Specifically, the Disclosure Statement mentions only that "a series mistakes and operational difficulties" with the Pat Howell well negatively impacted the Debtors and their ongoing obligations.  A better description of the problems with the Pat Howell well is needed, particularly given that future completion and production the Pat Howell well is virtually the entire source of recovery for unsecured creditors.

26.     Similarly, the Disclosure Statement fails to describe the events leading to a transfer of substantially all of the assets of Heritage Standard to Heritage Consolidated.  According to the Debtors' *Schedules of Assets and Liabilities*, virtually all unsecured creditors are creditors of Heritage Standard.[21]  Yet, Heritage Standard does not own the Debtors' oil and gas properties, rather those assets are owned by Heritage Consolidated.[22]  According to the Disclosure Statement, Heritage Consolidated was formed in October 2008.  The Disclosure Statement further states that the "Debtors . . . have been exploring and developing the Target Area since 1984."[23]  Upon information and belief, Heritage Standard has been in existence since 2001.  Therefore, logic indicates that Heritage Standard was previously the owner and operator of the Debtors' oil and gas assets prior to October 2008 and, in October 2008, Heritage

---

21 *Compare* Schedule F of *Schedules of Assets and Liabilities of Heritage Consolidated LLC* [Case No. 10-36484, Docket No. 93] (disputing virtually every unsecured claim) *with*  Schedule F of *Schedules of Assets and Liabilities of Heritage Standard Corp.* [Case No. 10-36485, Docket No. 25] (containing most of the Debtors' unsecured claims).

22 *Compare* Schedule A of *Schedules of Assets and Liabilities of Heritage Consolidated LLC* [Case No. 10-36484, Docket No. 93] (containing approximately $23 million of real property) *with*  Schedule A of *Schedules of Assets and Liabilities of Heritage Standard Corp.* [Case No. 10-36485, Docket No. 25] (containing less than $1 million of real property).

23 *Disclosure Statement*, pp. 15, 16.

**CITY OF MIDLAND'S OBJECTION TO DISCLOSURE STATEMENT**
**FOR THE JOINT PLAN OF REORGANIZATION FOR THE DEBTORS**                    Page 16

Consolidated was formed and the oil and gas assets transferred from Heritage Standard to Heritage Consolidated. Because the transfer left Heritage Standard with little assets to serve as a source of recovery for unsecured creditors, the Disclosure Statement should describe the facts and circumstances surrounding the transfer of assets from Heritage Standard to Heritage Consolidated.

**E.     Disclosure Statement Contains Insufficient Description of Assets.**

27.     The Plan provides that Heritage Standard's lien against Non-Section 6 Assets shall be released and Heritage Standard shall waive any claims under the Non-Section 6 JOA and the Pat Howell JOA. However, the Disclosure Statement fails to provide an explanation of the nature and value of the assets that comprise Section 6 Assets and Non-Section 6 Assets. Because unsecured creditors' source of recovery will be Section 6 Assets (and will not include any Non-Section 6 Assets), there must be an explanation of the nature and value of what assets comprise Section 6 Assets and Non-Section 6 Assets. The Plan defines those assets by referring to exhibits that list wells and working interests, but provides no explanation of whether those wells are producing or the estimated value of the wells.[24] Therefore, creditors are unable to determine whether it is advisable to vote for a plan that releases liens against Non-Section 6 Assets and forces creditors to look only to Section 6 Assets for recovery.

28.     Similarly, the Disclosure Statement contains no description of the operator's liens of Heritage Standard on the assets of Heritage Consolidated. Creditors are unable to determine the value of the operator's liens or whether the liens are senior to those of CIT. Given that unsecured creditors are paid via the Standard Secured Claim (which presumably arose because of

---

24 *See* Plan, §§ 1.85 and 1.121 (referring reader to exhibits attached to Plan for list of wells).

the operator's lien), it is crucial that creditors understand the nature of the secured claim and the assets it encumbers.

29.    The Disclosure Statement fails to describe the Debtors' insurance policies that may serve as a potential source of recovery for unsecured creditors.  According to the Debtors' *Schedules of Assets and Liabilities*, the Debtors have no insurance policies.[25]  But Articles X.G.7-8 of the Disclosure Statement reference insurance vesting in Reorganized Standard (including specific Federal Insurance Policies defined in the Plan).[26]  Upon information and belief, part of the Debtors' insurance referenced in Article X of the Disclosure Statement may be available to pay for a portion of Midland's Claims.  But there is no description of the nature of the insurance policies, the balance of policy limits available, or likelihood that such policies can satisfy claims against the Debtors' estates.  Creditors have no way of knowing whether additional insurance policies exist that may provide an avenue of recovery, such as director and officer liability insurance, insurance that may cover expenses associated with an improperly drilled well, etc. The Disclosure Statement must be amended to fully describe available insurance policies and the value of such policies.

**F.    Disclosure Statement Contains Insufficient Description of Liabilities.**

30.    Just as the Disclosure Statement fails to adequately describe the Debtors' assets, it similarly fails to describe the Debtors' liabilities.  As mentioned repeatedly herein, there is no description of Midland's Claims.  For that matter, there is no description of any claims but those of CIT.  Article II of the Disclosure Statement contains a chart that would assist creditors in

---

25 *See* Schedule B.9 of *Schedules of Assets and Liabilities* for each of Heritage Standard Corp. and Heritage Consolidated.
26 *See* Plan § 1.61; Disclosure Statement Art. X.G.7-8.

determining anticipated distribution amounts.  Unfortunately, that chart contains no estimates of the number of creditors, the claims asserted, or the Debtors' estimates of probable allowed claim amounts.

31.     As with all oil and gas bankruptcy cases, materialmen and mechanic's lien claims ("**M&M Claims**") have a large impact on recovery for unsecured creditors.   Valid M&M Claims, as with all secured claims, reduce assets available for payment of unsecured creditors. While the Disclosure Statement briefly describes the secured claim asserted by CIT, it does not describe the extent, validity, or priority of any M&M Claims, nor does it adequately describe Heritage Standard's operator's lien.  The value of M&M Claims will directly impact unsecured creditors and must be described.

32.     Moreover, the Disclosure Statement does not describe which unsecured claims are likely to be paid as part of any assumption and assignment of joint operating agreements.  As the Court is aware, to assume and assign a joint operating agreement, the Debtors must cure all defaults under those agreements.[27]   Such "cure" would include paying balances due to creditors that contracted with the operator.

33.     Finally, the Disclosure Statement fails to adequately describe insider claims.  As the Court is aware, "[a] fiduciary's dealings with those it represents are subject to rigorous scrutiny."[28]  The Disclosure Statement should describe the insider claims that will be subject to such rigorous scrutiny.

---

27 *See* 11 U.S.C. §365(b)(1)(A).
28 *In re Mesta Mach. Co.*, 67 B.R. 151, 157 (Bankr. W.D.Pa. 1986).

### G.    Disclosure Statement Contains Insufficient Description of Sale Process.

34.    On the second day of these Cases, the Debtors filed a motion to approve procedures for soliciting and accepting offers to buy substantially all of their assets.[29]  In fact, the Debtors' related request to employ an investment banker was the subject of numerous objections and a contested hearing.[30]  While the Debtors fought hard to employ an investment banker and implement a sale process, there is virtually no discussion of the sale process in the Disclosure Statement.  The Disclosure Statement contains no discussion of any pre-petition efforts to sell the Debtors' assets, nor any discussion of the Debtors' post-petition efforts.  Rather, the Disclosure Statement's most substantive discussion of the sale process is the following paragraph:

> Pursuant to the Sale Procedures Order, the offers set forth in the Purchase and Sale Agreement are subject to higher and better offer on the terms set forth in the Sale Procedures Order. Under certain circumstances set forth in the Sale Procedures Order, the Plan may be withdrawn prior to Confirmation to effectuate a transaction under an Alternative Transaction Agreement.[31]

35.    The Disclosure Statement appears to presume that the sale process will be unsuccessful and the Debtors' assets will be transferred to an entity affiliated with CIT.  There is no discussion of how a potential sale impacts recoveries to unsecured creditors or how sale proceeds will be distributed.  Nothing in the Disclosure Statement describes the Court-approved bid procedures, deadline for submitting bids, minimum bid needed to be deemed "qualified," the anticipated date of the auction, or the anticipated date of closing.  As can be seen, the two

---

29 *See Expedited Motion for Order (A) Approving Plan Support Agreement, Sale Procedures and Bid Protections in Connection with Sale of Assets; (B) Approving Form and Manner of Notice of Sale and of Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 14].
30 *See* Docket Entry for October 27, 2010.
31 Disclosure Statement, Art. VIII.C.

sentences provided in the Disclosure Statement to describe the sale process are woefully

deficient.

**H.    Disclosure Statement Contains Insufficient Description of Anticipated Claim
Amounts and Distribution Percentages.**

36.    As mentioned previously, the Disclosure Statement fails to provides creditors

with an estimate of probable recovery.   Rather, the Disclosure Statement merely states that

unsecured creditors will receive their *pro rata* share of available cash until such claims have

been paid in full.[32]  There is no discussion of anticipated claim amounts or claim recoveries, nor

is there any discussion of how long it will take for unsecured creditors to be paid.

37.    Further, the Plan and Disclosure Statement are unclear as to how the debt to CIT

is being treated.   The Plan provides that the Lender Secured Claims (i.e., debt to CIT) shall be

allowed and paid from production of the Pat Howell well and A.G. Hill well.[33]  However, there is

no indication of whether the Lender Secured Claims or how the liens securing the claims are

treated.   For example, it is unclear whether CIT will be permitted to foreclose its liens upon

default under the Plan.   The Disclosure Statement needs to be amended to clarify how the liens

securing the Lender Secured Claim will be treated.

38.    The Plan also provides that all liens against non-Debtor working interest owners

are being released.[34]  To the extent that M&M Claims encumber the working interests of non-

Debtor working interest owners, such liens against non-Debtors have value to the estates because

the claimants could look to their liens against non-Debtors for payment (which would reduce the

amount of general unsecured claims against the estates).   The Disclosure Statement fails to

---

32 Disclosure Statement, Arts. VII.D.7, VII.E.7.
33 *See, e.g.*, Disclosure Statement Art. VIII.F.3.
34 *See, e.g.*, Disclosure Statement Art. VIII.K.

describe the consideration being paid by non-Debtor working interest owners in return for such releases.

**I.      Disclosure Statement Contains Insufficient Description of How the Plan Will be Implemented and Whether the Plan is Feasible.**

39.      As mentioned above, the Pat Howell well appears to be the primary source of recovery for creditors.   However, the Disclosure Statement fails to provide a sufficient description of the Pat Howell well.   The Debtors are relying on the Pat Howell well to pay millions of dollars in creditors' claims, therefore the Disclosure Statement should contain a fulsome description of the Pat Howell well and the likelihood of successfully completing the well.

40.      The Disclosure Statement should describe: (a) the amount of funds that have been spent on the Pat Howell well to date; (b) the estimated cost to complete the well; (c) the estimated length of time it will take to complete the well; (d) who will be in charge of overseeing the completion; (e) the amount of revenue the well is expected to generate; (f) the length of time the well is expected to be a producing well; and (g) the estimated mineral reserves that underlie the well.   Further, as commodity prices are ever fluctuating, to make an informed decision, creditors must know the Debtors' assumptions as to commodity prices in determining that the Pat Howell well is a viable source of recovery for so many creditors.

41.      The Disclosure Statement also fails to set forth the amount of cash expected to be on hand on the Effective Date or whether the Plan is feasible.   Given Section 1129's requirements that administrative expenses and priority tax claims be paid in full on the Effective Date, it is important for creditors to know the amount of cash the Debtors expect to have on the

Effective Date.  Furthermore, the Disclosure Statement fails to describe plainly for creditors to understand (a) how much of that cash is to be paid to secured creditors on the Effective Date; (b) how much of that cash will be used to fund the Distribution Reserves under the Plan; and (c) the source of that cash (i.e., secured financing that must be repaid versus cash from operations).  To that end, the Disclosure Statement should also describe the amount of cash being generated by the Debtors' existing assets and estimated amount of cash that will be available to creditors in the event that completion of the Pat Howell well is unsuccessful.  Such estimates should include sufficient information for creditors to evaluate the Debtors' projections, such as anticipated (a) commodity prices; (b) expenses associated with operations; and (c) estimated useful life of the wells.

**J.      Disclosure Statement Does Not Contain Liquidation Analysis and Other Exhibits.**

42.      Without a liquidation analysis, creditors cannot determine whether confirmation of the Plan is in their best interests.  Thus, the Disclosure Statement cannot be approved without Exhibit F being completed and included with the Disclosure Statement.  Moreover, consideration of the Disclosure Statement is premature because creditors have not had a sufficient opportunity to review the liquidation analysis to determine whether that analysis meets the definition of "adequate information."[35]  A liquidation analysis is a crucial piece of information for creditors to

---

35 *See, e.g., In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr. S.D.N.Y. 1990) (finding that disclosure statement did not contain "adequate information" because liquidation analysis was flawed and stating "[t]hey and the testimony of its author indicate that the Liquidation Analysis was prepared without recognition of the nature of this industry and the Debtor's significant place in the market for its goods. In this respect, it can no longer be said that the Disclosure Statement contained adequate information on the key issue of whether the Plan satisfies the best interests test."); *In re Zaruba*, 384 B.R. 254, 256 (Bankr. D. Alaska 2008) ("The debtors appear to have dispensed with an appropriate liquidation analysis because most creditors have voted for the plans. Proper disclosure, however, is a predicate to plan solicitation and voting. Votes cannot be counted until proper disclosure has been made."); *In re Sierra-Cal*, 210 B.R. 168, 176-77 (Bankr. E.D. Cal. 1997) (denying confirmation of plan because, among other things, disclosure statement's liquidation analysis was inadequate).

determine not only whether the Plan is in the best interests of creditors, but also whether the Disclosure Statement itself contains adequate information. Therefore, the Disclosure Statement should not be approved until creditors have had a sufficient opportunity to review the liquidation analysis and determine whether it contains adequate information.

43.     Additionally, under *United Operating*, it is crucial that the Debtors describe with particularity the anticipated litigation and potential defendants that may serve as a source of recovery.[36] Therefore, without completion of Exhibits D and E, the Disclosure Statement cannot be approved.

**K.     Disclosure Statement Contains Insufficient Information Regarding Insiders.**

44.     As stated above, claims of insiders are viewed with rigorous scrutiny. Therefore, the Disclosure Statement must, but fails to, fully disclose the relationship between the recipient of equity in the Newcos and the Debtors or their creditors. Additionally, because the Debtors propose to vest Mr. Wisenbaker with equity in the Reorganized Debtors and grant Mr. Wisenbaker (and his affiliated entities) a release under the Plan (none of which are permissible), the Debtors must describe what consideration is being provided by Mr. Wisenbaker and his entities for such equity and releases.

45.     Additionally, the Disclosure Statement fails to describe the compensation that will be received by Mr. Wisenbaker from the Reorganized Debtors. According to Plan Sections 6.08 and 6.10, Mr. Wisenbaker will be the owner, sole manager, and sole director of the Debtors. Yet, there is no description in the Plan or Disclosure Statement as to the compensation that will be received by Mr. Wisenbaker. Such omission is in clear contravention of 11 U.S.C.

---

36 *See In re United Operating, LLC*, 540 F.3d 351 (5th Cir. 2008) ("If a debtor has not made an effective reservation [of a cause of action], the debtor has no standing to pursue a claim that the estate owned before it was dissolved.")

§ 1129(a)(5)(B).  Therefore, the Disclosure Statement may not be approved, nor may the Plan be confirmed, until such disclosures are made.

**L.      Disclosure Statement Contains Insufficient Description of Risks Associated with the Plan.**

46.      As stated repeatedly herein, unsecured creditors' recovery is pinned to the Pat Howell well; however, the Disclosure Statement fails to describe the risks associated with the completion of the Pat Howell well and the corresponding result to creditor recoveries if completion of the Pat Howell well is unsuccessful.

47.      Additionally, the Plan does not provide for the substantive consolidation of the Debtors, nor has such a motion been filed with the Court.  Therefore, the Plan constitutes two separate plans—one for each Debtor.  The Disclosure Statement needs to clearly state, not only that the Plan constitutes two separate plans, but also the risks associated with the Plan of only one Debtor being confirmed.

**M.      Incorporation of Objections**

48.      Midland joins and incorporates herein by reference all other objections to the Disclosure Statement filed by any creditor or party-in-interest.

WHEREFORE, Midland respectfully requests that the Court sustain this Objection and grant such other and further relief to which Midland may be entitled.

DATED:  December 10, 2010

Respectfully submitted,

**GARDERE WYNNE SEWELL LLP**

*/s/ Holland Neff O'Neil*
Holland Neff O'Neil (14864700)
Michael S. Haynes (24050735)
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201-4761
(214) 999-4961
(214) 999-4667 FAX
honeil@gardere.com
mhaynes@gardere.com

-AND-

Terry W. Rhoads (16811750)
Matt Catalano (24003918)
COTTON BLEDSOE TIGHE & DAWSON, P.C.
500 West Illinois, Suite 300
Midland, Texas 79701
Telephone (432) 685-8570
Facsimile (432) 684-6131
Email trhoads@cbtd.com

COUNSEL FOR THE CITY OF MIDLAND

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 10, 2010 a true and correct copy of the foregoing document was served electronically on all registered ECF users in this case.

*/s/ Michael S. Haynes*
Michael S. Haynes