Holland Neff O'Neil (14864700)
Michael S. Haynes (24050735)
**GARDERE WYNNE SEWELL LLP**
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201-4761
Telephone:  (214) 999-3000
Facsimile: (214) 999-4667
honeil@gardere.com
mhaynes@gardere.com

And

Terry W. Rhoads (16811750)
Matt Catalano (24003918)
**COTTON BLEDSOE TIGHE & DAWSON, PC**
500 West Illinois, Ste. 300
Midland, Texas 79701
Telephone:  (432) 897-1440
Facsimile:  (432) 682-3672
trhoads@cbtd.com
mcatalano@cbtd.com

COUNSEL FOR CITY OF MIDLAND

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| **HERITAGE CONSOLIDATED, LLC et al.,**[1] | § | **CASE NO. 10-36484-hdh-11** |
| | § | |
| | § | **(Jointly Administered)** |
| **DEBTORS.** | § | |

## CITY OF MIDLAND'S LIMITED REPLY TO DEBTORS' RESPONSE TO CITY OF MIDLAND'S MOTION FOR ESTIMATION OF CLAIMS AND OBJECTION TO CITY OF MIDLAND'S REQUEST FOR ADMINISTRATIVE CLAIM
### (RE: DOCKET NO. 371)

The City of Midland ("**Midland**"), by and through its undersigned counsel, hereby files

---

[1] Pursuant to the *Order Directing Joint Administration of Bankruptcy Cases*, Heritage Consolidated, LLC's case was jointly administered with Heritage Standard Corporation's case no. 10-26485-hdh (collectively, the "**Debtors**").

this limited reply (the "**Reply**") to the *Debtors' Response to City of Midland's Motion for Estimation of Claims and Objection to City of Midland's Request for Administrative Claim and Brief in Support* [Docket No. 371] (the "**Debtors' Response**").   In support of this Reply, Midland respectfully states as follows:

**I.**
**PRELIMINARY STATEMENT**

1.      On November 15, 2010, Midland filed the *City of Midland's Motion for Estimation of Claims for Purpose of Allowance, Voting, and Determining Plan Feasibility, and Request for Determination that Remediation Claim is Entitled to Administrative Expense Priority* (the "**Estimation Motion**").   On December 31, 2010, the Debtors filed the Debtors' Response (a) contesting the validity of and bases for Midland's claims, (b) disputing Midland's assertion that its remediation claim is entitled to administrative expense priority, and (c) asserting that Midland's claims are barred by statute of limitations and/or laches.   The allegations in the Debtors' Response are insupportable by both the facts and the applicable case law.

2.      The validity of and bases for Midland's claims will be the subject of significant expert testimony at the estimation trial (the "**Trial**") currently set to begin on January 10, 2011. For purposes of this Reply, suffice it to say that Midland disputes the Debtors' recitations of the purported scientific facts set forth in the Debtors' Response.   Further, the Debtors' reliance on the Texas Railroad Commission's ("**TRC**") alleged "approval" of its proposed remediation work plan as "evidence" refuting Midland's claims is misplaced.   The TRC has *not* approved the Debtors' remediation plan.   Rather, only the TRC's *staff* has done so, and the staff's approval has been appealed by Midland.   Regardless, any approval by the TRC of a work plan for remediation has no bearing on the amount or extent of Midland's claims; rather, approval of a remediation

plan by the TRC serves only to prevent the imposition of fines and penalties on the Debtors. However, as discussed below, the remediation plan approved by the TRC has not been approved on a *final* basis; such approval is the subject of an on-going administrative appeal proceeding before the TRC.  As to the extent of Midland's claims, the evidence at the Trial will demonstrate, among other things, that:

    i.    The staff of the TRC has undertaken no independent study to assess the extent of the contamination of the Aquifer, nor does that body have the responsibility to do so;

    ii.    The staff of the TRC undertook no valuation of the cost of remediation,[2] so its endorsement of a remediation plan has no bearing on Midland's claims; and

    iii.    The remediation plan approved by the staff of the TRC covers only a 10-year period and does not provide for complete remediation of the Aquifer to its original condition.

    3.    More importantly, the Debtors' remediation plan sent to the TRC was nothing more than a flawed academic exercise intended only to deflect mounting pressure on the Debtors by the TRC.  Based on the Debtors' Plan of Reorganization, post-confirmation, there will be no surviving entity responsible for actually implementing the remediation plan tendered to the TRC.

---

[2] Mr. Dan O'Donnell was the TRC representative vested with the obligation to review the budget to the Debtors' proposed remediation plan.  Mr. O'Donnell stipulated as follows:  "[T]he Railroad Commission agreed in the December 15 mediation in this case that Ritter's $6.5 million estimate for its plan was adequate. The Agency's review of that budget was conducted by Daniel O'Donnell, a professional engineer in the Railroad Commission's Site Remediation Section. He worked -- has worked at the Railroad Commission for 10 years and has experience in reviewing budgets in the course of his duties as a project manager over state-funded remediation of contaminated sites.  Mr. O'Donnell spent no more than 10 minutes reviewing the budget line items in the left-hand column . . . . Then he looked at the total amounts in the next column, and based on that verified that the budget included -- I'm sorry, and then verified that the budget included a month-by-month breakdown over the life of the plan. Mr. O'Donnell did not compare that budget to any other budget, nor did he compare it to the Ritter plan itself.  Based on that cursory review, Mr. O'Donnell concluded that the estimate was adequate to implement the Ritter plan."  Renfro Deposition Transcript, 158:14 – 159:14.

So whether the Debtors have gone through the motions of complying with the TRC requirement to propose a remediation plan (in order to avoid significant fines and penalties), the remediation plan proposed is of no substance.

4.      What is of substance is the Debtors' recognition that the Tubb #1A saltwater disposal well was discovered to have damaged casing in the summer of 2005, which caused saltwater to leak into the Aquifer owned by Midland.   The parties' respective experts may diverge from there, but those facts are uncontested.   As such, the Court will hear significant expert testimony on the scope of the contamination, the cost of the damage to water that cannot be cleaned-up, as well as the estimated costs of remediation, which the City contends are substantial.

5.      The remainder of this Reply will refute the Debtors' legal contentions that (a) Midland's remediation claim is not entitled to administrative expense priority, and (b) Midland's claims are barred by statute of limitations and/or laches.[3]

## II.
## RECAP OF MIDLAND'S CLAIMS

6.      The Debtors, themselves and through their predecessors, have been engaged in the exploration, acquisition, production and sale of crude oil and gas in West Texas since 1984. *See Disclosure Statement*, p. 16.  Part of those operations was in the Crittendon field in Winkler County, Texas.   Sometime in 2005, it became clear that one (or more) of the Debtors' underground injection wells being used in the Crittendon field leaked.  The leaks resulted in the release of a tremendous amount of water contaminated with chloride (and other harmful elements) into the Cenozoic Pecos Alluvium Aquifer (the "**Aquifer**").  The rights to the fresh

---

[3] In addition to the limited response contained herein, Midland reserves its rights to assert any applicable arguments at Trial.

water in the Aquifer are owned by Midland and the water is intended to be a source of drinking water for the citizens of Midland, Texas.

7.        Because of these leaks, the Aquifer is now contaminated with a "plume" of chloride infested water that is (and has been for some time) migrating through the Aquifer; thereby continually contaminating more-and-more fresh water.  Midland's experts currently estimate the plume has contaminated approximately 19,000-acre feet (approximately 6.2 billion gallons) of water within the Aquifer.  Midland has suffered damages in at least two forms as a result of the Debtors' discharge of contaminated water into the Aquifer: (a) the anticipated costs of remediating the Aquifer from the ongoing contamination (the "**Remediation Claim**") and (b) the irreparable damage and loss of water suffered by Midland as a result of the contamination (the "**Damage Claim**" and, with the Remediation Claim, the "**Claims**").

## III.
## PROCEEDING BEFORE TEXAS RAILROAD COMMISSION

8.        As stated in the Debtors' Response, the staff of the TRC approved a remediation plan proposed by the Debtors (the "**Debtor Plan**") shortly after Midland filed the Estimation Motion.  Midland asserts that approval of the Debtor Plan by the staff was error because the Debtor Plan is woefully deficient.  Consequently, on December 10, 2010, Midland filed an appeal with the TRC thereby commencing a formal proceeding.  Midland commenced the appeal in accordance with applicable procedural rules set forth in the Texas Administrative Code.  On January 4, 2011, the Debtors and Midland received from the TRC notice that Midland's appeal (Oil & Gas Docket No. 08-0268870) has been forwarded to the Docket Services Section to be set for a formal hearing.  *See* <u>Exhibit A</u> attached hereto.  On January 6, 2011, the Debtors and

Midland received notice from the TRC that the formal hearing has been set for February 7, 2011. *See* Exhibit B attached hereto.

9.      At the formal hearing, Midland will present its side to the TRC, and is confident the TRC will agree that the Debtor Plan is deficient and impose additional remediation obligations on the Debtors.  During a recent deposition, a TRC representative acknowledged that the TRC reserves all rights to enforce additional remediation obligations and, if the TRC requires additional remediation in connection with Midland's appeal, the TRC will have the right to impose fines and penalties against the Debtors for noncompliance with the additional remediation obligations.[4]  Therefore, contrary to the assertions in the Debtors' Response, approval of the Debtor Plan by the staff of the TRC is not final and likewise has no impact on the TRC's ability to impose substantial fines and penalties against the Debtors.

## IV.
## REMEDIATION CLAIM IS ENTITLED TO ADMINISTRATIVE EXPENSE PRIORITY

10.     As conceded in the Debtors' Response, the Debtors are liable under Texas law for contamination caused by the Debtors' operations, and are obligated under state law to remediate the contamination.  Actual costs of remediation—whether incurred by the Debtors, the Texas Railroad Commission, or Midland—to bring the Debtors' estates in compliance with state law (i.e., to remediate the property) are entitled to administrative expense priority.  The Debtors' Response contends that entitlement to administrative expense priority is dependent on whether the claimant has authority to exercise "police" or "regulatory" authority.  Such contention misses the mark—the issue is not whether the claimant can enforce state law, the issue is whether

---

[4] Specifically, David Cooney—a Rule 30(b)(6) Representative of the TRC—testified "I will never say that this Commission will ever give up its right to assert its entitlement to penalties so long as they're called for by the fact in law in our opinion."

**CITY OF MIDLAND'S LIMITED REPLY TO DEBTORS' RESPONSE TO
CITY OF MIDLAND'S MOTION FOR ESTIMATION OF CLAIMS AND
OBJECTION TO CITY OF MIDLAND'S REQUEST FOR ADMINISTRATIVE CLAIM**            **Page 6**

amounts expended bring the estates in compliance with state law.  In this instance, Midland's remediation claim is necessary to bring the estates in compliance with state law.  Therefore, Midland's remediation claim is entitled to administrative expense priority.

11.     Midland's Remediation Claim should be allowed as an administrative expense under 11 U.S.C. § 503(b) ("**Section 503**").  Section 503(b)(1)(A) provides that administrative expenses shall include "actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  Additionally, 28 U.S.C. § 959(b) ("**Section 959**") provides that "… a debtor in possession [] shall manage and operate the property in his possession as such trustee . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."  28 U.S.C. § 959(b).

12.     Section 959, read in conjunction with Section 503, provides that the Debtors' post-petition obligation to remediate the Aquifer gives rise to administrative expense for the cost of such remediation.

13.     The Debtors contend that their obligation to remediate the Aquifer gives rise to an administrative expense *only* in two instances—first, if the contaminated property is "property of the estate;" second, if the party asserting the claim is exercising "police power."  *See* Debtors' Response, pp. 9-11.

14.     The Debtors' contention is wrong.  First, the Debtors are obligated to operate their property according to the requirements of applicable state law pursuant to 28 U.S.C. § 959(b).  The Debtors do not dispute that Heritage Standard owns the Tubb #1A saltwater disposal well.  They also do not dispute that leakage from the well caused contamination.  While an

administrative expense under 11 U.S.C. § 503 is normally associated with costs necessary to preserve the estate (such as "estate" property), environmental claims are different. As discussed below, applicable law imposes an obligation to remediate environmental contamination post-petition, regardless of ownership of the property. It is the fact that the Debtors <u>caused</u> the contamination that dictates the Debtors' responsibilities to remediate under applicable law thereby imposing a responsibility to remediate that continues even in bankruptcy; thus, the costs are administrative. Here, state law requires the party causing the contamination to clean up its mess (regardless of where the mess was made), and the expenditure of funds necessary to remediate the mess gives rises to an administrative expense.

15.    Second, it is not necessary that the party asserting the administrative expense be a "regulatory" authority enforcing the Debtors' remediation obligations. Rather, if the costs of remediation serve to place the Debtors in compliance with state law, the expenditure is entitled to administrative expense regardless of who expends the funds.

**A.    Remediation As Administrative Expense: The U.S. Supreme Court in *Midlantic***

16.    The seminal case on the allowance of environmental remediation claims as administrative expenses was *Midlantic National Bank v. New Jersey Dept. of Envtl. Prot.,* 474 U.S. 494, 496-97 (1985). In *Midlantic*, Quanta Resources Corporation ("**Quanta**") processed waste oil on two sites. The New Jersey Department of Environmental Protection ("**NJDEP**") discovered that Quanta had accepted more than 400,000 gallons of contaminated oil in violation of Quanta's permit. The NJDEP ordered Quanta to cease operating at one of its sites and entered into negotiations regarding cleanup. On October 6, 1981, prior to reaching an agreement with NJDEP, Quanta filed for bankruptcy under chapter 11 of the Bankruptcy Code. The next day,

NJDEP entered an administrative order requiring Quanta to clean up the site.  The following month Quanta converted its bankruptcy to a liquidation under chapter 7.

17.      The chapter 7 trustee determined that the best action was to abandon the property pursuant to section 554(a).  The State of New York ("**New York**") objected to the abandonment, arguing that abandonment "would threaten the public's health and safety, and would violate state and federal environmental law."  *See id.* at 498.  New York argued that under 28 U.S.C. § 959(b), the trustee was obligated to "manage and operate" the property of the estate "according to the requirements of the valid laws of the State in which such property is situated."  Upon ultimate appeal to the U.S. Supreme Court, the Court noted its prior decision in *Ohio v. Kovacs*,[5] which established that a "'person or firm may not maintain a nuisance, pollute the waters of the State or refuse to remove the source of such conditions.'"  *See id.* at 502 (quoting *Ohio v. Kovacs*, 469 U.S. 274, 285 (1985)).  The Court further noted that 28 U.S.C. § 959(b) requires a trustee to "manage and operate the property in his possession … according to the requirements of the valid laws of the State."  *See id.* at 505.

18.      The Court concluded that section 554 does not pre-empt all state and local laws.  "The Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety."  *See id.*  "[W]e hold that a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards."  *See id.*  at 507.

---

5 Ohio v. Kovacs, 469 U.S. 274, 285 (1985).

**B.      Fifth Circuit Holds Environmental Claims Entitled to Administrative Expense Priority**

19.      In *In re H.L.S. Energy Co., Inc.*, 151 F.3d 434 (5th Cir. 1998), the Fifth Circuit relied on *Midlantic* in holding that, not only was a trustee restricted from abandoning contaminated property, the post-petition costs for addressing environmental obligations can be administrative expenses.  Specifically, in *H.L.S. Energy*, the Fifth Circuit held that the costs of plugging oil and gas wells would be granted administrative priority.  H.L.S. Energy Co., Inc. ("**HLS**") engaged in oil and gas development and filed a chapter 11 petition for bankruptcy in 1991.  The chapter 11 trustee formulated a plan to sell off the viable assets of the debtor, while maintaining those that were not profitable.  During the bankruptcy proceeding, the TRC brought an action requiring HLS to plug certain inactive oil wells in which HLS had a working interest. The Texas Administrative Code required that an inactive or dry well be plugged within one year of cessation of drilling or operations.  The estate did not have sufficient resources to plug the wells, and the TRC plugged the wells.  The TRC then filed a claim requesting administrative priority for its expenses incurred plugging the wells.

20.      The Fifth Circuit held that under 28 U.S.C. § 959, a trustee must comply with state law.  Because the Texas Administrative Code required plugging of wells within a year of becoming inactive, and the debtor's wells became inactive either post-petition or after a year prior to the petition, the plugging obligations occurred post-petition.  Therefore, "a combination of Texas and federal law placed on the trustee an inescapable obligation to plug the unproductive wells, an obligation that arose during the chapter 11 proceedings."  *See In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 438 (5th Cir. 1998).  "The unplugged unproductive wells operated as a legal liability on the estate, a liability capable of generating losses in the nature of substantial fines

every day the wells remained unplugged." *See id.* The Fifth Circuit held that the cost of plugging the wells was an actual and necessary cost of managing the estate, which should be allowed administrative priority. *See id.*

21.     As with *H.L.S. Energy*, the Heritage Debtors have an ongoing obligation to remediate the Aquifer.  Under Texas law, the Debtors have an affirmative obligation not to pollute subsurface water.  *See* Tex. Admin. Code § 3.8(b) ("No person conducting activities subject to regulation by the commission may cause or allow pollution of surface or subsurface water in the state."); Tex. Admin. Code § 3.9 ("Any person who disposes of saltwater or other oil and gas waste by injection into a porous formation not productive of oil, gas, or geothermal resources shall be responsible for complying with this section, Texas Water Code, Chapter 27, and Title 3 of the Natural Resources Code.").  Obviously, the Debtors violated applicable state law by contaminating the Aquifer and are subject to substantial post-petition fines and penalties if the Aquifer is not remediated.[6]  Therefore, the Debtors' obligation to remediate the Aquifer constitutes an ongoing, post-bankruptcy obligation and gives rise to an administrative expense.

## C.     Pre-Petition Contamination Gives Rise to Administrative Expense

22.     Because the plugging liability in *H.L.S. Energy* arose post-petition, the Fifth Circuit did not address whether an environmental obligation that arose pre-petition was entitled to an administrative expense.[7]  However, the Southern District of Texas later relied on *H.L.S. Energy* in holding that an environmental obligation that accrued pre-petition is an administrative

---

[6] Also, such violations subject the Debtors to fines and penalties of up to $10,000 **per day**, which may be imposed by the Texas Railroad Commission.  *See* Tex. Water Code § 27.1011 ("If a person violates the provisions of this chapter . . . the person may be assessed a civil penalty by the railroad commission.  The penalty may not exceed $10,000 a day for each violation.  Each day a violation continues may be considered a separate violation for purposes of penalty assessments.").

[7] *See In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 439 (5th Cir. 1998) ("Because the plugging requirement here accrued post-petition, we need not reach the question whether post-petition expenses for the remediation of pre-petition environmental liabilities would likewise constitute an administrative expense.").

expense if necessary to bring the estate in compliance with state law because the estate receives

the benefit of avoiding substantial fines and penalties that could be imposed on the debtor for

non-compliance.

23.    In *In re American Coastal Energy Inc.,* 399 B.R. 805 (Bankr. S.D. Tex. 2009),

American Coastal Energy Inc. ("**American Coastal**") operated oil and gas wells.  Prior to

American Coastal filing for bankruptcy, eight of its wells became inactive for over a year, which,

under Texas law, required that they be plugged.  The TRC issued an order requiring American

Coastal to plug the wells.  Approximately one year after the TRC order was issued, American

Coastal filed its chapter 11 bankruptcy petition.  Thereafter, the TRC was required to plug four

of the wells and filed a claim against American Coastal seeking administrative priority for its

costs.  Relying on *Midlantic* and 28 U.S.C. § 959, the bankruptcy court determined that the

debtor must comply with state and federal laws and could not circumvent that responsibility by

abandoning estate property if public safety prohibited abandonment.  Texas law "imposes a

continuing duty to plug the wells at issue.  That continuing state law health and safety duty

makes the plugging obligation a post-petition obligation that has pre-petition antecedents." *See

id.* at 811.

24.    The court determined "that expenses incurred to comply with state or federal

environmental or safety laws are actual and necessary costs of preserving the estate." *See id.* at

812 (citing *Wall Tube* at 121-22).  The bankruptcy court held that *Midlantic* requires only a court

to determine whether a debtor is violating a statute "reasonably designed to protect the public

health or safety from identified hazards. . . ." *See id.* (citing *Midlantic* at 507).[8]

---

[8] *In re Americal Coastal Energy Inc.* disagreed with a portion of *In re Nat'l Gypsum Co.*, 139 B.R. 397, 413 (N.D.
Tex. 1992), which granted administrative expense priority for environmental claims whose "costs were necessitated

25.     The *American Coastal* court also determined that "environmental claims arising from a pre-petition liability do not fit within the same framework as trade-creditor claims arising from pre-petition liabilities." *See id.* at 816.  The court concluded that because the debtor must comply with state laws, expenses to bring the estate into compliance are entitled to administrative priority:

> Under § 959 and *Midlantic*, American Coastal's obligation to plug the wells in accordance with Texas law is a continuing post-petition obligation. American Coastal's continuing post-petition duty to conform with Texas law renders expenditures necessary to conform with that law actual and necessary costs of preserving the estate entitled to § 503(b)(1)(a) administrative priority.

*Id.* at 811-12.

26.     "[E]xpenditures for remedying violations of environmental and safety laws are necessary to preserve the estate, regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition." *See id.*[9]  Here, the Debtors have an

---

by conditions that posed an imminent and identifiable harm to the environment and public health." *In re Nat'l Gypsum Co.* was decided prior to *H.L.S. Energy*. *Compare In re Nat'l Gypsum*, 139 B.R. 398 (N.D. Tex. 1992) *and In re H.L.S. Energy Co.*, 151 F.3d 434 (5th Cir. 1998).  *H.L.S. Energy* effectively removed the "imminent and identifiable harm" standard imposed by *In re Nat'l Gypsum* by holding that an environmental claim is entitled to administrative expense if there exists a post-petition obligation to address the environmental liability according to applicable state law.  *In re H.L.S. Energy Co.*, 151 F.3d at 438 ("The failure of the trustee in *In re Al Copeland Enters.*, 991 F.2d 233, 239 (5th Cir. 1993) to fulfill his state law obligations resulted in further liability under state law, liability that was given priority as an administrative expense.  Similarly, the instant trustee's failure to plug the wells resulted in the state's action in plugging them, an action for which the bankrupt estate was obligated to pay. This, too, must be given priority.").

[9] *See also In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 120, 124 (6th Cir. 1987) ("We believe the above-cited authority to be per-suasive. It is undisputed that the hazardous wastes still within the debtor's estate after the 1984 conveyance presented a danger to the public's health and safety. The State of Tennessee, in the absence of compliance by the debtor's estate, was entitled by its own law to expend funds to assess the gravity of the environmental hazard. We thus find those expenses to be actual and necessary, both to preserve the estate in required compliance with state law and to protect the health and safety of a potentially endangered public."); *In re Chateaugay Corp.*, 944 F.2d 997, 1010 (2d. Cir. 1991) (affirming a District Court holding which "ruled that all clean-up costs assessed post-petition with respect to sites currently owned by [debtor] where there has been a pre-petition release or threatened release of hazardous wastes will be entitled to administrative priority."); *Commonwealth of Pennsylvania, Dept. of Envtl. Res. v. Conroy*, 24 F.3d 568, 569 (3d. Cir. 1994) (holding that post-petition costs to clean up property of the debtor due to pre-petition contamination can be allowed as administrative expense.); *In re Stevens*, 68 B.R. 774, 782-83 (D. Maine 1987) (holding that post-petition costs for cleaning property

ongoing obligation to remediate the Aquifer under Texas law regardless of when the contamination occurred.  That ongoing obligation is an administrative expense.

## D.   Administrative Expense Not Limited to Regulatory Agency

27.   The Debtors assert that, because the Aquifer is not property of the estate, only the TRC, as the regulatory authority, can assert an administrative expense.  *See* Debtors' Response, p. 10 ("or if the **RRC** was incurring post-petition costs to remediate the *Debtors* [sic] *property*, then the **RRC** would have the right to seek an administrative claim.") (emphasis added).  The Debtors are wrong.  The issue is not whether the regulatory agency incurs the remediation costs; the issue is whether the remediation costs are necessary to bring the Debtors in compliance with state law.  For example, in *First Virginia Bank of Tidewater v. Virginia Builders, Inc. (In re Virginia Builders)*, 153 B.R. 729 (Bankr. E.D. Va. 1993), a bank foreclosed on property that a debtor had contaminated.  After the foreclosure, the bank expended funds necessary to remediate the property even though it was no longer owned by the debtor, and asserted an administrative expense claim in the debtor's bankruptcy proceeding.  The debtor argued that the bank was not entitled to an administrative expense claim because (a) the contamination occurred prepetition and (b) the property was not owned by the estate and, therefore, the remediation did not benefit the estate.

28.   In holding that the bank was entitled to an administrative expense claim, the bankruptcy court noted that the state of Virginia could have ordered the debtor to remediate the property, but did not order such remediation because the bank had already undertaken the

---

of the estate, drums containing contaminated oil, could be allowed administrative priority); *In re Great Northern Forest Prod., Inc.*, 135 B.R. 46, 61 (Bankr. W.D. Mich. 1991) ("Therefore, following the analysis in *Wall Tube*, any pre-petition environmental damage caused by property of the estate will enjoy administrative expense priority as long as there are actual costs incurred.").

remediation.  The bankruptcy court held that the bank's remediation had brought the debtor in compliance with state law (i.e., the debtor's obligation to remediate) and, therefore, the remediation costs incurred by the bank were entitled to administrative expense priority.  *See In re Virginia Builders*, 153 B.R. at 736.  Specifically, the bankruptcy court held:

> In this case, the debtor could not have avoided liability imposed by Virginia law if the Commonwealth had directed the clean up, and the weight of the evidence suggests the [State Water Control Board] would have mandated clean up due to the high level of contamination.
>
> Moreover, the debtor is liable under Virginia law to private parties for negligently or intentionally causing property damage arising from environmental contamination.  The bank expended funds to clean up the site which in the court's view were actual and necessary to bring the estate in compliance with state law, and to eliminate a threat to public health and safety.  Accordingly, the court must conclude the actual costs of remediation incurred by the bank are entitled to administrative expense priority.

*Id.*

29.    As correctly held by the court in *In re Virginia Builders*, ownership of the property is not relevant, nor is the identity of the party expending the funds to remediate.  Rather, the pertinent question is whether the remediation is necessary to bring the Debtors into compliance with state law pursuant to 28 U.S.C. § 959(b).   In this case, the remediation is necessary to bring the Debtors into compliance with state law.    Therefore, Midland's Remediation Claim is entitled to administrative expense priority.

30.    Until the TRC has issued a final determination as to the appropriate plan of remediation, Midland's Remediation Claim is unliquidated.  Therefore, given the Debtors' fast-track toward confirmation of a liquidating plan, it is necessary for this Court to estimate Midland's Remediation Claim.  The Debtors are obligated under Texas law to remediate the contamination since its property (Tubb #1A Well) caused the contamination.  Such obligation

continues post-bankruptcy pursuant to 28 U.S.C. § 959(b).  Because the remediation is necessary under applicable state law, the costs associated with remediating the Aquifer are an administrative expense.  The party entitled to assert the administrative expense is the party that must expend the funds to remediate the Aquifer.  Since the Debtors are effectively going out of business per their plan of reorganization, Midland, as the owner of the water, is left to ensure the remediation occurs.  Under these facts, the Court is left to conclude that Midland's Remediation Claim is entitled to administrative expense priority.

## V.
## STATUTE OF LIMITATION / LACHES NOT APPLICABLE

31.     The Debtors' Response also states that Midland's claims are time barred by Section 16.003 of the Texas Civil Practice and Remedies Code.  *See* Debtors' Response, pp. 11-12.  This argument is without merit and should be dispensed with little effort.  Section 16.061 of the Texas Civil Practice and Remedies Code ("**Section 16.061**") clearly states that the statute of limitations does not apply to an incorporated city.  Specifically, that section states, in pertinent part:

> A right of action of this state or a political subdivision of the state, including a county, an incorporated city or town, a navigation district, a municipal utility district, a port authority, an entity acting under Chapter 54, Transportation Code, a school district, or an entity created under Section 52, Article III, or Section 59, Article XVI, Texas Constitution, is not barred by any of the following sections:  16.001-16.004, 16.006, 16.007, 16.021-16.028, 16.030-16.032, 16.035-16.037, 16.051, 16.062, 16.063, 16.065-16.067, 16.070, 16.071, 31.006, or 71.021.

TEX. CIV. PRAC. & REM. CODE § 16.061.

32.     Midland is an incorporated city.  Thus, any argument that Midland's Claims are time barred is disingenuous and contrary to the plain reading of Section 16.061.

33.     The Debtors also argue that Midland cannot rely on Section 16.061 based on the doctrine of "laches." The Debtors' defense of laches also fails. First, it is important to note that laches is an affirmative defense and the Debtors bear the burden to prove the elements. *See Knesek v. Witte*, 754, S.W. 2d 814, 816 (Tex. App. – Houston [1st Dist.] 1988) (citing *Culver v. Pickens,* 176 S.W. 2d 167, 170-71 (Tex. 1943)). In order to prove a defense of laches, the Debtors must show "(1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of the delay." *Caldwell v. Barnes*, 975 S.W. 2d 535, 538 (Tex. 1998) (quoting *Rogers v. Ricane Enterprises, Inc*., 772 S.W. 2d 76, 80 (Tex. 1989)). Here, Midland has not delayed asserting its rights, nor have the Debtors changed their position due to any alleged delay by Midland. Rather, Midland has been actively involved in working with the TRC and the Debtors in an attempt to reach an agreement on a remediation plan. Midland's involvement, and the Debtors' knowledge of Midland's Claims, dates back to 2005. In fact, it was Midland who notified the Debtors, and then the TRC, of the apparent contamination in 2005. Midland has been active, but patient, with the Debtors in an attempt to reach a consensual resolution of the remediation of the Aquifer. Unfortunately, the Debtors' bankruptcy and impending cessation of operations requires Midland to assert its Claims in this forum. These facts clearly preclude any showing by the Debtors of an unreasonable delay by Midland in asserting its rights.

34.     Further, by their own admissions, the Debtors have "…expended over $2 million dollars to remediate the contamination," which demonstrates not only the Debtors' direct liability for the contamination, but that the Debtors have been aware of Midland's Claims and have taken

specific action consistent with that knowledge.  The Debtors cannot now contend that they experienced a good-faith change of position to their detriment.

35.    Additionally, "laches should not bar an action on which limitations has not run unless allowing the action 'would work a grave injustice.'"  *See Caldwell v. Barnes* 975 S.W. 2d at 538 (quoting *Culver*, 176 S.W. 2d at 170).  Midland, as stated above, is not subject to the general statutes of limitations found in the Tex. Civ. Prac. & Rem. Code § 16.003.  Pursuant to Section 16.061, there is *no* statute of limitations that could run on Midland's Claims, and as discussed above, the Debtors cannot show any injustice; therefore, laches does not apply.

36.    Finally, numerous courts have limited the application of laches to equitable actions or actions at law that are equitable in character.  *See, Wayne v. A.V.A. Vending, Inc.,* 52 S.W. 3d 412, 415 (Tex. App. – Corpus Christi 2001) (holding that laches does not apply to a claim based strictly on legal grounds) (citing *Brewer v. Nationsbank of Texas, N.A.,* 28 S.W. 3d 801 (Tex. App. – Corpus Christi 2000); *In re Moragas*, 972 S.W. 2d 86, 92 (Tex. App. – Texarkana 1998)).

WHEREFORE, Midland respectfully requests that the Court grant the relief requested in the Estimation Motion and such other and further relief to which Midland may be entitled.

DATED:  January 7, 2011

Respectfully submitted,

**GARDERE WYNNE SEWELL LLP**

*/s/ Holland Neff O'Neil*
Holland Neff O'Neil (14864700)
Michael S. Haynes (24050735)
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201-4761
(214) 999-4961
(214) 999-4667 FAX
honeil@gardere.com
mhaynes@gardere.com

-AND-

Terry W. Rhoads (16811750)
Matt Catalano (24003918)
COTTON BLEDSOE TIGHE & DAWSON, P.C.
500 West Illinois, Suite 300
Midland, Texas 79701
Telephone (432) 685-8570
Facsimile (432) 684-6131
Email trhoads@cbtd.com

COUNSEL FOR THE CITY OF MIDLAND

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 7, 2011 a true and correct copy of the foregoing

document was served electronically on all registered ECF users in this case.

*/s/ Michael S. Haynes*
Michael S. Haynes



MICHAEL L. WILLIAMS, CHAIRMAN
ELIZABETH A. JONES, COMMISSIONER
VICTOR G. CARRILLO, COMMISSIONER

LINDIL C. FOWLER, JR., GENERAL COUNSEL
COLIN K. LINEBERRY, DIRECTOR
HEARINGS SECTION

# RAILROAD COMMISSION OF TEXAS
## OFFICE OF GENERAL COUNSEL

January 4, 2011

Mark A. Mayfield
Gardere Wynne Sewell, LLP
600 Congress Avenue, Suite 3000
Austin, Texas 78701

Re:    **Oil & Gas Docket No. 08-0268870**; Interim Appeal by the City of Midland, Texas
of Approval of Site Remediation Work Plan - Operator Cleanup Program No. 08-
4175

Dear Mr. Mayfield:

I have reviewed the referenced filing and have forwarded to the Docket Services Section to set for a hearing at which the City of Midland will have the opportunity to show why RRC Staff approval of the final work plan submitted on behalf of Heritage Standard Corporation regarding remediation and monitoring in the Crittendon Field area, Winkler County, Texas should be vacated or the work plan modified.

You will be sent a formal notice of hearing setting forth the time and date for the hearing. If you have any questions, please feel free to call.

Sincerely,

Colin K. Lineberry
Director, OGC Hearings Section
Railroad Commission of Texas

cc:    Service List Attached:



RECEIVED
JAN - 6 2011
By_____

**Mark A. Mayfield**                                                                  Page 2
**January 4, 2011**

Service List

Holland Neff O'Neil                          Lowell Williams - RRC, Austin
Michael S. Haynes                            John Griffin - RRC, Austin
Gardere Wynne Sewell, LLP                    John Tintera - RRC, Austin
3000 Thanksgiving Tower                      William C. Renfro - RRC, Austin
1601 Elm Street
Dallas, Texas 75201-4761

Terry W. Rhoads
Matt Catalano
Cotton Bledsoe Tighe & Dawson, P.C.
500 West Illinois, Suite 300
Midland, Texas 79701

Keith Stretcher
City Attorney for Midland
P.O. box 1152
Midland, Texas 79702

Heritage Standard Corporation
Kevin McCullough
Scott DeWolf
Rochelle McCullough LLP
325 N. St. Paul St, Suite 4500
Dallas, Texas 75201

Hal Morris
OAG - Assstant Attorney General
Managing Attorney, Bankruptcy &
Collections Division
P.O. Box 12548
Austin, Texas 78711-2548

Heritage Standard Corporation
C/O Scott Pinsonnault, Bridge As
1700 Pacific Ave, Ste 2680
Dallas, Texas 75201

## RAILROAD COMMISSION OF TEXAS
## OFFICE OF GENERAL COUNSEL

OIL AND GAS DOCKET
NO. 08-0268870

IN RE:  CONSERVATION AND PREVENTION
OF WASTE OF CRUDE PETROLEUM
AND NATURAL GAS IN THE STATE
OF TEXAS

Austin, Texas
January 6, 2011

### NOTICE OF HEARING
### COMMISSION CALLED HEARING
### UPON THE APPEAL OF THE CITY OF MIDLAND, TEXAS
### TO GIVE THE CITY THE OPPORTUNITY TO SHOW CAUSE WHY
### STAFF APPROVAL OF THE FINAL WORK PLAN SUBMITTED
### ON BEHALF OF HERITAGE STANDARD CORPORATION
### REGARDING REMEDIATION AND MONITORING IN THE
### CRITTENDON FIELD AREA
### WINKLER COUNTY, TEXAS
### SHOULD BE VACATED OR THE WORK PLAN MODIFIED

---

NOTICE IS HEREBY GIVEN to the public and to all interested persons that under the legal

authority and jurisdiction of Title 3, Oil and Gas, Subtitles A, B, and C of the Texas Natural

Resources Code, Chapters 26, 27 and 29 of the Texas Water Code, and TEX. GOV'T CODE ANN.

art. §§ 2001 *et seq.* (2010), the RAILROAD COMMISSION OF TEXAS will hold a hearing on

**FEBRUARY 7, 2011, at 9:00 a.m.** at the William B. Travis State Office Building, 1701 N.

Congress Avenue, Austin, Texas.  This hearing will be conducted in conformity with the TEX.

GOV'T CODE ANN. §§ 2001 *et seq.* (2011).  For room assignment, on the date of the hearing please

check the bulletin board in the 1st Floor lobby.  Persons planning to attend this hearing are urged to

contact the complainant's representative (see service list) immediately prior to the hearing date to

be sure that the hearing will proceed on the scheduled date.

**OIL AND GAS DOCKET NO. 08-0268870**                                           **PAGE 2**

This hearing will be held to consider the appeal of The City of Midland, Texas, and give
the City the opportunity to show cause why Staff approval of the final work plan submitted
on behalf of Heritage Standard Corporation regarding remediation and monitoring in the
Crittendon Field Area, Winkler County, Texas, should be vacated or the work plan modified.
The work plan at issue is designated as Operator Cleanup Program No. 08-4175 and was
approved by the Railroad Commission's Site Remediation Staff on or about November 30,
2010 (the "Final Crittendon Field work plan"). Failure of the City of Midland to appear and
show cause at designated time and place for this hearing may result in the issuance of a final
order approving the final Crittendon Field work plan without further notice or opportunity
for hearing.

If you have questions regarding this application, please contact the Complainant's
representative, Mark Mayfield, at (512) 542-7115 . If you have any questions regarding the
hearing procedure, please contact the Railroad Commission, Office of General Counsel, at
(512) 463-6848.

IF A CONTINUATION IS NECESSARY, this hearing will proceed at the William B. Travis
State Office Building, Austin, Texas, and, to the extent possible, on subsequent working days. The
room number and exact time of the continuation will be announced on the record in this proceeding
and recorded with Docket Services, Office of General Counsel, Railroad Commission of Texas.

PURSUANT TO SAID HEARING, the Commission will enter such rules, regulations, and
orders as in its judgment the evidence presented may justify.

**OIL AND GAS DOCKET NO. 08-0268870**                                      **PAGE 3**

ANY REQUEST FOR POSTPONEMENT of this hearing must be received no later than five (5) working days prior to the scheduled date shown above. Copies of such request must be forwarded to all parties shown on the service list.

TO APPEAR IN SUPPORT OF OR IN OPPOSITION TO THIS PROCEEDING, a party other than the applicant must file with Docket Services, Office of General Counsel, at least five (5) working days in advance of the hearing date. A copy of the notice of intent to appear should be served on the applicant and any other parties of record.

IF ANY PARTY DESIRES A WRITTEN TRANSCRIPT of the hearing by a Court Reporter, that party should notify Docket Services at (512) 463-6848, at least five (5) working days in advance of the hearing date. **If a written transcript is requested, the Commission may assess the cost of the transcript to one or more parties.** Unless any party requests a written transcript, the record will be made by audio recording.

ANY INDIVIDUAL WITH A DISABILITY who needs auxiliary aids and services in order to have an equal opportunity to effectively communicate and participate in this hearing must request such aids or services <u>at least</u> two weeks prior to the scheduled hearing by notifying the Personnel office of the Railroad Commission of Texas by mail at P.O. Box 12967, Austin, Texas 78711-2967, or by telephone at (512) 463-7327 or TDD No. (512) 463-7284.

ALL EXHIBITS FILED AS A PART OF THE RECORD in this cause must be submitted in duplicate. Data in Commission records may be incorporated by reference, but the reference must be specific, and if it includes exhibits filed in prior proceedings before the Commission, a copy of such exhibit properly identified shall be submitted for this record.

**OIL AND GAS DOCKET NO.  08-0268870**                              **PAGE 4**


THE APPLICANT MUST review this notice and the attached service list for accuracy and completeness.  The applicant shall immediately notify Docket Services, Office of General Counsel of any discrepancy or omission.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Hearing in Oil & Gas Docket No. **08-0268870** was served on each of the persons named below by depositing same in the United States Mail (or by Inter-Agency Mail), postage thereon fully prepaid, properly addressed, as follows:

MARK MAYFIELD
GARDERE WYNNE SEWELL LLP
600 CONGRESS AVE STE 3000
AUSTIN TX 78701

HOLLAND NEFF O'NEIL
MICHAEL S. HAYNES
GARDERE WYNNE SEWELL LLP
3000 THANKSGIVING TOWER
1601 ELM STREET
DALLAS TX 75201-4761

TERRY W. RHOADS
MATT CATALANO
COTTON BLEDSOE TIGHE & DAWSON P.C.
500 WEST ILLINOIS SUITE 300 E
MIDLAND TX 79701

KEITH STRETCHER
CITY ATTORNEY FOR MIDLAND
P.O. BOX 1152
MIDLAND TX 79702

HERITAGE STANDARD CORPORATION
KEVIN MCCULLOUGH
SCOTT DEWOLF
ROCHELLE MCCULLOUGH LLP
325 N. ST. PAUL ST SUITE 4500
DALLAS TX 75201

HERITAGE STANDARD CORPORATION
C/O SCOTT PINSORMAULT BRIDGE
1700 PACIFIC AVE STE 2680
DALLAS TX 75201

HAL MORRIS
OAG · ASSSTANT ATTOMEY GENERAL
MANAGING ATTORNEY BANKRUPTCY &
COLLECTIONS DIVISION
P.O. BOX 12548
AUSTIN TX 78711-2548

LOWELL WILLIAMS
DIRECTOR ENFORCEMENT OGC
RRC - AUSTIN

JOHN GRIFFIN
STAFF ATTORNEY
RRC - AUSTIN

JOHN TINTERA
EXECUTIVE DIRECTOR
RRC-AUSTIN

WILLIAM C. RENFRO
OIL AND GAS DIVISON
RRC-AUSTIN

On this the **6th** day of **January**, 2011.

*DOLORES HOWARD*
_____
Office of General Counsel, RAILROAD
COMMISSION OF TEXAS