Holland Neff O'Neil (14864700)
Michael S. Haynes (24050735)
**GARDERE WYNNE SEWELL LLP**
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201-4761
Telephone:  (214) 999-3000
Facsimile: (214) 999-4667
honeil@gardere.com
mhaynes@gardere.com

And

Terry W. Rhoads (16811750)
Matt Catalano (24003918)
**COTTON BLEDSOE TIGHE & DAWSON, PC**
500 West Illinois, Ste. 300
Midland, Texas 79701
Telephone:  (432) 897-1440
Facsimile:  (432) 682-3672
trhoads@cbtd.com
mcatalano@cbtd.com

COUNSEL FOR CITY OF MIDLAND

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| HERITAGE CONSOLIDATED, LLC et al.,[1] | § | CASE NO. 10-36484-hdh-11 |
| | § | |
| | § | **(Jointly Administered)** |
| DEBTORS. | § | |

**CITY OF MIDLAND'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, City of Midland ("**Midland**"), and submits its proposed Findings of Fact

and Conclusions of Law as follows:

---

[1] Pursuant to the *Order Directing Joint Administration of Bankruptcy Cases*, Heritage Consolidated, LLC's case was jointly administered with Heritage Standard Corporation's case no. 10-26485-hdh (collectively, the "**Debtors**").

# I.
# FINDINGS OF FACT

**A.   Debtors' Pre-Petition Operations Result in Contamination of Aquifer**

1.   The Debtors have been engaged in the exploration, acquisition, production and sale of crude oil and gas since 1984.

2.   A waste byproduct of oil and gas operations is water containing various contaminates, including chloride.

3.   The contaminated water (referred to as "salt water" or "produced water" in the oil and gas industry) must be disposed of in a method that does not contaminate fresh water sources.

4.   A common method of disposing of salt water in oil and gas operations is to (a) convert an oil and gas well that is no longer producing into a salt water disposal well (a "**SWD well**"), and (b) pump the salt water down the SWD well into an underground formation.

5.   There are strict rules, regulations, and industry practices that must be followed to prevent salt water from flowing beyond the targeted formation and into a fresh water source.

6.   Heritage Standard Corporation ("**HSC**") was negligent in its operation of the Tubb 1-A well, a produced SWD well, located on Midland's property.

7.   HSC's negligence resulted in a failure of the Tubb 1-A SWD well, resulting in contamination of the Cenozoic Pecos Alluvium and Santa Rosa Aquifers (the "**Aquifer**").

8.   At all times relevant, the rights to the water in the Aquifer were owned by Midland.

9.   The water in the Aquifer is intended to serve as a future source of fresh water for the citizens of Midland in the near future.

10.   HSC discovered in June 2005 that the 4 ½ inch casing of the Tubb #1-A well (an SWD well) had lost its integrity, with perforations located across the groundwater zones.

11. Midland began notifying HSC in June through August 2005 of increased chloride levels in the Aquifer.

12. Midland and HSC discussed the situation throughout 2005 through 2007 regarding the contamination and the Debtors' need to remediate the Aquifer.

13. The volume of contaminated groundwater is at least 19,000 acre-feet (approximately 6.2 billion gallons) based on the plume delineation and the estimated volume of brine lost from the HSC's SWD well.

14. The plume of contaminated water continues to migrate through the Aquifer.

**B.    Proceedings Before the Texas Railroad Commission**

15. Midland filed a formal complaint with the Texas Railroad Commission (the "**RRC**") in May 2007.

16. In the late spring of 2010, both the Debtors and Midland submitted reports from their respective experts outlining the findings of each to the local RRC office.

17. The matter was referred by the local district office to the Austin office for review and action.

18. In a letter dated September 8, 2010, to the Debtors' expert, the RRC requested an extensive investigation to completely delineate the plume and propose a plan that establishes hydraulic control of the affected groundwater movement, while reminding the Debtors' expert that a natural attenuation by dispersal model or method alone would not be acceptable.

19. On November 30, 2010, the staff of the RRC approved a remediation plan proposed by the Debtors (the "**Debtor Plan**").

20. On December 10, 2010, Midland filed an appeal with the RRC thereby commencing a formal proceeding.

21. Midland commenced the appeal in accordance with applicable procedural rules set forth in the Texas Administrative Code.

22. On January 4, 2011, the Debtors and Midland received from the RRC notice that Midland's appeal (Oil & Gas Docket No. 08-0268870) has been forwarded to the Docket Services Section to be set for a formal hearing.

23. On January 6, 2011, the Debtors and Midland received notice from the RRC that the formal hearing has been set for February 7, 2011.

24. At the formal hearing, the RRC will consider the appeal of Midland, and give Midland the opportunity to show cause why staff approval of the Debtor Plan should be vacated or modified.

25. The RRC has reserved all rights to enforce additional remediation obligations and, if the RRC requires additional remediation in connection with Midland's appeal, the RRC will have the right to impose fines and penalties against the Debtors for noncompliance with the additional remediation obligations.

26. The staff of the RRC has undertaken no independent study to assess the extent of the contamination of the Aquifer, nor does that body have the responsibility to do so.

27. The staff of the RRC undertook no valuation of the cost of remediation, so its endorsement of a remediation plan has no bearing on Midland's Claims.

28. The remediation plan approved by the staff of the RRC covers only a 10-year period and does not provide for complete remediation of the Aquifer to its original condition.

C. **The Debtors' Bankruptcy Cases**

29. The Debtors commenced their chapter 11 bankruptcy proceedings on September 14, 2010.

30. Pursuant to Sections 1107 and 1108, the Debtors are operating their business and properties as debtors-in-possession.

31. On September 17, 2010, the Debtors filed the Disclosure Statement for the Joint Plan of Reorganization for the Debtors [Docket No. 38] (the "**Disclosure Statement**"), which contained as an exhibit the Debtors' current draft of their Joint Plan of Reorganization for the Debtors (the "**Plan**").

32. The Plan provides that allowed administrative expenses shall be paid in full on the "Effective Date" of the Plan.

33. The Plan contemplates a transfer of substantially all of the Debtors' assets to a third party, leaving the Debtors with virtually no assets or operations.

**D.    Need To Estimate Midland's Claims**

34. By estimating Midland's Claims (defined below) for allowance, voting, and feasibility purposes, the Debtors and parties-in-interest avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions.

35. Midland's Claims must be estimated because they are currently unliquidated.

36. The damages asserted by Midland are not easily ascertainable, nor are they capable of ready determination and precision in computation.

37. Both the remediation costs and calculation of damages are based on a series of geologic and financial models.

38. Estimation of Midland's Remediation Claim (defined below) will establish for the Debtors the amount of remediation expenses that must be provided for as an administrative expense on the Effective Date of the Plan; similarly, estimation of Midland's Damage Claim

(defined below) will establish Midland's entitlement to a *pro rata* share of the Debtors' estate and the value of its vote.

39. Midland's Claims must be estimated prior to the Court's consideration of whether to approve the Disclosure Statement.

40. Failure to estimate the Claims will disadvantage the creditors of the Debtors.

41. Without estimating the Claims, the Debtors will have to fully resolve the Claims or maintain a significant reserve for these Claims before making distributions.

42. Estimation of the Claims is in the best interests of the estates and their creditors.

**E.  Damage to Midland**

43. Midland's damages are expressed in two remedies: (a) diminution of fair market value; and (b) cost of repair / restoration.

44. Midland's repair damages are composed of two forms: (a) the anticipated costs of remediating the Aquifer from the ongoing contamination (the "**Remediation Claim**") and (b) the irreparable damage and loss of water suffered by Midland as a result of the contamination (the "**Damage Claim**" and, with the Remediation Claim, the "**Claims**").

**F.  Costs to Remediate the Aquifer**

45. Approximately seven (7) new monitor wells, located to the southeast and east of the current plume monitor wells, will be necessary to finish delineation of the brine plume.

46. These monitor wells will be drilled to 550 to 600 feet.

47. Delineation is necessary to determine the extent of the migration and to monitor the remediation's progress.

48. The estimated cost of ascertaining the size of the plume is approximately $350,000 to $400,000.

49. There are three remediation options available to Midland to remediate the Aquifer: the (a) Aquifer Restoration Program, (b) One Pore Volume Program, and (c) Treat at Point of Use Program.

### *Aquifer Restoration Program*

50. Remediation of brine-impacted groundwater typically entails pumping and treating the water to both contain the plume and effect remediation.

51. To accomplish remediation (reducing chloride, total dissolved liquids, and other harmful chemical concentrations to acceptable regulatory levels), the volume of groundwater pumped is usually several times the volume of water in the plume (a term referred to as "pore volume sweeps").

52. A conservative estimate of four (4) pore volume sweeps will be needed to restore the water to its "pre-contamination" state.

53. Using that estimate, the expected volume of groundwater that will be forever lost is fifteen percent (15%) if the Aquifer Restoration Program ("**ARP**") is selected.

54. Eight (8) groundwater recovery wells will be required—three (3) located in the near source area and five (5) located in the distal area to the southeast and east of the plume—to provide containment and recovery of contaminant mass.

55. The system will consist of recovery wells and associated piping, a water treatment unit and associated instrumentation, fresh water injection wells and associated piping, and deep injection wells for the wastewater and associated piping.

56. The total estimated costs include capital costs (EDR plant, groundwater recovery wells, wastewater injection wells, pumps, piping, etc.), power costs, chemical costs, membrane costs, and other operations and maintenance costs such as plant operator, consultants, subcontractors, replacement equipment, etc.

57. The cumulative cost for the ARP (which would operate for about nineteen (19) years) is estimated at approximately $66,768,000, calculated as follows:

- Capital Costs (EDR plant, wells, piping, etc.)        $10,000,000
- Power, chemicals, membrane, etc.                      $36,400,000
- Other O&M (operator, consultants, subs, etc.)         $20,481,000
- **Total**                                             **$66,768,000**

58. The present value for the cost to remediate utilizing ARP using a discount rate of four percent (4%) is **$44,800,000**.

### *One Pore Volume Program*

59. A single pore volume program ("**OPVP**") utilizing similar parameters as the Aquifer Restoration option should bring the impacted water within guidelines acceptable to the Texas Commission on Environmental Quality, which is less than 300 parts per million of chloride and less than 1,000 parts per million of total dissolved solids.

60. OPVP should result in 279 parts per million of chlorides, which is an acceptable level for drinking water, but more than twice the salt concentration of the Aquifer's native groundwater.

61. The remediation cost, in present dollars using a four percent (4%) discount rate, for the OPVP (1,000 gallons per minute) is **$16,700,000**.

### *Treat at Point of Use Program*

62. Another viable remediation option provides for treatment and decontamination of the water when it is pumped for supply use by Midland as the water field is developed ("**Treat at Point of Use Program**" or "**TPUP**").

63. This practice has gained industry acceptance and provides flexibility to remediate the impacted groundwater used as Midland's supply as it is extracted.

64. Given these parameters, the TPUP cost, in present dollars using a four percent (4%) discount rate, for a three (3) well program and a six (6) well program is **$12,700,000** and **$20,200,000**, respectively.

### G. Midland's Damages After Remediation

65. Despite the ability to remediate much of the contaminated water, it is impossible to completely restore the Aquifer.

66. The value of that lost property (i.e., water that simply cannot be treated or recovered) after the contamination has been remediated is the primary component of Midland's Damage Claim.

67. The Damage Claim is derived from the lost resource (i.e., fifteen percent (15%)) of the impacted Aquifer with remediation and the reduction in water quality under the various remediation options.

68. Midland's Damage Claim depends upon the particular remediation option adopted.

### *Value of Impacted Groundwater*

69. The volume of impacted groundwater is currently estimated to be at least 19,000 acre-feet (in place) based on the current plume delineation (which remains undelineated to the southeast and east) and the estimated volume of brine lost from the Debtors' SWD well.

70. In West Texas, contracts/agreements for the purchase of groundwater or the acquisition of groundwater rights have been of two major types with several variations.

71. The two major types are: (a) leasing the groundwater rights; and (b) purchase of the groundwater or the groundwater rights.

72. In general, several factors and issues affect the value of a groundwater resource in the West Texas area, including the quality of the groundwater, the volume of groundwater

available, the location of the groundwater resource relative to potential end users, and recent sales/purchases in the area.

73. For the current case of the 19,000 acre-feet (minimum) of impacted groundwater caused by the failure of the Debtors' SWD well, the value of the groundwater is best determined by recent sales/purchases of groundwater or groundwater rights in the area.

74. An alternative equally valid approach is to determine the cost for replacement of the same volume of groundwater that has been damaged.

### *Recent Sales / Purchases of Groundwater in the West Texas Area*

75. Recent sales/purchases of groundwater in the west Texas area over the last two to three years include:

- New groundwater agreements between the University of Texas Land System ("UTLS") and Midland as well as the City of Andrews, Texas;
- Current price being paid to Midland by HSC for groundwater pumped for recovery of impacted groundwater; and
- Rate schedule for contracts and sales of fresh water published by the UTLS that went into effect on September 1, 2010.

#### *1. New Groundwater Agreement with Between UTLS and Midland*

76. The new water contract between UTLS and Midland went into effect on August 1, 2008.

77. Based on that contract, the agreed price that Midland pays to UTLS for groundwater in a nearby well field is as follows:

- Year 2008: $0.40 per 1,000 gallons
- Year 2013: $0.50 per 1,000 gallons
- Year 2018: $0.60 per 1,000 gallons

78. These rates were the result of negotiations between the UTLS and Midland and are based on a long-term contract covering twenty-five (25) years.

79. The rates for short-term contracts and agreements and current sales would reasonably be expected to be higher.

80. Prices paid by the City of Andrews, Texas to UTLS are very similar.

81. Based on the above prices, the value of the 19,000 acre-feet of impacted groundwater is at least **$2.48 million**.

### 2.    *Current Price Being Paid to Midland by Heritage Standard Corporation*

82. Based on an agreement between Midland and the Debtors reached in 2008, the price paid to Midland by the Debtors for groundwater pumped for the groundwater remediation project is $1.00 per 1,000 gallons.

83. This price establishes the value of the water via precedence.

84. Based on the current price being paid by the Debtors, the value of the 19,000 acre-feet of impacted groundwater is approximately **$6.2 million**.

### 3.    *Current Rate Schedule for Contracts and Sales of Groundwater by UTLS*

85. The price of groundwater based on the current rate schedule for water contracts with maximum of five-year term is $0.75 per 1,000 gallons.

86. Based on this price, the value of the 19,000 acre-feet of impacted groundwater is approximately **$4.64 million**.

87. Groundwater sales by UTLS for drilling and completion of one oil or gas well, including "fracing" (which requires approximately 2,000,000 gallons), is $4,000 per well (for wells less than 4,000 feet in depth).

88. The price increases to $9,000 for depths up to 7,999 feet, and increases further for greater depths.

89. The price of $4,000 for 2,000,000 gallons of groundwater (for well depths below 4,000 feet) equates to $2.00 per 1,000.

90. The price of the water is greater than $2.00 per 1,000 gallons for the wells with greater depths.

91. Based on the price of $2.00 per 1,000 gallons, the value of the 19,000 acre-feet of impacted groundwater is as much as **$12.4 million**.

*Estimate of Groundwater Value*

92. Based on the above findings, a reasonable range for the value of the 19,000 acre-feet of impacted groundwater (i.e., the Damage Claim) ranges from approximately $2.48 million to as much as $12.4 million.

93. The current price paid by the Debtors for groundwater pumped for recovery of impacted groundwater is $1.00 per 1,000 gallons which establishes the value of the 19,000 acre-feet of impacted groundwater at approximately **$6.2 million**.

94. The middle of the range—and, coincidentally, the price being paid by the Debtors for the past two years—is an appropriate estimation of the water-value component of Midland's Damage Claim.

95. Therefore, the Court finds that a price of $1.00 per 1,000 gallons is an appropriate estimation of the value of the groundwater.

96. Approximately fifteen percent (15%) of the impacted groundwater will be lost under any remediation option.

97. Using the industry-accepted lost resource percentage of fifteen (15%) of the impacted Aquifer, the Court estimates Midland's Damage Claim at **$930,000** (which is fifteen

percent (15%) of lost resource at $1.00 per 1,000 gallons) if the Aquifer Restoration Program were adopted.

98. The Court estimates Midland's Damage Claim at **$1,860,000** if the One Pore Volume Program option were adopted, and at **$1,240,000** if the Treat at Point of Use Program were adopted.

**H.    Summary**

99. HSC was negligent in its operation of the Tubb 1-A well, a produced saltwater disposal well, located on Midland's T Bar Ranch, which negligence caused the contamination and damage to a portion of the Aquifer underlying the T Bar Ranch located in Winkler County, Texas.

100. HSC's conduct constitutes gross negligence per se.

101. The diminution in fair market value of the T Bar Ranch and Midland's water rights on adjoining acreage caused by the damage to the Aquifer is $60 million.

102. The present value cost to restore the damaged aquifer beneath the T Bar Ranch which was caused by HSC's negligence in its operation of the Tubb 1-A well, is $44,800,000, which is the present value cost to remediate the Aquifer to the state it existed prior to the contamination of the Aquifer by Heritage Standard Corporation.

103. Midland has incurred additional damages of **$930,000** for the portion of the Aquifer which cannot be restored by remediation.

**II.
CONCLUSIONS OF LAW**

**A.    Contamination is Violation of Texas Law**

104. Pursuant to applicable state law, the Debtors have an affirmative obligation not to pollute subsurface water. *See* TEX. ADMIN. CODE § 3.8(b) ("No person conducting activities

subject to regulation by the commission may cause or allow pollution of surface or subsurface water in the state."); TEX. ADMIN. CODE § 3.9 ("Any person who disposes of saltwater or other oil and gas waste by injection into a porous formation not productive of oil, gas, or geothermal resources shall be responsible for complying with this section, Texas Water Code, Chapter 27, and Title 3 of the Natural Resources Code.").

105. The Debtors violated applicable law by contaminating the Aquifer.

106. The Debtors have an ongoing obligation to remediate the Aquifer.

107. The Debtors' violations of applicable law subjects the Debtors to fines and penalties of up to $10,000 per day, which may be imposed by the Texas Railroad Commission. *See* TEX. WATER CODE § 27.1011 ("If a person violates the provisions of this chapter . . . the person may be assessed a civil penalty by the railroad commission. The penalty may not exceed $10,000 a day for each violation. Each day a violation continues may be considered a separate violation for purposes of penalty assessments.").

108. The RRC reserves all rights to enforce additional remediation obligations and, if the RRC requires additional remediation in connection with Midland's administrative appeal before the RRC, the RRC will have the right to impose fines and penalties against the Debtors for noncompliance with the additional remediation obligations.

109. Approval of the Debtor Plan by the staff of the RRC is not final and likewise has no impact on the RRC's ability to impose substantial fines and penalties against the Debtors.

110. If the Debtors do not remediate the Aquifer, the Debtors will be subject to an increasing liability in the nature of substantial fines every day the Aquifer goes untreated.

**B.    Authority for Estimation of Claims**

111. Section 502(c) of the Bankruptcy Code provides statutory authority for estimating Midland's Claims for purposes of allowance.

112. Bankruptcy Rule 3018(a) allows for the estimation of claims for purposes of voting on a plan and determining whether a plan may be confirmed under Section 1129.

113. Local Bankruptcy Rule 3007-4 contemplates that a motion to estimate may be for multiple purposes.

114. In estimating a claim, a bankruptcy court should use whatever method is best suited to the particular circumstances.

115. Although a bankruptcy court is bound by the legal rules which govern the ultimate value of the claim, there are no other limitations on the court's authority to estimate claims.

116. Midland and the Debtors have agreed to the procedures for estimating Midland's Claims.

117. The procedure agreed to by Midland and the Debtors is embodied in the Court's *Agreed Scheduling Order for City of Midland's Motion for Estimation of Claims for Purpose of Allowance, Voting, and Determining Plan Feasibility, and Request for Determination that Remediation Claim is Entitled to Administrative Expense Priority*.

118. The Court has the authority to estimate the Claims for purpose of allowance, voting, and determining feasibility of any chapter 11 plan proposed in these cases.

119. The Court has the authority to determine whether the Remediation Claim is entitled to treatment as an administrative expense in these cases.

C. **Midland's Remediation Claim Is An Administrative Expense**

120. Section 503(b)(1)(A) of the Bankruptcy Code provides that administrative expenses shall include "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

121. 28 U.S.C. § 959(b) ("**Section 959**") provides that "… a debtor in possession [] shall manage and operate the property in his possession as such trustee . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b).

122. Section 959, read in conjunction with Section 503, provides that the Debtors' post-petition obligation to remediate the Aquifer gives rise to administrative expense for the cost of such remediation.

123. The Fifth Circuit has held that an environmental obligation may be an administrative expense. *See In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 438 (5th Cir. 1998) ("The unplugged unproductive wells operated as a legal liability on the estate, a liability capable of generating losses in the nature of substantial fines every day the wells remained unplugged.").

124. "Expenses incurred to comply with state or federal environmental or safety laws are actual and necessary costs of preserving the estate." *See In re American Coastal Energy Inc.,* 399 B.R. 805, 812 (Bankr. S.D. Tex. 2009).

125. "[E]xpenditures for remedying violations of environmental and safety laws are necessary to preserve the estate, regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition." *See In re American Coastal Energy Inc.,* 399 B.R. 805, 811-12 (Bankr. S.D. Tex. 2009).

126. The Debtors' obligation to remediate the Aquifer constitutes an ongoing, post-bankruptcy obligation and gives rise to an administrative expense.

127. By remediating the Aquifer, Midland will bring the Debtors in compliance with state law and, therefore, the remediation costs incurred by Midland are entitled to administrative

expense priority. *See First Virginia Bank of Tidewater v. Virginia Builders, Inc. (In re Virginia Builders)*, 153 B.R. 729, 736 (Bankr. E.D. Va. 1993).

**D.      Summary.**

128.    Midland's Remediation Claim is allowed as an administrative expense in these cases in the amount of $44,800,000, and the Debtors shall make adequate provision in any proposed plan of reorganization to pay for such remediation costs of $44,800,000.

129.    Midland's Damage Claim is allowed as a general unsecured claim in these cass in the amount of $930,000.

Wherefore, the City of Midland, Texas, requests entry of the above findings and conclusions following the estimation hearing, and for such other and further relief to which it may be justly entitled.

*/s/Holland N. O'Neil*_____
Holland Neff O'Neil (14864700)
Michael S. Haynes (24050735)
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201-4761
(214) 999-4961
(214) 999-4667 FAX
honeil@gardere.com
mhaynes@gardere.com

**GARDERE WYNNE SEWELL LLP**

And

Terry W. Rhoads (16811750)
Matt Catalano (24003918)
500 West Illinois, Ste. 300
Midland, Texas 79701
Telephone: (432) 897-1440
Facsimile: (432) 682-3672
trhoads@cbtd.com
mcatalano@cbtd.com

**COTTON BLEDSOE TIGHE & DAWSON, PC**

**COUNSEL FOR CITY OF MIDLAND**