**<u>EXHIBIT A</u> TO EXPEDITED MOTION TO (A) SELL
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES, (B) ASSUME AND ASSIGN CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND
(C) GRANT RELATED RELIEF; OR, IN THE ALTERNATIVE,
MOTION TO (A) APPROVE THE BACK-UP PURCHASE AND
SALE AGREEMENT; AND (B) GRANT RELATED RELIEF**

# PURCHASE AND SALE AGREEMENT

## for Oil and Gas Properties
### located in

## Winkler and Loving Counties, State of Texas
## and Lea County, State of New Mexico

### by and among

## Heritage Consolidated LLC

### and

## Heritage Standard Corporation

### as "Sellers"

### and

## Permian Atlantis LLC

### as "Buyer"

### Dated _____, 2010

{00099077.1}
US 515000v.2

CONFIDENTIAL

# TABLE OF CONTENTS

**Page**

1.  **DEFINITIONS; CONSTRUCTION** ................................................................. 1

2.  **PURCHASE AND SALE**. ........................................................................... 9

3.  **CONSIDERATION** .................................................................................... 12

4.  **ASSIGNMENT EFFECTIVE DATE AND CLOSING**............................. 13

5.  **REPRESENTATIONS AND WARRANTIES OF SELLERS** .................. 13

6.  **REPRESENTATIONS AND WARRANTIES OF BUYER** ..................... 15

7.  **ENVIRONMENTAL INSPECTION** ....................................................... 17

8.  **CASUALTY LOSS** .................................................................................... 17

9.  **COVENANTS PRIOR TO CLOSING.** ................................................... 17

10. **ADDITIONAL COVENANTS** ................................................................. 19

11. **CONDITIONS PRECEDENT TO CLOSING**. ...................................... 20

12. **CLOSING** .................................................................................................. 22

13. **POST CLOSING OBLIGATIONS**. ......................................................... 23

14. **INDEPENDENT INVESTIGATION AND DISCLAIMER** .................. 26

15. **TERMINATION** ....................................................................................... 26

16. **MISCELLANEOUS.** ................................................................................. 27

*US 515000v.2*

**Attachments**

| | | |
|---|---|---|
| Exhibit A | - | Leases |
| Exhibit B | - | Wells |
| Exhibit C | - | Section 6 Properties |
| | | |
| Schedule 2(b)(iv) | - | Excluded Items |
| Schedule 5(d) | - | Suits and Claims |
| Schedule 5(f) | - | Maintenance of Interest |
| Schedule 5(h)-1 | - | Environmental Matters |
| Schedule 5(h)-2 | - | Texas Railroad Commission forms W-3 (Plugging Record) and W-15 (Cementing Report) for Plugged and Abandoned Wells |
| Schedule 5(k) | - | Current Commitments |
| Schedule 5(o) | - | Material Documents |
| Schedule 10(d) | - | Designation of Assumed Contracts |

*US 515000v.2*

{00099077.1}                              ii

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "**Agreement**") is made this __ day of _____, 2010 ("**Execution Date**") by and among **HERITAGE CONSOLIDATED LLC**, a Texas limited liability company, located at 2911 Turtle Creek Blvd., Suite 850, Dallas, Texas 75219 ("**HCL**"), **HERITAGE STANDARD CORPORATION**, a Texas corporation, located at 2911 Turtle Creek Blvd., Suite 850, Dallas, Texas 75219 ("**HSC**"), (HSC and HCL, are sometimes collectively referred to herein as the "**Sellers**") and **PERMIAN ATLANTIS LLC**, a Delaware limited liability company, located at 6630 Cypresswood Drive, Suite 200, Spring, Texas 77379 ("**Buyer**").  The Buyer and Sellers may be collectively referred to herein as the "**Parties**" and individually as a "**Party**."  Buyer and Sellers agree as follows:

## AGREEMENT

1.    **Definitions; Construction**.    Unless provided otherwise in this Agreement or the Exhibits, each capitalized term in this Agreement and the Exhibits and Schedules have the meaning given to it in this Section.

(a)    "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries or otherwise) controls, is controlled by, or is under common control with the first Person.

(b)    "**Agreement**" has the meaning given to it in the introductory paragraph.

(c)    "**Allowed**" has the meaning given to it in the Plan.

(d)    "**Assignment and Bill of Sale**" has the meaning given to it in Section 12 .

(e)    "**Assignment Effective Date**" has the meaning given to it in Section 4.

(f)    "**Assumed Obligations**" means the following obligations and no others, but expressly excluding any Retained Liabilities, to-wit: (a) all duties and obligations of Sellers arising from and after the Assignment Effective Date, under the terms of all oil, gas and mineral leases, easements and similar agreements constituting part of the Properties, as well as under the terms and provisions of all Contracts constituting part of the Properties and under any Contracts entered into by the Sellers after the Execution Date which are both attributable to, and constitute part of, the Property, and (b) all Third Party claims, demands, violations, actions, assessments, penalties, fines, costs, expenses, obligations or other liabilities with respect to the ownership, operation or maintenance of any of the Property from and after the Assignment Effective Date.

(g)    "**Bankruptcy Cases**" shall mean the bankruptcy cases of HCL and HSC jointly administered under Bankruptcy Case No. 10-36484-HDH-11 currently pending in the Bankruptcy Court.

(h)  "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

(i)  "**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 through 1532, as may have been or are amended from time to time.

(j)  "**Bankruptcy Rules**" shall mean, collectively, (i) the Federal Rules of Bankruptcy Procedure, (ii) the Federal Rules of Civil Procedure, and (iii) the local rules of the Bankruptcy Court, as (i) through (iii) may be applicable to the Bankruptcy Cases and proceedings therein and as (i) through (iii) may have been or are amended from time to time.

(k)  "**Business Day**" means between 8:00 a.m., Central Time and 5:00 p.m., Central Time, on any Day other than a Saturday or Sunday or a Day on which banking institutions in Dallas, Texas are authorized by Law to close.

(l)  "**Buyer**" has the meaning given to it in the introductory paragraph of this Agreement.

(m)  "**Capital Expenditures**" means, with respect to either the Properties or the Section 6 Properties: the sum of (a) the cost of (i) drilling and completion of any development and/or exploration well; (ii) providing surface, lease, and well equipment to produce such wells; (iii) deepening and/or recompleting an existing wellbore to a formation which has not previously produced; and (iv) renewing or extending any existing Lease included in the Properties; and (b) imputed interest on such costs calculated at a rate equal to 10% per annum from the date such costs are incurred until such costs are repaid in full.

(n)  "**Casualty Loss**" means an instance in which any portion of the Property is damaged, destroyed or taken by condemnation or eminent domain or suffers a reduction in value as a result of a volcanic eruption, act of God, terrorist act, fire, explosion, earthquake, wind storm, flood, drought, condemnation, the exercise of eminent domain, confiscation or seizure.

(o)  "**Claims**" means any and all claims, demands, suits, causes of action, losses, damages, liabilities, fines, penalties, expenses, and costs (including attorneys' fees and costs of litigation), whether known or unknown.

(p)  "**Closing**" or "**Closing Date**" has the meaning given to it in Section 4.

(q)  "**Contracts**" has the meaning given to it in the definition of "Properties".

(r)  "**Data**" means originals or copies (electronic media, hardcopy media or both) of the Sellers' books, records and files, wherever located and whether in the possession of Sellers' representatives, consultants, or employees, including all

Contracts and any and all title, Tax, financial, joint interest billing, technical, engineering, environmental and safety records and information, and, to the extent available, such Data in an electronic format that relate to the Properties. "Data" shall include originals of lease files, land files, wells files, rights of way, easements, title opinions, run sheets, title documents, land data, and revenue decks, division order files, abstracts, title files, engineering and/or production files, maps, accounting records, proprietary seismic data, consultant's geologic, geophysical and engineering reports, mapping and interpretations, studies and information and engineering, facility design (including equipment data books and design drawings), electrical (including equipment data books and design drawings), geological and geophysical information, automation (including equipment data books and design drawings, field automation software, piping and instrument drawings), mechanical, maintenance, property, property tax (including 2008 and 2009 filed ad valorem tax returns), contract, environmental, U.S. Department of Transportation documents and records, operational and land books, records, drawings, maps, manuals and files in their present form, and other information owned by Sellers or copies thereof related to the Properties, and all rights relating thereto.

(s)    "**Day**" means a calendar day consisting of twenty-four (24) hours from midnight to midnight central time.

(t)    "**Delivery Point**" means the tanks and facilities located at the Black Kettle #1W disposal well located 1420' FEL & 2180' FSL of Section 7, Block 74, PSL Survey, and the Little Wolf #1W disposal well located1660' FEL & 223' FNL of Section 16, Block C-23, PSL Survey, both in Winkler County, Texas, and to such other points as to which the Parties hereto may mutually agree.

(u)    "**DIP Claim**" has the meaning given to it in the Plan.

(v)    "**Due Diligence Expiration Date**" shall mean a date three days prior to the Bid Deadline, as defined in the Sale Procedures Order.

(w)    "**Easements**" has the meaning given to it in the definition of "Properties".

(x)    "**Environmental Claim**" means any Claim that is asserted pursuant to Environmental Laws.

(y)    "**Environmental Laws**" means any and all Laws that relate to (a) prevention of pollution or environmental damage, (b) removal or remediation of pollution or environmental damage, or (c) protection of the environment or health and safety.

(z)    "**Equipment**" has the meaning given to it in the definition of Properties.

(aa)    "**Excluded Items**" has the meaning given to it in Section 2(b).

(bb)    "**Execution Date**" has the meaning given to it in the introductory paragraph.

(cc)    "**GAAP**" means generally accepted accounting principles, consistently applied, as recognized by the U.S. Financial Accounting Standards Board (or any generally recognized successor).  The requisite that such principles be consistently applied means that the accounting principles in a current period are comparable in all material respects to those applied in preceding periods.

(dd)    "**Governmental Authority**" means any federal, state, local, municipal or other government or department thereof, any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or any court or governmental tribunal, including without limitation, any tribal authority.

(ee)    "**Hydrocarbons**" means crude oil, natural gas, casinghead gas, condensate, sulfur, natural gas liquids and other liquid or gaseous hydrocarbons and such other substances conveyed to the lessee under each respective Lease.

(ff)    "**Knowledge of Sellers**" or "**Sellers' Knowledge**" means the actual knowledge after reasonable investigation of the following individuals:

    (i)    Michael Wisenbaker

    (ii)    Gary Todd

(gg)    "**Laws**" means any and all laws, statutes, codes, ordinances, permits, licenses, authorizations, agreements, decrees, writs, orders, judgments, principles of common law, rules or regulations (including, for the avoidance of doubt, Environmental Laws) that are promulgated, issued or enacted by a Governmental Authority having jurisdiction.

(hh)    "**Leases**" has the meaning given to it in the definition of "Properties".

(ii)    "**Lender**" has the meaning given to it in the Plan.

(jj)    "**Lender Secured Claim**" has the meaning given to it in the Plan.

(kk)    "**Lien**" means any lien, mortgage, security interest, pledge, burden, charge, encumbrance, restriction or rights of a vendor under any title retention.

(ll)    "**Marketable Title**" means (i) as defined in Standard 2.10 of the Texas Title Examination Standards, a record title that is free from reasonable doubt such that a prudent person, with knowledge of all salient facts and circumstances and their legal significance, would be willing to accept it, and (ii) all consents to assign and preferential rights to purchase applicable to the subject Lease have been obtained or waived, respectively.

(mm)  "**Material Adverse Effect**" means any result, consequence, condition or matter (i) that materially adversely affects the Properties, the rights to be acquired in the Properties under this Agreement, or the value of such Properties, in each case with the materiality of such change being evaluated in light of the impact of such change on all of the Properties and rights considered in the aggregate; or (ii) that impairs, prevents or materially delays the Sellers' ability to perform any of their obligations under this Agreement or to consummate the transactions contemplated by this Agreement; provided, however, that neither the commencement nor prosecution of the Bankruptcy proceedings of the Sellers nor any change in the market price for oil or gas, generally, shall constitute a Material Adverse Effect

(nn)  "**Material Documents**" means the following documents:

(i)  All joint venture and area of mutual interest agreements which affect any Property after the Assignment Effective Date;

(ii)  All gas purchase contracts, oil purchase contracts, gathering contracts, exchange agreements, transportation contracts, supply contracts, marketing contracts, disposal or injection contracts and all other contracts affecting any Property which are not, by the terms thereof, subject to termination upon sixty (60) Days or less notice;

(iii)  All governmental approvals and third party contractual consents required in order to consummate the transactions contemplated by this Agreement, other than routine consents required in connection with transfers of U.S. federal, state and Indian leases;

(iv)  All agreements pursuant to which third parties have preferential rights or similar rights to acquire any portion of the Property upon the transfer of the Property by Sellers to the Buyer as contemplated by this Agreement;

(v)  Any contract or agreement for capital expenditures or the acquisition or construction of fixed assets that requires aggregate future payments in excess of Ten Thousand Dollars ($10,000.00) which affects any Property;

(vi)  Any indenture, mortgage, loan, credit, sale-leaseback or similar contract or agreement which affects any Property;

(vii)  Any contract which involves any future payment or obligation in excess of Ten Thousand Dollars ($10,000) or is otherwise or could reasonably be expected to be material to the operations or development of the Properties;

(viii)  Any contract or agreement with any Affiliate of Sellers which affects any Property; and

(ix)     Any unit agreement, joint operating agreement, operating agreement, surface use agreement, easement or right of way or similar agreement applicable to the Properties.

(oo)     "**Net Cash Flow**" means (a) the proceeds from settlements, proceeds from judgment and other recoveries associated with the Apollo Litigation and the Pathfinder Litigation received by Buyers in accordance with the Plan; plus (b) proceeds of production from the Properties or sale of the Properties, LESS (c) the sum of the following, to the extent related to either the Properties or the Section 6 properties:   lease operating expenses, Capital Expenditures, well workover expenses, severance taxes, ad valorem taxes, allocated G&A expenses, and other direct costs associated with operating either the Properties or the Section 6 Properties.

(pp)     "**Non-Appealable Order**" means an order entered by the Bankruptcy Court or other court of competent jurisdiction on its docket as to which (a) the time to appeal, petition for certiorari, or move for re-argument, new trial or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument, new trial or rehearing shall then be pending; or (b) in the event that any appeal, writ of certiorari, re-argument, new trial or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which re-argument, new trial or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for re-argument, new trial or rehearing shall have expired; provided, however, that no order shall fail to be a Non-Appealable Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or a similar rule under the Federal Rules of Bankruptcy Procedure may be filed with respect to such order..

(qq)     "**Non-Section 6 JOAs**" has the meaning given to it in the Plan.

(rr)     "**Parties**" or "**Party**" has the meaning given to it in the introductory paragraph of this Agreement.

(ss)     "**Payout Date**" means the date and time at which Net Cash Flow equals the Payout Obligations.

(tt)     "**Payout Obligations**" means the sum of the Allowed DIP Claim, as defined in the Plan, the Allowed Lender Secured Claim (which shall bear interest at a rate of 12% per annum from the Petition Date until such Claim has been satisfied in full), as defined in the Plan, the unpaid attorney's fees and other out-of-pocket expenses of the Lender, as defined in the Plan, the Allowed Standard Non-Section 6 Secured Claim, as defined in the Plan, and the Allowed Standard Section 6 Secured Claim, as defined in the Plan.

(uu)     "**Permit**" has the meaning given to it in the definition of "Properties."

(vv) "**Permitted Encumbrances**" means any and all:

    (i)    Consents to assignment and similar contractual provisions affecting the Property;

    (ii)    Rights reserved to or vested in a Governmental Authority having jurisdiction to control or regulate the Properties in any manner whatsoever, and all Laws of such Governmental Authorities;

    (iii)    Easements, rights-of-way, servitudes, surface leases, sub-surface leases, grazing rights, logging rights, ponds, lakes, waterways, canals, ditches, reservoirs, equipment, pipelines, utility lines, railways, streets, roads and structures on, over and through the Properties; provided, that such encumbrances do not either individually or in the aggregate interfere materially with the use, operation or development of the Property affected thereby for the purpose for which such Property is currently used or is intended to be used; and

    (iv)    Liens for Taxes not yet delinquent.

(ww) "**Person**" means an individual, group, partnership, limited partnership, limited liability company, corporation, trust, Governmental Authority or other entity.

(xx) "**Plan**" means the Joint Plan of Reorganization for the Debtors dated September 17, 2010, as the same may be amended, supplemented, or otherwise modified.

(yy) "**Properties**" has the meaning given to it in Section 2(a).

(zz) "**Purchase Consideration**" has the meaning set forth in Section 3.

(aaa) "**Retained Liabilities**" means those liabilities and obligations of Sellers arising from the following: (i) all Claims arising out of, incident to or in connection with Sellers' failure to pay or incorrect payment of any Taxes relating to the Properties prior to the Assignment Effective Date (excluding any Sales Taxes arising from the transactions contemplated hereunder to occur at the Closing); (ii) Claims for bodily injury or death arising from operations on the Properties prior to the Assignment Effective Date; (iii) all Claims, violations, actions, assessments, obligations or other liabilities with respect to the ownership, operation or maintenance of any of the Properties prior to the Assignment Effective Date, including, but not limited to, Claims related to the plugging and abandonment of wells that were plugged and abandoned prior to the Closing Date; and (iv) all Claims, violations, actions, assessments, obligations or other liabilities with respect to any of the Excluded Items whether or not attributable to periods before or after the Assignment Effective Date.

Case 10-36484-hdh11    Doc 412    Filed 01/18/11    Entered 01/18/11 18:22:17    Desc
Main Document    Page 12 of 36


(bbb)  "**Sale Order**" shall mean an order of the Bankruptcy Court that is reasonably acceptable to Sellers and Buyer; that contains a finding of fact that Buyer is a good faith purchaser for value within the meaning of Sections 363(m) of the Bankruptcy Code and not in violation of Section 363(n) of the Bankruptcy Code; and and that authorizes, without further order of the Bankruptcy Court, the transactions contemplated hereunder, including (i) authority to convey and assign the Properties to the Buyer free and clear of any Liens, Claims, and encumbrances, other than Permitted Encumbrances, (ii) authority to permit the assumption of the Assumed Obligations by the Buyer, (iii) authority for Sellers to assume the Contracts and assign the same to the Buyer, (iv) authority to enter into each of the ancillary transactions, if any, contemplated by this Agreement and (v) authority to appoint the Buyer (or its assignee) as operator under the Non-Section 6 JOAs or the new joint operating agreements, all pursuant to Sections 105, 363, and 365 of the Bankruptcy Code.

(ccc)  "**Sale Procedures Order**" has the meaning given to it in the Plan.

(ddd)  "**Sales Tax**" means any and all transfer, sales, gross receipts, compensating use, use or similar taxes, and any associated penalties and interest.

(eee)  "**Section 6 Properties**" means the leases and wells set forth on **Exhibit C [or Schedule 1(eee)]**, attached hereto.

(fff)  ""**Seller**" or "**Sellers**" has the meaning given to it in the introductory paragraph.

(ggg)  "**Seismic**" has the meaning given to it in the definition of Properties**.**

(hhh)  "**Standard Secured Claim**" has the meaning given to it in the Plan.

(iii)  "**Tax**" means all taxes, including income tax, surtax, remittance tax, presumptive tax, net worth tax, special contribution, production tax, pipeline transportation tax, value added tax, withholding tax and any gross receipts tax, windfall profits tax, profits tax, severance tax, personal property tax, real property tax, sale tax, ad valorem tax, transfer tax, use tax, excise tax, premium tax, environmental tax (including taxes under Section 59A of the Internal Revenue Code, as amended), customs duties, stamp tax, capital stock tax, franchise tax, occupation tax, payroll tax, employment tax, social security, unemployment tax, disability tax, alternative or add-on minimum tax, estimated tax, any similar tax or assessment imposed by any Governmental Authority thereof, together with any interest, fine or penalty or addition thereto, whether disputed or not.

(jjj)  "**Third Party**" or "**third party**" (whether or not capitalized) means any Person other than Sellers and Buyer; provided that a Claim against a Party by an officer, director or employee of that Party, an Affiliate of that Party, or any officer, director or employee of such an Affiliate shall not be a Claim brought by or owed to a "third party". No Sellers' Affiliates shall be considered to be third parties for

{00099077.1}                                    8

US 515000v.2

purposes of this Agreement.  No Buyer Affiliates shall be considered third parties for the purpose of this Agreement.

(kkk)    "**Title Defect**" has the meaning given it in Section 13.

(lll)    "**Units**" has the meaning given to it in the definition of Properties.

(mmm)    "**Wells**" has the meaning given to it in the definition of Properties

(nnn)    "**Working Interest Back-In**" has the meaning given it in Section 13.

(ooo)    **References; Construction**.    All references in this Agreement to Exhibits, Schedules, Sections, paragraphs, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Sections, paragraphs, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise.  Titles appearing at the beginning of any Sections, subsections or other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof.  The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  The words "this Section" and "this subsection," and words of similar import, refer only to Section or subsection hereof in which such words occur.  The word "or" is not exclusive, and the word "including" (in its various forms) means including without limitation.  Each accounting term not defined herein, and each accounting term partly defined herein to the extent not defined, will have the meaning given to it under GAAP.  Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.  When a term is defined as one part of speech (e.g., noun), any other part of speech (e.g., verb) with respect to the term has a comparable meaning.

**THE WORDS AND PHRASES DEFINED IN THIS AGREEMENT, WHICH ARE DEFINED BY REFERENCE TO THE "PLAN", ARE ONLY THOSE WORDS OR PHRASES AS DEFINED IN THE JOINT PLAN OF REORGANIZATION FOR THE DEBTORS DATED SEPTEMBER 17, 2010, THAT IS ATTACHED AS AN EXHIBIT TO THE DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION FOR THE DEBTORS [DOCKET NO. 38], WHICH FOR THE PURPOSES OF DEFINITIONS HEREIN, SHALL NOT BE MODIFIED OR ALTERED BY ANY AMENDMENTS, SUPPLEMENTS OR OTHER MODIFICATIONS TO SUCH PLAN.**

2.    **Purchase and Sale**.

(a)    **Property Being Sold**.  Subject to the terms and conditions of this Agreement, Sellers agree to sell and convey and Buyer agrees to purchase and accept the

Property free and clear of all Liens and Claims for the Purchase Consideration as defined hereinafter.  The term "**Property**" (or within context "**Properties**") means all of Sellers' right, title and interest (real, personal, mixed, contractual or otherwise) in, to and under or derived from the following:

(i)     **Leaseholds**. All of Sellers' right, title and interest in and to all oil and gas leases, including renewals, extensions, ratifications and amendments to such leases, and further including working interests, rights of assignment and reassignment, net revenue interests and undeveloped locations under or in oil, gas or mineral leases, and interests in rights to explore for and produce oil, gas or other minerals insofar and only insofar as such rights, titles and interests cover and include the lands, depths and rights described in **Exhibit A**, attached hereto and made a part hereof (collectively, the **"Leases"**);

(ii)    **Wells**. All of Sellers' right, title and interest in and to the wells described in **Exhibit B**, attached hereto and made a part hereof (collectively, the **"Wells"**);

(iii)   **Units**.  All of Sellers' right to the unitization, communitization and pooling declarations, orders, agreements or designations (including all units formed by voluntary agreement and those formed under the rules, regulations, orders or other official acts of any Governmental Authority having jurisdiction) and statutorily, judicially or administratively created drilling, spacing and/or production units, whether recorded or unrecorded, to the extent they relate to the Leases and all of the interest of the Sellers in and to the properties covered or units created thereby (collectively, the "**Units**");

(iv)    **Rights in Production**.  All of Sellers' right, title and interest in and to all (A) other rights to oil, gas and minerals in place and similar interests and the production of Hydrocarbons attributable thereto together with all rights that arise by operation of Law or otherwise in all properties and land unitized, communitized or pooled with therewith, and (B) rights and benefits arising from or in connection with any gas production, pipeline, storage, processing or other imbalance attributable to Hydrocarbons produced from the Leases or the Units as of the Assignment Effective Date; and it being expressly understood that Buyer shall have all rights to all oil inventory in tanks as of the Assignment Effective Date;

(v)     **Proprietary Seismic**. An undivided interest in the following:  (A) Sellers' intellectual property rights relating to the Properties, including the 2-D and 3-D seismic to include all prestack and poststack volumes and other generated data sets including but not limited to AVO volumes, all forms of Gathers, velocity volumes, and inversion volumes; (B) all original field data, tapes, field records and all other data generated during acquisition

and processing of seismic (2-D and 3-D) and derivative volumes, as well as project work flows, notes and digital copies of the projects used to generate any of the aforementioned data created in-house by the Seller to the extent available; and (C) All other geotechnical data relating to the Properties (collectively, the "**Seismic**");

(vi)    **Contract Rights**.  All of Sellers' right, title and interest in or derived from all water rights contracts or other contracts providing access to water, all joint operating agreements and operating agreements, all farm-in and farm-out contracts, all agreements containing area of mutual interest provisions, all exploration agreements, development agreements, joint venture agreements or participation agreements or similar agreements, in each case to the extent any such agreement burdens or benefits any of the Leases or the Units, or the production of Hydrocarbons from the Leases, the Permits, all access agreements, easements, servitudes, surface leases, subsurface leases, licenses or right of way agreements or any other agreements relating to the Property to the extent such Contracts either: (x) are beneficial or would be reasonably expected to be beneficial in the operation or development of the Property or (y) are used in connection with, are intended to be used or reasonably expected to be used in connection with the Property (the **"Contracts"**);

(vii)    **Equipment**.  All of Sellers' right, title and interest in and to the following:

    a.    All equipment, production facilities, meters, flow lines (extending to the meters or upstream thereof);

    b.    All water gathering lines, water transportation lines, water tanks and pumps (upstream to the Delivery Point); and

    c.    All machinery, fixtures, and other tangible personal property and improvements located on the Properties or used or held for use in connection with the operation of the Properties or the production of Hydrocarbons from the Properties, (collectively, the "**Equipment**");

(viii)    **Easements**.  All of Sellers' right, title and interest in and to all rights-of-way, easements, licenses, and servitudes (the **"Easements"**) appurtenant to or used in connection with those Properties described on **Exhibits A and B**, attached hereto;

(ix)    **Permits.**  All of Sellers' right, title and interest in and to all permits and licenses of any nature owned, held or operated in connection with operations for the exploration and production of oil, gas or other minerals to the extent the same are used or obtained in connection with the Property (the **"Permits"**);

(x) **Title Documents**. All of Sellers' interests in and to all orders, title opinions and documents, run sheets, ownership reports, abstracts of title, division of interest statements, and similar rights and interests, subject to the rights of Third Parties;

(xi) **Insurance**. All insurance benefits arising after the Assignment Effective Date under existing policies of insurance, if any, relating to the foregoing Properties; and

(xii) **Data**. All Data with respect to the Properties and all rights relating thereto.

(b) **No Assumption of Liabilities; Excluded Properties**. Buyer is not assuming any liabilities or obligations of Sellers related to the Properties or otherwise in connection with the transactions contemplated herein except as expressly provided for in this Agreement. Notwithstanding anything herein contained to the contrary and without limiting the preceding sentence, the Properties do not include, and there is hereby excepted and reserved unto Sellers, the following (the "**Excluded Items**"):

(i) All Vested Assets, as defined by the Plan;

(ii) All hedging transactions and any gains or losses attributable to any hedging activities, whether occurring before or after the Assignment Effective Date;

(iii) All ad valorem, property, production, excise, severance, and any other taxes (except income or franchise taxes) based upon or measured by the ownership of the Properties or the production of Hydrocarbons or the receipt of proceeds therefrom attributable to the period prior to the Assignment Effective Date; and

(iv) Those items listed on **Schedule 2(b)(iv)**.

3. **Consideration**. The consideration for the sale and transfer of the Properties (the "**Purchase Consideration**") shall be as follows:

(a) The payment, at Closing, of Three Million Five Hundred Sixty Thousand Dollars and No/100 ($3,560,000.00)

(b) The assumption or other satisfaction one-fourth (1/4th) of the DIP Claim as provided under the Plan;

(c) The assumption or other satisfaction of Twelve Million Dollars and No/100 ($12,000,000.00) of the Allowed Lender Secured Claim; and

(d) Working Interest Back-In, if any, to be assigned to HCL upon the Payout Date.

4.      **Assignment Effective Date and Closing**.  The closing shall occur two Business Days after satisfaction or waiver by the requisite Parties of the conditions to closing set forth in Section 11 (other than those conditions that by their nature cannot be satisfied until the time of closing) (the "**Closing**", or the "**Closing Date**"), unless an earlier time is mutually agreed upon. The conveyance of the Property to Buyer shall be effective as of the first day of the month in which the Closing takes place (the "**Assignment Effective Date**").

5.      **Representations and Warranties of Sellers**.  The Sellers, jointly and severally, hereby represent and warrant to Buyer as of the date hereof and will be deemed to represent and warrant to Buyer at the Closing, as follows:

(a)      **Corporate Authority**.  HCL is a limited liability company duly organized and in good standing under the laws of the State of Texas.  HSC is a corporation duly organized and in good standing under the laws of the State of Texas.  Each Seller is duly qualified and in good standing to carry on its respective business in the state where the Property is located, and has all the requisite power and authority to enter into, deliver and perform this Agreement and carry out the transactions contemplated under this Agreement subject to Bankruptcy Court approval.

(b)      **Valid Agreement**.  Subject to obtaining the approvals required under Section 11(a), this Agreement constitutes the legal, valid and binding Agreement of the Sellers.

(c)      **Authorization**.  Subject to obtaining the approvals required under Section 11(a), this Agreement has been duly authorized, executed and delivered by the Sellers. Subject to obtaining the approvals required under Section 11(a), all instruments required to be delivered by the Sellers at the Closing shall be duly authorized, executed and delivered by the Sellers.  Subject to obtaining the approvals required under Section 11(a), this Agreement and all documents executed by Sellers in connection with this Agreement shall constitute legal, valid and binding obligations of the Sellers, enforceable against each Seller in accordance with their terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect, as well as general principles of equity.

(d)      **Suits and Claims**.  Except as set forth on **Schedule 5(d)** (the "**Outstanding Litigation**"), no suit, action, claim, or other proceeding is now pending or, to the Knowledge of Sellers, threatened before any court or governmental agency against Sellers that are attributable to Sellers' ownership or operation of any of the Properties.

(e)      **Properties Conveyed**.  Sellers are conveying to Buyer all of their interests in the oil and gas leases owned by Sellers in Sections 21, 22, 23, 24, and 25, Block C-23; Sections 1 and 2, Block C-24; Section 9, Block 74; Section 1, Block 75; all Public School Land Surveys, Winkler and Loving Counties, Texas, and Section 21, Township 26 South, Range 35 East, Lea County, New Mexico, together with

all of all of their interests in the wells located thereon, related Equipment, facilities, and contract rights, LESS AND EXCEPT the items listed on **Schedule 2(b)(iv)**.

(f)  **Maintenance of Interest**.  Except as set forth on **Schedule 5(f)**, Sellers have not alienated or assigned any interest in the Properties in the time period from October 30, 2008, through Closing;

(g)  **Interest Conveyed**.  The interests set forth on **Exhibit B** accurately reflect the ownership interests of Sellers in the Properties.

(h)  **Environmental Matters**.  **Schedule 5(h)-1** contains an accurate and complete list of all environmental issues related to the Properties.  **Schedule 5(h)-2** sets forth a complete list of wells that have been plugged and abandoned by Sellers or their Affiliates on the Leases, together with copies of the Texas Railroad Commission forms W-3 (Plugging Record) and W-15 (Cementing Report) for each of these wells.  Except as set forth on **Schedule 5(h)-1**:

(i)  To the Knowledge of Sellers, the Properties are in material compliance with all applicable Environmental Laws or with all terms and conditions of all environmental Permits.

(ii)  To the Knowledge of Sellers, there has been no contamination of groundwater, surface water or soil on the lands covered by the Leases resulting from the operation of the Properties which requires notification to any Governmental Authority or remediation under applicable Environmental Laws. Any and all of the wells contained on any of the Properties that have been plugged and abandoned (temporarily or permanently) have been plugged in accordance with all applicable requirements of each Governmental Authority having jurisdiction over the Properties.

(iii)  To the Knowledge of Sellers, there are no civil, criminal or administrative actions, lawsuits, demands, litigation, claims or hearings or other proceedings relating to an Environmental Claim, and Sellers have not received any notice of any Environmental Claim or notice of any alleged violation or non-compliance with any Environmental Law or of non-compliance with the terms or conditions of any environmental Permits, arising from, based upon, associated with or related to the Properties or the ownership or operation of any thereof.

(iv)  To the Knowledge of Sellers, no pollutant, waste, contaminant or hazardous, extremely hazardous or toxic material, substance, chemical or waste identified, defined or regulated as such under any Environmental Law is present or has been handled, managed, stored, transported, processed, treated, disposed of, released, migrated or escaped on, in, from,

under or in connection with the Properties or the ownership or operation of any thereof, such as to cause a condition or circumstance that would reasonably be expected to result in an Environmental Claim or a violation of any Environmental Law.

(v)      The Sellers have made available to Buyer copies of all Third Party environmental audits, assessments and other similar reports and studies in Sellers' possession describing environmental conditions of the Properties.

(i)      **Planned Future Commitments**.  Except for the obligations set forth in the Leases, Sellers have not and will not commit to expenditures relating to the Properties (drilling of wells, workovers, pipeline projects, production facilities, etc.) in excess of Ten Thousand Dollars ($10,000) in the aggregate.

(j)      **Hedges**.  Neither the Properties nor the production therefrom are subject to any type of hedge or forward agreement with respect to which Buyer will have any obligations.

(k)      **Current Commitments**.  Except as listed on **Schedule 5(k)**, there are no (i) authorizations for expenditures applicable to the Properties, whether or not accepted by Sellers or any other Person and (ii) authorizations for expenditure and written commitments for drilling operations applicable to such Properties or for other capital expenditures applicable to such Properties for which all of the activities anticipated in such authorizations for expenditures or commitments have not been completed by the Effective Date.

(l)      **Brokers**.  Except as approved by the Bankruptcy Court, no Seller has incurred any obligation or liability, contingent or otherwise, for brokers' or finders' fees with respect to this transaction for which Buyer shall have any obligation or liability.

(m)      **Data**.  The Data is in the possession or control of Sellers.

(n)      **Foreign Person**.  Each Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code.

(o)      **Material Documents.  Schedule 5(o)** contains a list of all Material Documents related to the Properties, including any amendments or other related documents. Sellers shall promptly provide Buyer with copies of any and all Material Documents but, in any event, no later than two (2) business days after receipt of a written request from Buyer.  To Sellers' knowledge, except as may be noted in such list: the Material Documents are in  all material respect in full force and effect in accordance with their respective terms, and there exist no material defaults by Sellers or by another party thereto in the performance of any material obligation thereunder and no event has occurred that with notice or lapse of time or both would constitute any default under any such Material Document.

6.    **Representations and Warranties of Buyer**.  Buyer represents and warrants to Sellers as of the date hereof and will represent and warrant at the Closing, as follows:

(a)    **Corporate Authority**.  Buyer is a limited liability company duly organized and in good standing under the laws of the State of Delaware, is duly qualified and in good standing to carry on its business in the state where the Property is located and has all the requisite power and authority to enter into and perform this Agreement and carry out the transactions contemplated under this Agreement.

(b)    **Valid Agreement**.  This Agreement constitutes the legal, valid and binding Agreement of Buyer.  At the Closing, all instruments required hereunder to be executed and delivered by Buyer shall be duly executed and delivered to Sellers and shall constitute legal, valid and binding obligations of Buyer.  Buyer's execution and delivery of this Agreement, the consummation of the transactions set forth herein and Buyer's performance of Buyer's obligations hereunder have been duly and validly authorized by all requisite action on the part of Buyer.  Buyer's execution and delivery of this Agreement and consummation of the transactions contemplated by this Agreement will not:

(i)    conflict with or require consent of any Person under any terms, conditions or provisions of Buyer's formation documents;

(ii)    violate any provision of, or require any consent or approval under any Law applicable to Buyer (except for consents and approvals of Governmental Authorities customarily obtained subsequent to transfer of title); or

(iii)    conflict with, result in a breach of, constitute a default under or constitute an event that with notice or lapse of time, or both, would constitute a default under, accelerate or permit the acceleration of the performance required by, or require any consent, authorization or approval under: (i) any agreement of Buyer, or any mortgage, indenture, loan, credit agreement or other agreement evidencing indebtedness for borrowed money to which Buyer is a party, or (ii) any order, judgment or decree of any Governmental Authority.

(c)    **Governmental Approvals**.  Buyer shall obtain all local, state, federal governmental and agency permissions, approvals, permits, bonds and consents, required for Buyer to assume the Assumed Obligations as contemplated hereunder.

(d)    **Independent Evaluation**.  Buyer is an experienced and knowledgeable investor in the oil and gas business.

(e)    **Financial Wherewithal**.  Buyer has the financial wherewithal and resources to satisfy the commitments in this Agreement, including, without limitation, (i) the

{00099077.1}

16

US 515000v.2

payment of all cash at Closing, and (ii) the funding of the sidetrack operations for the Pat Howell No. 1 Well.

    (f)    **Brokers**.  Buyer has incurred no obligation or liability, contingent or otherwise, for brokers' or finders' fees with respect to this transaction for which Sellers shall have any obligation or liability.

7.    **Environmental Inspection**.  Prior to Closing and upon reasonable prior notice to Sellers, Buyer will have access to and the opportunity to inspect the Property for all purposes, including without limitation, for the purposes of detecting the presence of hazardous or toxic substances, pollutants or other contaminants, environmental hazards, naturally occurring radioactive materials (NORM), produced water, air emissions, and contamination of the surface and subsurface. Buyer shall coordinate any such inspections with Sellers and Sellers shall have the right to have their representatives present to observe any of Buyer's inspections of the Property.

8.    **Casualty Loss**.

    (a)    **Notice of Loss**.  Sellers shall promptly notify Buyer of all instances of Casualty Loss that occur and become known to Sellers between the Execution Date and the Closing.

    (b)    **Casualty Loss**.  If, prior to the Closing any portion of the Properties suffers a material Casualty Loss, Sellers and Buyer shall meet to attempt to agree on an adjustment to the Purchase Consideration reflecting the "reduction in value" of the Properties because of such Casualty Loss.  For this purpose, "reduction in value" is based on the principle that Sellers should generally bear the costs of repairing the Properties to the state existing immediately prior to the Casualty Loss.  If the Parties are unable to agree on resolution of a Casualty Loss, then the reduction, if any, shall be determined by the Bankruptcy Court.

9.    **Covenants Prior to Closing**.

    (a)    **Operations**.  Until the Closing, subject to the financial limitations contained in any approved operating budget as well as Sellers' liquidity, Sellers shall do the following:

        (i)    Operate the Property in a good and workmanlike manner consistent with prudent oilfield practices;

        (ii)    Dispose of production from the Property;

        (iii)    Comply with all material covenants and conditions contained in agreements relating to the Property;

        (iv)    Maintain insurance now in force with respect to the Property;

(v)     Notify Buyer of any material Claim which might adversely affect title to or operation of the Property;

(vi)    Pay postpetition taxes, costs and expenses attributable to the Property as they become due; and

(vii)   Advise and consult with Buyer on all material matters relating to the operation of the Property, including all authorizations for expenditures.

(b)     **Negative Covenants**.  From the Execution Date until Closing Sellers shall not do any of the following with regard to the Property without Buyer's consent, which consent shall not be unreasonably withheld:

(i)     Incur liabilities or obligations with respect to the Property for which Buyer would be responsible after the Closing other than transactions in the normal, usual and customary manner, of a nature and in an amount (not to exceed Ten Thousand Dollars ($10,000), counting liabilities or obligations arising from one transaction or a series of similar transactions, and all periodic installments or payments under any lease or other agreement providing for periodic installments or payments, as a single liability or obligation);

(ii)    Cancel any indebtedness or waive any Claims or rights against third parties, which Claims or rights have a value, individually or in the aggregate, in excess of Ten Thousand Dollars ($10,000);

(iii)   Make any material change in any method of accounting or accounting practice or policy consistent with past practices;

(iv)    Voluntarily permit, without consultation with the Buyer or approval by the Bankruptcy Court, any Leases or other material rights with respect to the Property to expire, waive or release any material rights with respect to the Property, or relinquish its position as operator with respect to the Property;

(v)     Except as otherwise provided in this Agreement, amend or terminate any Material Document;

(vi)    Release all or any portion of a Lease, Contract or Easement;

(vii)   Create a lien, security interest or other encumbrance on the Property;

(viii)  Dispose of the Property;

(ix)    Enter into, terminate or amend any contract or agreement affecting the Property;

(x)     Waive, compromise or settle any claim that would adversely affect ownership, operation or value of any of the Property by an amount exceeding Ten Thousand Dollars ($10,000) before the Closing;

(xi)    Except upon Bankruptcy Court approval, enter into, terminate or amend any contract or commitment for capital expenditures or the acquisition or construction of fixed assets for which Buyer shall have financial responsibility after the Closing in an amount individually or in the aggregate in excess of Ten Thousand Dollars ($10,000), except in connection with situations believed in good faith by Sellers to constitute an emergency (in which case Sellers shall notify Buyer as soon as reasonably practicable of such emergency and obligations); or

(xii)   Agree, whether in writing or otherwise, to do any of the foregoing.

(c)     **Governmental Reviews**.  Sellers and Buyer shall each in a timely manner make (i) all required filings, including (if applicable) filings required under the Hart-Scott-Rodino Act, and prepare applications to and conduct negotiations with, each Governmental Authority as to which such filings, applications or negotiations are necessary or appropriate in the consummation of the transactions contemplated hereby, and (ii) provide such information as the other may reasonably request in order to make such filings, prepare such applications and conduct such negotiations.  Each Party shall cooperate with and use all reasonable efforts to assist the other with respect to such filings, applications and negotiations.

10.     **Additional Covenants**.

(a)     **Assumed Obligations and Retained Liabilities**.  Upon the Closing the Buyer shall agree (and, upon the delivery by Sellers to Buyer of the Assignment and Bill of Sale, Buyer shall be deemed to have agreed) to assume the Assumed Obligations.  At all times, the Sellers, either or both HSC or HCL, shall retain and be responsible for the Retained Liabilities, subject to the terms of the Sales Order.

(b)     **Affiliate Contracts**.  Except as otherwise provided under the Plan or the Confirmation Order, if requested by Buyer, Sellers will terminate or cause Affiliates to terminate, effective as of the Assignment Effective Date, any contracts or agreements between such Sellers and Affiliates to the extent they relate to or bind the Property.

(c)     **General Access**.  In addition to the rights of Buyer set forth in Section 7, after execution and delivery of this Agreement, Sellers shall provide Buyer and Buyer's representatives, reasonable access to all Properties following reasonable notice to inspect the condition of the same.  Sellers shall also make available to Buyer and to Buyer's representatives from the Execution Date, for examination and copying, all Data and other information relating to the Properties, including, but not limited to, those records required by Buyer to ascertain title, lease expirations, continuous

{00099077.1}                           19

US 515000v.2

drilling obligations, rental payments, lease extension payments, net revenue interest, surface restrictions, water utilization rights, gathering/processing/transportation/marketing arrangements, litigation files (including any potential conflicts, notices of violations or potential violations, or demands), regulatory compliance records, permits, environmental conditions and Sellers' corporate structure; provided Sellers may restrict access and provision of information to the extent it reasonably believes necessary to comply with existing confidentiality agreements with Third Parties (provided that Sellers shall use their best efforts to secure waivers of any such confidentiality agreements). All access to the foregoing shall be provided by and through the Sellers' Chief Restructuring Officer and/or Sellers' counsel. If any of the referenced Data and information in this Section is in possession of Persons other than Sellers, Sellers shall make reasonable efforts to cause such access to be provided by the appropriate Person.

(d)     **Designation of Assumed Contracts**. **Schedule 11(d)** contains a list of those Contracts which Buyer desires to have assumed by the applicable Seller(s) and assigned to Buyer by the applicable Seller(s) together with the maximum cure cost associated with each designated contract. Sellers shall, promptly after receiving the Designation, file a motion pursuant to Section 365 of the Bankruptcy Code (unless such Contracts are identified in the Plan as Contracts to be assumed and assigned) to assume and assign the Contracts identified in the Designation as of the Closing Date, and shall use their commercially reasonable efforts to obtain the approval of such assumption and assignment on such terms and conditions designated by Buyer. If any Contract is required to be either assumed or rejected by any Seller prior to the Closing, the Sellers shall promptly notify Buyer in writing of such fact and, at the request of Buyer and upon the entry of a Bankruptcy Court order providing therefor, shall assume any such Contract. Nothing herein shall prevent the transfer and assignment to Buyer of any Contract that is not an executory contract or unexpired lease that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code.

11.     **Conditions Precedent to Closing**.

(a)     **Bankruptcy Proceedings**.

(i)     This Agreement is entered into by all parties with the express understanding that it is subject to approval of the Bankruptcy Court, and all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

(ii)     The Bankruptcy Court shall have entered the Sale Procedures Order, in a form and substance reasonably acceptable to Buyer, and such Sale Procedures Order shall not have been withdrawn, vacated, or otherwise modified.

(b)     **Conditions Precedent to Sellers' Obligation to Close**.    Sellers shall consummate the sale of the Properties on the Closing Date, provided the following conditions precedent have been satisfied or waived by Sellers at or prior to the Closing:

   (i)     The Sale Order (i) shall have been entered by the Bankruptcy Court, (ii) shall include a finding that the sale was negotiated at arms' length and in good faith, and that Buyer is deemed a good faith purchaser for value, and (iii) shall not be subject to a stay;

   (ii)    All representations and warranties of Buyer contained in this Agreement shall have been true and correct in all material respects when made and are true and correct in all material  respects as of the time of the Closing as if then made; and

   (iii)   Buyer shall have complied in all material respects with all of Buyer's obligations and covenants in this Agreement to be performed or complied with at or prior to the Closing.

(c)     **Conditions Precedent to Buyer's Obligation to Close**.  Buyer shall consummate the purchase of the Properties contemplated by this Agreement on the Closing Date provided the following conditions precedent have been satisfied or waived by Buyer at or prior to the Closing:

   (i)     the Sale Order shall have been entered by the Bankruptcy Court, shall not be subject to a stay, and shall be a Non-Appealable Order;

   (ii)    Buyer and Heritage Gathering Corp. shall have executed a Transportation Agreement in form agreed to by the Parties on September 4, 2010 (the "**Gathering Agreement**");

   (iii)   On or before the Due Diligence Expiration Date, Buyer shall be satisfied (i) that the potential environmental liabilities associated with the Properties do not exceed Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate, and (ii) that Sellers have Marketable Title to at least ninety-five percent (95%) of the interests represented on Exhibits A and B.

   (iv)    All representations and warranties of Sellers contained in this Agreement shall have been true and correct in all material respects when made and, as updated and amended by Sellers periodically prior to Closing, are true and correct in all material respects as of the time of the Closing as if then made;

   (v)     Sellers shall have complied in all material respects with all of Sellers' obligations and covenants in this Agreement to be performed or complied with at or prior to the Closing;

(vi)    Sellers will not have sold, assigned, transferred, encumbered, conveyed or otherwise disposed of any of the Properties;

(vii)    No injunction, order or award restraining, enjoining or otherwise prohibiting consummation of or granting material damages associated with the transactions contemplated by this Agreement or sale of any one or more of the Properties has been issued by any Governmental Authority or arbitrator of competent jurisdiction, and no suits, actions or other proceedings are pending before any such court, Governmental Authority or arbitrator in which a third party seeks to restrain, enjoin or otherwise prohibit consummation of or obtain material damages associated with the transactions contemplated by this Agreement or sale of any one or more of the Properties; provided, however, that notwithstanding the foregoing, if the Bankruptcy Court has issued a Non-Appealable Order authorizing the transfer of the Properties to Buyer free and clear of all liens, claims and encumbrances then such restriction shall have no force and effect;

(viii)    Sellers shall have demonstrated to Buyer that Sellers shall convey to Buyer at the Closing, Marketable Title, free and clear of all Liens other than Permitted Encumbrances, to Properties, for which all applicable preferential purchase rights have been waived or the time to elect under such preferential purchase rights has lapsed and all applicable consents to assignment have been obtained; and

(ix)    No Material Adverse Effect shall have occurred.

12.    **Closing**.  The Closing shall be held in Dallas, Texas, or such other place as the Parties shall mutually agree. At the Closing, the following shall occur:

(a)    Sellers shall execute, acknowledge and deliver, in each case to the reasonably satisfaction of Buyer, the following:

(i)    Four (4) originals of a certificate executed by an authorized officer of each Seller, dated as of the Closing, certifying on behalf of each Seller that the conditions set forth in Sections 11(c)(v), 11(c)(vi) and 11(c)(vii) have been fulfilled;

(ii)    Four (4) originals of a certificate from each Seller pursuant to Internal Revenue Code Section 1445 certifying that such Seller is not a foreign person;

(iii)    Four (4) originals of a certificate duly executed by the secretary or assistant secretary of each Seller, dated as of the Closing, certifying on behalf of each Seller the incumbency of each officer of such Seller executing this Agreement or any document delivered in connection with the Closing;  and

        (iv)     An Assignment, Conveyance and Bill of Sale in a mutually satisfactory and recordable form containing a special warranty of title by, through and under Sellers, but not otherwise, of the Leases (the "**Assignment and Bill of Sale**").

(b)     Buyer shall execute, acknowledge, and deliver, in each case to the reasonable satisfaction of Sellers, the following:

        (i)     Four (4) originals of a certificate executed by an authorized officer of each Buyer, dated as of the Closing, certifying on behalf of each Buyer that the conditions set forth in Sections 11(b)(ii) and 11(b)(iii) have been fulfilled; and

        (ii)    Four (4) originals of a certificate duly executed by the secretary or assistant secretary of each Buyer, dated as of the Closing, certifying on behalf of each Buyer the incumbency of each officer of such Buyer executing this Agreement or any document delivered in connection with the Closing.

(c)     Payment of any portion of the Purchase Consideration payable at the Closing as required under the Plan or applicable order entered by the Bankruptcy Court shall be delivered by wire transfer in immediately available funds pursuant to wire instructions provided to Buyer by Sellers.

(d)     Sellers shall deliver the Data (as defined above) to Buyer.  Sellers shall deliver possession of the Property transferred as part of the Closing to Buyer.  Sellers shall provide Buyer access to all relevant computers, databases, and servers so that Buyer has the ability to copy therefrom all lease files, land files, well files, regulatory files, operational files, and anything else related to the Properties and/or the operation thereof.

13.    **Post Closing Obligations**.

(a)     **Post Closing Assignment of Leases**.   Sellers acknowledge that for the consideration received by Sellers under this Agreement, Buyer is entitled to acquire, and Sellers are obligated to sell to Buyer, any and all of Seller's oil and gas leases covering the following lands: (i) Sections 21, 22, 23, 24, and 25, Block C-23; Sections 1 and 2, Block C-24; Section 9, Block 74; Section 1, Block 75, all Public School Land Surveys, Winkler and Loving Counties, Texas; and (ii) Section 21, Township 26 South, Range 35 East, Lea County, New Mexico. Therefore, from time to time following the Closing, should Sellers become aware of any additional oil and gas leases that Sellers did not disclose to or offer to Buyer prior to Closing, then, Sellers shall offer to assign such leases to Buyer, and if Buyer accepts such offer, such leases shall be deemed Leases for purposes of this Agreement and Sellers shall assign such Leases and all other Properties related to such Leases to Buyer for an additional consideration of Ten Dollars

($10.00).   After the Closing, the acquisition of additional leases shall be at Buyer's sole option, and in no event shall Buyer be obligated to acquire such additional leases.  In particular, Buyer shall have no obligations related to the items listed on **Schedule 2(b)(iv)**.

(b)     **Post Closing Revenues**.    Except as expressly provided otherwise in this Agreement and/or the Plan or order entered by the Bankruptcy Court:  (i) Buyer shall pay Sellers any and all amounts received by Buyer attributable to the Properties and relating to the period prior to the Assignment Effective Date, and (ii) Sellers shall pay Buyer any and all amounts received by Sellers attributable to the Properties and relating to the period on and after the Assignment Effective Date.  The Party responsible for the payment of amounts shall make full payment to the other Party within fifteen (15) Business Days after receipt of such amounts. In no event shall Buyer be obligated to pay Sellers for crude oil inventory as of the Assignment Effective Date.

(c)     **Post Closing Expenses**.    Except as expressly provided otherwise in this Agreement and subject to Bankruptcy Court approval consistent with the terms of a confirmed Plan:  (a) Sellers shall reimburse Buyer for any and all pre-approved reasonable costs and expenses paid by Buyer attributable to the Properties and relating to the period prior to the Assignment Effective Date, if any, and (b) Buyer shall reimburse Sellers for any and all pre-approved reasonable costs and expenses paid by Sellers attributable to ownership of the Properties and relating to the period on and after the Assignment Effective Date.  The Party responsible for the payment of such costs and expenses shall make full payment to the other Party within fifteen (15) Business Days after receipt of an applicable invoice and proof that such invoice was paid.  Neither Party shall agree to settle any audit with respect to periods for which the other is in part responsible without the prior written consent of the other, such consent not to be unreasonably withheld

(d)     **Working Interest Back-In**.  Upon the occurrence of the Payout Date, Buyer shall assign to HCL fifteen percent (15%) of its working interest in the Properties (the "**Working Interest Back-In**").

(e)     **Title Defect or Environmental  Liability Charged Against Working Interest Back-In**.

(i)     Notwithstanding the provisions of Section 16(r), the representations and warranties set forth in Section 5(e), 5(f) and 5(g) shall survive for a period of one (1) year following the Closing.

(ii)     Notwithstanding the provisions of Section 16(r), the representations and warranties set forth in Section 5(h) shall survive for a period of two (2) years following the Closing.

{00099077.1}                                      24

US 515000v.2

(iii)    A "**Title Defect**" shall exist if the Sellers do not have Marketable Title to support the interests represented on **Exhibit B**. If the value of the Title Defects on all of the Properties totals more than One Hundred Thousand Dollars ($100,000.00), any Title Defect value over and above One Hundred Thousand Dollars ($100,000.00), plus eighteen percent (18%) interest per annum, shall be recouped by Buyer from the production attributable to the Working Interest Back-In.

 a. The value of the Title Defects shall be determined using the most recent third party reserve report, which, as of the Execution Date, is the report dated July 27, 2010, titled "Evaluation of the Oil and Gas Properties in Crittendon and Cheyenne Fields, Owned by Heritage Standard Corporation, Effective August 01, 2010," and signed by James L. Merkel, Principal Reservoir Analyst, RPS Group.

 b. No assignment of the Working Interest Back-In shall be owed to HCL unless and until the value of all Title Defects over and above One Hundred Thousand Dollars ($100,000.00), together with interest, has been recouped by Buyer from the production attributable to the Working Interest Back-In, which recoupment shall begin at Payout.

(iv)    Should Buyer discover environmental liabilities resulting from Sellers' operation of the Properties that are a breach of the representations and warranties set forth in Section 5(h), then the costs associated with any such liabilities, over and above One Hundred Thousand Dollars ($100,000.00), plus eighteen percent (18%) per annum shall be recouped from the production attributable to the Working Interest Back-In. No assignment of the Working Interest Back-In shall be owed to HCL unless and until the value of all costs associated with environmental liabilities over and above One Hundred Thousand Dollars ($100,000.00), together with interest, have been recouped by Buyer from the production attributable to the Working Interest Back-In, which recoupment shall begin at Payout.

(v)    Disputes.  In the event of any disputes between Buyer and HCL concerning the calculation of Net Cash Flow, Payout Obligations, the Working Interest Back-In, or any reductions to the Working Interest Back-In, the Parties shall first attempt to reach an amicable settlement of such dispute, and if they are unable to reach such a settlement, either party may submit the dispute to a mutually acceptable independent arbitrator for resolution.  In the event that Sellers and Buyer are unable to mutually agree upon an independent arbitrator, Seller and Buyer shall each select an arbitrator, and an additional arbitrator shall be selected by the agreement of Parties' arbitrators.

14.   **Independent Investigation and Disclaimer**.  The express representations of Sellers set forth in this Agreement, and the Assignment and Bill of Sale are exclusive and in lieu of any and all other representations.  **EXCEPT FOR THE EXPRESS REPRESENTATIONS SET FORTH IN THIS AGREEMENT, AND THE ASSIGNMENT AND BILL OF SALE, SELLERS DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY OTHER REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED, ORALLY OR IN WRITING, TO BUYER, INCLUDING ANY STATEMENTS, REPRESENTATIONS, OPINIONS, INFORMATION OR ADVICE WHICH MAY HAVE BEEN PROVIDED AS AN ACCOMMODATION TO THE BUYER BY AN OFFICER, SHAREHOLDER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF SELLERS, OR ANY ENGINEER OR ENGINEERING FIRM, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, AND THE ASSIGNMENT AND BILL OF SALE, SELLERS MAKE ABSOLUTELY NO REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR STATUTORY, AS TO:**

- **TITLE TO ANY OF THE PROPERTY;**

- **THE ABILITY OF ANY COMPONENT OF THE PROPERTY TO PRODUCE ANY HYDROCARBONS;**

- **THE AMOUNTS, QUALITY OR DELIVERABILITY OF HYDROCARBON RESERVES ATTRIBUTABLE TO THE PROPERTY, OR ANY PART THEREOF;**

- **GEOLOGICAL, GEOPHYSICAL OR OTHER INTERPRETATION OF ANY ECONOMIC EVALUATION;**

- **PRESENT OR FUTURE SALES PRICES, OPERATING COSTS, OR OTHER ECONOMIC FACTORS; OR**

- **THE REGULATORY STATUS OF THE PROPERTIES WITH RESPECT TO ACTIONS, PAST OR PENDING, BEFORE THE TEXAS RAILROAD COMMISSION**.

15.   **Termination**.

(a)   **Termination**.  This Agreement may be terminated at any time prior to the Closing:

(i)   by the mutual prior written consent of Sellers and Buyer;

{00099077.1}                      26

US 515000v.2

(ii) by either Sellers or Buyer, if the Closing has not occurred within fifteen (15) days of the Confirmation Date;

(iii) by either Party if the Bankruptcy Court has approved the sale or other disposition of the Properties to any entity other than Buyer or its Affiliates; or

(iv) by Buyer, by written notice to Seller prior to the expiration of the Due Diligence Expiration Date, if the condition set forth in Section 11(c)(iv) is not satisfied to the satisfaction of Buyer at or prior to such date;

provided, however, that no Party shall be entitled to terminate this Agreement under Sections 15(a)(ii) or 15(a)(iv) if the Closing has failed to occur because such Party failed to perform or observe in any material respect its covenants and agreements hereunder or such Party is in breach of its representations and warranties set forth in this Agreement

(b) **Effect of Termination**.  If this Agreement is terminated pursuant to Section 15(a) prior to Closing, this Agreement shall become void and of no further force or effect (except for the provisions of the following Sections: 15, 16(f), 16(i), 16(l), 16(m), and 16(o), all of which shall continue in full force and effect). Notwithstanding anything to the contrary in this Agreement, the termination of this Agreement under Section 15(a) shall not relieve any Party from liability for any willful or negligent failure to perform or observe in any material respect any of its agreements or covenants contained herein that are to be performed or observed at or prior to the Closing.  In the event this Agreement terminates under Section 15(a) and any Party has willfully or negligently failed to perform or observe in any material respect any of its agreements or covenants contained herein which are to be performed or observed at or prior to the Closing, then the other Party shall be entitled to all remedies available at law or in equity and shall be entitled to recover court costs and attorneys' fees in addition to any other relief to which such Party may be entitled; provided that, NO PARTY SHALL BE ENTITLED TO RECOVER ANY PUNITIVE DAMAGES OR ANY LOSS OF PROFITS, WHETHER ACTUAL OR CONSEQUENTIAL, OR ANY OTHER CONSEQUENTIAL DAMAGES suffered by such Party in connection with or as a result of any such termination.

16. **Miscellaneous**.

(a) **Further Assurances**.  The Parties agree to execute any documents, whether before or after the Closing to aid the other Party in fulfilling the purpose of this Agreement.

(b) **Entire Agreement**.  This Agreement together with the Exhibits and Schedules attached hereto, shall constitute the complete agreement between the Parties

hereto and shall supersede all prior agreements, whether written or oral, and any representations or conversations with respect to the Property.

(c) **Notices**.  Any notice, demand or communication required or permitted to be given by any provision of this Agreement will be in writing and will be deemed to have been given and received when (i) delivered personally, or (2) on the date of delivery when delivered prior to 5:00 p.m. local time on a Business Day by scanned email to the Party designated to receive such notice, otherwise on the next succeeding Business Day, or (3) on the date following the Day sent by overnight courier, or (4) on the third (3rd) Business Day after the same is sent by certified mail, postage and charges prepaid, directed to the following addresses or to such other or additional addresses as any Party might designate by written notice to the other Party:

| | |
|---|---|
| Notices to Sellers: | Heritage Consolidated LLC |
| | Heritage Standard Corporation |
| | Turtle Creek |
| | Dallas, Texas _____ |
| | Attn: _____ |
| | Telephone: (214) ___-____ |
| | Facsimile:  (214) ___-_____ |
| | Email: _____ |

And a copy to:

Joe E. Marshall
Munsch Hardt Kopf & Harr, P.C.
3800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201-6659
Telephone:(214) 855-7500
Facsimile:(214) 978-4365
Email: jmarshall@munsch.com

-and-

Kevin McCullough
Rochelle McCullough LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Telephone: (214) 953-0182
Facsimile: (214)  953-0185
Email:

| | |
|---|---|
| Notices to Buyer: | Robert P. Munn |

President and CEO
Permian Atlantis LLC
6630 Cypresswood Drive
Spring, Texas 77379
Telephone:  (832) 559-6060
Facsimile: (832) 559-6088
Email:  BobMunn@xcane.com

And a copy to:

J. Kirby Barry
Burleson Cooke, LLP
711 Louisiana Street
Houston, Texas  77002
Phone:  (713) 358-1700
Email:  kbarry@burlesoncooke.com

(d)    **Binding Effect**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, and their successors and assigns.

(e)    **Counterparts**.  This Agreement may be executed in any number of counterparts, which taken together shall constitute one instrument and each of which shall be considered legally enforceable.

(f)    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

(g)    **Headings**.  The headings of the articles and sections of this Agreement are for guidance and convenience of reference only and shall not limit or otherwise affect any of the terms and provisions of this Agreement.

(h)    **Timing**.  Time is of the essence in this Agreement.  If the date specified in this Agreement for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date that is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next Day which is a Business Day.

(i)    **Expenses**.  All fees, costs and expenses incurred by the Parties in negotiating this Agreement and in consummating the transactions contemplated by this Agreement shall be paid by the Party that incurred such fees, costs and expenses.

(j)    **Amendment and Waiver**.  This Agreement may be altered, amended or waived only by a written agreement executed by both Buyer and Sellers.  No waiver of

{00099077.1}

29

US 515000v.2

any provision of this Agreement shall be construed as a continuing waiver of the provision.

(k) **Parties in Interest**.  This Agreement is binding upon and shall inure to the benefit of the Parties and, except where prohibited, their successors, representatives or assigns.

(l) **No Partnership Created.**  It is not the purpose or intention of this Agreement to create (and it shall not be construed as creating) a joint venture, partnership or any type of association, and neither Party is authorized to act as an agent or principal for the other Party with respect to any matter related hereto.

(m) **Third-Party Beneficiaries**.  Unless expressly stated to the contrary, no third party is intended to have any rights, benefits or remedies under this Agreement, however, Sellers acknowledge that following each Closing, Buyer may offer to assign a portion of the Property to a third party.

(n) **Severance**.  If any provision of this Agreement is found to be illegal or unenforceable, the other terms of this Agreement shall remain in effect and this Agreement shall be construed as if the illegal or unenforceable provision had not been included.

(o) **Not to be Construed Against Drafter**.  Each Party has had an adequate opportunity to review each and every provision of this Agreement and to submit the same to legal counsel for review and advice.  Based on the foregoing, the rule of construction, if any, that a contract be construed against the drafter shall not apply to interpretation or construction of this Agreement.

(p) **Recordation**.  The Assignment and Bill of Sale is intended to convey all of the Properties.  Certain Properties or specific portions of the Properties that are leased from, or require the approval to transfer by, a Governmental Authority are conveyed under the Assignment and Bill of Sale and also are described and covered by separate assignments made by Sellers to Buyer on officially approved forms, or forms acceptable to such entity, in sufficient multiple originals to satisfy applicable statutory and regulatory requirements.

(q) **Remedies Not Exclusive**.  The remedies set forth in this Agreement are intended to be cumulative and not exclusive and are intended to be in addition to any other rights a Party may have hereunder or under applicable Law.

(r) **Survival of Certain Obligations**.  Except as expressly provided otherwise in this Agreement, representations and warranties, covenants, agreements, waivers, disclaimers, releases and obligations of indemnity and defense contained in this Agreement expire at Closing.

{00099077.1}                                                    30

US 515000v.2

(s)      **Audit Rights**. HCL or its assigns shall have the right, upon notice in writing to Buyer to audit Buyer's calculation of the Payout Obligations, Net Cash Flow, and Working Interest Back-In, including all accounts and records relating to such calculations. The audits will be conducted during the normal business hours and shall not be conducted more than once each year without prior approval of the Buyer. Buyer shall reply in writing to an audit report within ninety (90) days after receipt of such report with any audit exception to be settled by the mutual agreement of the Parties within thirty (30) days of the date of the delivery of the audit report response.

With regard to Seller's Section 6 Properties, Buyer or its assigns shall have the right, upon notice in writing to Seller to audit Seller's calculation of the Payout Obligations, Net Cash Flow, and Working Interest Back-In, including all accounts and records relating to such calculations. The audits will be conducted during the normal business hours and shall not be conducted more than once each year without prior approval of the Seller. Seller shall reply in writing to an audit report within ninety (90) days after receipt of such report with any audit exception to be settled by the mutual agreement of the Parties within thirty (30) days of the date of the delivery of the audit report response. In the event Seller sells the Section 6 Properties to a third party, the purchase and sale agreement or other contract for the sale of said property shall contain the contractual obligation requiring the purchaser or assignee thereof to allow Buyer or its assigns to fully exercise its right to audit the Section 6 Properties as set forth in this paragraph. No transfer and assignment to Seller's interest in said Section 6 Properties shall be made, otherwise.

(t)      **Conspicuousness of Provisions**. Except as otherwise expressly provided for in this Agreement, the release, defense, indemnification and hold harmless provisions provided for in this Agreement shall be applicable whether or not the Claims, (including attorneys' fees and costs of litigation) in question arose solely or in part from the active, passive or concurrent negligence, strict liability, breach of duty (statutory or otherwise), violation of Law, or other fault of any Indemnified Party, or from any pre-existing defect. The Parties agree that provisions of this Agreement in "bold" type satisfy any requirement of the "express negligence rule" and other requirement at law or in equity that provisions be conspicuously marked or highlighted.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed below by their duly authorized representatives.

| **SELLERS** | **BUYER** |
|---|---|

**HERITAGE CONSOLIDATED LLC**          **PERMIAN ATLANTIS LLC**

By: _____          By:_____
                                              Robert P. Munn
       President                          President & CEO

Date:_____          Date:_____


**HERITAGE STANDARD CORPORATION**          **PERMIAN PHOENIX LLC**

By: _____          By:_____
                                              Robert P. Munn
       President                          President & CEO

Date:_____          Date:_____